1  LIONEL Z. GLANCY (#134180)
   ROBERT V. PRONGAY (#270796)
2  LESLEY F. PORTNOY (#304851)
   CHARLES H. LINEHAN (#307439)
3  PAVITHRA RAJESH (#323055)
4  **GLANCY PRONGAY & MURRAY LLP**
   1925 Century Park East, Suite 2100
5  Los Angeles, California 90067
   Telephone: (310) 201-9150
6  Facsimile: (310) 201-9160
   Email: info@glancylaw.com
7
8  *Attorneys for Plaintiff Nicholas Melucci*

9              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| NICHOLAS MELUCCI, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, and CHARLES ROBB,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nicholas Melucci ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Corcept Therapeutics Incorporated ("Corcept" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Corcept; and (c) review of other publicly available information concerning Corcept.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Corcept securities between August 2, 2017 and February 5, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Corcept is a pharmaceutical company that purports to develop medications to treat severe metabolic, oncologic, and psychiatric disorders by modulating the effect of cortisol. Korlym is the Company's drug that has been approved by the FDA to treat hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome.

3. On January 25, 2019, Southern Investigative Reporting Foundation ("SIRF") published a report alleging that Corcept paid doctors to prescribe its drug Korlym for off-label uses.

4. On this news, the Company's share price fell $1.52, or more than 11%, to close at $12.29 per share on January 25, 2019, on unusually heavy trading volume.

5. On January 31, 2019, likely due to the increased scrutiny of its illicit sales practices, the Company forecast a sharp slowdown in sales of Korlym, projecting full-year 2019 revenue of $285 million to $315 million while investors and analysts had expected approximately $328 million.

6. On this news, the Company's share price fell $1.15, or more than 10%, to close at

1  $10.03 per share on February 1, 2019, on unusually heavy trading volume.

2      7.    On February 5, 2019, Blue Orca Capital published a report alleging that Corcept's "sole specialty pharmacy and exclusive distributor is an undisclosed related party" and that the relationship "creates a material risk that the Company is using its captured pharmacy to boost sales, hide losses, or engage in other financial shenanigans."

    8.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company had improperly paid doctors to promote its drug Korlym; (2) that the Company aggressively promoted Korlym for off-label uses; (3) that the Company's sole specialty pharmacy was a related party; (4) that the Company artificially inflated its revenue and sales using illicit sales practices through a related party; (5) that such practices are reasonably likely to lead to regulatory scrutiny; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

    9.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

    10.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

    11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

    12.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information,

occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this district.

13. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

14. Plaintiff Nicholas Melucci, as set forth in the accompanying certification, incorporated by reference herein, purchased Corcept securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

15. Defendant Corcept is incorporated under the laws of Delaware with its principal executive offices located in Menlo Park, California.  Corcept's common stock trades on the NASDAQ exchange under the symbol "CORT."

16. Defendant Joseph K. Belanoff ("Belanoff") was the President, Chief Executive Officer, and a Director of the Company at all relevant times.

17. Defendant Charles Robb ("Robb") was the Chief Financial Officer of the Company at all relevant times.

18. Defendants Belanoff and Robb, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The

1  Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

4        19.     Corcept is a pharmaceutical company that purports to develop medications to treat severe metabolic, oncologic, and psychiatric disorders by modulating the effect of cortisol. Korlym is the Company's drug that has been approved by the FDA to treat hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome.

### Materially False and Misleading Statements Issued During the Class Period

        20.     The Class Period begins on August 2, 2017. On that day, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2017, in which it reported $35.56 million revenue and $12.65 million net income.

        21.     On November 3, 2017, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2017, in which it reported $42.76 million revenue and $13.58 million net income.

        22.     On February 28, 2018, the Company filed its annual report on Form 10-K for the period ended December 31, 2017 (the "2017 10-K"). Therein, the Company reported $159.2 million revenue and $129.12 million net income.

        23.     The 2017 10-K also disclosed that the Company would be "subject to civil or criminal penalties if [the Company] market[s] Korlym in a manner that violates FDA regulations or health care fraud and abuse laws." The Company stated, in relevant part:

> In the United States, we are subject to FDA regulations governing the promotion and sale of medications. Although physicians are permitted to prescribe drugs for indications other than those approved by the FDA, manufacturers are prohibited from promoting products for such "off-label" uses. In the United States, we market Korlym for treatment of hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery and provide promotional materials and training programs to physicians regarding the use of Korlym for this indication. Although we believe our marketing materials and training programs for physicians do not constitute "off-label" promotion of Korlym, the FDA may disagree. If the FDA determines that our promotional materials, training or other activities by our employees or agents constitute "off-label" promotion of Korlym, it could ask us to change our training or promotional materials or other activities. The FDA could also subject us to regulatory

enforcement actions, including issuance of a public "warning letter," injunction, seizure, civil fine or criminal penalties. Other federal or state enforcement authorities might act if they believe that the alleged improper promotion led to the submission and payment of claims for an unapproved use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement. Even if it is determined that we are not in violation of these laws, we may be faced with negative publicity, incur significant expenses and be forced to devote management time to defending our position.

