**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (to be admitted *pro hac vice*)
Sebastiano Tornatore (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiff the
Ferraro Family Foundation, Inc. and
James L. Ferraro*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated, | Case No. 19-CV-01372-LHK |
| Plaintiffs, | **CLASS ACTION** |
| v. | **FIRST AMENDED COMPLAINT** |
| CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK | Judge: Hon. Lucy H. Koh Courtroom: 8, 4th floor |
| Defendants. | |

# TABLE OF CONTENTS

I.     SUMMARY OF THE ACTION .................................................................................1

II.    JURISDICTION AND VENUE ..............................................................................9

III.   THE PARTIES..........................................................................................................10

       A.    Plaintiff .........................................................................................................10

       B.    Defendants ....................................................................................................10

       C.    Relevant Non-Parties ...................................................................................12

IV.    FACTUAL ALLEGATIONS ................................................................................13

       A.    Corcept is a Pharmaceutical Company that Relies on a Single Drug Product to Generate all of its Revenue ............................................................................................13

       B.    The FDA Approves Korlym to Treat A Narrow Subset of Endogenous Cushing's Syndrome, a Rare Disorder Impacting Just One to Two in One Million People in the United States ................................................................................................15

             1.    Corcept Obtains FDA Approval of Korlym to Treat Endogenous Cushing's Syndrome Under the Orphan Drug Act ...............................15

             2.    Korlym's Total Addressable Market for its FDA-Approved Indication is but a Fraction of all Cushing's Patients .....................................................19

       C.    Endogenous Cushing's Syndrome Has Well-Established Diagnosis and Treatment Guidelines that Require Multiple Diagnostic Tests Be Performed to Confirm the Presence of Cushing's Syndrome ...................................................................20

       D.    Corcept Engages Dohmen as a Specialty Pharmacy to Distribute Korlym Directly to Patients .........................................................................................................29

       E.    With the End of Market Exclusivity for Korlym Looming, Corcept Fires Dohmen for Refusing to Acquiesce to its Off-Label Marketing Scheme and Hires Optime, a New Specialty Pharmacy Willing to go Along with the Company's Aggressive Off-Label Marketing Scheme .......................................................................................31

             1.    Corcept's Intellectual Property Rights Over Mifepristone are Limited and the Company's Market Exclusivity is Winding Down ...........................31

             2.    Corcept Contracts with Optime, A Specialty Pharmacy, with No Other Clients, to Facilitate Off-Label Sales of Korlym .........................................33

             3.    Corcept Fabricates a Breach of Contract to Exit its Relationship with Dohmen and Partner Exclusively With Optime ...............................36

       F.    With the Necessary Pieces in Place, Corcept Dupes Non-Endocrinologists into Prescribing Korlym Off-Label to a Wider Range of Patients Not Approved by the FDA Label With Misinformation and Payments of Honoraria and Other Financial Benefits .........................................................................................................39

1.    Corcept Drastically Increases Payments to Family and Internal Medicine Physicians to Induce Korlym Prescriptions and Gain Physician Allies in its Off-Label Marketing Push ........................................................................... 39

2.    Confidential Witnesses Confirm Corcept Aggressively Marketed Korlym As a First-Line Therapy for Off-Label Use ............................................................ 42

3.    Defendants' Off-Label Marketing Scheme Materially Contributed to its Sales and Bottom Line ............................................................................................. 47

G.    Suspecting Off-Label Marketing and Prescriptions of Korlym, Insurance Providers Tighten Approval Standards to Require Physical Evidence of Cushing's Syndrome and Diagnosis By an Endocrinologist, Causing Corcept Revenue Growth to Plummet ....... 52

V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ................. 54

VI.    THE TRUTH IS REVEALED IN TWO PARTIAL DISCLOSURES ..................................... 55

VII.    POST-CLASS PERIOD EVENTS ............................................................................... 56

VIII.    ADDITIONAL SCIENTER ALLEGATIONS .............................................................. 59

A.    The Individual Defendants' Knowledge and/or Recklessness ....................................... 60

1.    CWs Confirm Corcept Engaged in a Pervasive Companywide Scheme to Market and Sell Korlym Off-Label Using A Uniform Marketing Message ....... 60

2.    Defendants' Admission they Knew the Basis for Each Korlym User's Prescription, the Identity of Each User, and His or Her Prescribing Doctor Supports Scienter ........................................................................................ 60

3.    That Corcept's Quarter-Over-Quarter Revenue Growth Is Statistically Improbable Absent Off-Label Marketing Supports Scienter ........................... 62

4.    Defendant Maduck, Corcept's Senior Vice President of Commercial and a Company Executive Officer, Was Aware of Corcept's Off-Label Marketing Scheme Through His Responsibilities to Oversee Corcept's Sales Staff and Korlym's Marketing Practices .......................................................... 63

5.    Korlym is Corcept's Only FDA-Approved Drug and Revenue Source ............ 64

6.    Corcept's Failure to Follow Industry Guidelines Supports an Inference of Scienter ................................................................................................... 65

7.    Defendants' Payments to Physicians Who Prescribe the Most Korlym Prescriptions Supports Scienter ................................................................ 65

8.    Corcept's Limited Number of Sales Regions and Sales Representatives Supports Scienter .................................................................................... 66

9.    Defendants' Awards to Sales Representatives Supports Their Knowledge of the Representatives Off-Label Marketing ................................................ 67

10.    The Temporal Proximity of Corcept's Chief Medical Officer's Departure and Defendants' False Statements Regarding On-Label Use Supports an Inference of Scienter .............................................................................. 67

B.    The Individual Defendants' Motive to Commit Fraud ....................................68

    1.    The Individual Defendants Were Motivated to Conduct the Alleged Fraud in Order to Capitalize on the Company's Market Exclusivity before its Expiration ....................................................................................................68

    2.    The Individual Defendants Were Motivated to Commit the Alleged Fraud in Order to Continue Funding Operations and the Development of Relacorilant ..69

C.    Corporate Scienter is Additionally Supported by the Actions of Corcept's Employees ....................................................................................................70

IX.    LOSS CAUSATION ..............................................................................................71

X.    PRESUMPTION OF RELIANCE ..........................................................................72

XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ......................................................................................74

XII.    CLASS ACTION ALLEGATIONS ........................................................................75

XIII.    PRAYER FOR RELIEF ........................................................................................79

XIV.    JURY DEMAND ...................................................................................................79

**Case No. 19-CV-01372-LHK**

FIRST AMENDED COMPLAINT

Court-appointed Lead Plaintiff Ferraro Family Foundation, Inc. and James L. Ferraro (collectively, "Plaintiff" or the "Ferraro Group") bring this action against Corcept Therapeutics Incorporated ("Corcept" or the "Company"), its Chief Executive Officer Joseph K. Belanoff ("Belanoff"), its Chief Financial Officer Charles Robb ("Robb"), and its Vice President of Commercial Sean Maduck ("Maduck," and collectively with Corcept, Belanoff, and Robb, the "Defendants") pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder on behalf of themselves and all other persons similarly situated who purchased or otherwise acquired Corcept securities between August 2, 2017 and January 31, 2019, inclusive (the "Class Period"), and were damaged thereby.

Plaintiff alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of their undersigned Lead Counsel, which included, among other things, review and analysis of: (i) Corcept's public filings with the U.S. Securities and Exchange Commission ("SEC") and Food and Drug Administration ("FDA"); (ii) Corcept's other public statements, including press releases and investor conference calls; (iii) interviews with confidential physician witnesses with firsthand experience with Corcept's sales staff; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning Corcept and the industry in which it operates; and (v) court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   <u>SUMMARY OF THE ACTION</u>

1.      At the core of this securities class action is a pervasive Company-wide off-label marketing scheme orchestrated by Defendants to dupe unsuspecting primary care physicians (family medicine physicians and general internists) unfamiliar with the proper diagnosis and treatment of endogenous Cushing's Syndrome into inappropriately prescribing Korlym, Corcept's only FDA-approved commercial drug, to their patients so that Defendants could expand the market beyond its very

narrow FDA-approved indication to finance the development of a new drug candidate before the period of market exclusivity for Korlym expired in February 2019.

2.      Corcept purports to be a pharmaceutical Company engaged in the development and commercialization of drugs that treat severe metabolic, oncologic, and psychiatric disorders by modulating the effects of the hormone cortisol. The Company's only FDA-approved drug, Korlym, generates all of the Company's revenues and carries an exceptional yearly retail price tag of between $180,000 and $700,000 per patient.

3.      Korlym sales not only fund Corcept's day-to-day operations but are also relied upon to finance the Company's ongoing clinical trials. Corcept is presently conducting clinical trials for its Korlym replacement, Relacorilant, as market exclusivity to distribute Korlym has come to an end with well-capitalized generic competitors waiting in the wings, held off only by a statutory stay pending ongoing patent infringement litigation.

4.      Despite the Company's best efforts to gain broad regulatory approval for the use of Korlym as a general treatment for endogenous Cushing's Syndrome, a rare disease affecting only approximately 20,000 patients in the United States, in 2012 the FDA approved the drug's use for a narrow subset of endogenous Cushing's Syndrome: "to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's Syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery." Further, the FDA added this specific limitation to Korlym's label: "Do not use [Korlym] for the treatment of type 2 diabetes mellitus unrelated to endogenous Cushing's syndrome."

5.      Based on Corcept's proposed broad indication for Korlym, the FDA estimated the potential number of Cushing's Syndrome patients in the U.S. qualified to be on Korlym was "approximately 5,000 patients." However, the FDA subsequently restricted the indication for Korlym, reducing this number even further.  In addition, achieving treatment of this reduced number of patients with Korlym would be unlikely because other drugs are available to treat endogenous Cushing's Syndrome and diabetes and some patients might refuse Korlym therapy because of the cost or side effects.  Thus, only a very small fraction of endogenous Cushing's Syndrome patients in the U.S. might eventually receive Korlym therapy, based on the FDA approved label.

6.      Because of Korlym's orphan drug status, Corcept employed Dohmen Life Sciences Services, LLC ("Dohmen") as its specialty pharmacy in 2013 to distribute Korlym. At that time, the Company's espoused marketing strategy for Korlym was to purportedly target the 300 endocrinologists who handled 70% of all Cushing's Syndrome patients in the United States. An endocrinologist is a physician who specializes in diagnosing and treating conditions that affect the body's adrenals, bone metabolism, cholesterol, hypothalamus, pancreas, parathyroids, pituitary, reproductive glands, and thyroid. An endocrinologist is uniquely qualified to treat Cushing's Syndrome because Cushing's Syndrome affects the cortisol-producing adrenal glands.  Due to the rare nature of Cushing's Syndrome, it is common for other physicians to refer patients with signs and symptoms of Cushing's Syndrome to the expert endocrinologists, particularly those who routinely care for such patients.

7.      Corcept's focus on endocrinologists paid immediate dividends as a first-to-market treatment for its approved indication, driving Company revenue from approximately $3.3 million in 2012 to $81.32 million in 2016.

8.      However, looming in February 2019 was the end of the marketing exclusivity for Korlym afforded to the Company by the Orphan Drug designation it had previously been granted – the expiration of which would open the door to price competition from generic competitors that would ultimately erode the Company's only revenue source. Moreover, endocrinologists became reluctant to use Korlym as anything but a last resort therapy due to the drug's side effects and the fact there are other more effective drugs on the market for the treatment of endogenous Cushing's Syndrome and diabetes.

9.      Faced with the looming expiration of exclusivity, endocrinologist distaste for Korlym as anything but a last resort therapy, and the fact that, as a secondary or tertiary treatment for a rare disease, the total addressable market for Korlym was limited and would soon plateau, Defendants engaged in a multi-faceted scheme to target non-endocrinologist physicians unfamiliar with the protocol for diagnosing and treating endogenous Cushing's Syndrome patients. Defendants fed them misinformation regarding the screening and diagnosing procedures for Cushing's Syndrome, while also pushing these doctors to prescribe Korlym for off-label uses, including for the treatment of diabetes, and obesity.

10.      To facilitate Defendants' off-label marketing scheme, Defendants abruptly fired Dohmen, which would not participate in approving the off-label use of Korlym, and clandestinely

assisted in the creation of a new specialty pharmacy that was entirely beholden to Corcept as its only customer: Optime Care, LLC ("Optime"). Optime acted as the Company's liaison between the non-endocrinologists prescribing Korlym and insurance companies, doing the Company's bidding to ensure that these off-label uses went undetected and the Company received payment.

11.     Confidential witnesses ("CWs") who are physicians from across the country that directly interacted with Corcept sales representatives have confirmed that, throughout the Class Period, Corcept's sales force aggressively marketed Korlym for off-label use, targeting non-endocrinologist physicians (mainly family medicine and internal medicine doctors). According to CWs, during office visits, Corcept sales representatives instructed them to employ a single test to test for Cushing's Syndrome—the single 1-mg overnight Dexamethasone suppression test ("DST")—and if it came back even close to positive, advised the doctor to immediately prescribe Korlym to these patients, in violation of the FDA approved indication and widely-accepted industry guidelines for diagnosis and treatment of Cushing's Syndrome developed by the endocrinology professional societies—the Endocrine Society and the American Association of Clinical Endocrinologists (AACE).

12.     Confidential witnesses further confirmed that Corcept sales representatives also instructed physicians to "proactively" use Korlym to "pre-treat" patients with adrenal masses, prior to surgical resection, again, in violation of the FDA approved indication and industry guidelines.

13.     As stated in myriad scholarly articles authored by endocrinologists across the country, and confirmed by Plaintiff's CWs and Plaintiff's Expert ("PE"), a practicing endocrinologist in Western Massachusetts with over twenty years of experience who has published on Cushing's Syndrome, the DST is unreliable as a standalone test for diagnosing Cushing's Syndrome because it is highly susceptible to generating false positives and negatives and, instead, should only be used as an initial screening tool to inform additional testing. This position is supported by the findings of Dr. Lynn Loriaux, an endocrinologist and professor of medicine at the Oregon Health & Science University who noted in his 2017 article in the New England Journal of Medicine titled "Diagnosis and Differential Diagnosis of Cushing's Syndrome," N Engl J Med 2017; 376:1451-1459, that the DST is particularly unhelpful in diagnosing endogenous Cushing's in an obese patient population, with a positive predictive value of just 0.4% -- meaning that, for those obese patients whom Corcept's marketing team was

explicitly pushing non-endocrinologists to test, among those that screened as abnormal with the DST, just 0.4% would actually be diagnosed with endogenous Cushing's following an appropriate workup. Despite the unlikelihood of a confirmed diagnosis in these patients, Corcept's sales staff advocated for the immediate commencement of Korlym upon an even borderline DST result.

14.     This consistent and uniform marketing pitch, employed in each of the Company's six sales regions, was designed to cause Korlym to be inappropriately prescribed to a host of patients without a confirmed endogenous Cushing's diagnosis, seeking to circumvent the narrow FDA label indication and established diagnosis and treatment guidelines published by the Endocrine Society. Endocrine Society guidelines call for confirmatory testing using several screening tests and surgical resection of adenomas where possible as the first-line treatment for endogenous Cushing's Syndrome (with radiological intervention and several other medications available as secondary and tertiary treatments).

15.     According to the CWs, Corcept's sales representatives were relentless and visited their offices weekly to follow-up on new patients, the results of the DST and even provided instructions and assisted in the completion of patient forms required for insurance company approval for Korlym therapy. In an effort to end-run the requirements of the approved label, the Company's representatives advised physicians to simply check the box on the form that the patient did not qualify for surgery so the prescription would be approved. CWs stated that Corcept representatives advised physicians that patients "don't really want surgery" and that Korlym should be tried before sending the patient for surgery, in clear violation of professional society guidelines for treatment of Cushing's Syndrome patients.

16.     To solidify support for the use of Korlym among these newly targeted non-endocrinologists, the Company began leveraging its marketing dollars, drastically increasing the amount of money it paid to family medicine and internal medicine doctors to coincide with its newfound focus on these physician subgroups – with the total dollar spend on each group increasing by 267% and 367%, respectively, from 2016 to 2017 based on data available in the Centers for Medicare and Medicaid Services Open Payments database.

17.     The Company's new marketing approach is best exemplified by a ***single general internist*** practicing in North Charleston, South Carolina: Dr. Jerry Back. According to publicly available

Medicare Part D data, Dr. Back had 115 Medicare Part D claims for Korlym originate from his office in 2017 (representing 5% of *all claims submitted nationwide* to the program), worth a total drug cost of $3,562,308.06.  Dr. Back's Medicare claims were the highest of any physician submitting Korlym claims to the system and he was the only physician with more than 100 claims – a sharp increase from the 19 Korlym claims he submitted in 2016 (after submitting **zero** claims in 2014 and 2015). Unsurprisingly, Dr. Back was also one of the largest recipients of monetary benefits from Corcept's increased focus on internists and family medicine physicians, seeing his monetary receipts from Corcept skyrocket from $154.38 in 2016 (for food and beverage payments) to $55,454.60 in 2017 ($47,000 of which were honoraria payments), with an additional $31,099.16 ($20,000 of which were honoraria payments) flowing to Dr. Back in 2018 from Corcept.

18.    This exponential rise in supposed confirmed cases of endogenous Cushing's in a patient population that otherwise met the narrow indication set forth on the Korlym label by a general internist in North Charleston, South Carolina (a city with an estimated population of approximately 110,000) raises the specter of impropriety on its own, particularly as the known incidence rate of endogenous Cushing's Syndrome is approximately 1 to 2 *per million*. The anomalous nature of these alleged diagnoses is compounded by the fact that, according to 2017 Medicare Part D data, the second highest prescriber of Korlym was Dr. Joseph Matthews – a community-based endocrinologist practicing in Summerville, South Carolina, just twenty minutes from Dr. Back.

19.    Like Dr. Back, Dr. Matthews saw his number of Korlym claims submitted to Medicare Part D increase from 16 in 2016 to 85 in 2017 (or 3.6% of all claims submitted to Medicare that year), accounting for a total drug cost of $374,151.80 and $2,053,739.20, respectively, after submitting zero Korlym claims in 2014 or 2015. Also, like Dr. Back, Dr. Matthews lined his pockets with payments from Corcept during this same period, receiving $73,777 from Corcept in 2017, including $48,000 in honoraria payments.

20.    Together, Drs. Back and Matthews' collective Medicare Part D submissions accounted for more than $5.6 million, or 3.5% of the Company's net product revenue for 2017 alone, without factoring in the financial impact of additional undisclosed prescriptions these doctors presumably wrote during the same period that were reimbursed by private insurance companies. Further, given the rarity

of true endogenous Cushing's Syndrome, there is a next to zero percent chance of having such a large cluster of affected individuals in North Charleston, South Carolina. Yet, Drs. Back and Matthews have purportedly identified large patient groups in a small geographic area just minutes from one another.

21.    Unsurprisingly, this large increase in patients treated with Korlym caught the attention of Dr. Eveline Waring and Dr. Beatrice Hull, two endocrinologists also practicing in North Charleston, South Carolina, who noted an increase in doctors prescribing Korlym (the active ingredient in which is mifepristone) to address diabetes in patients *without a confirmed endogenous Cushing's diagnosis*.  In a chapter titled "Inappropriate Use of Mifepristone to Treat Diabetes Mellitus" in Dr. Michael T. McDermott's 2019 book, *Management of Patients with Pseudo-Endocrine Disorders*, Drs. Waring and Hull presented a case study for a patient who was prescribed Korlym, concluding that "the indication for mifepristone use was arrived at in reverse: the patient presented with difficult-to-control metabolic syndrome (obesity, hypertension, diabetes, depression), and then the search for hypercortisolemia was undertaken, culminating in the patient being placed on mifepristone."