24. Moreover, the 2017 10-K stated that one specialty pharmacy, Optime Care, Inc. represents approximately 99 percent of the Company's revenue.

25. On May 9, 2018, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2018, in which it reported $57.66 million revenue and $17.46 million net income.

26. On August 9, 2018, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2018, in which it reported $62.31 million revenue and approximately $18.20 million net income.

27. On November 2, 2018, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2018, in which it reported $64.45 million revenue and $17.75 million net income.

28. The above statements identified in ¶¶20-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company had improperly paid doctors to promote its drug Korlym; (2) that the Company aggressively promoted Korlym for off-label uses; (3) that the Company's sole specialty pharmacy was a related party; (4) that the Company artificially inflated its revenue and sales using illicit sales practices through a related party; (5) that such practices are reasonably likely to lead to regulatory scrutiny; and (6) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

29. On January 25, 2019, SIRF published a report alleging that Corcept paid doctors to prescribe its drug Korlym for off-label uses.

30. Regarding off-label uses, the SIRF report stated, in relevant part:

> Another thing that stands out in the list of high-volume Korlym prescribers is their peculiar geographic clustering. Cushing's syndrome is a rare disease. The FDA has estimated that the number of people in the United States who could be prescribed this drug is 5,000. So some medical experts might be surprised to see Korlym prescribers found mainly in small towns and modest-sized cities, many at a substantial distance from established medical research centers. (For example, Dr. John C. Parker, a Wilmington, North Carolina–based endocrinologist, wrote at least 41 Korlym prescriptions in 2016. But one would have expected instead that some larger-volume prescribers would be located, say, in the state's heavier populated Durham and Chapel Hill area, where two pituitary disorder clinics are affiliated with prominent university hospitals. Wilmington, though, is about 2.5 hours by car from these clinics.)
>
> Could these doctors based in smaller communities with a limited pool of patients to draw from be prescribing Corcept to patients merely with diabetes — instead of endogenous Cushing's syndrome?
>
> When Corcept's CFO Robb was asked during the late December interview if his company was using its speakers bureau program to encourage doctors to prescribe the drug for off-label uses, he said the company was doing no such thing. He argued that the FDA's estimate of 5,000 U.S. patients who could potentially take the drug was somewhat arbitrary and nearly seven years old. He said that a better figure, based on research by Corcept and Novartis, is closer to 20,000. (Novartis is in the late stages of testing its own Cushing's syndrome drug.)
>
> In addition, Robb said that as awareness of Korlym grows, doctors will realize that more of their patients have Cushing's syndrome, and the clustering of Korlym prescribers in smaller communities happened only because one group of physicians recognized earlier than their colleagues how the disease could be treated.
>
> Pressed on the unusual odds of so many prescriptions for a treatment of such a rare disease from doctors in Zanesville, Ohio and Murfreesboro, Tennessee, Robb declared that "over 90 percent" of all Korlym prescriptions were "on label." He added that "since it's an expensive drug," nearly all commercial insurers have an extensive preapproval process before paying for the drug.

31. SIRF alleged that the Company was using its speakers bureau program to compensate doctors for prescribing Korlym, stating:

> Medicare Part D and the Department of Veteran Affairs records are the only two sources for the general public to search for details about who prescribes Korlym. People who rely on private insurers place their orders through a single specialty pharmacy, whose sales are not reported to prescription-monitoring services. According to Medicare Part D payment records, 44 doctors each wrote at least 11 Korlym prescriptions in 2016. (The Centers for Medicare & Medicaid Services doesn't release the names of doctors writing 10 or fewer prescriptions.)
>
> Eleven of the 15 doctors who are the most frequent prescribers of Korlym to Medicare Part D enrollees received at least $7,500 in speakers bureau payments from Corcept in 2016 and 2017 combined.

32. On this news, this news, the Company's share price fell $1.52, or more than 11%,

CLASS ACTION COMPLAINT

6

to close at $12.29 per share on January 25, 2019, on unusually heavy trading volume.

33. On January 31, 2019, likely due to the increased scrutiny of its illicit sales practices, the Company forecast a sharp slowdown in sales of Korlym, projecting full-year 2019 revenue of $285 million to $315 million while investors and analysts had expected approximately $328 million.

34. On this news, the Company's share price fell $1.15, or more than 10%, to close at $10.03 per share on February 1, 2019, on unusually heavy trading volume.