22.    Driven by this pivot towards off-label marketing of Korlym to non-endocrinologists, the Company's revenue flourished, nearly doubling in 2017 before growing an additional 58% in 2018:

| Fiscal Year | Product Revenue (in thousands) |
|---|---|
| 2016 | $81,321 |
| 2017 | $159,201 |
| 2018 | $251,247 |

23.    Spurred by the sharp uptick in these costly Korlym prescriptions, beginning in 2018, several private insurance companies began to tighten their requirements for Korlym approval, requiring documentary physical evidence that the prescription meets the FDA-approved indication. These changes in the private insurance approval process for Korlym coincided with a decline in revenue growth year-over-year from 2017 to 2018 and in a drastic decline in Corcept's quarter over quarter revenue growth. Corcept's third quarter revenue growth in 2018 was just 50.2% (after reporting growth of at least 75% in each of the four prior quarters). The Company's quarter over quarter revenue growth continued to fall into 2019 to a low of 12.4% in the first quarter of 2019, as the insurance companies became wise to

Corcept and Optime's scheme and it became more difficult for Optime to secure insurance approval for Korlym, severely cutting into Corcept's growth.

24.     The truth about Corcept's off-label marketing scheme for Korlym began to surface on January 25, 2019, when the Southern Investigative Reporting Foundation ("SIRF") published a report titled "Corcept Therapeutics: The Company That Perfectly Explains the Health Care Crisis" (the "SIRF Report").  The SIRF Report questioned the off-label use of the drug in light of increasing deaths associated with it, as reported to the FDA's adverse events reporting system, while highlighting the Company's increased use of honoraria and speaker payments to physicians whose Korlym prescriptions drastically increased during the same period.

25.     Upon the release of the SIRF Report, the Company's common stock price fell $1.52, or more than 11%, to close at $12.29 per share on January 25, 2019, on unusually heavy trading volume.

26.     Then, after the close of the market on January 31, 2019, likely due to the increased scrutiny of its illicit sales practices involving Korlym, the Company forecasted a slowdown in Korlym sales, projecting full-year 2019 revenue of $285 million to $315 million, well below the $328 million expected by analysts.  On this news, the Company's share price fell $1.15, or more than 10%, to close at $10.03 per share on February 1, 2019, on unusually heavy trading volume.

27.     Then, shortly after the Class Period, on February 5, 2019, prominent short-selling activist investment firm Blue Orca Capital ("Blue Orca") published on its website its investment thesis for Corcept, valuing the Company at just $5.42 per share (nearly half of the then-prevailing common stock price of $10.20 per share), endorsing the SIRF Report, and noting the Company's relationship with Optime as a controlled party (the "Blue Orca Report"), concurrently posting on YouTube the audio of an investigative call to Optime wherein multiple Optime employees asserted that they were, in fact, Corcept employees.

28.     As alleged herein, throughout the Class Period Defendants made a series of materially false and misleading statements and failed to disclose material facts regarding, *inter alia*, Defendants' off-label marketing scheme, which targeted a broader population of non-endocrinologist physicians, the basis for the Company's revenue growth and Defendants' compliance with FDA-regulations.

29.     Each of the Defendants acted with the requisite scienter during the Class Period, either knowingly or recklessly disregarding the truth about the Company's pervasive off-label marketing strategy for Korlym employed across the country in all six of Corcept's sales regions to artificially prop up Corcept's revenue and stock price.  Defendants' scienter is multi-faceted and shows a desperate Company on the verge of losing its marketing exclusivity for Korlym - its only revenue and trial financing source - which was already shackled by a very limited FDA-approved indication. Instead, the way forward for the Defendants was simple: a pivot towards an illicit off-label marketing scheme that preyed on primary care physicians less knowledgeable about the established diagnosis and treatment protocols for endogenous Cushing's Syndrome, a very rare disorder.

30.     As a result of the fraud alleged herein, Plaintiff and the putative Class have suffered significant harm.

## II.   <u>JURISDICTION AND VENUE</u>

31.     The claims asserted herein arise pursuant to Section 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated therein, 17 C.F.R. § 240.10b-5.

32.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 27 of the Exchange Act, 15 U.S.C. §78aa.  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange. Corcept trades in an efficient market on the NASDAQ Stock Market ("Nasdaq").

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts charged herein, including the preparation and/or dissemination of materially false or misleading information, occurred in substantial part in this District. Additionally, Defendant Corcept maintains executive offices in this District at 149 Commonwealth Drive, Menlo Park, California.

III.   **THE PARTIES**

A. **Plaintiff**

34.     Lead Plaintiff Ferraro Family Foundation, Inc. and James L. Ferraro (collectively, the "Ferraro Group") purchased Corcept securities during the Class Period at artificially inflated prices and was damaged thereby, as previously set forth in the PSLRA certification accompanying Plaintiff's motion for appointment as lead plaintiff (ECF No. 19), incorporated herein by reference.

B. **Defendants**

35.     Defendant Corcept is a pharmaceutical company engaged in the development and commercialization of drugs that treat severe metabolic, oncologic and psychiatric disorders by modulating the effects of the hormone cortisol. According to the Company's website, Corcept is "committed to improving patient lives through the discovery and development of drugs that address serious unmet medical needs related to excess cortisol activity." Corcept maintains executive offices at 149 Commonwealth Drive, Menlo Park, California 94025.  The Company's common stock is traded on the Nasdaq under the ticker symbol "CORT."

36.     Defendant Joseph K. Belanoff, a co-founder of Corcept, has served as the Company's Chief Executive Officer and as a Director since 1999, and was appointed President in 2014. Defendant Belanoff is a medical doctor and, in addition to his role as Company CEO, is an Adjunct Professor of Psychiatry at Stanford University (School of Medicine), where he has held positions in the Department of Psychiatry and Behavioral Sciences since 1992.  As stated in the Company's Definitive Proxy Statement filed with the SEC on April 24, 2019, "Dr. Belanoff brings to our Board a deep knowledge of our financial activities, commercial operations and our research and development programs. He also has valuable expertise in business administration, drug discovery, clinical medicine and psychopharmacology."

37.     Defendant Charles Robb has served as the Company's Chief Financial Officer since 2011.

38.     Defendant Sean Maduck has been at Corcept since 2012. From 2012 to 2016 Maduck was Corcept's Vice President, Sales & Marketing. Since 2016, Maduck has been Corcept's Senior Vice President, Commercial.

39.     Defendants Belanoff, Robb, and Maduck are collectively referred to as the "Individual Defendants" and, together with Corcept, as the "Defendants."

40.     Each of the Individual Defendants, by virtue of their high-level positions with Corcept, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential and proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition during his respective tenure with the Company, as alleged herein. As alleged below in Sections V and VII, the materially false or misleading information conveyed to the public resulted from the collective actions of the Individual Defendants. Each of these individuals, during his tenure with the Company, was involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and knew or recklessly disregarded that these statements were being issued regarding the Company.

41.     As executive officers of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose common stock was, and is, traded on the Nasdaq, and governed by federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that had become materially misleading or untrue, so that the market prices of the Company's publicly traded securities would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

42.     Each of the Individual Defendants, because of his position of control and authority as an executive officer of Corcept, was able to and did control the content of the SEC filings, press releases, and other public statements that Corcept issued during the Class Period, was provided with copies of the statements at issue in this action before they were made to the public, and had the ability to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the materially false or misleading public statements alleged herein.

43.     Each of the Individual Defendants, because of his position of control and authority as an executive officer of Corcept, had access to the adverse undisclosed information about Corcept's

business, operations, financial statements, and internal controls through access to internal corporate documents, conversations with other Corcept officers and employees, attendance at Corcept management meetings, and via reports and other information received in connection therewith, and knew or recklessly disregarded that these adverse undisclosed facts rendered the representations made by or about Corcept materially false or misleading.

44.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme or course of conduct that operated as a fraud or deceit on purchasers of Corcept securities by disseminating materially false or misleading statements and/or concealing adverse facts. The scheme: (i) deceived the investing public regarding Corcept's products, business, operations, and management, and the intrinsic value of Corcept common stock; and (ii) caused Plaintiff and members of the Class to acquire Corcept common stock at artificially inflated prices.

C. **Relevant Non-Parties**

45.    Non-Party Dohmen Life Sciences Services, LLC (now known as EVERSANA) ("Dohmen") is a company engaged in the wholesale distribution of prescription drugs, proprietary drugs, and toiletries.  Dohmen was contracted by Corcept from 2013 to 2017 as its specialty pharmacy to provide services for a direct to distribution model for Korlym. Dohmen acted as conduit between Corcept and patients prescribed Korlym, responsible for, among other things, inventory control services, prescription fulfillment services, product distribution services, patient reimbursement support services, insurer contract management services, accounts receivable services, account management services, financial reporting services, and patient support services.[1]

46.    Non-party Optime Care, LLC ("Optime") purports to be a "nationally recognized pharmacy, distribution, and patient management organization, that brings to the market a suite of comprehensive services tailored to maximize the therapeutic opportunities for the treatment of orphan and rare disorders." Optime was incorporated in 2015.

---

[1] Centric Health Services ("Centric") was a specialty pharmacy purchased by Dohmen in 2011. Centric was initially allowed to continue operating under the Centric name until 2014, when it adopted the Dohmen name. Dohmen's initial contract with Corcept was signed through its Centric subsidiary.

47.     Non-party Donovan Quill ("Quill") is the current President and CEO of Optime. Quill previously worked for Dohmen as the Vice-President of Client Services from 2012 to 2015 and as Senior Vice President Direct to Patient Programs in 2015. From 2015 to 2016, Quill opened his own consulting agency, DJQ Consulting LLC. Quill officially joined Optime as their President in September of 2016.

48.     Non-party Michelle Hefley ("Hefley") co-founded Optime. Hefley has been a managing partner at Optime since 2015. Hefley was the President of Centric Health until 2014 and executed the original services agreement between Centric and Corcept on behalf of Centric.

49.     Non-party Lawrence Glasscott ("Glasscott") was the CFO and Senior VP of Payer Reimbursement for Centric/Dohmen until 2015. Glasscott has been the CFO of Optime since 2015.

## IV.     FACTUAL ALLEGATIONS

### A.     Corcept is a Pharmaceutical Company that Relies on a Single Drug Product to Generate all of its Revenue

50.     During the 1980s, French pharmaceutical company Roussel-Uclaf S.A. began developing glucocorticoid receptor antagonists, the most well-known of which was mifepristone or RU-486 – a progesterone receptor antagonist used in the termination of early pregnancies.  While the FDA would ultimately approve mifepristone for medical abortions in the year 2000, Defendant Belanoff and Corcept were simultaneously exploring alternative uses for the drug, including for the treatment of psychiatric and neurological diseases.

51.     Corcept was founded in 1998 after Defendant Belanoff supposedly observed encouraging results in the testing of mifepristone on individuals with psychotic major depression ("PMD"). In reality, despite garnering national interest, the clinical trial results failed to validate the Company's theories. Several prominent psychiatric researchers observed that the test results provided no statistical backing for the claims that mifepristone was beneficial for those with PMD.  Accordingly, in 2007, Corcept halted clinical trials without publishing any results, acknowledging in its SEC filings that none of the Phase 3 clinical trials testing mifepristone for PMD demonstrated statistically significant response rates in comparison to the placebo.

52.     With the Company's future in jeopardy, and deeply in debt, Corcept was desperate for a lifeline.  That came in July 2007 with the FDA's granting of the orphan drug designation for the

Company's mifepristone drug, Korlym,[2] for the treatment of endogenous Cushing's Syndrome. Designation of Korlym as an orphan drug conferred market exclusivity, tax credits, research support and other benefits to Corcept under the Orphan Drug Act of 1983.

53.     There are two types of Cushing's Syndrome: exogenous and endogenous. Exogenous Cushing's Syndrome, by far the more common form of Cushing's Syndrome, is caused by taking glucocorticoid hormones, better known as corticosteroids, and is treated by decreasing and eventually discontinuing intake of these corticosteroids, allowing the body to return to natural levels without the need for other medication.  Physicians routinely prescribe glucocorticoid drugs to patients with a variety of inflammatory conditions, such as rheumatoid arthritis, lupus, and asthma.

54.     Endogenous Cushing's Syndrome, on the other hand, is a debilitating and rare disease that occurs when the body is exposed to high levels of cortisol[3] produced by the adrenal glands for a sustained period of time and requires treatment through surgery and/or medications. Endogenous Cushing's Syndrome is most commonly caused by a hormone-secreting tumor in the adrenal or pituitary glands.  In the adrenal glands, the tumor produces too much cortisol. In the pituitary gland, the tumor produces too much ACTH – a neuroendocrine hormone that tells the adrenal glands to produce cortisol. Both types of tumors result in excess cortisol production.

55.     Cushing's Syndrome is typically treated by an endocrinologist. An endocrinologist is a physician who specializes in diagnosing and treating conditions that affect the body's adrenals, bone metabolism, cholesterol, hypothalamus, pancreas, parathyroids, pituitary, reproductive glands and thyroid. An endocrinologist is uniquely qualified to treat Cushing's Syndrome because Cushing's Syndrome affects the cortisol-producing adrenal glands.  Due to the rare nature of Cushing's Syndrome, it is common for other physicians to refer patients with symptoms of Cushing's Syndrome to the expert endocrinologists. Given the rarity of endogenous Cushing's Syndrome, only a very limited number of endocrinologists around the country routinely treat Cushing's Syndrome patients.

---

[2] Korlym was previously known as "Corlux." For the sake of clarity, this complaint only uses the name "Korlym" when referring to the drug, regardless of then-prevailing marketing terminology.

[3] Cortisol is the steroid hormone produced by the adrenal glands. In normal amounts, cortisol helps the body: respond to stress; maintain blood pressure and cardiovascular function; keep the immune system in check; and convert fat, carbohydrates, and proteins into energy.

56.     Korlym, a treatment of endogenous Cushing's Syndrome, is currently Corcept's only FDA-approved drug and provides the Company with 100% of its revenue.

57.     As a developmental pharmaceutical company, Corcept's ability to generate revenue was entirely dependent on getting Korlym approved by the FDA.  In the Company's Annual Report on Form 10-K for the fiscal year ending December 31, 2010, Corcept stated it "[did] not expect to generate significant revenue until [Korlym] has been approved by the FDA for marketing in the United States."

**B.   The FDA Approves Korlym to Treat A Narrow Subset of Endogenous Cushing's Syndrome, a Rare Disorder Impacting Just One to Two in One Million People in the United States**

58.     In search of a new, profitable use for mifepristone following the unsuccessful trial results related to PMD, the Company pivoted towards the treatment of endogenous Cushing's Syndrome, looking to leverage the United States' laws and policies regarding orphan diseases and drugs.

**1.     Corcept Obtains FDA Approval of Korlym to Treat Endogenous Cushing's Syndrome Under the Orphan Drug Act**

59.     The Orphan Drug Act of 1983 was enacted to promote research and development of expensive medicines used to treat rare diseases. The designation is available for disease treatments affecting fewer than 200,000 patients in the United States. Along with the orphan designation, the developing sponsor obtains certain benefits, including tax credits for clinical testing, assistance from the FDA in the drug development process, and seven years of marketing exclusivity for the drug. The market exclusivity period begins when the FDA approves the drug.

60.     In July 2007, the FDA granted Corcept the orphan drug designation for Korlym. Korlym received the Orphan Drug designation because there are an estimated 20,000 patients in the United States suffering from endogenous Cushing's Syndrome.

61.     Following the Orphan Drug designation, in September 2007, Corcept filed an Investigational New Drug Application ("INDA")[4] with the FDA for Korlym for the treatment of endogenous Cushing's Syndrome. As the Company stated in its September 11, 2007 press release

---

[4] An INDA is the first step in the drug review process by the FDA. The INDA is not an application for marketing approval. Instead, it is the avenue through which the sponsor gets from the FDA an exemption to the federal law that prohibits an unapproved drug from being transported across state borders, allowing the sponsor to commence clinical trials.

announcing the INDA, "[i]n the communication regarding the opening of the IND, the FDA indicated that a single study may provide a reasonable basis for the submission of a New Drug Application (NDA) for [Korlym] for the treatment of endogenous Cushing's Syndrome, which allows us to initiate the 50-patient open label study defined by the protocol submitted with the application for the IND."

62.     In December 2007, Corcept initiated C1073-400, or Study 400 (also known as the SEISMIC study), a 24-week open label, uncontrolled trial that enrolled a total of 50 patients with endogenous Cushing's Syndrome.

63.     An open-label study, like the one Corcept conducted, is the least rigorous type of scientific investigation because all participants know they are receiving the drug, and not a placebo, and there is no control group. The stated objective of Study 400 was to evaluate the safety and efficacy of mifepristone in the treatment of the signs and symptoms of endogenous Cushing's Syndrome based on two primary endpoints: glycemic control and blood pressure.

64.     Of the 50 patients enrolled in Study 400, 34 reported protocol violations.  These protocol violations included: (1) missing or performing out-of-window study assessments[5] (21 patients); (2) deviations in blood pressure measurement procedure including obtaining difference in two blood pressure values of >5 mmHg (16 patients); and (3) administration of prohibited medications or change in doses of antihypertensive or antidiabetic medications (12 patients).

65.     While Study 400 was ongoing, the Company was twice denied a "Fast Track"[6] designation for Korlym (on September 9, 2009 and January 4, 2010) on the basis that Corcept had not demonstrated that Korlym affects a serious aspect of endogenous Cushing's Syndrome. According to the FDA, "[d]etermining whether a condition is serious is a matter of judgment, but generally is based on whether the drug will have an impact on such factors as survival, day-to-day functioning, or the

---

[5] An "out-of-window" visit is a visit in which the participant misses their scheduled "window" to check in with the trial.

[6] "Fast track" is a process designed to facilitate the development and expedite the review of drugs to treat serious conditions and fill an unmet medical need.

**Case No. 19-CV-01372-LHK**

likelihood that the condition, if left untreated, will progress from a less severe condition to a more serious one."[7]

66.     Study 400 was showed a clinically significant response rate in patients with Cushing's syndrome and glucose intolerance or diabetes induced by hypercortisolemia. However, there was not any evidence of Korlym being effective in producing clinically meaningful improvement of hypertension induced by hypercortisolemia in patients with Cushing's Syndrome.

67.     In April 2011, the Company submitted a New Drug Application (the "NDA") for Korlym to the FDA. Importantly, this NDA sought regulatory approval for Korlym as a **general** treatment for all forms of endogenous Cushing's Syndrome (as opposed to the vastly more limited indication ultimately approved by the FDA).

68.     The FDA approved Korlym on February 17, 2012 for the treatment of endogenous Cushing's Syndrome in patients with hyperglycemia who have type 2 diabetes or glucose intolerance and who have failed or are ineligible for surgery—a much narrower subset of patients than what Defendants had sought in the NDA. As set forth on the FDA-approved label of Korlym:

> Korlym (mifepristone) is a cortisol receptor blocker indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's Syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery.
>
> Important Limitations of Use (1.1)
>
> - Do not use for the treatment of type 2 diabetes mellitus unrelated to endogenous Cushing's Syndrome.

69.     According to the Korlym label, it can only be administered once daily at a 300mg dose, which may be increased to a maximum dose of 1200mg daily.

70.     Side effects listed on the Korlym label include nausea, fatigue, headache, decreased blood potassium, arthralgia, vomiting, peripheral edema, hypertension, dizziness, decreased appetite, and endometrial hypertrophy.  The FDA has also issued warnings and precautions for those taking Korlym, including adrenal insufficiency, hypokalemia, vaginal bleeding and endometrial changes,

---

[7] https://www.fda.gov/patients/fast-track-breakthrough-therapy-accelerated-approval-priority-review/fast-track

exacerbation of conditions treated with corticosteroids (e.g. autoimmune disorders), and an increased risk for opportunistic infections such as pneumonia. Korlym, as a result of using mifepristone as its active agent, also presents hazards during pregnancy. The FDA does not prohibit the use of Korlym during pregnancy but requires patients who are pregnant or who become pregnant while using Korlym to be apprised of the potential hazards.

71.     Importantly, the FDA **_did not_** approve Korlym for the treatment of hypertension in patients with endogenous Cushing's Syndrome (as sought by Corcept), noting that the response rate in this patient cohort in Study 400 was equivocal and potentially impacted by the study's design flaws.