35. On February 5, 2019, Blue Orca Capital published a report alleging that Corcept's "sole specialty pharmacy and exclusive distributor is an undisclosed related party" called Optime Care ("Optime") and that the relationship "creates a material risk that the Company is using its captured pharmacy to boost sales, hide losses, or engage in other financial shenanigans." The report stated, in relevant part:

> The growth rate in Corcept revenues, driven exclusively by Korlym prescriptions, accelerated significantly in Q3 and Q4 2017, immediately following the switch from [Dohmen Life Science Services ("Dohmen")] to Optime, which formally took place in August 2017.
>
> * * *
>
> Corcept is financially incentivizing physicians with direct payments to prescribe Korlym beyond the narrow set of circumstances for which the drug was approved and in which the drug is appropriate. This is extremely costly to the health care system, in part because Corcept has raised prices on Korlym since FDA approval. Yet pay-for-play with physicians is only half the thesis, because such prescriptions have to clear an increasingly high bar set by PBMs and payers.
>
> That is why the specialty pharmacy is so important. A specialty pharmacy like Dohmen with hundreds of clients and a large book of business would have no incentive to push Korlym through the approval process in situations where the drug would not be appropriate or merited. But the same cannot be said of Optime, whose first and we think only major client is Corcept and thus has direct financial incentive to match the Company's aggressive tactics.
>
> Notably, right before Corcept switched from Dohmen to Optime, the Company increased guidance substantially.
>
> * * *
>
> Optime is supposed to be an independent third-party pharmacy, yet when we called Optime and asked for Corcept, an Optime representative told us that Optime and Corcept were one and the same.

**CLASS ACTION ALLEGATIONS**

36. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Corcept securities between August 2, 2017 and February 5, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

37. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Corcept's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Corcept common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Corcept or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

40. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Corcept; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

41. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## **UNDISCLOSED ADVERSE FACTS**

42. The market for Corcept's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Corcept's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Corcept's securities relying upon the integrity of the market price of the Company's securities and market information relating to Corcept, and have been damaged thereby.

43. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Corcept's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Corcept's business, operations, and prospects as alleged herein.

44. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the

1  Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Corcept's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased Corcept's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Corcept, their control over, and/or receipt and/or modification of Corcept's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Corcept, participated in the fraudulent scheme alleged herein.

**APPLICABILITY OF PRESUMPTION OF RELIANCE**
**(FRAUD-ON-THE-MARKET DOCTRINE)**

48. The market for Corcept's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Corcept's securities traded at artificially inflated prices during the Class Period. On January 29, 2018, the Company's share price closed at a Class Period high of $25.50 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Corcept's securities and market information relating to Corcept, and have been damaged thereby.

49. During the Class Period, the artificial inflation of Corcept's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Corcept's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Corcept and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50. At all relevant times, the market for Corcept's securities was an efficient market for the following reasons, among others:

(a) Corcept shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Corcept filed periodic public reports with the SEC and/or the NASDAQ;

(c) Corcept regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Corcept was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

51. As a result of the foregoing, the market for Corcept's securities promptly digested current information regarding Corcept from all publicly available sources and reflected such information in Corcept's share price. Under these circumstances, all purchasers of Corcept's securities during the Class Period suffered similar injury through their purchase of Corcept's securities at artificially inflated prices and a presumption of reliance applies.

52. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

53. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Corcept who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

54. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

55. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Corcept's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

56. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Corcept's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Corcept's financial

CLASS ACTION COMPLAINT
13

well-being and prospects, as specified herein.

58. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Corcept's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Corcept and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

59. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

60. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Corcept's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by

Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Corcept's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Corcept's securities during the Class Period at artificially high prices and were damaged thereby.

62. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Corcept was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Corcept securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

63. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

65. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66. Individual Defendants acted as controlling persons of Corcept within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

68. As set forth above, Corcept and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

CLASS ACTION COMPLAINT
16

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 14, 2019                              **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Lesley F. Portnoy*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Attorneys for Plaintiff Nicholas Melucci*

CLASS ACTION COMPLAINT
17

## SWORN CERTIFICATION OF PLAINTIFF

## CORCEPT THERAPEUTICS INCORPORATED SECURITIES LITIGATION

I, Nicholas Melucci individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1. I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the Corcept Therapeutics Incorporated securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Corcept Therapeutics Incorporated securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

2/19/2019
Date

DocuSigned by:
Nicholas Melucci
05C255E84BC840D...

Nicholas Melucci

**Nicholas Melucci's Transactions in Corcept Therapeutics Incorporated (CORT)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 09/14/2017 | Bought | 300 | $18.0590 |
| 09/14/2017 | Bought | 100 | $18.0550 |
| 11/07/2017 | Bought | 170 | $17.4892 |
| 01/30/2019 | Sold | -570 | $11.7850 |