72.     The FDA further noted that, despite Corcept's efforts to prove efficacy across the general population of endogenous Cushing's Syndrome patients, Korlym had only demonstrated limited efficacy for treating hyperglycemia associated with diabetes or glucose intolerance in Cushing's Syndrome, warning that "the observed effects should not be extrapolated beyond this patient population and it would be inappropriate to consider the use of Korlym in the management of diabetes unrelated to hypercortisolism due to Cushing's Syndrome."

73.     The FDA also concluded that the Study 400 trial design was flawed based on its open label structure and lack of control group, but that it would be "unethical to randomize any patient to placebo" given the seriousness of Cushing's Syndrome.

74.     In connection with its approval, the FDA issued a Summary Review discussing the scientific and regulatory issues surrounding Korlym, noting several key factors related to its approval, including that:[8]

> The diagnosis of Cushing's Syndrome **requires a multitude of laboratory and radiologic tests** whose discussion extends beyond the scope of [the Summary Review]. The objective of the laboratory tests is to demonstrate inappropriate and sustained hypercortisolism to distinguish these patients from conditions such as pseudo-Cushing's, severe depression, or cyclical Cushing's. **Reliance on just clinical presentations is not possible or acceptable as patients' presentations are highly variable and span a wide spectrum that includes textbook descriptions of buffalo hump, violaceous striae, hirsutism and facial plethora to more subtle signs of just diabetes and depression.**

---

[8] Unless otherwise indicated, all emphasis is added.

75.     Korlym is a particularly expensive medication. Drugs.com estimates the monthly cost (28 tablets) for a 300mg Korlym prescription at approximately $14,600[9] (totaling more than $175,000 for an entire year). Notably, the FDA's approved dosing guidelines provide that Korlym's daily dosage may be increased in 300mg increments up to 1200mg per day, meaning that in a single year a patient on Korlym could pay up to **$700,000 for their prescription**.

## 2.   Korlym's Total Addressable Market for its FDA-Approved Indication is but a Fraction of all Cushing's Patients

76.     In the FDA's Clinical Review related to its approval of Korlym, Dr. Marina Zemskova estimated that "at any given time there are approximately 20,000 patients with [endogenous] Cushing's Syndrome in the U.S."

77.     Further, in the redacted section of her Clinical Review labeled "Applicant's Proposed Indication," Dr. Zemskova lays out *Corcept's* **proposed** indication for Korlym before estimating that, in the United States, "approximately 5,000 patients with Cushing's Syndrome would be considered candidates for the chronic treatment with Korlym":

> The Sponsor proposes Korlym to treat clinical and metabolic effects of hypercortisolemia in patients with endogenous Cushing's Syndrome, including:
> - patients with Cushing's disease who have not adequately responded or relapsed after surgery
> - patients with Cushing's disease who are not candidates for surgery

78.     Notably, Corcept's proposed indication underlying the 5,000-patient estimate *is not the same indication that was ultimately approved by the FDA*. Instead, as acknowledged in the FDA's Summary Review, "FDA has already **negotiated a more limited patient population** with Korlym than was originally proposed by [Corcept]." That more limited patient population necessarily reduced the estimated total addressable market well below the 5,000 patients originally forecasted by the Company.

79.     The Company never ascribed a figure to the limited subset of Cushing's patients actually eligible to use Korlym *on label*. However, throughout the Class Period and continuing to this day, the Company claims there are 20,000 estimated Cushing's patients in the United States at any given time

---

[9] https://www.drugs.com/price-guide/korlym

(and forecasting an additional 3,000 newly diagnosed patients per year who replace those endogenous Cushing's Syndromes who pass away) as a reliable figure in its corporate press releases.[10]

80.     Similarly, Defendant Belanoff touted the 20,000 figure during the Class Period on earnings calls, while also incredulously claiming that approximately 50% of the total Cushing's Syndrome population is a candidate for treatment with Korlym (despite the limited indication requiring type 2 diabetes or glucose intolerance):

- "There are about 20,000 patients diagnosed with Cushing's Syndrome in the United States. Approximately half of them have been cured by surgery. The rest are candidates for treatment with Korlym." Earnings Call, January 30, 2017.

- "As a reminder, at least 20,000 people in the United States have been diagnosed with Cushing's Syndrome. 3,000 new cases Cushing's Syndrome are diagnosed each year. Half of these cases are cured by surgery, but that leaves at least 10,000 patients in need of medical therapy. Some of these patients have been treated with Korlym, but there are many more that can benefit from it." Earnings Call, November 1, 2018.

81.     According to PE, Cushing's Syndrome is a very rare disease endocrinologists encounter only in the rarest of situations. PE screens for Cushing's after the patient describes symptoms that could be indicative of Cushing's or if the patient has an adrenal mass. In addition, PE receives referrals from other physicians of patients those physicians believe might have Cushing's Syndrome. Despite this, PE sees only two to three patients who are actually diagnosed with Cushing's Syndrome each year.

## C.   Endogenous Cushing's Syndrome Has Well-Established Diagnosis and Treatment Guidelines that Require Multiple Diagnostic Tests Be Performed to Confirm the Presence of Cushing's Syndrome

82.     Cortisol is the body's main stress hormone. Cortisol works with certain parts of your brain to control your mood, motivation and fear.

83.     According to the Clinical Guidelines Subcommittee of the Endocrine Society in its published practice guideline titled "The Diagnosis of Cushing's Syndrome: An Endocrine Society Clinical Practice Guideline" (the "Diagnosis Guideline"), "[a]lthough Cushing's syndrome is clinically

---

[10] *See* Concept press releases issued on: January 30, 2017; March 6, 2017; May 1, 2017; August 1, 2017; November 2, 2017; February 1, 2018; February 22, 2018; March 15, 2018; May 8, 2018; August 9, 2018; November 1, 2018; November 19, 2018; December 13, 2018; January 31, 2019; February 25, 2019; May 2, 2019; May 9, 2019; August 1, 2019; and November 7, 2019.

unmistakable when full blown, the spectrum of clinical presentation is broad, and the diagnosis can be challenging in mild cases." As set forth in the below table, the symptoms and signs of Cushing's significantly overlap with other, more common ailments:

| TABLE 1. Overlapping conditions and clinical features of Cushing's syndrome[a] | | |
|---|---|---|
| Symptoms | Signs | Overlapping conditions |
| *Features that best discriminate Cushing's syndrome; most do not have a high sensitivity* | | |
| | Easy bruising | |
| | Facial plethora | |
| | Proximal myopathy (or proximal muscle weakness) | |
| | Striae (especially if reddish purple and > 1 cm wide) | |
| | In children, weight gain with decreasing growth velocity | |
| *Cushing's syndrome features in the general population that are common and/or less discriminatory* | | |
| Depression | Dorsocervical fat pad ("buffalo hump") | Hypertension[b] |
| Fatigue | Facial fullness | Incidental adrenal mass |
| Weight gain | Obesity | Vertebral osteoporosis[b] |
| Back pain | Supraclavicular fullness | Polycystic ovary syndrome |
| Changes in appetite | Thin skin[b] | Type 2 diabetes[b] |
| Decreased concentration | Peripheral edema | Hypokalemia |
| Decreased libido | Acne | Kidney stones |
| Impaired memory (especially short term) | Hirsutism or female balding | Unusual infections |
| Insomnia | Poor skin healing | |
| Irritability | | |
| Menstrual abnormalities | | |
| In children, slow growth | In children, abnormal genital virilization | |
| | In children, short stature | |
| | In children, pseudoprecocious puberty or delayed puberty | |

[a] Features are listed in random order.

[b] Cushing's syndrome is more likely if onset of the feature is at a younger age.

84.    As discussed above, endogenous Cushing's Syndrome is the rarer form of Cushing's Syndrome. The incidence of endogenous Cushing's Syndrome ranges from .7 to 2.4 per million population per year. As Dr. Marina Zemskova stated in her clinical review of Korlym in connection with Corcept's new drug application to the FDA, "[i]t is estimated that at any given time there are approximately 20,000 patients with [endogenous] Cushing's Syndrome in the U.S."

85.    Women are five times more likely to suffer from endogenous Cushing's Syndrome than men.

86.    Because of its rarity, the robust Diagnosis Guidelines created by the Endocrine Society recommend against widespread testing for Cushing's Syndrome in any other patient group besides:

- Patients with unusual features for age (e.g. osteoporosis, hypertension);

- Patients with multiple and progressive features, particularly those who are more predictive of Cushing's Syndrome;

- Children with decreasing height percentile and increasing weight;

FIRST AMENDED COMPLAINT

- Patients with adrenal incidentaloma compatible with adenoma found on imaging studies.

87.    For those patients who fall in this recommended testing population, the consensus process established by the Endocrine Society recommends the initial use of one of the four established hypercortisolism tests, with those patients with abnormal results recommended to see an endocrinologist for a second confirmatory testing and clinical analysis. These recommended tests include:

- Urinary free cortisol ("UFC") test (at least two measurements) which measures the amount of cortisol in your urine. This test is done over a 24-hour period where the patient collects his urine to be sent to a lab for testing. A normal adult range for cortisol levels in urine is usually < 40 – 50 ug/d. A result higher than 50 ug/d could be indicative of Cushing's Syndrome;

- Late-night salivary cortisol ("LNSC") (two measurements) measures the patient's cortisol between 11 pm and midnight. Patients with Cushing's Syndrome typically have elevated cortisol levels during this time of day compared to other individuals. The normal range of cortisol at this time is 0.10-0.15 ug/dL. A result higher than .15 ug/dL could be indicative of Cushing's Syndrome;

- 1-mg overnight Dexamethasone suppression test ("DST") suppresses the cortisol production of patients through the use of a synthetic steroid. The patient receives the steroid at 11 pm followed by a measurement of serum cortisol early the following morning. Normal subjects should suppress their cortisol level to less than 1.8 ug/dL. A result higher than 5.0 ug/dL could be indicative of Cushing's Syndrome. A result between 1.8 and 5.0 ug/dL is, according to PE, a "gray area;"

- Longer low-dose DST (2 mg/d for 48 h) is the same test as the DST but the Dexamethasone is administered in .5 mg tablets every 6 hours for 48 hours as opposed to one dose at 11 pm the night before measuring the serum cortisol.

88.    While the Diagnosis Guideline provides that a non-endocrinologist clinician may perform an initial screen for Cushing's Syndrome using one of the above tests, in the event the initial test is abnormal, a further evaluation by an endocrinologist (including the performance of a second screening test to either confirm the initial test or identify a false positive) is recommended to confirm or

exclude an endogenous Cushing's Syndrome diagnosis. An evaluation by an endocrinologist is also recommended if the patient tests normal, but for whom pretest probability is high (i.e. patients with clinical features suggestive of Cushing's Syndrome).

89.    As set forth in the Diagnosis Guidelines:

If the initial test result is abnormal, further evaluation by an endocrinologist will ensure that the disorder is confirmed or refuted and that the possibility of a false-positive result will be considered.

Conversely, in cases in which there is a high pretest probability of Cushing's Syndrome but a normal initial test, use of an additional alternative test has the potential benefit of disclosing those with milder disease.

90.    The importance of confirming any diagnosis through an endocrinologist specialist lies in both the rarity of the disease and the difficulty in diagnosing it in mild cases, particularly as each of the four preliminary screening tests are susceptible to false negatives or positives based on external factors, including pre-existing conditions and interference from other medications.

91.    For example, a recent study observed a high rate of false negatives in the UFC test due to interference from other medications. As noted by several doctors in the clinical case report *Diagnosis of Cushing's disease in a patient with consistently normal urinary free cortisol levels: a case report,* Clin Case Rep. 2016 Dec; 4(12): 1181–1183:[11]

A recent study demonstrated a high rate of normal UFC test results in patients with Cushing's syndrome, which suggests that negative UFC test results are not uncommon despite the presence of hypercortisolism-related disease[12]. Moreover, drugs such as carbamazepine, fenofibrate, and carbenoxolone have been reported to increase the cortisol levels and interfere with the accurate interpretation of UFC results[13]. These observations have important clinical implications because they suggested that the UFC screening method can fail to indicate disease and that ***complementary tests are potentially needed to help with the diagnosis of CD***. Furthermore, current clinical practice guidelines recommend additional testing and further evaluation by an endocrinologist to confirm or exclude the diagnosis of CD in individuals with normal UFC test results.

---

[11] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5134332/

[12] https://www.thieme-connect.com/products/ejournals/html/10.1055/s-0030-1263128

[13] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2386281/

92.     Likewise, the 1-mg overnight DST and longer dose DST screening tests are subject to a high level of false positive readings and are not to be relied upon in isolation as the sole basis for a Cushing's diagnosis. As noted by Drs. Teresa Brown, Regina Belokovskaya and Rachel Pessah Pollack in their chapter titled "Pseudo-Cushing's Syndrome: A Diagnostic Dilemma" in the 2019 book *Management of Patients with Pseudo-Endocrine Disorder*, edited by endocrinologist Dr. Michael T. McDermott:

> Dexamethasone metabolism in individual patients can affect the results of the 1 mg DST. Drugs that induce the hepatic clearance of dexamethasone via the CYP 3A4 enzyme (phenytoin, phenobarbital, carbamazepine, rifampicin, and alcohol) can reduce plasma dexamethasone levels and result in false-positive results. Drugs that impair dexamethasone metabolism via inhibition of CYP 3A4 (aprepitant/fosaprepitant, itraconazole, ritonavir, fluoxetine, diltiazem, and cimetidine) can increase dexamethasone levels and potentially produce false-negative results. Patients with liver or renal failure may also have reduced clearance of dexamethasone. There is also variation in dexamethasone metabolism among healthy individuals with no other medical problems. It is therefore recommended that a serum dexamethasone level be measured along with the cortisol level to ensure that plasma dexamethasone concentrations are appropriate. The 1 mg DST results in false-positive result in up to 50% of females taking oral contraceptive pills.

93.     Moreover, according to PE, the DST can provide false positives in patients with cyclical Cushing's Syndrome, depression, and excessive alcohol use.

94.     The current state of these initial screening tests was summarized by Drs. Ernest Yorke, Yacoba Atiase, Josephine Akpalu, and Osei Sarfo-Kantanka in their article published in the *International Journal of Endocrinology* titled "Screening for Cushing Syndrome at the Primary Care Level: What Every General Practitioner Must Know," Int J Endocrinol. 2017; 2017: 1547358.[14] This article, which relied on the Endocrine Society's guidelines, observed: (i) that the UFC test's "sensitivity and specificity are lower than other tests and hence mild [Cushing's Syndrome] can be missed. Moreover, it gives false positive and negative results in many conditions and with many drugs [and] [h]igh fluid intake, incomplete collection, contamination, and decreasing GFR (<60 ml/min) can make UFC unreliable;" (ii) "LNSC is not reliable in patients with disturbed sleep, shift work, smoking, chewing tobacco, brisk brushing of teeth, depression, and critical illness;" and (iii) in the DST,

---

[14] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5551520/

"[e]xercise and poor sleep after dexamethasone will lead to false positivity [and] [e]nzyme inducers, gastrointestinal malabsorption, and rapid transit time decrease the available drug for suppression and may lead to false positive results," while noting that a recent study concluded that "in populations with a high prevalence of obesity such as the United States of America, **the positive predictive value of the [DST] is only 0.4%** and therefore [that study's author] discourages its use in diagnosing [Cushing's Syndrome]." These authors concluded that "[m]ost often in clinical practice, LNSC is preferred because of its higher sensitivity and specificity compared to the others though strict precautions should be followed prior to sampling such as avoiding smoking, tobacco, brisk brushing of teeth, and irregular sleep patterns. **It is recommended to combine more than one investigation based on the patient's presentation and medical history. Any abnormal finding can then be combined with a low-dose DST, and if that also turns out positive, further screening and referral to an endocrinologist should be done to localize the source**."

95.     As stated in the Diagnosis Guideline, "[m]ore often patients have a number of features that are caused by cortisol excess but that are also common in the general population, such as obesity, depression, diabetes, hypertension, or menstrual irregularity. As a result, there is an overlap in the clinical presentation of individuals with and without the disorder. We encourage caregivers to consider Cushing's Syndrome as a **_secondary cause_** of these conditions, particularly if additional features of the disorder are present."

96.     Additionally, "overactivity of the hypothalamic-pituitary-adrenal (HPA) axis occurs without true Cushing's Syndrome, so that there is an overlap between physiological and pathophysiological causes of hypercortisolism. Thus, certain psychiatric disorders (depression, anxiety disorder, obsessive-compulsive disorder), **poorly controlled diabetes mellitus**, and alcoholism can be associated with mild hypercortisolism and **may produce test results suggestive of Cushing's Syndrome, including abnormal dexamethasone suppressibility** and mildly elevated UFC."

97.     Thus, as discussed in the above articles authored by well-respected physicians in the field and the Diagnosis Guidelines established by the Endocrine Society, the need for multiple rounds of confirmatory laboratory testing (as opposed to diagnosing a patient based only on physical appearance or as a result of a single initial screening test) is paramount. As stated by the National Adrenal Diseases

Foundation, the risk of misdiagnosing a patient with pseudo-Cushing's based on physical appearance is high, particularly as these symptoms are often manifestations of other, less rare diseases:[15]

> Most people who appear to have some of the classic physical features of Cushing's Syndrome (Cushingoid appearance) do not actually have the disease. Other reasons for these features include iatrogenic Cushing's (high dose steroids taken for treatment of a condition), polycystic ovary Syndrome (androgen excess from the ovaries), ovarian tumors, congenital adrenal hyperplasia, ordinary obesity, excessive alcohol consumption, family tendency to have a round face and abdomen with high blood pressure and high blood sugar.

> Because Cushing's Syndrome is a rare but serious disorder, it is very important to carefully exclude (rule out) other disorders and then separate the different types, leading eventually to a specific cause that can be treated. This process of testing and excluding usually takes days to weeks and requires a lot of patience and cooperation by the person being tested.

98.    Because of the rarity of true endogenous Cushing's Syndrome and the risks associated with misdiagnosing an individual with pseudo-Cushing's, endocrinologists have established a consensus protocol for the treatment for endogenous Cushing's Syndrome, as set forth in the Endocrine Society Clinical Practice Guideline for the Treatment of Cushing's Syndrome (the "Treatment Guidelines"). Importantly, these specialized experts specifically recommend *against* treatment to reduce cortisol levels or action if there is not an **established diagnosis** of Cushing's Syndrome (which, according to Diagnosis Guidelines, should be done after evaluation by an endocrinologist and multiple rounds of laboratory testing), while also suggesting **against treatments** designed to normalize cortisol or its action when there is **only borderline biochemical abnormality** of the hypothalamic-pituitary-adrenal (HPA) axis without any specific signs of Cushing's Syndrome.

99.    Assuming an established diagnosis of endogenous Cushing's Syndrome, the Treatment Guidelines recommend a first-line treatment option of surgical resection of the primary lesions underlying Cushing's Syndrome whenever possible. According to the Treatment Guidelines, the first-line surgical treatment is especially effective: "In the absence of overt metastatic disease, ectopic ACTH-producing **tumor resection cured 76% of patients**, as demonstrated by observational studies."

---

[15] https://www.nadf.us/adrenal-diseases/cushings-Syndrome/

100.     For those individuals for whom initial surgery was ineffective or not an option, there exists a host of second-line therapeutic options. These include: (i) a second surgery; (ii) radiation therapy/radiosurgery; and (iii) medical treatments, including the use of ketoconazole or mifepristone.

101.     Repeat surgery is suggested by the Treatment Guidelines, particularly in patients with evidence of incomplete resection or a pituitary lesion in imaging.

102.     Radiation therapy is recommended as a second-line option for those individuals for whom surgery failed but can also be instituted as a first-line treatment in individuals who cannot undergo surgery or when the tumor is invasive and unresectable. Several forms of radiation are available, including conventional radiation and stereotactic radiation. According to the Treatment Guidelines, conventional radiation treatment results in remission in up to 83% of adult patients in 6 to 60 months, but often within two years, and is even faster among pediatric patients. Stereotactic radiation, or "radiosurgery," increases patient convenience by allowing a single treatment day, rather than 6 weeks of therapy using conventional radiation, and has shown to be upwards of 86% effective in controlling cortisol excess.

103.     As for medical treatments, the Treatment Guidelines have established several different options (some of which are off-label recommendations).

104.     Steroidogenesis inhibitors are recommended as second-line treatment after surgery in patients with endogenous Cushing's Syndrome. This class of medication includes ketoconazole, metyrapone, mitotane, and etomidate, none of which are approved by the FDA for Cushing's Syndrome treatment, but each of which has proven effective. For example, the Treatment Guidelines note that ketoconazole normalized urine free cortisol in 57 of 82 patients with presumed Cushing's Disease (and had a 93% rate in individual studies), with recent data showing a 50% drop in UFC in 75% of 200 patients, and with clinical improvements in diabetes, hypertension, and hypokalemia.

105.     The Treatment Guidelines make clear that mifepristone (the active ingredient in Korlym), which is a glucocorticoid antagonist, is only suggested for patients with diabetes or glucose intolerance who are not surgical candidates or who have persistent Cushing's Syndrome after surgery.

106.     The Treatment Guidelines also highlight the difficulties with administering mifepristone, as the drug blocks cortisol at the glucocorticoid receptor, but does not actually decrease cortisol levels.

"Because practitioners must use clinical cortisol-dependent variables for these purposes, it is difficult to estimate the correct dose," making the drug difficult to titrate.[16] Further, several adverse events accompany mifepristone use, including fatigue, nausea, vomiting, arthralgias, headache, hypertension, hypokalemia, edema, endometrial thickening, contributing to the Treatment Guidelines' limited recommendation of its usage.

107.    The Treatment Guidelines provide a chart of pros and cons for each medical treatment available for Cushing's Syndrome. Mifepristone is the only treatment without any listed pros:

**Table 1.** Medical Treatment of CS

| Drug | Pros | Cons | Dose[a] |
|------|------|------|---------|
| Steroidogenesis inhibitors | | | |
| Ketoconazole[b] | Quick onset of action | Adverse effects: GI, hepatic dyscrasia (death); male hypogonadism; requires acid for biological activity; DDIs | 400−1600 mg/d; every 6−8 h dosing |
| Metyrapone[b] | Quick onset of action | Adverse effects: GI, hirsutism, HT, hypokalemia; accessibility variable across countries | 500 mg/d to 6 g/d; every 6−8 h dosing |
| Mitotane[c] | Adrenolytic, approved for adrenal cancer | Slow onset of action; lipophilic/long half-life, teratogenic; adverse effects: GI, CNS, gynecomastia, low WBC and T₄, ↑ LFTs; ↑ CBG, DDIs | Starting dose, 250 mg; 500 mg/d to 8 g/d |
| Etomidate | Intravenous, quick onset of action | Requires monitoring in ICU | Bolus and titrate |
| Pituitary-directed | | | |
| Cabergoline | | Adverse effects: asthenia, GI, dizziness | 1−7 mg/wk |
| Pasireotide[d] | | Most successful when UFC <2-fold normal; sc administration; adverse effects: diarrhea, nausea, cholelithiasis, hyperglycemia, transient ↑ LFTs; ↑ QTc | 600−900 μg twice daily |
| Glucocorticoid receptor-directed | | | |
| Mifepristone[e] | | Difficult to titrate (no biomarker); abortifacient; adverse effects: fatigue, nausea, vomiting, arthralgias, headache, hypertension, hypokalemia, edema, endometrial thickening | 300−1200 mg/d |

Abbreviations: GI, gastrointestinal; DDI, drug-drug interactions; HT, hypertension; CNS, central nervous system; WBC, white blood cell count; LFTs, liver function tests; CBG, corticosteroid binding globulin; ICU, intensive care unit; QTc, corrected QT interval.

[a] Except as noted, the lowest dose may be used initially, unless the patient has severe hypercortisolism (UFC more than five times normal), in which case the starting dose may be doubled.

[b] Ketoconazole and metyrapone are approved by the European Medicines Agency for the treatment of CS.

[c] Mitotane has FDA approval for treatment of adrenal cancer.

[d] Pasireotide has FDA approval for treatment of patients with CD who are not surgical candidates or have failed surgery. The agent is also approved in Europe.

[e] Mifepristone has FDA approval for treatment of patients with CS and diabetes or glucose intolerance who are not surgical candidates or have failed surgery.

The use of other agents listed here represents an off-label use for the treatment of CS.

---

[16] Drug titration refers to the process of adjusting a dose of a medication for the maximum benefit without the adverse effects.

**Case No. 19-CV-01372-LHK**

### D. Corcept Engages Dohmen as a Specialty Pharmacy to Distribute Korlym Directly to Patients

108.    In its Summary Review, the FDA noted Corcept "proposed to establish a distribution program through a central pharmacy" where "physicians can submit their prescriptions through this central pharmacy to have Korlym delivered directly to the patient." This distribution method would supposedly "limit [Korlym's] availability for potential off-label use."

109.    A specialty pharmacy focuses on high cost, high touch medications[17] for patients with rare and complex diseases. Specialty pharmacies are used because local pharmacies generally do not carry these rare medications that are rarely prescribed.

110.    The specialty pharmacy works with the prescriber and insurance companies to negotiate the price and to get the expensive drugs approved for the patients. The pharmaceutical company supplying the drug is typically not involved in these transactions.

111.    Upon approval of the Korlym NDA, Corcept set out to secure a specialty pharmacy for Korlym's distribution. Following an approximately one-year period where the Company retained a different specialty pharmacy and distributor (each with the same corporate parent), Corcept entered into an agreement with Dohmen on May 21, 2013 to provide specialty pharmacy services on a consignment basis (i.e. sales are made directly to patients without Dohmen taking title to the Korlym prescriptions they help facilitate). The services agreement carried a three-year term with an option to be renewed for an additional three years, in perpetuity, so long as no party had given written notice of non-renewal not less than 180 days prior to the end of the current term.

112.    Under the agreement, Dohmen was responsible for "design[ing] and develop[ing]" an "exclusive distribution and patient services program…for furnishing [Korlym] in the United States to individuals who register and are accepted for participation by [Dohmen]." Dohmen was required to "prepare detailed work plans, identify key vendor relationships, develop patient services programs, develop training programs…hire and train staff for the Program, and conduct test runs of the services prior to launch."

---

[17] High touch medicines are medicines which have a higher degree of complexity in terms of distribution, administration, or patient management which drives up the cost of the drugs.

113.   Dohmen was also to provide "services including inventory control, order fulfillment, product distribution, patient services, patient reimbursement support, payer contract management, accounts receivable management, account management and reporting."

114.   Corcept would be responsible for all marketing of Korlym and would publicly "disclose the extent to which services are provided by Dohmen." Dohmen would also have the opportunity to "review and approve" all marketing materials referencing Dohmen before they were distributed. Additionally, both parties would need prior written consent to "issue any press release or public statement relating to the relationship of the parties to th[e] Agreement."

115.   As Corcept's exclusive specialty pharmacy, Dohmen was responsible for distributing Korlym to patients, without taking title to the drug.  Dohmen was required to use a system that recorded "receipt, inventory levels, and shipments on a Product-by-Product basis." If there were any credible complaints regarding Korlym, Dohmen was required to notify Corcept within 48 hours of receiving the information.

116.   Dohmen was also required to provide Corcept with an itemized invoice every month for the services provided. In addition to this invoice, Dohmen provided Corcept with six daily financial reports.

117.   As Corcept's exclusive specialty pharmacy, Dohmen would receive "a range of prices for Korlym" and "negotiate[e] with Pharmacy Benefit Managers ('PBMs') and payers to establish the prices that PBMs and payers would pay for Korlym."[18][19]

118.   Dohmen was also required to "maintain an operations system for the purposes of order processing, distribution, billing of Customer and management of accounts receivables" and provide regular "inventory and distribution" reports to Corcept.[20]

---

[18] Dohmen Life Sciences Services, LLC. v. Corcept Therapeutics Incorporated, 2017-0567-TMR.

[19] Pharmacy Benefits Managers or "PBMs" are companies that manage prescription drug benefits on behalf of health insurers, Medicare Part D drug plans, large employers, and other payers.

[20] Dohmen Life Sciences Services, LLC. v. Corcept Therapeutics Incorporated, 2017-0567-TMR.

119.   The agreement allowed for either party to terminate the agreement in the event of a material breach if the breach remained uncured for 30 days following the breaching party's receipt of written notice of such breach from the non-breaching party.

120.   The Corcept/Dohmen services agreement automatically renewed in May 2016. Corcept's Annual Report on Form 10-K for the period-ending December 31, 2016 and filed with the SEC on March 6, 2017, makes no mention of any intention to discontinue the relationship with Dohmen, nor any past issues in dealing with the pharmacy. The Company's quarterly report on Form 10-Q for the period ending June 30, 2017, filed with the SEC on August 2, 2017 similarly makes no disclosures regarding the Dohmen relationship.

121.   As discussed below, however, as market exclusivity for Korlym was set to expire in February 2019, Defendants had been aggressively pushing off-label use of Korlym in order to quickly generate revenue and sufficient cash flow to sustain the Company's business while developing its next drug, Relacorilant (CORT-125134).[21] When Dohmen would not push through approvals for off-label Korlym prescriptions, Defendants abruptly terminated the relationship with Dohmen in favor of a newly-created pharmacy effectively controlled by Corcept.

**E.   With the End of Market Exclusivity for Korlym Looming, Corcept Fires Dohmen for Refusing to Acquiesce to its Off-Label Marketing Scheme and Hires Optime, a New Specialty Pharmacy Willing to go Along with the Company's Aggressive Off-Label Marketing Scheme**

**1.   Corcept's Intellectual Property Rights Over Mifepristone are Limited and the Company's Market Exclusivity is Winding Down**

122.   Korlym's underlying drug, mifepristone, was developed in 1980 and, as such, its underlying patent covering its structure has expired. Instead, Corcept relies on 10 patents regarding the use of mifepristone in the FDA's Orange Book.[22]

---

[21] Relacorilant is Corcept's new version of Korlym. Relacorilant is currently in Phase 3 trials to be approved by the FDA. Corcept believes relacorilant will fully replace Korlym if it gets approved by the FDA. Relacorilant is very similar to Korlym except that it does not bind to the progesterone receptor. As a result, Relacorilant would have less severe adverse side effects compared to Korlym.

[22] The Orange Book identifies drug products approved on the basis of safety and effectiveness by the FDA under the Federal Food, Drug and Cosmetic Act and related patent and exclusivity information.

123.     Throughout the Class Period, the Company touted its intellectual property in its filings with the SEC, claiming that "[p]atents and other proprietary rights are important to our business." Further, the Company's SEC filings highlight the tenuous nature and risks associated with the Company's mifepristone-related patents:

**The mifepristone patents that we own or license cover the use of mifepristone, not its composition, which may make it more difficult to prevent patent infringement if physicians prescribe another manufacturer's mifepristone or if patients acquire mifepristone from other sources, such as the internet or underground market.**

We own or have exclusively licensed issued U.S. patents covering the use of cortisol modulators to treat a variety of disorders, including TNBC and CRPC. A method of use patent covers only a particular use of a compound, not its composition. Because our patents do not cover the composition of mifepristone, we cannot prevent others from commercializing mifepristone to treat disorders not covered by our method of use patents. The availability of mifepristone for these disorders may enable patients to obtain mifepristone for indications covered by our patents. Although any such "off-label" use would violate our patents, effectively monitoring compliance and enforcing our rights may be difficult and costly. Patients may be able to purchase mifepristone through the internet or underground market. Mifepristone is sold in the United States by Danco Laboratories for the termination of pregnancy. Although distribution is limited to a single dose provided in the physician's office and covered by other restrictions, we cannot be certain that patients with Cushing's syndrome will not be able to obtain mifepristone from this or other sources, should another company receive approval to market mifepristone for another indication.

124.     In addition to its use patents, Corcept was also particularly reliant on the seven years of marketing exclusivity following the FDA's approval in February 2012 afforded for Korlym based on its Orphan Drug designation. Not unexpectedly, larger competitors took note of the end of Corcept's exclusivity for Korlym set for February 2019 and began taking measures to enter the market upon expiration. As Defendants stated in its Corcept's Annual Report on Form 10-K for the period-ending December 31, 2017 filed with the SEC on February 28, 2018, "[i]n February 2018, [Corcept] received notice that Teva [Pharmaceuticals USA, Inc. "Teva")] had filed an [Abbreviated New Drug Application ("ANDA")] requesting approval to market a generic version of Korlym.  Teva's Paragraph IV certification stated that [Corcept's] patents in the Orange Book for Korlym are invalid, unenforceable or will not be infringed by Teva's proposed generic product."

125.     Similarly, according to the Company's quarterly report on Form 10-Q for the period ended June 30, 2019, filed with the SEC on August 1, 2019, the Company received a "Paragraph IV

Notice Letter advising that Sun Pharmaceutical Industries Limited ("Sun Ltd."), had submitted an Abbreviated New Drug Application ("ANDA") to the FDA seeking authorization to manufacture, use or sell a generic version of Korlym in the United States prior to the expiration of certain of [Corcept's] patents."

126.    In response, Corcept has filed two lawsuits against Teva (the first of which was filed in March 2018 and the second in February 2019) and a lawsuit against Sun Ltd. Corcept has alleged infringement of its intellectual property, triggering an automatic injunction against the final approval of any ANDA by the FDA until the earlier of 30 months following the initiation of Corcept's lawsuits or a court opinion finding the patents in question invalid, unenforceable, or not infringed under the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act.

### 2. Corcept Contracts with Optime, A Specialty Pharmacy, with No Other Clients, to Facilitate Off-Label Sales of Korlym

127.    Shortly after the FDA approved Korlym, in order to quickly generate substantial revenue growth to support the Company's operations and continued drug development, Corcept representatives began aggressively marketing Korlym to endocrinologists.

128.    Defendants, however, had limited success gaining traction in getting endocrinologists to prescribe Korlym, particularly among those endocrinologists who routinely treat endogenous Cushing's Syndrome patients. In fact, endocrinologists wanted little to do with Korlym because of its cost and severe adverse side effects. These specialists viewed Korlym as a fourth-line or last resort therapy for an already rare disease that was better addressed through alternative approaches (i.e. surgical resection, radiological intervention, or one of the other well-established endogenous Cushing's Syndrome treatments).

129.    Indeed, according to PE, he will only consider Korlym for medical treatment as a last resort because: (i) Korlym has a different method of use than other medical treatments for Cushing's Syndrome as it blocks the body from  utilizing  the excess cortisol that is being produced thereby leading to increased cortisol levels instead of stopping the production of the cortisol, making it difficult to track the efficacy of the drug because it is impossible to measure   whether actual cortisol levels have decreased; (ii) Korlym carries with it too many high-risk side effects, such as hypokalemia and the risk

of interfering with adrenal insufficiency tests; (iii) Korlym interferes with the metabolism of numerous other drugs, making it a risky choice in patients taking other medications; and (iv) Korlym is not as powerful as other options, such as ketoconazole, and is very expensive.

130.    Similarly, CW 1, an endocrinologist practicing in the Southeast with decades of experience, has never prescribed Korlym because the drug has never been clinically indicated, in addition to having concerns of the drug's lack of efficacy coupled with its high potential for dangerous side effects. CW 1 has seen patients come in who were already prescribed Korlym and declared the results to be "pretty much disastrous."

131.    Thus, Defendants needed a new plan. That plan would involve preying on less knowledgeable non-endocrinologists, mainly family medicine doctors[23] and internal medicine doctors (also known as internists),[24] by inducing them to prescribe Korlym for off-label use, thus artificially expanding the total addressable market for Korlym and buoying Company revenue.

132.    In order to execute the multi-year plan, Defendants first replaced Corcept's entire marketing team. Steven Lo, Corcept's former Vice President/Head of Commercial Operations and Chief Commercial Officer, departed the Company in September 2015 and Corcept brought in an entirely new marketing group led by defendant Maduck, who assumed the role of Senior Vice President of Commercial in April 2016, after acting as the Company's Vice President of Sales and marketing from 2012 to that point.

133.    Next, in order to support these non-endocrinologists throughout the prescription (and insurance approval) process, Corcept needed an additional ally in the form of a collaborating and cooperating specialty pharmacy: Optime, which was being created and incorporated by former Dohmen executives who had previously worked with Corcept. Optime purports to provide comprehensive,

---

[23] Family physicians are similar to internists except that they treat patients of all ages. A family physician is uniquely qualified to provide ongoing, comprehensive medical care to each member of the family. However, family physicians generally have no specialization in any specific ailment or organ system.

[24] An internal medicine doctor, commonly referred to as an internist, is equipped to handle a broad and comprehensive spectrum of illnesses that affect adults. Internists are not limited to one type of medical problem or organ system. An internist, by the very nature of their broad patient population, will be less familiar with treatment patterns for rare diseases, such as Cushing's.

customized, patient-centered, services to small specialized patient populations. Optime's first, and only, customer is Corcept.

134.    Donovan Quill, Michelle Hefley, and Lawrence Glasscott all previously worked for Dohmen. Quill, currently the president and CEO of Optime, previously worked for Dohmen as the Vice-President of Client Services from 2012 to 2015 and Senior Vice President Direct to Patient Programs in 2015. Quill left Dohmen in 2015 to open his own consulting agency before starting work at Optime in 2016. Michelle Hefley was a co-founder of Centric Health and president until 2014. Hefley co-founded Optime and has been a managing partner since 2015. Lawrence Glasscott was the CFO and Senior VP of Payer Reimbursement for Centric Health until 2015. Glasscott is currently the CFO of Optime.

135.    Quill, Hefley and Glasscott all had experience working with Corcept through their time working at Dohmen.

136.    In fact, Hefley was the individual who originally signed the agreement between Dohmen and Corcept on behalf of Dohmen.

137.    The services agreement entered into between the Company and Optime materially differed from Corcept's agreement with respect to the tasks that Optime was to perform for Corcept.

138.    Dohmen's service agreement, as mentioned above, was explicit in the tasks that Dohmen was to complete. This was not the case for Corcept's agreement with Optime.

139.    Instead, Optime and Corcept left their agreement vague, agreeing that the services to be provided would be defined as "Projects," which would each be defined in separate "Task Orders." Each Task Order would be agreed upon on a Project-by-Project Basis.

140.    There are no limitations on what a Project could entail outside of it being an "activity" related to a "pharmaceutical product owned or controlled by Corcept."

141.    In addition to being able to assign any activity as a Task Order, Corcept can also assign a representative to be involved in the implementation of the Task Order. A representative from Corcept and a "Project Director" from Optime are to coordinate on all Projects and "[share] responsibility over all matters relating to performance of such Project on behalf of Corcept."

142.    Corcept uses these task orders as a way to exert control over Optime, treating Optime as its ministerial arm while providing strict day-to-day oversight on any project it sees fit.

143.    For its part, Optime is entirely dependent on Corcept. Optime has no other clients other than Corcept. If Optime were to exercise its illusory right to reject a task order, it risked losing its only client. Thus, Corcept could "request" Optime to complete any "Project" that was feasibly connected to any product of Corcept's without fear that Optime would decline. This is in stark contrast to Corcept's relationship with Dohmen, which has hundreds of clients and was less susceptible to economic pressure from the Company.

144.    Corcept knew that, with Optime's backing as its specialty pharmacy, off-label uses of Korlym could still receive approval from insurance companies, as Optime would take the necessary steps to push for approval or risk facing the reprisals of Corcept (fear that did not exist for Dohmen and its vast portfolio of clients).

145.    As would only come to light following the end of the Class Period, the relationship between Optime and Corcept was so entangled that Optime employees would identify themselves to inbound callers as Corcept employees, while providing marketing-related information that went well beyond the role of a specialty pharmacy tasked with filling client prescriptions. The FDA did not expect this level of collaboration between Corcept and its specialty pharmacy when Korlym was approved in 2012.  In fact, the FDA expected that the use of a specialty pharmacy would limit off-label abuses of Korlym.

### 3.   Corcept Fabricates a Breach of Contract to Exit its Relationship with Dohmen and Partner Exclusively With Optime

146.    Before Corcept could execute on its plan to leverage its undisclosed Optime asset into additional Korlym insurance approvals, it needed to exit its relationship with Dohmen.

147.    On June 29, 2017, Corcept put its exit strategy in motion. Despite renewing its contractual relationship with Dohmen just one year prior, Corcept sent to Dohmen a letter summarizing what it claimed were purported material breaches of the service agreement. Corcept officially terminated the agreement on August 4, 2017, entering into a service agreement with Optime the same day.

148.    Specifically, Corcept claimed that Dohmen had made systematic errors since 2013, including supposedly losing "almost 250 Korlym tablets" in the second half of 2013.

149.     Further, Corcept claimed it was "forced to make a $75,000 negative adjust to its internal financial records" in the first quarter of 2014 as a result of "reporting errors by Dohmen."

150.     In total, Corcept claimed it had to make "$350,000 in negative adjustments to its internal financial records, and to write off the cost of more the 700 lost Korlym tablets." Notably, a review of Corcept's SEC filings provides no indication of these write downs or lost pills during Corcept's relationship with Dohmen.

151.     Corcept also alleged that Dohmen was "unsuited for the task and ineffective" – a particularly incredulous claim given that Dohmen supports several hundred biotech, pharmaceutical, and medical devices companies.

152.     Despite allegedly having these concerns since 2013, Corcept allowed its agreement with Dohmen to renew in 2016. In actuality, Corcept was buying more time for Optime to gain the required regulatory approvals and set up its business operations with the undisclosed assistance of Corcept.

153.     Importantly, Optime was founded and is largely operated by former employees of Dohmen, providing these individuals with an inside look at Corcept's inner workings, as well as access to Corcept's management team.

154.     This was not lost on Dohmen which, in response to Corcept's suit, counterclaimed that Corcept was falsely manufacturing the breach claim to get out of the service agreement with Dohmen.

155.     In its own amended complaint against the Company, Dohmen stated "that at some point prior to March 2017, Corcept began secretly negotiating with [Dohmen's] competitor, Optime Care ('Optime'), to enter a new provider agreement with Optime" – a startling development as, at the time, Optime lacked "the necessary protocols and systems in place to effectively serve Corcept."

156.     Dohmen further alleged that Corcept secretly helped Optime create its system by incorporating Dohmen's own protocols and proprietary systems, going as far as to copy Dohmen's work product to create its new controlled specialty pharmacy:

> 73. As just one example, on Wednesday, April 12, 2017, Amy Hanstein, Corcept's Cost Accounting Manager sent an email to Tina Pheasant, [Optime's] Vice President of IT Pharmacy Services, in which Hanstein requested modification to Optime's mock-up reports.

> 74. In this email, Hanstein revealed that she "tried to bring this up on our call approximately a month ago, but you said this would have to be a phase 2, because

you were only copying the existing reports."

75. The "existing reports" that Optime was "copying" were developed by [Dohmen].

157. According to Dohmen, the only problem for Corcept was its existing services agreement with Dohmen – a problem that could be addressed by Corcept's fabrication of "vague, inaccurate, and unsubstantiated assertions of a material breach against Dohmen."

158. Importantly, Corcept's claimed breach by Dohmen did not refer to any of the "Key Performance Indicators" ("KPI") set forth in the services agreement governing the parties' relationship. In fact, Dohmen had met all of the agreed upon KPIs.

159. Further, any claim of Dohmen's breach of the material terms of the service agreement was directly belied by Corcept's own past practices.  Despite having "conducted annual quality reviews of [Dohmen]," Corcept had "never previously reported any deficiency or observation of material concern."

160. In the notice of breach sent to Dohmen, Corcept claimed that "[Dohmen] had not obtained 'prior authorizations' from payers in a timely enough manner." In fact, Dohmen had actually been decreasing its turn-around time for prior-authorizations of Korlym "despite the increasingly complex requirements imposed by PBMs and relevant payers."

161. Additionally, it was "Corcept's [purported] view, [Dohmen] was not diligently pursuing medical appeals of insurance coverage denials of Korlym claims." However, Dohmen had been following "Corcept's own [standard operating procedures] in pursuing medical appeals" and there were no KPIs regarding medical appeals.

162. At a meeting on July 12, 2017 attended by the CEO of Dohmen's parent company and Defendants Robb and Maduck in San Francisco, California, "Corcept was unable to refute [Dohmen's] evidence of full compliance with the requirements of the Exclusive Provider agreement." Seeking to salvage the relationship, Dohmen pressed Corcept on how it would like Dohmen to "cure" the breaches, but "Corcept was unable to identify with any reasonable specificity how Corcept could possibly be satisfied," further evidencing the illusory nature of the claimed breach and the true motive behind Corcept's actions.

163.     Most importantly, during the "cure" period, Corcept made reference to another specialty pharmacy, but would not disclose the name. Dohmen interpreted this to mean "Corcept's decision to terminate the Exclusive Provider Agreement was predetermined."

164.     In actuality, Corcept exited its relationship with Dohmen not because of any material breach by the pharmacy, but because Optime was finally ready to take up the Company's cause and willingly assist in the off-label marketing scheme for Korlym.[25]

**F.     With the Necessary Pieces in Place, Corcept Dupes Non-Endocrinologists into Prescribing Korlym Off-Label to a Wider Range of Patients Not Approved by the FDA Label With Misinformation and Payments of Honoraria and Other Financial Benefits**

165.     Now armed with a new specialty pharmacy that was entirely dependent on its relationship with the Company (and which viewed itself as one in the same), Corcept entered the next phase of its plan to spur continued growth in Korlym prescriptions– an off-label marketing scheme that targeted non-endocrinologist physicians representing a marked pivot from the strategy previously espoused publicly by the Company to only target the 300 endocrinologists who treat 70% of Cushing's Syndrome patients in the United States.

166.     If Corcept was able to convert these non-endocrinologists into Korlym prescribers, the financial benefits would be astronomical, particularly given Korlym's price tag.

**1.     Corcept Drastically Increases Payments to Family and Internal Medicine Physicians to Induce Korlym Prescriptions and Gain Physician Allies in its Off-Label Marketing Push**

167.     When Korlym was first approved, Steven Lo, then Vice President of Commercial Operations for Corcept, touted the competitive advantage Corcept had based on the rarity of Cushing's Syndrome and the limited number of doctors who would actually use it, stating, "I don't have to hire an army of sales reps."[26] Instead, Corcept's initial marketing strategy was to target the 300 endocrinologists who treat 70% of US Cushing's cases.

---

[25] Dohmen and Corcept privately settled their claims in January 2018.

[26] https://www.mmm-online.com/home/channel/features/orphan-drugs-small-is-the-new-big/

168.    The Company's payments reported under the Physicians Payments Sunshine Act[27] support this marketing strategy. In 2013, Corcept only made payments to 298 physicians, 203 of which were endocrinologists.

169.    According to Open Payments data, since 2013,[28] Corcept has made more payments to endocrinologists than any other physician specialty, showing that the Company has rapidly expanded its focus well beyond the previously identified 300-endocrinologist group:

| Year | Endocrinologists paid | Total Physicians Paid | % Endocrinologists |
|------|----------------------|----------------------|--------------------|
| 2013 | 203 | 298 | 68% |
| 2014 | 637 | 1107 | 58% |
| 2015 | 891 | 1467 | 61% |
| 2016 | 894 | 1651 | 54% |
| 2017 | 989 | 2305 | 43% |
| 2018 | 1072 | 2438 | 44% |

170.    The number of payments to endocrinologists follows a similar pattern:

| Year | Payments to endocrinologists | Total Payments | % to Endocrinologists |
|------|------------------------------|----------------|-----------------------|
| 2013 | 426 | 547 | 78% |
| 2014 | 1144 | 1699 | 67% |
| 2015 | 2068 | 2944 | 70% |
| 2016 | 2770 | 4050 | 68% |
| 2017 | 3712 | 6215 | 60% |
| 2018 | 4204 | 6940 | 60% |

171.    The percentage of endocrinologists receiving payments and the percentage of payments received remained relatively stable in relation to the overall number of physicians and payments until 2017 when there was a noticeable dip as Corcept shifted its strategy to focus on non-endocrinologists. Notably, this inflection point coincided with Corcept's shift from Dohmen to Optime.

---

[27] The Physician Payments Sunshine Act was established to increase transparency of financial relationships between health care providers and pharmaceutical manufacturers. Information reported under the Sunshine Act is referred to herein as "Open Payments" data.

[28] https://openpaymentsdata.cms.gov/company/100000000247/general-payments

172.    As demonstrated in the chart below, since 2013 the number of payments to physicians classified as internists has ballooned from 29 in 2013 to 586 in 2018, representing an increase of 1,920.69%. Similarly, the number of payments to family medicine physicians has increased from just 14 in 2013 to 414 in 2018 representing, an increase of 2,857.14%. During the same timeframe, the total number of endocrinologists receiving payments increased just 428.08%, showing the marked shift in focus on these non-endocrinologists. By contrast, the total number of physicians receiving payments from Corcept only increased 646.67% from 2013 to 2018, evidencing the outlier nature of the internist and family medicine increases.

| Year | Internal Medicine Physicians Paid (% of total) | Family Medicine Physicians Paid (% of total) | Total Physicians Paid |
|------|------|------|------|
| 2013 | 29 (10%) | 14 (5%) | 298 |
| 2014 | 95 (8.6%) | 18 (1.6%) | 1107 |
| 2015 | 230 (15.7%) | 62 (4.2%) | 1467 |
| 2016 | 325 (19.7%) | 107 (6.5%) | 1651 |
| 2017 | 516 (22.4%) | 323 (14%) | 2305 |
| 2018 | 586 (24%) | 414 (17%) | 2438 |

173.    Similarly, the total number of payments to internists and family medicine physicians also grew at an exceptional rate compared to all other specialties. From 2013 to 2018, the total number of payments to internists increased 3,841.67%, and the total number of payments to family medicine physicians increased 6,160%. For comparison, in the same time frame, the total number of payments to endocrinologists increased only 1168.74%

174.    As the chart above shows, the largest jump in targeting both internists and family medicine physicians occurs in 2017. The year over year increase in 2017 was 59% for internists and 202% for family medicine physicians. Both figures far exceed the 40% increase in total physicians paid by Corcept in 2017.

175.    As reflected in the Company's Open Payments data, endocrinologists, internists, and family medicine doctors were the only medical specialties to ever exceed 100 physicians receiving payments from Corcept in a single year. In fact, no other specialty had more than 16 physicians receive payments in 2017 and 2018.

176.    As to be expected with the large increase in payments, the total dollars spent on internists and family medicine physicians also saw massive increases between 2013 and 2018:

| Year | $ spent on internists | $ spent on family medicine |
|------|----------------------|----------------------------|
| 2013 | $2,902.05 | $221.56 |
| 2014 | $22,249.79 | $340.24 |
| 2015 | $14,593.98 | $1,940.51 |
| 2016 | $17,344.99 | $4,216.37 |
| 2017 | $80,963.91 | $15,460.36 |
| 2018 | $89,104.38 | $19,302.72 |

177.    In 2017, Corcept increased its spending by 366.79% and 266.67% on internists and family medicine physicians, respectively. The total increase in spending by Corcept from 2016 to 2017 was only 103.57%.

178.    Corcept's reasoning for targeting internists and family medicine physicians with their Korlym marketing is clear – the Company perceived these doctors as being unlikely to have the same in-depth understanding of endogenous Cushing's Syndrome as endocrinologists – a group of specialists who have declined to embrace Korlym. Since these doctors are presumed to be less familiar with Cushing's, they would also be less familiar with the other medical treatment options available such as ketoconazole, metyrapone, mitotane, or etomidate and thus, would be more susceptible to prescribing Korlym as a first-line treatment.

### 2.    Confidential Witnesses Confirm Corcept Aggressively Marketed Korlym As a First-Line Therapy for Off-Label Use

179.    Confidential witnesses have confirmed that prior to and throughout the Class Period (and continuing to the present), Corcept representatives aggressively marketed Korlym for off-label use, not just for those with possible endogenous Cushing's Syndrome (but without a confirmed diagnosis), but also for patients with a general Cushingoid appearance,[29] Subclinical Cushing's Syndrome,[30] purported

---

[29] Cushingoid appearance is when a patient has the constellation of symptoms and signs caused by an excess of cortisol hormone, but without a confirmed Cushing's Syndrome diagnosis. These symptoms include striations, adiposity, hypertension, diabetes, and osteoporosis.

[30] Subclinical Cushing's Syndrome is when patients with adrenal tumors present with bio-chemical evidence of mild autonomous cortisol production without development of overt cushingoid features. Subclinical Cushing's is associated with a high prevalence of hypertension, obesity, diabetes mellitus, dyslipidemia and osteoporosis.

"Pre-Cushing's," poorly controlled diabetes,[31] and to "pre-treat" patients with adrenal masses prior to surgery. Corcept's off-label marketing was pervasive and, upon information and belief, extended across the country in each of the Company's six sales regions—Northeast, Southeast, South, Central, West, Pacific Northwest.[32]

180.    Rather than educating physicians on the appropriate method for diagnosing and treating a Cushing's Syndrome patient (as established by specialists and set forth in the Diagnosis and Treatment Guideline), Corcept's sales staff is marketing Korlym as a first-line treatment option for each of these non-approved ailments. According to physicians surveyed by Plaintiff's counsel, Corcept representatives visit the physician's office, often without an appointment, recommend using the DST on patients with uncontrolled diabetes with poor glucose control, obesity, or a Cushingoid appearance, and if the results are even borderline abnormal or fall within the DST's "gray area," the representative instructs the physician to immediately begin treatment with Korlym, with no further testing to confirm the endogenous Cushing's Syndrome diagnosis or evaluation of whether the patient is eligible for surgery, as required by the FDA-approved label before Korlym may be prescribed.

181.    For example, CW 1 was visited by Corcept sales representative No. 1 ("Rep No. 1")[33] frequently between early 2017 and early 2019. CW 1 said Rep No. 1 initially came to CW 1's office and held lunches every couple of weeks and then at least once per month. CW 1 described Rep No. 1 as "aggressive" in the way he frequently came to CW 1's office and wanted the practicing physicians to dig up potential patients who fit the profile described above.  CW 1 believed that this was a very heavy presence for a drug that treats such a rare condition such as Cushing's Syndrome. CW 1 said Rep No. 1 told CW 1 to use the single 1-mg overnight Dexamethasone suppression test ("DST") on patients and if

---

[31] Diabetes is a disease in which the blood glucose, or blood sugar, levels are too high.

[32] Plaintiffs' counsel have conferred with physician CWs from four of the Company's six sales regions, each of whom have recounted uniform off-label marketing practices by the Company.

[33] According to his publicly available LinkedIn profile, Rep No. 1 has been the recipient of several Company awards and accolades since joining Corcept as a Clinical Specialist in 2015, including: 2016: Clinical Specialist of the Year; President's Club; Rookie of the Year; Peer Impact Award; 2017: Clinical Specialist of the Year; President's Club; Promoted to Senior Clinical Specialist; 2018: Clinical Specialist of the Year; President's Club; Peer Impact Award; Promoted to Executive Clinical Specialist.

the result was even close to positive, to start the patient on Korlym immediately. CW 1 stated that the DST generated many false positives due to confounding patient variables such as obesity, depression and uncontrolled diabetes.

182.    CW 1 attended a dinner talk in January 2018 given by a local internal medicine physician who has been practicing for over twenty years who received nearly $80,000 in honoraria payments from the Company in 2017 and 2018. At the dinner, that physician gave multiple personal accounts of treating patients with diabetes and insulin resistance with Korlym. He claimed that he was using Korlym as a means to reduce high doses of insulin required for treatment of patients' diabetes and, by reducing the dose of insulin, Korlym helped patients lose weight.  Because of this potential for weight loss, the lecturing physician believed that prescribing Korlym -- even with equivocal DST results -- justified the risk for potential complications that the drug might cause. CW 1 said the physician's understanding of the DST test was incomplete because he was using the wrong A.M. cortisol to support his diagnosis of Cushing's. CW 1 stated that at the dinner, very little information was actually provided about Cushing's Syndrome.

183.    CW 2, a family medicine physician from Oklahoma practicing for over 13 years, similarly recalled a Corcept sales representative ("Rep No. 2"), the Corcept representative for Oklahoma, coming to CW 2's office beginning in 2018. CW 2 stated Rep No. 2 advised CW 2 to review CW 2's patient charts for individuals with poorly controlled diabetes who were obese and had hypertension and to perform a DST on those patients. According to CW 2, Rep No. 2 instructed this witness that, if the DST was positive, then CW 2 should immediately start the patients on Korlym. In fact, Rep No. 2 recommended putting patients on Korlym even if the test was normal or inconclusive because different laboratories use different levels and even a patient who tests below the threshold could still benefit from using Korlym.

184.    In perhaps the most egregious example, Rep No. 2 instructed CW 2 to "close [CW 2's] eyes" and not just look for physical symptoms of Cushing's Syndrome because "anyone could have it." CW 2 said Rep No. 2 frequently sought the opportunity to do chart reviews to find more potential candidates for Korlym.

185.   CW 2 described Rep No. 2 as "aggressive" in the way he frequently came to CW 2's office. CW 2 stated that once Rep No. 2 knew CW 2 had ordered a DST for a patient, Rep No. 2 would follow up daily to get updates on the result, drawing the ire of CW 2's staff.

186.   CW 2 recalls prescribing Korlym to two patients. CW 2 described the process of putting the patients on Korlym as if Rep No. 2 "was trying to replace the doctor," as he would instruct the staff on how to get the drug approved and even assisted them with completing the forms that were then submitted to Optime for approval by the insurance companies. For instance, Rep No. 2 said that in order to get Korlym approved, "you had to check the box on the insurance form saying the patient is not a candidate for surgery."

187.   CW 2 heard a similar improper marketing pitch while attending a dinner on Korlym, hosted by Dr. Matthew Draelos (who has received $51,192.42 from Corcept since 2017), in late 2018. At the dinner, Corcept representatives discussed, among other things, that physicians should perform the DST and, if it yielded even close to a positive result, to prescribe Korlym.

188.   PE recalls attending a "Grand Rounds" lecture on Cushing's at a local hospital in early 2017 where Dr. Andreas Moraitis[34] discussed using Korlym in patients with adrenal masses *prior* to surgery. After the lecture, PE was approached by a Corcept sales representative who, unsolicited, provided PE with materials on Korlym that included the aforementioned study. This represented a clear instance of off-label marketing, as not only was this representative advocating for the prescribing Korlym *before* surgery but was also marketing the drug's use for those individuals even if diabetes or glucose intolerance were not present, in contradiction of the FDA-approved label. Moreover, a sales representative including an off-label study in promotional materials violates FDA regulations.

189.   CW 3, an endocrinologist practicing in Nebraska for over 15 years, has had a similar experience with Corcept's sales staff marketing Korlym for off-label use. CW 3 stated that the Corcept regional sales representative has visited CW 3's office approximately two times per year since mid-2017 to the present. During the representative's office visits in 2017 and 2018, the sales representative recommended to CW 3 that CW 3 should test all of CW5's type 2 diabetes patients with a DST. CW 3

---

[34] Dr. Moraitis is the Senior Medical Director at Corcept.

described this suggestion as "crazy" because of the high likelihood of obtaining a false positive with the DST. Given how rare Cushing's Syndrome is, CW 3 stated, it is more likely the patient does not have Cushing's Syndrome. Thus, because of the extensive testing a patient is put through to perform a proper Cushing's diagnosis and the high likelihood of false positives, CW 3 was not receptive to testing all patients with Type 2 diabetes with the DST, as the Corcept representative suggested.

190.    After CW 3 was not receptive to the original recommendation, in late 2018 or early 2019, the same sales representative returned to CW 3's office and switched tactics by recommending the witness use Korlym "proactively" to "pre-treat" patients with adrenal masses, prior to surgery.

191.    CW 3 recalled a recent instance of off-label marketing and use of Korlym where a patient with an adrenal tumor who failed the DST was put on Korlym prior to surgery or any Cushing's diagnosis. This patient was subsequently hospitalized due to adrenal insufficiency and taken off Korlym.

192.     This second off-label use recommended by the sales rep was the same message PE heard from Dr. Moraitis during a "Grand Rounds" lecture in 2017 and at a presentation at the Endocrine Society annual meeting, discussed below.

193.    The Company's sales team's consistent recommendation that non-endocrinologist physicians rely solely on the DST to support a Korlym prescription as a first line therapy for treatment of Cushing's Syndrome is additionally troublesome.

194.    As set forth above, the DST is unreliable as a standalone test for diagnosing Cushing's Syndrome because it is highly susceptible to generating false positives and negatives. As Dr. Lynn Loriaux noted in his article titled "Diagnosis and Differential Diagnosis of Cushing's Syndrome," N Engl J Med 2017; 376:1451-1459, the DST is particularly unhelpful in diagnosing endogenous Cushing's in an obese patient population, with **a positive predictive value of just 0.4%** - meaning that, for those obese patients whom Corcept's marketing team was explicitly pushing non-endocrinologists to test, among those that screened as abnormal with the DST, just 0.4% would actually be diagnosed with endogenous Cushing's following an appropriate workup (or just 4 out of every 1000, meaning the other 996 would be improperly receiving Korlym).

195.    Indeed, according to PE and the Diagnostic Guidelines, Corcept's advocated method for diagnosing Cushing's Syndrome with just one DST test is not a proper method for testing for

endogenous Cushing's Syndrome. For example, PE uses one of the common Cushing's Syndrome tests, as stated in ¶ 86 above, to initially determine if the patient is likely to have Cushing's. If the test comes back positive, PE would then conduct a second screening to confirm the diagnosis. PE performs a second screening to confirm the diagnosis because there are many variables involved in cortisol levels that can produce a false positive diagnosis of Cushing's Syndrome. Third, PE would then use medical imaging to locate the tumor causing the increased cortisol.

196.    PE, and the Treatment Guidelines, also believe medical treatment should not be the first option for treating Cushing's Syndrome. PE stated, in accordance with the FDA-approved label, "the first, second, and third step [for treating Cushing's] *is surgery*."

197.    The Company has not shied away from its support of off-label uses of Korlym.  For example, in 2017 at the Endocrine Society annual meeting, Corcept co-sponsored a presentation on the use of Korlym in treating an individual with "Subclinical" Cushing Syndrome. There, the patient's response to a low dose of mifepristone, Korlym's active ingredient, was supposedly "well tolerated and elicited metabolic benefits." The presentation concluded that "[m]edically modulating the underlying cortisol excess may be an option for patients [with Subclinical Cushing's Syndrome] in whom surgical benefit is uncertain, particularly those who potentially have bilateral adrenal disease" – a medical suggestion that represents a boon to the Company as it opens the door to a new set of potential patients to bolster its total addressable market.

198.    Corcept was promoting Korlym specifically for this off-label use throughout the Class Period.

### 3.    Defendants' Off-Label Marketing Scheme Materially Contributed to its Sales and Bottom Line

199.    A closer analysis of publicly available Medicare Part D prescription data, as well as the Company's Open Payments information, illustrates the material impact the Company's newfound marketing strategies have had on its bottom line.

200.    For example, Jerry Back, an Internal Medicine doctor from North Charleston, South Carolina, had 115 Medicare Part D Korlym claims originate from his office in 2017 (accounting for nearly 5% of all Korlym claims submitted for Medicare reimbursement that year), the highest of any

physician submitting Korlym claims to Medicare Part D in 2017. The sheer magnitude of Dr. Back's Korlym prescriptions, alone, call for scrutiny for several reasons.

201.    Not only was Dr. Back the only physician with over 100 claims submitted to Medicare for Korlym in 2017 but, critically, Dr. Back is an Internal Medicine doctor, *not* an endocrinologist. Most Internists and Family Medicine physicians refer Cushing's Syndrome patients to an endocrinologist, especially for the testing necessary to *confirm* a Cushing's Syndrome diagnosis, as set forth in the Diagnosis Guideline.

202.    Dr. Back presents himself as treating diabetic patients. As noted above, one of the pre-requisites for the FDA-approved use of Korlym is that the patient has type two diabetes or glucose intolerance in addition to endogenous Cushing's Syndrome. Thus, it is reasonable to infer that Dr. Back, at the direction of Corcept representatives, is likely performing the DST on his patients with uncontrolled diabetes and prescribing Korlym if the DST is even borderline positive without any attempt to actually confirm an endogenous Cushing's Syndrome diagnosis and without any attempt to locate and resect any responsible tumor. This first-line reliance on Korlym constitutes an off-label use, as the drug is specifically approved only after a confirmed diagnosis and a failed surgery or confirmation that surgery is not an option.

203.    Further, despite his physician profile claiming that "he is a provider of excellence in diabetes with more than 20 years of experience,"[35] Dr. Back submitted *zero* Korlym claims to Medicare Part D for the years of 2014 and 2015, before increasing that number to 19 in 2016 (with a total drug cost of $433,784.70) and then seeing that figure explode to 115 in 2017 (worth a total drug cost of $3,562,308.06 – *nearly 2.5% of Corcept's total net product revenues for that year*).[36]

204.    Medicare Part D does not disclose the number of beneficiaries a specific physician has prescribed a drug to unless the figure is at least 11. From 2013 to 2016, there were no physicians who prescribed Korlym to at least 11 individuals in one year. However, as demonstrated in the chart below,

---

[35] https://advancedcentersforim.com/physicians/profile/Dr-Jerry-G-Back-MD#

[36] Medicare Part D data for 2018 will not be available until Spring 2020.

in 2017 there were four such physicians, including Dr. Back, and **only one** of whom was an endocrinologist:

| Physician | # of Beneficiaries | Specialty |
|---|---|---|
| Jerry Back | 23 | Internal Medicine |
| Norman Crabb | 19 | Family Medicine |
| Joseph Mathews | 13 | Endocrinology |
| Roberto Pabalate | 13 | Family Medicine |

205.   These numbers stand in stark contrast to Defendant Belanoff's assertion in a November 7, 2019 earnings call that "this is a disease where you're adding to your enrollment total by 1s and 2s everywhere you go."

206.   Perhaps unsurprisingly, Dr. Back was also one of the largest recipients of monetary benefits from Corcept's increased focus on internists and family medicine physicians. Dr. Back received only $154.38 in 2016 from Corcept in the form of food and beverage payments. However, in 2017, a year in which Dr. Back produced 115 Korlym claims according to Medicare Part D data, he received $55,454.60 from Corcept, with an additional $31,099.16 flowing to the doctor in 2018 from Corcept. This included $47,000 and $20,000 in honoraria payments in 2017 and 2018, respectively.

207.   Honoraria payments are similar to consulting fees but are generally reserved for a one-time short duration activity. Honoraria also differs from consulting fees in that the payments are generally provided for services which custom prohibits a price from being set.

208.   Dr. Back appears to be no stranger to bending the ethical rules regarding receipt of payments from medical industry participants in exchange for using a company's product.  According to a May 29, 2019 announcement by the Department of Justice, Dr. Back agreed to pay $92,506.30 as settlement for claims that he allegedly accepted illegal kickback payments from OK Compounding, L.L.C. in exchange for prescribing pain management creams compounded by that entity.

209.   Dr. Back was not the only beneficiary of Corcept's new marketing strategy in 2017, particularly its focus on the use of honoraria payments

210.   Another major beneficiary was Dr. Joseph Mathews of Summerville, South Carolina, an endocrinologist, who received $73,777 from Corcept in 2017, including $48,000 in honoraria payments. Dr. Mathews had never received an honoraria payment from Corcept prior to 2017. According to

Medicare Part D data, Dr. Mathews was the prescribing physician for 85 claims for Korlym, the second highest among Medicare Part D prescribers in 2017, second only to Dr. Back.

211.   CW 1 was aware that starting in 2017 there was a significant uptick in Korlym prescriptions from local physicians in CW 1's area. CW 1 could not believe that there could be so many patients with true endogenous Cushing's syndrome in such a small region, particularly given how rare the disease is. CW 1 reached out to one of the doctors who Rep No. 1 said was treating around 30-40 patients with Korlym in 2018 to discuss CW 1's concerns about his practice of prescribing Korlym after learning about several of his patients having adverse outcomes after Korlym and most of which did not have confirmed diagnoses of Cushing's Syndrome. In that lengthy conversation, the other physician brushed off the concern.

212.   In total, Corcept increased its honoraria spending to $366,750 in 2017, a 322% increase from 2016. In fact, Corcept's honoraria spending alone in 2017 nearly exceeded all payments not associated with a research study to physicians in 2016 combined. Honoraria payments consisted of just 22.8% of Corcept's non-research study payments to physicians in 2016. That number jumped to 47.4% in 2017.

213.   Upon information and belief, these honoraria payments were largely comprised of payments made to high-prescribing physicians to host informal marketing sessions or roundtable discussions (usually over dinner) at which the paid physician plays the role of Company spokesperson.

214.   PE sought to speak about Cushing's Disease on behalf of Corcept in 2012 or 2013 through their speakers' bureau but was told by Corcept that he could not speak because PE had not issued enough prescriptions of Korlym.

215.   Given the rarity of endogenous Cushing's Syndrome, large clusters of affected individuals should be inherently few and far between. Additionally, one would expect that if there was a large cluster of the rare disease, it would be centered around a highly dense population. However, the Medicare D prescriber data for 2017 does not support this expectation. Between Dr. Back and Dr. Mathews, there were 200 claims spread between 36 patients for Korlym in 2017 in the area of South Carolina where Dr. Back and Dr. Mathews practice just 20 minutes apart from one another. PE, an endocrinologist specialist who screens for endogenous Cushing's between 300 and 400 times a year but

only diagnoses between 2 and 3 individuals with Cushing's, described the number of patients Drs. Back and Matthews claim qualify for treatment with Korlym as "astronomical."

216.    Compounding the abnormality of Dr. Back and Dr. Mathews' increased prescription rate was the overall rapid increase in the number of doctors prescribing Korlym to address diabetes in patients without a confirmed endogenous Cushing's Syndrome diagnosis. The issue has become so prevalent that it caught the attention of two endocrinologists, Dr. Eveline Waring and Dr. Beatrice Hull, who published a chapter titled "Inappropriate Use of Mifepristone to Treat Diabetes Mellitus" in Dr. McDermott's 2019 book, *Management of Patients with Pseudo-Endocrine Disorders*.

217.    In their chapter, Drs. Waring and Hull presented a case study regarding "a particularly difficult patient, with multiple comorbidities and a striking appearance consistent with Cushing's syndrome" who had been prescribed Korlym by her prior physician. Ultimately, the doctors determined that, for this patient, "the indication for mifepristone use was arrived at in reverse: the patient presented with difficult-to-control metabolic syndrome (obesity, hypertension, diabetes, depression), and then the search for hypercortisolemia was undertaken, culminating in the patient being placed on mifepristone."

218.    Assessing that a patient has diabetes and then working in reverse in an attempt to validate a Korlym prescription would be a clear off-label use, particularly as Korlym's FDA-approved label is unequivocal, including in its "Important Limitations of Use" just one provision: "Do not use for the treatment of type 2 diabetes mellitus unrelated to endogenous Cushing's syndrome."

219.    Drs. Waring and Hull also summarized the issues with the initial screening tests generally used for Cushing's, explaining why each of them, particularly used in isolation, potentially produces unreliable results:

> The majority of studies evaluating the diagnostic approach to autonomous cortisol secretion have been done in patients with adrenal incidentalomas. The overnight 1 mg dexamethasone suppression test (1 mg DST), 24h urinary free cortisol (UFC), midnight salivary cortisol (MSC), and ACTH measurement have all been studied as diagnostic tests for this condition with very variable results in sensitivity and specificity. **Subsequently, the definition of autonomous cortisol secretion varies, and there is no one reliable test to diagnose this condition, leading physicians to utilize multiple available tests to try to make an accurate diagnosis, but it also creates the situation where the interpretation of tests results can to be interpreted "loosely" depending on physician personal bias and experience.**

220.    Drs. Waring and Hull practice with the Carolina Endocrine Associates in North Charleston, South Carolina – the same town as Dr. Back and just minutes from Dr. Mathews – the two doctors responsible for 200 of the total 2,333 claims submitted for Medicare Part D reimbursement in 2017 who received hundreds of thousands of dollars in remuneration from Corcept over the past few years.

221.    The overall rapid increase in prescriptions of Korlym that drove the Company's revenues over the past several years unfortunately coincided with an increase in patient deaths while on Korlym. Korlym sales exploded in August of 2017 when Corcept switched from Dohmen to Optime. According to the FDA's Adverse Events Reporting System ("FAERS"), there were 17 reported deaths of patients on Korlym in 2017. In 2018, there were 40 deaths reported to FAERS. So far in 2019, a year with less rapid increase in prescriptions of Korlym, there have been only 7 deaths reported to FAERS. There have been 103 deaths reported since 2012. In 17 of the deaths reported, Korlym was "used for [an] unknown indication." Corcept has denied that any of these deaths could be directly attributed to Korlym or its dosage.

222.    In sum, Defendants were specifically targeting non-endocrinologists who were unfamiliar with Cushing's Syndrome in an effort to get them to prescribe Korlym for off-label uses. Additionally, to help with the "exacting and intense" insurance approval process, Corcept created Optime to expedite insurance authorizations for the drug. This led to a dramatic increase in sales in the first year of the agreement between Corcept and Optime.

223.    Corcept did not disclose to investors that sales of Korlym were dependent on unregulated, illicit off-label marketing.

**G.    Suspecting Off-Label Marketing and Prescriptions of Korlym, Insurance Providers Tighten Approval Standards to Require Physical Evidence of Cushing's Syndrome and Diagnosis By an Endocrinologist, Causing Corcept Revenue Growth to Plummet**

224.    Becoming wise to the apparent off-label use of Korlym as evidenced by the skyrocketing prescription rate, in July 2018, insurance provider Blue Cross/Blue Shield of South Carolina (the very state of Drs. Back and Mathews) tightened its requirements for approving Korlym.

225.    In its bulletin announcing the new review process for Korlym, Blue Cross/Blue Shield of South Carolina stated that review of Korlym prescriptions was "previously conducted by CVS Caremark, [its] Pharmacy Benefit Manager (PBM) partner."[37]

226.    According to CVS Caremark's "Specialty Guideline Management" for Korlym,[38] a twelve month authorization for a Korlym prescription may be granted for members who meet the following criteria: (a) member has a diagnosis of Cushing's syndrome/disease; (b) member has type 2 diabetes mellitus or glucose intolerance; (c) Korlym is being prescribed to control hyperglycemia secondary to hypercortisolism; (d) Member has had surgery that was not curative OR member is not a candidate for surgery. *Importantly*, CVS Caremark's Korlym guidelines **did not** require any documentation proving a patient's satisfaction of the established criteria.

227.    Presumably in response to rising Korlym claims, Blue Cross/Blue Shield of South Carolina changed its prior policy to now require documentation to support a Korlym prescription, including: (1) A1C lab results showing a clinical response to therapy for those seeking a coverage continuation; (2) documentation of surgical history and response; and (3) if the patient is not a surgical candidate, documentation of previous medication therapy failures, including doses and dates of all drugs tried to date, and laboratory tests (including dates obtained) of serum and urinary cortisol levels to assess efficacy of the previous regimens.

228.    Blue Cross/Blue Shield of South Carolina is hardly the only insurance company to further scrutinize the rising number of Korlym prescriptions, with Independence Blue Cross modifying its Korlym policy effective January 1, 2019 to require documentary evidence of *all* of the following criteria: (1) Hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance; and (2) that the patient has failed surgery or is not a candidate for surgery; and (3) that Korlym is being prescribed by or in consultation with an endocrinologist.

---

[37]https://www.bluechoicesc.com/providers/news/2018/pharmacy-new-review-process-prescription-drugs-korlym-and-xyrem

[38] https://www.caremark.com/portal/asset/Korlym_Policy.pdf

FIRST AMENDED COMPLAINT                                    **Case No. 19-CV-01372-LHK**

229.    Highmark Blue Cross/Blue Shield ("Highmark") is based in Pittsburgh, Pennsylvania and insures patients in Pennsylvania, West Virginia, and Delaware. On May 4, 2018 Highmark revised its policy[39] to require trial and failure of one diabetes medication before a patient receives Korlym.

230.    These changes in the Korlym prescription approval process coincided with a drastic decline in Corcept's quarter over quarter revenue growth. After posting quarter over quarter revenue growth of at least 75% in each of the first four quarters with Optime as its specialty pharmacy, Corcept's third quarter revenue growth in Q3 2018 was just 50.7%. The revenue growth continued to fall into 2019 to a low of 12.4% in Q1 2019 as the insurance companies became wise to Corcept and Optime's scheme and it became more difficult for Optime to secure insurance approval for Korlym.

| Quarter | Revenue (in thousands) | Quarter over Quarter % Increase |
|---|---|---|
| Q3 2017 | $42,763 | 96.8% |
| Q4 2017 | $53,280 | 123.8% |
| Q1 2018 | $57,659 | 108.9% |
| Q2 2018 | $62,312 | 75.2% |
| Q3 2018 | $64,445 | 50.7% |
| Q4 2018 | $66,831 | 25.5% |
| Q1 2019 | $64,829 | 12.4% |

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

231.    As set forth in the chart attached hereto as Exhibit A and incorporated by reference into this paragraph, throughout the Class Period, Defendants made materially false and misleading statements about the Company and Korlym which materially altered the total mix of information in the market.

232.    These statements were made by the Individual Defendants in, among other sources, Company press releases, SEC filings, presentations and during earnings conference calls and concerned, *inter alia*: (i) the target physician demographic of the Company's marketing efforts; (ii) the aim of the Company's physician education programs and the resulting awareness they purportedly raised; (iii) the indication targeted in the Company's marketing, namely, that the Company's efforts were in line with

---

[39] https://content.highmarkprc.com/Files/Region/PA-WV/SpecialBulletins/sb-pa-wv-3rd-qtr-formulary-update-070318.pdf

the FDA-approved label for Korlym; (iv) the Company's compliance with FDA-regulations regarding "off-label" marketing; (v) the basis for the Company's revenue growth, as connected to broader prescription trends in its Korlym franchise, Corcept's *only* commercial product and profit source; (vi) the Company's controls over the processes and activities of its specialty pharmacy, Optime; (vii) the landscape with respect to insurance reimbursements for Korlym; and (viii) the percentage of Korlym patients who meet with FDA-approved indication and can be considered "on-label."

## VI.   THE TRUTH IS REVEALED IN TWO PARTIAL DISCLOSURES

233.   On January 25, 2019, SIRF released the SIRF Report alleging that Corcept has been reimbursing doctors through honoraria payments in exchange for them agreeing to prescribe Korlym for off-label uses in an effort to boost sales.  For example, the SIRF Report highlighted the relationship between Corcept and Dr. Hanford Yau, an endocrinologist at the Orlando Veterans Administration Medical Center. In 2016, Dr. Yau received $13,524.27 from Corcept, none of which was defined as honoraria. Dr. Yau had received $12,300 from Corcept as a consulting fee and the rest was reimbursement for travel and food expenses. In 2017, Dr. Yau received $95,139.66, of which $77,000 was defined as honoraria. This represented a 603% increase in total compensation from Corcept to Dr. Yau from 2016 to 2017.

234.   The SIRF Report also questioned whether there was a connection between Dr. Yau receiving more money from Corcept and The Orlando Veteran's Administration Medical Center, where Dr. Yau worked, prescribing Korlym. The Orlando Veterans Administration Medical Center became a large client of Corcept in 2017. The VA clinic wrote 50 prescriptions to new patients alone in 2017. According to the SIRF Report, these 50 patients accounted for up to 9.1% of Corcept's 2017 revenue.

235.   The SIRF Report found these numbers to be surprising because endogenous Cushing's Syndrome is five times more likely to affect women than men. However, the Orlando VA Medical Center has a patient base that is historically 91 percent male. The SIRF Report hypothesized that the only way to reach these numbers required the clinic, and specifically Dr. Yau, to prescribe Korlym off-label.

236.   The SIRF Report also brought to light the increasing number of patient deaths signaling off-label marketing and use.  As reported in the FDA's FAERS, the number had dramatically increased

1  in recent years and that 17 of the 103 deaths reported in the FAERS mentioned Korlym being "***used for***

2  ***[an] unknown indication***," i.e. likely off-label.

3      237.   The SIRF Report also questioned the geographic clustering of supposed endogenous

4  Cushing's diagnoses, as the analyzed data skewed not towards areas with heavier populations with

5  pituitary disorder clinics affiliated with  prominent university hospitals, but instead towards smaller

6  communities, lending credence to the report's allegations that these doctors in smaller communities with

7  limited patient populations could be prescribing the drug to individuals solely with diabetes and not an

8  established endogenous Cushing's Syndrome diagnosis.

9      238.   Following the release of the SIRF Report, the Company's share price fell $1.52, or more

10  than 11%, to close at $12.29 per share on January 25, 2019, on unusually heavy trading volume.

11      239.   After the market closed on January 31, 2019, the Company issued a press release

12  announcing its fourth quarter and full-year 2018 preliminary selected financial results.  Therein, and

13  likely due to the increased scrutiny of its illicit sales practices, the Company forecasted a slowdown in

14  sales of Korlym, projecting full-year 2019 revenue of $285 million to $315 million, well below the $328

15  million expected by analysts.

16      240.   On this news, the Company's share price fell $1.15, or more than 10%, to close at $10.08

17  per share on February 1, 2019, on unusually heavy trading volume.

18  **VII.   POST-CLASS PERIOD EVENTS**

19      241.   In the wake of the Class Period and the partial disclosures exposing the truth about

20  Corcept's off-label marketing, the Company has struggled to recapture the growth levels it enjoyed at

21  the outset of its relationship with Optime.

22      242.   On February 5, 2019, shortly after the market opened, Blue Orca published a report

23  adopting the SIRF Report's allegations and alleging that Optime, Corcept's "sole specialty pharmacy

24  and exclusive distributor[,] is actually an undisclosed related party" and that the relationship "creates a

25  material risk that [Corcept] is using its captured pharmacy to boost sales, hide losses, or engage in other

26  financial shenanigans." The Blue Orca Report detailed the extreme revenue increases posted by Corcept

27  after it switched specialty pharmacies and the potential regulatory risks of using a captured pharmacy.

28

The report requested that, at a minimum, Corcept restate its financials to consolidate its specialty pharmacy.

243.    In conjunction with the release of its report, Blue Orca posted a video on YouTube of a call between a Blue Orca employee and Optime.[40]   On that call, multiple Optime representatives identified themselves as employees of Corcept. An edited version of the transcript is as follows:

> Optime Representative: Optime Care, this is XXXX.
>
> Blue Orca: Hi, I'm looking for Corcept Therapeutics please.
>
> Optime Representative: Yes, you have reached it, is there anyone in particular you need to speak with.
>
> Blue Orca: I'm a physician in the Austin area, an endocrinologist, and I was wondering if there is a Corcept sales rep that covered the area?
>
> [….]
>
> Optime Representative: Sir, I'm going to transfer you over to XXXX and XXXX is one of our care coordinators and he can find a sales rep in your area for you.
>
> …(call transferred internally)
>
> Optime Representative #2: Thank you for holding, this is XXX, how can I help you?
>
> Blue Orca: Hi, is this Corcept?
>
> Optime Representative #2: It Is.

244.    Importantly, the call shows Optime working as a sales arm of Corcept. Both representatives of Optime identified themselves as working for Corcept. The second Optime representative then put the Blue Orca representative in touch with the regional sales manager of Corcept to help set up a meeting on Korlym. The regional sales manager provided contact information for a sales representative in the area.

245.    In response to the SIRF Report, Corcept released a Form 8-K on February 5, 2019. The Form 8-K was supposedly intended to "help investors ground their analysis in the facts." Therein, Corcept falsely stated that "literally, ninety-nine percent of the Korlym we sell goes to patients whose

---

[40] https://www.youtube.com/watch?v=C0ktvZiZiYc

diagnosis matches Korlym's FDA-approved label." Additionally, Defendants refuted the claim that there are not enough patients available to support Corcept's growth stating, in contradiction to their years of prior statements to the FDA and the public, that there are "probably several times more than 10,000 patients [in the United States with Cushing's Syndrome] than are required to account for our revenue."

246. On May 9, 2019, Corcept announced its lowest quarter over quarter growth since Korlym was approved by the FDA, coming in at just 12.4%. This was the third consecutive quarter posting the lowest quarter over quarter revenue growth since Korlym was approved by the FDA, likely due to being unable to induce as many unsuspecting physicians to prescribe Korlym and the tightening of insurance company approval procedures.

247. On this news, the Company's share price fell $0.49, or more than 4%, to close at $10.83 per share on May 10, 2019.

248. While Corcept's quarter over quarter growth has rebounded slightly in the second and third quarter of 2019, to 16% and 26.5% respectively, these quarters are still the second and fourth lowest quarter over quarter growth numbers since Korlym was approved by the FDA. In the three quarters since the SIRF report was published, Corcept has posted three of its four lowest quarter over quarter revenue growths since Korlym was approved.

249. Corcept is also locked in legal battles with both Teva and Sun Ltd. regarding potential generic versions of Korlym. On May 7, 2019, Teva filed for a post-grant review of Corcept's recently issued '214 use patent[41] before the US Patent and Trademark Office ("USPTO"). On November 20, 2019, the USPTO announced it will hear arguments from Teva regarding Corcept's '214 patent.

250. On this news, Corcept's share price fell $3.68, or more than 22%, to close at $13.22 per share on November 20, 2019 on unusually heavy trading volume.

251. This massive drop in stock price when the USPTO granted **review** of one of Corcept's patents indicates the Defendants' fear of a potential generic entering the market was well-founded. In

---

[41] The Company's '214 patent, filed by the Company with the USPTO on June 19, 2017, is directed to methods of reducing the dose of mifepristone for patients also taking a CYP3A inhibitor, such as ketoconazole.

anticipation of new market players entering the endogenous Cushing's Syndrome arena, Defendants perpetuated the scheme detailed above to increase the stock price to lessen the impact.

252.    On November 8, 2019, Corcept filed a lawsuit in the Superior Court of the State of California, County of San Mateo, captioned as *Corcept Therapeutics, Inc. v. Doe*, 19-civ-06658, against a John Doe for defamation and trade libel. The Company alleges that, on August 19, 2019, John Doe posted on Cafepharma.com, an online message board for pharmaceutical professionals, asserting that Corcept "sells off label big time" and "patient deaths have escalated."

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

253.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

254.    The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Corcept and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings.  As a result, each could falsify the information that reached the public about the Company's business and performance.

255.    Throughout the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's off-label marketing scheme.  Such actions allowed Corcept to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Corcept as the Individual Defendants were among Corcept's most senior management and were acting within the scope of their employment.

A. **The Individual Defendants' Knowledge and/or Recklessness**

      1. **CWs Confirm Corcept Engaged in a Pervasive Companywide Scheme to Market and Sell Korlym Off-Label Using A Uniform Marketing Message**

256.    Throughout the Class Period, Corcept operated out of six sales regions. Confidential witnesses in four of the Company's six sales regions have confirmed that Corcept sales representatives were primarily marketing Korlym for off-label use.

257.    Witnesses have further confirmed that Corcept used a uniform marketing message across each of its regions in which they told physicians to look for obese patients with poorly controlled diabetes and then perform the DST. According to these representatives, if the DST was positive, or even close to positive, then the physicians should immediately begin treatment with Korlym as a first line treatment. Defendants' marketing is in violation of the FDA label because these patients were not properly diagnosed with endogenous Cushing's Syndrome and did not undergo surgery (nor were they properly evaluated for surgery) prior to being prescribed Korlym. Instead, Corcept representatives marketed Korlym as a potential first-line treatment for uncontrolled diabetes and obesity and instructed physicians on how to validate their prescription post-fact by relying solely on the otherwise unreliable DST.

      2. **Defendants' Admission they Knew the Basis for Each Korlym User's Prescription, the Identity of Each User, and His or Her Prescribing Doctor Supports Scienter**

258.    Because Korlym (and, more generally, mifepristone) is an abortifacient, it is subject to tight FDA restrictions regarding its prescription. Thus, as the Individual Defendants admit, they knew every patient on Korlym and the indication for which it was given, among other information. As defendant Belanoff stated on the November 2, 2017 earnings call in response to a question regarding the potential patient transition from Korlym to any newly approved second-generation Corcept drug offering:

> **It's intended so that there will be very tight control of where Korlym tablets are. We know where are they all – *essentially, every single tablet goes*.** And because relacorilant is not the abortion pill, I think that portion of the equation really changes tremendously. In addition to that, while we're not expecting relacorilant to have any better efficacy than Korlym because Korlym has superb efficacy, taking away the progesterone side effects, particularly for women who are the majority of patients with Cushing's syndrome, things get much, much easier for them and for their doctors in

prescribing the medication.

259.    Defendant Belanoff, again, acknowledged Corcept's tight control over the distribution of Korlym based on its pharmacological properties when, during an earnings call on May 8, 2018, he stated, "Because its active ingredient is the same as the abortion pills, Korlym's distribution is tightly controlled."

260.    On this same call, Defendant Belanoff invoked the stringent distribution controls when discussing the possibility of Korlym's use for more widespread conditions: "The observation [is] that Korlym reverses fatty liver disease in patients with Cushing's syndrome. But despite its demonstrated promise, Korlym's abortifacient properties which necessitate tightly controlled distribution, disqualify it as a treatment for these widespread conditions."

261.    In another example, on an earnings call dated May 1, 2017, defendant Robb stated, "because *we sell directly to patients*, we have actually pretty - very good insight into what sort of discounts from our full price that we expect to see."

262.    Moreover, during the Class Period, defendant Maduck, Corcept's Senior Vice President of Commercial, confirmed the Company's insight into the scope of Korlym's end-users, stating on an earnings call held on November 1, 2018, "So 99% of our Korlym patients are on label – prescription, sorry, are on-label and we continue to see favorable insurance reimbursement."

263.    Further, the Company, again, invoked this statistic in its February 5, 2019 "White Paper" wherein it refuted the SIRF Report and Blue Orca Report, as filed as an exhibit to a Form 8-K signed by defendant Robb. In this "white paper" response (the heading of which listed defendant Robb as a contact person), the Company stated:

> **In fact,** we do not. ***Literally, ninety-nine percent (99%) of the Korlym we sell goes to patients whose diagnosis matches Korlym's FDA-approved label***. Insurance companies require proof of this diagnosis before agreeing to cover the cost of Korlym. Patients who do not have a properly documented diagnosis of Cushing's syndrome rarely receive reimbursement.
>
> * * *
>
> **Do you promote for diagnoses other than Cushing's syndrome?** No. We only promote Korlym for its approved use. Literally, ninety-nine percent (99%) of the Korlym we sell goes to patients whose diagnosis matches Korlym's FDA-approved label. Our vigilance is matched by insurance companies, which in most cases insist on

comprehensively reviewing a patient's medical records to confirm the diagnosis of Cushing's syndrome before paying for the drug.

264.     Thus, by Defendants' own admission, the Company tracked Korlym's patient population to determine on-label versus off-label usage and thus, would have been aware of Corcept's aggressive off-label marketing practices, as well as the impact such off-label marketing had on prescription trends.

265.     With such clear insight into the end-users of Korlym, Defendants either knew of and endorsed, or recklessly disregarded the massive increased prescription rates in small geographic clusters like the North Charleston, South Carolina area where Drs. Back and Matthews practice.

266.     Additionally, the Company's services agreement with Dohmen required Dohmen to provide Corcept with an itemized invoice every month for the services provided and six daily financial reports.  It is reasonable to infer that Optime is under a similar obligation, particularly as the Company's direct-to-customer sales model has not shifted and with Corcept's demonstrated control over its specialty pharmacy (including assisting in the creation of the pharmacy's processes by copying those employed by Dohmen). Moreover, the direct-to-customer sales model necessarily requires the Company to know both the prescribing doctor and the prescribed indication of the patient, as well as general inventory levels at all times, supporting an inference of knowledge or reckless disregard of the Company's off-label marketing trends based on the sharp increase in off-label prescriptions of Korlym that these reports would have necessarily shown.

267.     Accordingly, at all times relevant to this Action, the Company and the Individual Defendants knew or had access to and recklessly disregarded internal Company information that showed Korlym was being prescribed off-label as a result of the Company's pivot in sales strategies.

### 3.     That Corcept's Quarter-Over-Quarter Revenue Growth Is Statistically Improbable Absent Off-Label Marketing Supports Scienter

268.     The astronomical increase in the first four quarters with Optime as a specialty pharmacy supports Defendants' knowledge or reckless disregard for Corcept's pervasive off-label marketing practices. Korlym is used to treat a rare disease with an FDA-approved label that limits treatable population to less than 5,000 patients.

269.   Yet, as demonstrated in the chart below, while Defendant Belanoff asserted that Cushing's Syndrome "is a disease where you're adding to your enrollment total by 1s and 2s everywhere you go," Corcept was somehow able to report near or over 100% quarter-over-quarter revenue growth for the first year Optime was acting as its specialty pharmacy, until insurance companies began tightening their approval guidelines in mid-2018, as discussed above (*see* Section IV.G, *supra*).

| Quarter | Revenue (in thousands) | Quarter over Quarter % Increase |
|---------|------------------------|---------------------------------|
| Q3 2017 | $42,763 | 96.8% |
| Q4 2017 | $53,280 | 123.8% |
| Q1 2018 | $57,659 | 108.9% |
| Q2 2018 | $62,312 | 75.2% |
| Q3 2018 | $64,445 | 50.7% |
| Q4 2018 | $66,831 | 25.5% |
| Q1 2019 | $64,829 | 12.4% |

270.   In context of their total revenue for the year, the growth is even more alarming:

| Fiscal Year | Revenue (in thousands) | Year over Year increase |
|-------------|------------------------|-------------------------|
| 2016 | 81,321 | 61.7% |
| 2017 | 159,201 | 95.8% |
| 2018 | 251,247 | 57.8% |

271.   A drug that can only be prescribed for a limited subset of a rare disease affecting only 20,000 patients in the United States could not experience such massive revenue growth in a short period of time absent off-label prescriptions.

272.   Thus, Defendants either knew or recklessly disregarded that these revenue numbers were not the result of prescriptions increasing by "1s and 2s".

**4.   Defendant Maduck, Corcept's Senior Vice President of Commercial and a Company Executive Officer, Was Aware of Corcept's Off-Label Marketing Scheme Through His Responsibilities to Oversee Corcept's Sales Staff and Korlym's Marketing Practices**

273.   During the Class Period, defendant Maduck was one of just four executive officers for the Company, along with defendants Belanoff and Robb, and Robert S. Fishman, the Company's former Chief Medical Officer ("CMO") who submitted his resignation from the Company on November 13, 2018, *less than two weeks after Maduck's 99% assertion*.

274.    Further, defendant Maduck, as the Corcept's head of commercial operations, was directly responsible for overseeing the sales staff and the education and training programs. Defendant Maduck's oversight over Korlym's marketing practices is evidenced by the comments made by defendant Belanoff during various earnings calls during the Class Period, including his reference to Maduck as the individual who "runs the whole Cushing's syndrome franchise" on November 2, 2017, and his lauding of Maduck's work on February 22, 2018 when he stated, "I would like to introduce you to a person who runs our Cushing's syndrome franchise, Sean Maduck, who's really done a fabulous job in really *educating really about the people, about the disease throughout the country*."

275.    Thus, it is reasonable to infer that defendant Maduck, as the head of sales and marketing for Corcept responsible for overseeing such activities, and who admittedly "educat[ed] people" (including physicians) "throughout the country" about Cushing's was aware of Corcept's off-label marketing practices.

276.    Moreover, as one of just three to four Corcept executive officers during the Class Period (two of whom were, at all relevant times, Defendants Belanoff and Robb), Maduck would have regularly reported on the Company's marketing strategies to the other Individual Defendants. Further, given the small size of the Company and the executive management team, it is reasonable to infer that the other Individual Defendants had access to the same information upon which Maduck based his 99% comment, as well as general information related to Korlym prescription trends and marketing.

**5.    Korlym is Corcept's Only FDA-Approved Drug and Revenue Source**

277.    As set forth above, Corcept's *only source of revenue* during the Class Period came from its sales of Korlym, representing the Company's "core operations."

278.    Defendants acknowledged the importance of Korlym in the Company's SEC filings, stating, *inter alia*, "We anticipate that for the foreseeable future our ability to generate meaningful revenue and fund our commercial operations and development programs **will be solely dependent on the successful commercialization of Korlym**."

279.    Defendant Belanoff further stated on an earnings call held May 1, 2017 that "the best way to think of Corcept" is as "a **self-funding company** with a vibrant clinical platform."

280.    Further, the Company's direct-to-customer distribution model illuminates the importance

of Corcept's relationship with prescribing doctors and its specialty pharmacy. Unlike other pharmaceutical companies who sell their drugs to wholesale drug distributors, which then supply large chain pharmacies, Corcept only distributes Korlym directly to patients through its specialty pharmacy, Optime. Importantly, under this model, Optime never takes title to Korlym and acts only as the conduit with the end-patient. This means that at any moment, Defendants have complete transparency into the end-users of Korlym, including the basis for the prescription.

### 6. Corcept's Failure to Follow Industry Guidelines Supports an Inference of Scienter

281. As discussed above, The Endocrine Society has very specific diagnosis and treatment guidelines regarding Cushing's Syndrome. The Diagnosis Guidelines provide that a non-endocrinologist clinician may perform the initial screen for Cushing's Syndrome and, in the event this initial test is abnormal, a further evaluation by an endocrinologist (including the performance of a second screening test to either confirm the initial test or identify a false positive) is recommended to confirm or exclude an endogenous Cushing's Syndrome diagnosis. Additionally, the Diagnosis Guidelines go in depth on the limitations of the four recommended tests for Cushing's Syndrome and stressed the need for confirmatory testing.

282. Yet confidential witnesses have all confirmed that the marketing message Corcept's sales representatives were actually using ignored the guidelines and, rather, instructed them to employ a single test to test for Cushing's Syndrome—the single 1-mg overnight Dexamethasone suppression test and if it came back even close to positive, they should immediately prescribe Korlym.

283. The Defendants, whose only product is for Cushing's Syndrome, either knew recklessly disregarded the proper diagnosing guidelines for Cushing's Syndrome in an effort to induce physicians to improperly diagnose patients.

### 7. Defendants' Payments to Physicians Who Prescribe the Most Korlym Prescriptions Supports Scienter

284. Corcept increased its honoraria payments by 322% to $366,750 in 2017. Corcept's honoraria spending alone in 2017 almost exceeded all payments not associated with a research study to

physicians in 2016 combined. Honoraria payments consisted of just 22.8% of Corcept's non-research study payments to physicians in 2016. That number jumped to 47.4% in 2017.

285.    That these honoraria payments were made to physicians who had the most Korlym prescriptions is no coincidence. As previously discussed, Drs. Back and Mathews were two of the largest prescribers of Korlym in 2017, prescribing the drug to at least 23 patients and 13 patients respectively. Drs. Back and Mathews were also second and third in receiving honoraria payments in that time frame, receiving $47,000 and $48,000 respectively. Drs. Back and Matthews were only behind Hanford Yau who received $77,000 in honoraria payments in 2017. According to the SIRF Report, Dr. Yau prescribed Korlym to 27 patients in 2017.

286.    Thus, this massive increase in Corcept's spending to physicians who prescribe the most Korlym supports an inference of Defendants' knowledge and/or recklessness with respect to the off-label marketing.

### 8.  Corcept's Limited Number of Sales Regions and Sales Representatives Supports Scienter

287.    The limited number of just six sales regions in which the Company operates and a small number of sales representatives covering these regions further supports Defendants' actual knowledge or recklessness related to the off-label marketing scheme.

288.    On a November 1, 2018 earnings call, Defendant Maduck stated, "In terms of our prescribing, as everybody may remember, we discussed this on previous calls, we have 6 sales regions that are comprised of 40 clinical specialists that are evenly distributed across the country in those regions."

289.    Further, the Company's overall relatively small size,[42] including the small salesforce tasked with pushing Korlym, further lends to an inference that the Individual Defendants knew or were reckless in not knowing of the off-label marketing scheme and relationship with Optime. According to the Company's Annual Report on Form 10-K for the period-ending December 31, 2018 filed with the

---

[42] According to the Company's Annual Report on Form 10-K for the period-ending December 31, 2017 filed with the SEC on February 28, 2018, Corcept had 136 employees. According to the Company's Annual Report on Form 10-K for the period-ending December 31, 2016 filed with the SEC on March 6, 2017, Corcept had 106 employees.

SEC on February 26, 2019, Corcept had 166 employees.

290. With such a small number of sales force members, the Individual Defendants either knew, or had the ability to know and recklessly disregarded, the off-label marketing strategies being pushed across the entire country.

### 9. Defendants' Awards to Sales Representatives Supports Their Knowledge of the Representatives Off-Label Marketing

291. Further, the Company clearly monitored the performance of its individual sales team members, bestowing upon them various accolades. Indeed, Rep No. 1 in South Carolina, alone, received recognition as the Clinical Specialist of the Year and membership in Corcept's "President's Club" in 2016, 2017, and 2018.

292. Thus, where Defendant Belanoff asserted in a November 7, 2019 earnings call that "this is a disease where you're adding to your enrollment total by 1s and 2s everywhere you go," any sales team member whose yearly numbers increased by the dozens (as was necessarily the case for Rep No. 1 based on Drs. Back and Matthews' drastic increase in Medicare Part D claims in 2017) should have, and did, draw the attention of the Company's executive management, lending to an inference that the Company was either aware of the off-label marketing push among its sales staff or recklessly disregarded it.

### 10. The Temporal Proximity of Corcept's Chief Medical Officer's Departure and Defendants' False Statements Regarding On-Label Use Supports an Inference of Scienter

293. As set forth above, on November 1, 2018, Defendant Maduck asserted that "99% of [the Company's] Korlym patients are on label" – a false and misleading statement given that the Company's growth had been driven by an off-label marketing scheme that encouraged non-endocrinologists to prescribe Korlym without a confirmed endogenous Cushing's diagnosis and in the absence of any surgical intervention (or evaluation for surgical suitability).

294. On November 19, 2018, the Company filed with the SEC a Form 8-K, announcing that, on November 13, 2018, the Company's CMO Dr. Robert S. Fishman tendered his resignation, effective January 31, 2019. Robert Fishman was the CMO of Corcept from September 2015 through January 31, 2019.

295.     The suspicious timing of Fishman's resignation and Maduck's false statement regarding purported on-label prescriptions supports an inference of scienter.

296.     As CMO, Dr. Fishman was one of just four executive officers for the Company (alongside Defendants Belanoff, Robb, and Maduck).

297.     Further, Dr. Fishman's departure appears to have been wholly unexpected, as no succession plan was in place at the time of the November announcement. The circumstances of Dr. Fishman's ultimate departure in January 2019 are particularly suspicious given that a replacement had not yet been named, and would not be named until March 18, 2019 when the Company announced the hiring of Andreas Grauer, an outside hire who had previously been Vice President of Global Development at Amgen Inc.

**B.   The Individual Defendants' Motive to Commit Fraud**

**1.   The Individual Defendants Were Motivated to Conduct the Alleged Fraud in Order to Capitalize on the Company's Market Exclusivity before its Expiration**

298.     As stated above, Korlym was designated as an "Orphan Drug" by the FDA in 2007. One of the benefits of having the orphan status is the seven years of marketing exclusivity for the drug from the date the FDA approves it. Korlym's marketing exclusivity as a result of its orphan status expired on February 17, 2019.

299.     Korlym's underlying drug, mifepristone, was developed in 1980 and, as such, its underlying patent covering its structure has expired. This left Corcept open to potential generic competitors when its market exclusivity period expired. In anticipation of this, Teva submitted a new drug application for a generic version of Korlym in early 2018. Sun Ltd. also filed a generic drug application in June of 2019. Corcept has since been locked in litigation with both companies, claiming they are violating Corcept's method of use patents.

300.     Defendants were aware of and relied on the advantages of having an Orphan Drug market exclusivity period. According to the Company's Annual Report on Form 10-K for each fiscal year between 2012 and 2017, "to protect our market for Korlym, [Corcept] re[lies] on the exclusive marketing rights conferred as a benefit of orphan drug designation and marketing exclusivity in the United States."

301.    With the market exclusivity period coming to a close in February 2019, the Defendants needed to employ new strategies to maximize profits from Korlym prior to the period's expiration, while also "protecting" their market share to fend off potential generic competitors by indoctrinating non-endocrinologists for off-label uses – doctors other companies entering the market would not target in fear of regulatory blowback.

### 2. The Individual Defendants Were Motivated to Commit the Alleged Fraud in Order to Continue Funding Operations and the Development of Relacorilant

302.    Corcept derives 100 percent of its revenue from sales of Korlym. As the Company stated in its annual report, "[Corcept's] ability to generate revenue and fund our commercial operations and development programs is entirely dependent on the sale of Korlym." Defendant Belanoff stated on the Q1 2017 earning call on May 1, 2017 that Corcept's "goal really has been… to be self-funding."

303.    Defendant Belanoff further stated "the best way to think of Corcept" is as "a self-funding company with a vibrant clinical platform that's in development and the growth of our commercial revenue matches it quite well."

304.    According to Defendant Belanoff on the Q2 2017 earnings call on August 1, 2017, Corcept's research and development projects included  the "Cushing's Syndrome business conducting Phase 2 and Phase 3 trials of [Corcept's] proprietary selective cortisol modulator 125134 in both Cushing's Syndrome and solid tumor cancers, conducting the Phase 1 and Phase 2 trials of CORT125281 for castration-resistant prostate cancer, and the Phase 1 trial of Cost 118335 and advancing into the clinic additional next-generation cortisol modulators."

305.    Defendant Belanoff stated on an investor call on August 1, 2017 that "as [Corcept's] studies get further along they become more expensive" and to "expect increasing costs as we get deeper into the studies."

306.    There was a sharp increase in Corcept's Research and Development Spending in 2017 and 2018. After staying between $14 million and $24 million for five years between 2011 and 2016, research and development spending hit $40.4 million in 2017. Not to be outdone, the spending almost doubled between 2017 and 2018 to $75.2 million.

| Year | Research and Development Spending (in millions) |
|------|-------------------------------------------------|
| 2018 | $75.2 |
| 2017 | $40.4 |
| 2016 | $23.8 |
| 2015 | $15.4 |
| 2014 | $18.4 |
| 2013 | $20.5 |
| 2012 | $14.1 |
| 2011 | $21 |

307.    The Individual Defendants knew of the increasingly high research and development costs Corcept was expected to (and did) incur in 2017 and 2018. The Individual Defendants felt pressure to keep Corcept as a "self-funding" company. This led the Individual Defendants to implement the aforementioned off-label marketing strategy and install Optime as Corcept's specialty pharmacy.

C. **Corporate Scienter is Additionally Supported by the Actions of Corcept's Employees**

308.    In addition to the inference of Corcept's scienter stemming from the above-alleged scienter of Individual Defendants Belanoff, Robb, and Maduck, Corcept's corporate scienter is further evidenced by the actions of its employees.

309.    As set forth above, Corcept's efforts to clandestinely prop up Optime and manufacture a breach of its contract with Dohmen for the purpose of facilitating its off-label marketing scheme create an inference of the Company's knowledge.

310.    As set forth in Dohmen's complaint against Corcept, on April 12, 2017, Amy Hanstein, Corcept's Cost Accounting Manager sent an email to Tina Pheasant, Vice President of IT Pharmacy Services for Optime, in which Hanstein requested modification to Optime's mock-up reports.  In this email, Hanstein revealed that she "tried to bring this up on our call approximately a month ago, but you said this would have to be a phase 2, because you were only copying the existing reports." As such, it is clear that Corcept and Optime employees were maneuvering to transition the Company's specialty pharmacy business – an essential portion of Corcept's business (given its reliance on a specialty pharmacy) that was necessarily dictated from the Company's senior-most executives – to Dohmen as early as March 2017.

311.    Further, Individual Defendants Robb and Maduck were each personally involved in the

meetings between Corcept and Dohmen related to Dohmen's termination. On July 12, 2017, the CEO of Dohmen's parent company met with defendants Robb and Maduck in San Francisco, California, seeking to address Corcept's claim of a breach.

312.    A subsequent follow-up meeting between Dohmen President Dan Johnson and Defendant Maduck occurred on July 18, 2017 in Denver, Colorado.

313.    This direct participation in the Dohmen/Optime transition by the Company's senior executives supports an inference of corporate scienter.

314.    Additionally, the actions of Corcept's sales staff promoting off-label use of Korlym supports the Company's scienter. Across the country, Corcept's sales staff was uniformly pushing non-endocrinologists to rely on a single DST screening test among their patients to validate a Korlym prescription despite the fact that clearly established Diagnosis Guidelines call for multiple confirmatory tests and that the DST itself is prone to yielding incorrect results given the targeted patient population and interference from other medications.

315.    Thus, the scienter of Corcept related to the alleged off-label marketing scheme and interplay of that scheme with the transition to Optime, can be inferred.

## IX.    LOSS CAUSATION

316.    At all relevant times, the market for Corcept securities was open, well-developed, and efficient. During the Class Period, Defendants named in this Action materially misled the investing public by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their statements, as set forth herein, not false and/or misleading, thereby inflating the price of Corcept securities.  These material misstatements and omissions concerned the capabilities, performance, and profitability of the Company's only source of revenue, Korlym. Defendants' materially false or misleading statements and omissions of material fact, alleged above in Section V, caused the price of Corcept's securities to be artificially inflated, and/or maintained such artificial inflation during the Class Period, operating as a fraud or deceit upon Plaintiff and other Class Period purchasers of Corcept securities.

317.     Plaintiff and other members of the Class purchased or otherwise acquired Corcept securities relying upon the integrity of the market of Corcept and market information related to the Company and have been damaged thereby.

318.     As Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the artificial inflation in the price of Corcept's securities was removed, and the price of Corcept shares fell.

319.     On January 25, 2019, SIRF published the SIRF Report alleging Corcept paid doctors to prescribe Korlym for off-label uses. Corcept's share price fell $1.52, or more than 11%, to close at $12.29 per share on January 25, 2019, on unusually heavy trading volume.

320.     On January 31, 2019, the Company forecast a sharp slowdown in sales of Korlym in 2019 presumably due to insurance companies tightening approval guidelines after getting wind of the off-label marketing and physicians starting to become wise to Defendants' improper marketing tactics. On this news, the Company's share price fell $1.15, or more than 10%, to close at $10.03 per share on February 1, 2019, on unusually heavy trading volume.

321.     As a result of their purchases of Corcept stock during the Class Period at artificially inflated prices, Plaintiff, and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price decline in Corcept stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct.

## X.     PRESUMPTION OF RELIANCE

322.     At all relevant times, the market for Corcept securities was efficient for the following reasons:

(a)     Corcept common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(b)     As a regular issuer, Corcept filed periodic reports with the SEC and Nasdaq;

(c)     Corcept regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national

circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     Concept was followed by four to five securities analysts employed by major brokerage firms (including Bank of America Merrill Lynch, Piper Jaffray Companies, Ladenburg Thalmann & Co. Inc., and Stifel, Nicolaus & Company, Incorporated, and B. Riley FBR, Inc.) who participated in the Company's Class Period earnings calls and wrote reports which were distributed to those brokerage firms' sales force and certain customers and each of these reports was publicly available and entered the public marketplace;

(e)     Concept had approximately 113.4 million and 114.7 million shares outstanding as of August 2, 2017 and February 5, 2019, respectively, with an average of 1.6 million shares trading daily on the Nasdaq;

(f)     During the Class Period, Concept common stock averaged a weekly trading volume of 7.5 million shares, translating to an average weekly turnover of 6.5% of the outstanding shares;

(g)     On January 25, 2019, the day the SIRF Report was released, approximately 7.6 million shares were traded - 4.7 times the normal daily average;

(h)     On February 1, 2019, the day after Concept revised their projected earnings for the fiscal year, approximately 6.1 million shares were traded - 3.8 times the normal daily average;

(i)     During the Class Period, the Company was eligible to register and sell its common stock pursuant to a Form S-3 shelf registration statement and, in fact, did so just prior to the commencement of the Class Period on May 5, 2017;

(j)     During the Class Period, the Company's public float ranged from 79.8% to 84.5%, indicating market efficiency; and

(k)     The presence of a major activist short-seller like Blue Orca supports a finding of market efficiency where there did not exist barrier to investors shorting the Company's stock during the Class Period.

323.     As a result of the foregoing, the market for Concept securities promptly digested current material information regarding Concept from all publicly available sources and reflected such

information in Corcept's stock price. Under these circumstances, all purchasers of Corcept securities during the Class Period suffered similar injury through their purchase of Corcept securities at artificially inflated prices, and a presumption of reliance applies.

324.    Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

325.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the materially false or misleading statements pleaded in this Complaint.

326.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time such statement was made.

327.    To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, any such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement. As alleged above in detail, then-existing facts contradicted Defendants' statements regarding, *inter alia*,  (i) the target physician demographic of the Company's marketing efforts; (ii) the aim of the Company's physician education programs and the resulting awareness they purportedly raised; (iii) the indication targeted in the Company's marketing, namely, that the Company's efforts were in line with the FDA-approved label for Korlym; (iv) the Company's compliance with FDA-regulations regarding "off-label" marketing; (v) the basis for the Company's revenue growth, as connected to broader prescription trends in its Korlym franchise, Corcept's only commercial product and profit source; (vi) the Company's controls over the processes and activities of its specialty pharmacy, Optime; (vii) the landscape with respect to insurance reimbursements for Korlym; and (viii) the percentage of Korlym patients who meet with FDA-approved indication and can be considered "on-label."  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Corcept

1  were not sufficient to insulate Defendants from liability for their materially false or misleading
2  statements.

3       328.    To the extent that the statutory safe harbor does apply to any forward-looking statement
4  pleaded herein, Defendants are liable for any such statement because at the time such statement was
5  made, the particular speaker actually knew that the statement was false or misleading.

6  **XII.**    **CLASS ACTION ALLEGATIONS**

7       329.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3)
8  on behalf of a class of all persons or entities that purchased or otherwise acquired Corcept securities
9  during the Class Period, seeking to pursue remedies under the Exchange Act (the "Class").

10       330.    Excluded from the Class are Corcept and its subsidiaries and affiliates, and their
11  respective officers and directors at all relevant times, and any of their immediate families, legal
12  representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a
13  controlling interest.

14       331.    Because Corcept had  between 113.4 million and 114.7 million shares of common stock
15  outstanding during the Class Period, and because its securities were actively traded on the Nasdaq, the
16  members of the Class are so numerous that joinder of all Class members is impracticable. While the
17  exact number of Class members is unknown at this time and can only be ascertained through discovery,
18  Plaintiff believes that there are, at a minimum, thousands of Class members. Members of the Class may
19  be identified from records maintained by Corcept or its transfer agent and may be notified of the
20  pendency of this action by mail, using forms of notice customarily used in securities class actions.

21       332.    Plaintiff's claims are typical of those of the members of the Class, as all Class members
22  have been similarly affected by Defendants' wrongful conduct as alleged herein.

23       333.    Plaintiff will fairly and adequately protect the interests of the Class and has retained
24  counsel competent and experienced in class action and securities litigation.

25       334.    Common questions of law and fact exist as to all Class members and predominate over
26  any questions solely affecting individual Class members. These common questions include:

27       (a) Whether Defendants violated the federal securities laws as alleged herein;

28

(b) Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Corcept's business and operations;

(c) Whether the price of Corcept's securities was artificially inflated during the Class Period; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

335.   A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Corcept and the Individual Defendants

336.   Plaintiff realleges each allegation as if fully set forth herein.

337.   This claim is brought under §10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Corcept and the Individual Defendants (the "Count I Defendants").

338.   The Count I Defendants (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

339.   The Count I Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's financial condition as reflected in the misrepresentations and omissions set forth above.

340.   The Count I Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

341.   As a result of the Count I Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and the Class were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

342.   Corcept is liable for the acts of the Individual Defendants and other Company personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, and/or agents of Corcept in taking the actions alleged herein.

343.   Plaintiff and the Class purchased Corcept securities, without knowing that the Count I Defendants had misstated or omitted material facts about the Company's financial performance or prospects.  In so doing, Plaintiff and the Class relied directly or indirectly on false and misleading statements made by the Count I Defendants, and/or an absence of material adverse information that was known to the Count I Defendants or recklessly disregarded by them but not disclosed in the Count I Defendants' public statements. Plaintiff and the Class were damaged as a result of their reliance on the Count I Defendants' false statements and misrepresentations and omissions of material facts.

344.   At the time of the Count I Defendants' false statements, misrepresentations and omissions, Plaintiff and the Class were unaware of their falsity and believed them to be true. Plaintiff and the Class would not otherwise have purchased Corcept securities had they known the truth about the matters discussed above.

345.   By virtue of the foregoing, the Count I Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

346.   As a direct and proximate result of the Count I Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Corcept securities.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act
Against Corcept and the Individual Defendants**

347.     Plaintiff realleges each allegation as if fully set forth herein.

348.     This claim is brought under §20(a) of the Exchange Act, 15 U.S.C. § 78t, against Corcept and the Individual Defendants (the "Count II Defendants").

349.     Each of the Count II Defendants, by reason of their status as senior executive officers and/or directors of Corcept, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of §20(a) of the Exchange Act.  The Count II Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff and the Class' investments in Corcept securities within the meaning of §20(a) of the Exchange Act.  Therefore, the Count II Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

350.     The Count II Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Count II Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

351.     The Count II Defendants knew or recklessly disregarded the fact that Corcept's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Count II Defendants did not act in good faith.

352.     By virtue of their high-level positions and their participation in and awareness of Corcept's operations and public statements, the Count II Defendants were able to and did influence and control Corcept's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

353.     The Count II Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

354.   As set forth herein, the Count II Defendants each violated §10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are also liable pursuant to §20(a) of the Exchange Act.

355.   As a direct and proximate result of the Count II Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Corcept securities.

## XIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a representative of the Class;

B.   Awarding Plaintiff and the members of the Class damages, including interest;

C.   Awarding Plaintiff reasonable costs and attorneys' fees; and

D.   Awarding such other relief as the Court may deem just and proper.

## XIV.   JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated: December 6, 2019                    Respectfully submitted,


**LEVI & KORSINSKY, LLP**

*/s/Sebastiano Tornatore*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

Shannon L. Hopkins
   (to be admitted *pro hac vice*)
Sebastiano Tornatore (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com

Email: stornatore@zlk.com

*Counsel for Lead Plaintiff the Ferraro Family Foundation, Inc. and James L. Ferraro*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE**

I hereby certify that on December 6, 2019, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/Sebastiano Tornatore*
Sebastiano Tornatore