**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (to be admitted *pro hac vice*)
Sebastiano Tornatore (admitted *pro hac vice*)
Michael J. Keating (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiff the*
*Ferraro Family Foundation, Inc. and*
*James L. Ferraro*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK, <br><br> Defendants. | Case No. 19-CV-01372-LHK <br><br> <u>**CLASS ACTION**</u> <br><br> **LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> Judge: Hon. Lucy H. Koh <br> Courtroom: 8, 4th floor <br> Hearing Date: October 8, 2020 <br> Hearing Time: 1:30 p.m. |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................................1

FACTUAL BACKGROUND ............................................................................................................3

    I.     ENDOGENOUS CUSHING'S SYNDROME IS A RARE DISEASE WITH A WELL-ESTABLISHED STANDARD OF CARE ...................................................................3

    II.    CORCEPT RECEIVES A LIFELINE WHEN KORLYM IS DESIGNATED AN ORPHAN DRUG FOR TREATING CUSHING'S SYNDROME ....................................4

    III.   CORCEPT ENTERS THE ECS MARKET, BUT gains only limited TRACTION ................5

    IV.   CORCEPT HATCHES A MULTI-YEAR OFF-LABEL MARKETING SCHEME .............6

        A.    Corcept Arranges the Necessary Pieces to Execute its Plan ........................................6

        B.    Corcept Sales Representatives Inundate Non-Endocrinologists with the Company's Uniform Off-Label Marketing Message ...................................................................7

    V.    THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES ..........................10

ARGUMENT ..................................................................................................................................11

    I.     PLAINTIFF HAS ADEQUATELY ALLEGED DEFENDANTS ENGAGED IN A PERVASIVE, COMPANY-WIDE OFF-LABEL MARKETING SCHEME USING A UNIFORM OFF-LABEL MARKETING MESSAGE ..........................................................11

    II.    THE COMPLAINT ALLEGES MATERIALLY FALSE AND/OR MISLEADING STATEMENTS *AND OMMISSIONS* .............................................................................17

        A.    Defendants Falsely Represented that Corcept Marketed Korlym Only for On-Label Use and for the Indication Approved by the FDA ..........................................17

        B.    Defendants' False Statements that "99%" of Korlym Prescriptions Were "On Label" and Received "Favorable Insurance Reimbursement" ......................................19

        C.    False Statements Regarding Corcept's Historical Revenue Growth ...........................19

        D.    False Statements Regarding Targeting Specialist Endocrinologists ..........................21

    III.   PLAINTIFF PLAUSIBLY ALLEGES A STRONG INFERENCE OF SCIENTER ...........22

    IV.   Plaintiff Adequately Alleges Loss Causation ..................................................................27

    V.    DEFENDANTS ARE LIABLE UNDER SECTION 20(A) ...............................................30

CONCLUSION ..............................................................................................................................30

    **Case No. 19-CV-01372-LHK**

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Berson v. Applied Signal Tech., Inc.,*
   527 F.3d 982 (9th Cir. 2008) ................................................................................................. 17, 21

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.,*
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ........................................................................................ 30

*Cunha v. Hansen Natural Corp.,*
   2012 WL 12886194 (C.D. Cal. 2012) ........................................................................................... 17

*Curry v. Yelp Inc.,*
   875 F.3d 1219 (9th Cir. 2017) ...................................................................................................... 28

*Di Donato v. Insys Therapeutics Inc.,*
   2017 WL 3268797 (D. Ariz. Aug. 1, 2017) ........................................................................... passim

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.,*
   778 F.3d 228 (1st Cir. 2015) ......................................................................................................... 16

*Garcia v. Guo,*
   2016 WL 102213 (C.D. Cal. Jan 7, 2016) .................................................................................... 28

*Gerritsen v. Warner Bros. Entm't Inc.,*
   112 F. Supp. 3d 1011 (C.D. Cal. Jan 30, 2015) ............................................................................. 3

*Great Am. Ins. Co. v. Chang,*
   2012 WL 3660005 (N.D. Cal. Aug. 24, 2012) .............................................................................. 26

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ........................................................................................................ 29

*Hartman v. Gilead Scis., Inc.,*
   536 F.3d 1049 (9th Cir. 2008) ................................................................................................. 27, 29

*Hatamian v. Advanced Micro Devices, Inc.,*
   87 F. Supp. 3d 1149 (N.D. Cal. 2015) .......................................................................................... 22

*Howard v. Everex Sys.,*
   228 F.3d 1057 (9th Cir. 2000) ...................................................................................................... 30

*Huang v. Higgins, et. al.,*
   2019 WL 1245136 (N.D. Cal. Mar. 18, 2019) ......................................................................... 16, 24

*In re Acadia Pharm. Inc. Sec. Litig.,*
   2020 WL 2838686 (S.D. Cal. June 1, 2020) ............................................................................ 15, 24

*In re Amgen Inc. Sec. Litig.,*
   2014 WL 12585809 (C.D. Cal. 2014) ................................................................................. 22, 25, 28

*In re Amgen Inc. Sec. Litig.,*
   544 F. 2d Supp. 1009 (C.D. Cal. 2008) ........................................................................... 14, 18, 19, 25

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

*In re Apollo Group, Inc. Sec. Litig.,*
2010 WL 5927988 (9th Cir. June 23, 2010) ................................................................. 29

*In re Apollo Group, Inc. Secs. Litig.,*
2008 WL 3072731 (D. Ariz. Aug. 4, 2008) .................................................................. 28

*In re Atossa Genetics, Inc. Sec. Litig.,*
868 F.3d 784 (9th Cir. 2017) ....................................................................................... 11

*In re BofI Holding, Inc. Secs. Litig.,*
2017 WL 5973340 (S.D. Cal. Dec. 1, 2017) ................................................................ 29

*In re Bristol Myers Squibb Co. Sec. Litig.,*
586 F. Supp. 2d 148 (S.D.N.Y. Aug. 19, 2008) ..................................................... 27, 29

*In re Countrywide Fin. Corp. Derivative Litig.,*
554 F. Supp. 2d. 1044 (C.D. Cal. May 14, 2008) ........................................................ 23

*In re Daou Systems, Inc.,*
411 F. 3d 1006 (9th Cir. 2005) .................................................................................... 23

*In re Galena Biopharma, Inc. Sec. Litig.,*
2019 WL 5957859 (D.N.J. Nov. 12, 2019) .................................................................. 16

*In re Immune Response Sec. Litig.,*
375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................................... 17

*In re Questcor Secs. Litig.,*
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ................................................................ 19

*In re Sanofi Secs. Litig.,*
155 F. Supp. 3d 386 (S.D.N.Y. 2016)........................................................................... 21

*In re Snap Sec. Litig.,*
2018 WL 2972528 (C.D. Cal. June 7, 2018).................................................................. 11

*In re VeriFone Holdings, Inc. Sec. Litig.,*
704 F.3d 694 (9th Cir. 2012) ....................................................................................... 22

*Khoja v. Orexigen Therapeutics, Inc.,*
899 F.3d 988 (9th Cir. 2018) ....................................................................................... 17

*Lloyd v. CVB Fin. Corp.,*
811 F.3d 1200 (9th Cir. 2016) ..................................................................................... 22

*Mauss v. NuVasive, Inc.,*
2015 WL 10857519 (S.D. Cal. Aug 28, 2015)............................................................. 16

*Mendell v. Greenberg,*
927 F.2d 667 (2d Cir. 1990) ........................................................................................ 18

*Milton Arbitrage Partners, LLC v. Syncor Int'l Corp.,*
239 Fed. Appx. 318 (9th Cir. 2007) ......................................................................... 18, 21

*Mineworkers' Pension Scheme v. First Solar Inc.,*
881 F.3d 750 (9th Cir. 2018)........................................................................................ 30

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

*Murphy v. Precision Castparts Corp.,*
  2017 WL 3084274 (D. Or. 2017) .................................................................................. 21

*Neborsky v. Valley Forge Composite Techs., Inc.,*
  2014 WL 3767011 (S.D. Cal. Jul. 29, 2014) ................................................................ 21

*Nguyen v. Radient Pharms. Corp.,*
  2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) .............................................................. 26

*No. 84 Employer-Teamster v. America West Holding Corp.,*
  320 F.3d 920 (9th Cir. 2003) ................................................................................. 25, 27

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
  380 F.3d 1226 (9th Cir. 2004) ............................................................................... 15, 23

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda,*
  730 F.3d 1111 (9th Cir. 2013) ..................................................................................... 30

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,*
  575 U.S. 175 (2015) .................................................................................................... 18

*Police Ret. Sys. v. Intuitive Surgical, Inc.,*
  759 F.3d 1051 (9th Cir. 2014) ..................................................................................... 23

*Reese v. Malone,*
  747 F.3d 557 (9th Cir. 2014) ....................................................................................... 24

*Rihn v. Acadia Pharm. Inc.,*
  2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ............................................................ 24

*Roberti v. OSI Sys. Inc.,*
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ............................................................. 24

*Rubin v. Trimble,*
  1997 WL 227956 (N.D. Cal. Apr. 28, 1997) ............................................................... 28

*Schaffer v. Horizon Pharma PLC,*
  2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) ................................................................ 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) .................................................................................................... 22

*U.S. v. Laurienti,*
  611 F.3d 530 (9th Cir. 2010) ....................................................................................... 17

v    **Case No. 19-CV-01372-LHK**

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

## PRELIMINARY STATEMENT

This securities fraud case arises from a pervasive, Company-wide off-label marketing scheme whereby Corcept Therapeutics Incorporated ("Corcept" or the "Company") promoted Korlym, its only commercial drug product accounting for 100% of Corcept's sales, for off-label use pursuant to a uniform off-label marketing message designed to boost Korlym sales in an otherwise limited market in order to remain a self-funded company despite increasing research and development costs and generic competitors waiting to enter the market.

In 2012, Corcept sought broad approval of Korlym as a general treatment in patients with Endogenous Cushing's Syndrome ("ECS"), a rare disease affecting only approximately 20,000 patients in the U.S. The FDA[1], however, only approved Korlym for a narrow subset of ECS patients with hyperglycemia who have type 2 diabetes or glucose intolerance **and** who have failed or are ineligible for surgery because Korlym showed only limited efficacy, resulting in a total market of fewer than even the 5,000 patients forecasted under Corcept's original proposed indication.

While endocrinologists are uniquely positioned to treat ECS because they specialize in treating conditions affecting the body's glandular systems, including the adrenal glands, only a fraction of endocrinologists specialize in diagnosing and treating ECS due to the rarity of the disease. Accordingly, Defendants stated Corcept would target the subset of "300 endocrinologists who treat 70% of all U.S. Cushing's cases" ("Specialist Endocrinologists"). As the market for the FDA-approved use of Korlym quickly dried up, and with Korlym market exclusivity set to expire in February 2019, Defendants hatched a plan to target less knowledgeable non-Specialist Endocrinologists, Family Medicine physicians or Internists with their uniform off-label message to increase Korlym sales, as needed to fund Corcept's operations and research and development.

Ten confidential witnesses ("CW") who are physicians in five of Corcept's six sales regions across the country, as well as Plaintiff's expert ("PE"), all confirmed they personally received the same uniform off-label marketing message from Corcept's sales representatives throughout the Class Period. Corcept's off-label marketing pitch was to instruct physicians to test all diabetic, pre-diabetic, or obese patients using a single screen for ECS—the 1-mg overnight Dexamethasone suppression test ("DST")—and if it came back even borderline

---

[1] Capitalized terms have the same meaning as in Plaintiff's Second Amended Complaint ("SAC") filed on March 20, 2020. ECF No. 100. Citations to ¶__ are to paragraphs in the SAC. Unless otherwise indicated, all internal citations are omitted and all emphasis is added

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

positive or in the "grey area," advised the doctor to immediately prescribe Korlym as a first-line therapy. Corcept representatives further told physicians that any sign of patient improvement after being put on Korlym should be interpreted as a confirmed diagnosis of ECS. CWs also confirmed Corcept representatives told them to use Korlym as a "bridge" to surgery to "pre-treat" patients before surgery occurred. In other words, Corcept's sales representatives marketed Korlym as a first-line therapy and "diagnostic tool" for ECS in violation of the FDA-approved indication and widely accepted FDA and industry guidelines. This off-label message was communicated verbally during office visits, Company-sponsored dinners and in written marketing materials such as "tear sheets" and studies embedded in promotional materials. Medicare Part D data further confirms Defendants' widespread scheme—every state listed in the data reported higher prescriptions of Korlym than reasonably estimated based on the rarity of ECS, with a majority of states reporting ***more than double*** their expected patient total based on its total Medicare population.

Defendants' off-label marketing message created a windfall for the Company. After implementing the scheme, Corcept's revenue increased by 96% in 2017.  This revenue growth, of course, was highly improbable given the rarity of ECS and the limited indication for which Korlym is approved.

Defendants admit they were aware of Corcept's off-label marketing scheme because they closely monitored prescription data and thus "know where. . . essentially, every single tablet goes."  Moreover, given the rarity of ECS, Corcept could not achieve the revenue growth it did without substantially expanding the pool of potential patients via off-label marketing. As Belanoff conceded "this is a disease where you're adding to your enrollment total by ***1s and 2s everywhere you go.***" Yet, the Medicare Part D data shows the annual increase in Korlym prescriptions were well above the 1s and 2s. Defendants' acknowledgment they actively monitored Korlym prescriptions, particularly coupled with Corcept's improbable revenue growth, and the Medicare data available to Defendants demonstrates Defendants either knew or recklessly disregarded Korlym was being aggressively marketed and prescribed for off-label use.

Yet, throughout the Class Period, Defendants falsely told investors that Corcept only marketed Korlym on-label for the exact indication on the FDA-approved label, that its "marketing materials and training programs for physicians ***do not constitute 'off-label' promotion*** of Korlym" and thus "***99% of our Korlym patients are on label,***" while also falsely attributing Corcept's purported "organic" quarterly sales growth to the "increasing willingness of physicians to screen patients for Cushing's syndrome."

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

The truth began to emerge on January 25, 2019, when the Southern Investigative Research Foundation ("SIRF") released the SIRF Report concluding that Corcept was engaging in a pervasive off-label marketing scheme. Following the release of the SIRF Report, Corcept's stock fell $1.52, or more than 11%, to close at $12.29 per share on January 25, 2019. On January 31, 2019, Corcept announced lower full-year 2019 forecasts due to an expected "slow down" in Korlym sales, causing Corcept's share price to further decline $1.15 (more than 10%) to a close of $10.08 on February 1, 2019, and investors to suffer losses.

Defendants' contention that Corcept's off-label message is no more than a disagreement about the proper method of diagnosing ECS misses the point. Plaintiff alleges that, regardless of whether the DST is sufficient, alone, to diagnose ECS (it is not), Corcept is prohibited from marketing Korlym *as a first-line therapy* and *without a confirmed ECS diagnosis*, as Defendants did here. Moreover, Defendants' statements are directly contradicted by CWs from all over the country who personally received Defendants' off-label message, some of whom admittedly prescribed Korlym based on that message. Finally, Defendants' contention that Plaintiff failed to adequately allege scienter because they did not allege Defendants' direct receipt of specific communications or reports ignores the fact that Korlym comprised 100% of Corcept's revenue and thus, it would be "absurd" to suggest Defendants were unaware of Corcept's off-label marketing scheme.

For these reasons, discussed further below, Defendants' motion should be denied in its entirety.

## FACTUAL BACKGROUND[2]

### I.    ENDOGENOUS CUSHING'S SYNDROME IS A RARE DISEASE WITH A WELL-ESTABLISHED STANDARD OF CARE

ECS is a debilitating and rare disease that occurs when the body is exposed to high levels of the hormone cortisol produced by the adrenal glands for a sustained period of time, most commonly caused by a hormone-secreting tumor in the adrenal or pituitary glands. ¶55. The incidence rate for ECS ranges from .7 to 2.4 per million population per year ¶86. The FDA estimates there are *just 20,000 patients* with ECS in the U.S., a number also touted by Corcept. ¶¶77, 80.

Because of its rarity, the Endocrine Society published the Diagnosis Guidelines wherein the professional

---

[2] Plaintiff does not object to Defendants' request for judicial notice except to the extent that Defendants seek to establish the truth of the contents in the noticed documents. *Gerritsen v. Warner Bros. Entm't Inc.,* 112 F. Supp. 3d 1011, 1033 (C.D. Cal. Jan 30, 2015) (declining to take judicial notice of the contents of documents not referenced in the complaint because it would be "inappropriate").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

organization both cautioned against widespread Cushing's testing (¶87) and established a consensus process for diagnosing those individuals in certain high-risk patient populations that includes an initial screening test followed by a second confirmatory test and clinical analysis by a Specialist Endocrinologist. ¶88. The importance of confirming any diagnosis with an endocrinologist who specializes in diagnosing and treating Cushing's and through full laboratory testing lies in both the rarity of the disease and the difficulty in diagnosing it in mild cases, particularly as each of the four preliminary screening tests are susceptible to false negatives or false positives based on external factors. ¶¶92-96. For example, the screening test pushed by Corcept sales representatives, the DST, is particularly susceptible to false positives, with one study pegging the test's **positive predictive value for ECS at just .4%** in obese patients, while also citing its propensity for false positives under myriad other circumstances. ¶96. Thus, the need for multiple rounds of confirmatory laboratory testing (as opposed to diagnosing a patient based only on physical appearance or as a result of a single initial screening test) is paramount. The FDA agrees, stating in response to the Korlym new drug application ("NDA"): "[t]he diagnosis of Cushing's syndrome requires a *multitude* **of laboratory and radiologic tests**…reliance on just clinical presentations is not possible or acceptable." ¶75.

Further, just as the Endocrine Society has created the Diagnosis Guidelines, it has also published its Treatment Guidelines which recommends surgical resection of the primary lesions underlying ECS whenever possible as a **first-line treatment**, with a recommendation of a second surgery in patients with evidence of an incomplete resection. ¶¶100, 102. According to the Treatment Guidelines, the first-line surgical treatment is especially effective, curing upwards of 76% of patients. ¶100. In the event surgery is unsuccessful or not an option, the Treatment Guidelines identify five different pharmaceutical options, with mifepristone (the active ingredient in Korlym) being the only drug option without any listed "pros," but several "cons," including a litany of adverse effects. ¶104. Thus, among Specialist Endocrinologists who most often deal directly with ECS patients, Korlym is viewed as a fourth-line or last resort therapy for an already rare disease. The FDA-approved label and indication (discussed *infra*) supports this viewpoint, with the regulator approving Korlym's use only for a narrow subset of the ECS patient population who have already exhausted the surgical option.

## II. CORCEPT RECEIVES A LIFELINE WHEN KORLYM IS DESIGNATED AN ORPHAN DRUG FOR TREATING CUSHING'S SYNDROME

In 2007, the FDA granted Korlym the orphan drug designation for the treatment of ECS. ¶¶60-61. Deeply

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

in debt and with no other drugs in its pipeline, Corcept filed its investigative new drug application ("INDA") in September 2007, seeking approval for a single open-label, uncontrolled 50-patient study to explore Korlym's efficacy in treating ECS. ¶¶62-63.  In April 2011, and based on the results from the earlier INDA study, the Company filed its NDA with the FDA seeking regulatory approval for Korlym as a **general treatment** for *all* forms of ECS. In response, the FDA noted that the results of the INDA study could not support such a broad application and, instead, on February 17, 2012 approved Korlym to treat ECS in patients with hyperglycemia who have type 2 diabetes or glucose intolerance *and* **who have failed or are ineligible for surgery**. ¶69.  The FDA further noted that, despite Corcept's efforts to prove efficacy across the general population of ECS patients, Korlym had only demonstrated limited efficacy for treating hyperglycemia associated with diabetes or glucose intolerance in ECS patients, warning that "the observed effects should not be extrapolated beyond this patient population and it would be inappropriate to consider the use of Korlym in the management of diabetes unrelated to hypercortisolism due to [endogenous] Cushing's Syndrome." ¶73.

As Korlym was Corcept's only FDA-approved drug, it would be relied upon to fund the Company's commercial development, with Corcept acknowledging in its SEC filings that it was "solely dependent on the successful commercialization of Korlym." ¶324. However, the narrowed indication for which Korlym was approved by the FDA meant the Company's actual total addressable market fell far below even the 5,000 patients (or one quarter of the estimated total ECS patient population in the United States) the FDA originally forecasted under Corcept's original broad NDA. *See* ¶¶77-80.

### III.    CORCEPT ENTERS THE ECS MARKET, BUT GAINS ONLY LIMITED TRACTION

With no other drug offerings besides Korlym and an established standard of care for ECS that favored surgical resection over medical treatment, Corcept sought to enter the market with a targeted sales strategy that supposedly underpinned a competitive advantage for the Company.  As stated by Steven Lo, then Vice President of Commercial Operations for Corcept, the Company did not "have to hire an army of sales reps," and, instead, would be focusing on the 300 endocrinologists who treat 70% of U.S. Cushing's cases. ¶166.

Further, the Company's sole reliance on Korlym sales meant that Defendant Belanoff's stated goal of being self-funded relied entirely on the Company's ability to convert endocrinologists into Korlym prescribers, the necessity of which was compounded by the Company's rising Research and Development spending, which increased from $23.8 million in 2016 to $75.2 million in 2018. ¶¶351-52. The seismic pressure to gain a foothold

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

in the ECS market was only multiplied by the February 2019 expiration of marketing exclusivity for Korlym, meaning Corcept had a small window to establish itself before generic competitors could flood the market with low-cost versions of the drug, siphoning off potential patients from an already limited patient population.[3]

However, the Company still faced difficulties making any inroads. The targeted Specialty Endocrinologists, who well understood the need to conduct a full diagnostic evaluation using multiple tests in order to properly diagnose ECS, were reluctant to use Korlym because of Korlym's lack of efficacy, severe adverse side effects, and high cost, these Specialty Endocrinologists often looked elsewhere for treatment options before using Korlym as a last resort. ¶¶125-29. Thus, Defendants needed a new plan; one that involved preying on less knowledgeable non-Specialist Endocrinologists, Internists and Family Medicine physicians, and inducing them to prescribe Korlym for off-label use without a confirmed ECS diagnosis, thus artificially expanding the total addressable market for Korlym and increasing Company revenue.

## IV.    CORCEPT HATCHES A MULTI-YEAR OFF-LABEL MARKETING SCHEME

### A.    Corcept Arranges the Necessary Pieces to Execute its Plan

With several near-term inflection points, including the expiration of marketing exclusivity and the need to continue financing the Company's studies, Corcept management orchestrated a marketing shift from the Specialty Endocrinologists previously cited by Steven Lo as the Company's purported focus, to unsuspecting physicians who would be more receptive to the Company's off-label marketing message. The multi-pronged plan turned the Company's sales and distribution systems upside down. *First,* Steven Lo departed the Company in September 2015, replaced by an entirely new marketing group led by Defendant Maduck, who assumed the role of Senior Vice President of Commercial in April 2016 after acting as the Company's Vice President of Sales and Marketing from 2012 to that point. ¶131. *Second*, in order to support its new targeted physicians throughout the prescription and insurance approval process, Corcept worked with former employees of its existing specialty pharmacy (Dohmen) to create a collaborating and cooperating specialty pharmacy: Optime Care, LLC ("Optime"). ¶132. Whereas Dohmen was a well-established player in the specialty pharmacy space supporting several different drug companies, Optime's first and only client was Corcept. ¶142 Optime employees even went as far as identifying themselves as employees of Corcept to inbound callers, while also providing marketing-

[3] Notably, mifepristone, the active ingredient in Korlym, was developed in the 1970s and has long been off patent.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

related information that went well beyond the role of a specialty pharmacy.[4] ¶286.

**B.    Corcept Sales Representatives Inundate Non-Endocrinologists with the Company's Uniform Off-Label Marketing Message**

With a new sales team no longer focused on the small subset of Specialty Endocrinologists and a captured specialty pharmacy standing at the ready to navigate insurance reimbursement, Defendants began their off-label marketing push, employing a multi-faceted marketing message throughout the country. The Company's sales pitch was simple: test all diabetic, pre-diabetic or obese patients with a single DST , and if the test came back positive or in a "grey area," the doctor should ***immediately*** start the patient on Korlym, in violation of the FDA label which requires a confirmed diagnosis and consideration of curative surgery.. ¶¶183, 185, 191, 196, 202, 204, 206, 210, 215, 220. But the Company's sales representatives did not stop there, with CWs 3-10 (physicians located in 7 different states encompassing 5 of the Company's sales regions) recalling their Corcept representatives advocating for the use of Korlym as a "diagnostic tool" and instructing these physicians that any patient condition improvement following the prescription of Korlym served as confirmation of ECS. ¶¶191, 196, 202, 204, 206, 210, 215, 220. PE, CW3, CW7, CW9 further confirmed that Corcept representatives told them to use Korlym as a "bridge" to surgery (*i.e.* before surgery occurred), again, presenting Korlym as a first line treatment in violation of the FDA label  (collectively, the "Uniform Off-Label Marketing Message"). ¶¶193, 195, 206, 217. This off label pitch, which was experienced first-hand by CWs 1-10 and PE (physicians from ten different states encompassing five out of Corcept's six sales regions) flew in the face of the Diagnosis Guidelines and the FDA requirement to use ***multiple*** confirmatory tests before rendering a diagnosis. ¶¶75, 90-91. The Uniform Off-Label Marketing Message was not limited to office visits, CWs 8 and 10 and PE received, unsolicited, tear sheets and studies embedded in promotional materials promoting the use of Korlym for the same off-label uses described above. ¶¶190, 214, 220.  CWs 1, 2, 4 and PE confirmed hearing off-label marketing from Korlym representatives at hospitals, dinners, and medical conferences. ¶¶184, 189, 195, 198. Despite Defendants' pervasive uniform off-label marketing, throughout the Class Period, they falsely told investors that "we believe our marketing materials and training programs for physicians do not

---

[4] Defendants try to spin this phone call by saying the Optime representative just properly transferred the caller to a Corcept representative. DB at 15 n. 9. However, Defendants conveniently ignore the beginning of the phone call, stated above, where the Optime representative answering the phone said the caller had reached Corcept.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

constitute 'off-label' promotion of Korlym." *See* S3, 11, 18, 24, 30 and 37.[5]

In order to convert off-label prescriptions for Korlym from unsuspecting physicians into insurance reimbursements and revenues for the Company, Corcept sales representatives offered to "help" CWs 2, 7, 8 and 9 fill out the required insurance paperwork by instructing them "to check the box on the insurance form saying the patient is not a candidate for surgery," even if surgery was never realistically considered or discussed, and no confirmed diagnosis was achieved. ¶¶188, 207, 212, 218.

To support the Uniform Off-Label Marketing Message, Corcept began dramatically increasing its spending on physicians in 2017. ¶¶168, 171, 175. In 2017, Corcept made payments to 989 endocrinologists and 1,316 non-endocrinologists, as compared to 894 and 757, respectively, in 2016. ¶168. Since, as Corcept admitted, 300 endocrinologists treat 70% of all Cushing's patients in the U.S., the massive expansion of their marketing approach (to over 2,400 physicians in 2017) reflects the Company's departure from a limited on-label sales strategy to a broad off-label marketing scheme. While Internists and Family Medicine physicians accounted for only an average of 15% of the physicians receiving payment for 2014 to 2016, in 2017 these physicians represented 36.4%. ¶171. While total spending in terms of dollars primarily went to endocrinologists (DB at 9)[6], this was due to the nature of the payments. Honoraria payments are typically given to physicians to talk over dinners, such as those attended by CWs 1 and 2, or at other one-time functions. ¶¶184, 189, 242. These dinners are used to reach numerous physicians, and the payment data only reflects a food and beverage payment for the attending physicians (typically between $20-$100), while honoraria payments to the host physician are typically $2,000 to $4,000.[7] These dinners were being used as a way for Corcept to spread their off-label message as CWs 1 and 2 each received off-label messages attending one of the dinners headlined by a physician on behalf of Korlym. ¶¶184, 189.

The off-label marketing provided a massive boon to Corcept's revenue, which increased by at least 98% quarter over quarter for three straight quarters (Q3-Q4 2017 and Q1 2018) after the switch to Optime. ¶273. A survey of publicly available Medicare Part D data illuminates the nature of the Company's scheme. Of the 75

---

[5] Citations to "S#" refers to the statement number from the false statements chart previously submitted as Ex. 1 to the SAC (ECF No. 100-1).

[6] The abbreviation DB refers to Defendants' Motion to Dismiss. ECF No. 106.

[7] https://openpaymentsdata.cms.gov/company/100000000247

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

named physicians[8] in the Medicare Part D data who prescribed Korlym in 2017, 20 of them are not listed as endocrinologists, yet accounted for approximately $14 million in revenue for Corcept and just over 33% of the total drug cost to the Medicare system.[9] Furthermore, there were just four physicians who prescribed Korlym to at least 11 patients in 2017, after no physician eclipsed the 11 patient figure between 2013 and 2016. ¶239. Two of these four were family medicine physicians, one was an endocrinologist, and the largest prescriber, Jerry Back, was an internal medicine physician. ¶239.

Dr. Jerry Back, an internist, went from 19 claims in 2016 to 115 claims for 23 patients in 2017 (worth a total drug cost of more than $3.5 million – *nearly 2.5% of Corcept's total net product revenues for the year*), all while being handsomely paid by Corcept to promote Korlym off-label at dinner talks. ¶¶184, 238, 241. More importantly, Dr. Jerry Back and Dr. Joseph Mathews collectively accounted for 36 Medicare patients on Korlym in 2017, despite practicing within 20 minutes of one another in South Carolina. ¶250. Applying the prevalence rate of ECS to the total number of patients on Medicare, the expected number of total ECS patients *in the entire state of South Carolina* would be between 9 and 14 individuals, a number Dr. Back and Dr. Mathews each independently meet, or exceed, while practicing down the road from each other. ¶251. Yet in 2017, there were *51 Medicare patients* prescribed Korlym in South Carolina. ¶251. In fact, all the states for which Medicare Part D provided data exceeded their expected patient total by at least 31%, with 9 out of 13 states exceeding the expected total by at least 166%. Georgia, a state that was not even included in the Medicare Part D data for Korlym in 2016 (indicating fewer than 11 *total claims* for that year), suddenly spiked to 16 Medicare *patients* in 2017.[10] This is a far cry from increasing by the "1s and 2s" defendant Belanoff asserted in November 2019. ¶240. Despite these numbers, Defendants falsely told investors during the Class Period that "99% of our Korlym patients are on label – prescription, sorry, are on label." Defendants were aware of Corcept's off-label prescriptions because, as defendant Belanoff stated "we know where they all – essentially, every single tablet goes." ¶¶303, 307.

The skyrocketing number of Korlym prescriptions was not lost on insurance providers who began

---

[8] Medicare Part D only names a physician if their prescriptions lead to 11+ claims in a year.

[9] https://data.cms.gov/Medicare-Part-D/Medicare-Provider-Utilization-and-Payment-Data-201/77gb-8z53/data

[10] *Id.*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

tightening requirements for reimbursing Korlym. In July 2018, Blue Cross/Blue Shield of South Carolina, imposed new restrictions requiring new documentation including surgical and prior medical therapy history, as well as multiple confirmatory diagnostic tests. ¶267. Blue Cross/Blue Shield affiliates in Pennsylvania, West Virginia and Delaware all made similar changes in May 2018, requiring more documentation before authorizing Korlym. ¶¶268-270. The trend has continued as the Drug Utilization Review Board, a subsection of the Oklahoma Health Care Authority, imposed new restrictions in January 2020 to only allow prior authorization of Korlym if it was "prescribed by, or in consultation with, an endocrinologist." ¶272. Thus, contrary to Defendants' representations that Corcept received "favorable" insurance treatment for Korlym, in fact, insurers were clamping down on their requirements leading to a drastic decline in quarterly revenue growth, which plummeted from 75.2% for Q1 and Q2 2018 to 50.7% in Q3 2018 (¶273) and just 12.4% by Q1 2019. ¶273.

## V.    THE TRUTH IS REVEALED OVER TWO PARTIAL DISCLOSURES

After several years of overwhelming physicians with the Uniform Off-Label Marketing Message and reaping the benefits of hundreds of off-label Korlym prescriptions, the truth began to emerge on January 25, 2019 when the SIRF Report was released, revealing that Corcept was engaging in a pay-for-play scheme by which the Company reimbursed physicians through honoraria payments in exchange for Korlym prescriptions and that Corcept's revenue was driven by off-label prescriptions. The SIRF Report was premised on, among other items, SIRF's FOIA request, which uncovered a suspicious relationship between Corcept and Dr. Hanford Yau, an endocrinologist at the Veterans Administration Medical Center in Orlando, Florida. Specifically, the SIRF Report exposed Dr. Yau's receipt of $95,139 in honoraria payments in 2017– the same year the Orlando VA Clinic prescribed Korlym to 50 patients, accounting for more than 9% of the Company's 2017 revenue. This sudden spike in prescriptions to treat a rare disease is highly improbable especially given the clinic's patient population was predominately male and ECS impacts females to males at a rate of 5-to-1. ¶85.

The SIRF Report also disclosed an increase in deaths reported in FAERS in 2017, including 17 instances where a patient passed away while using Korlym for "an unknown indication," while also questioning the geographic clustering of supposed ECS diagnoses. ¶¶279-80. As a result of their extensive investigation, the SIRF Report concluded that the only explanation for the sudden spike in prescriptions was that Corcept was engaging in improper off-label marketing of Korlym. Following the release of the SIRF Report, Corcept's stock fell $1.52, or more than 11%, to close at $12.29 per share on January 25, 2019, on unusually heavy trading volume. ¶281.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Then, on January 31, 2019, Corcept issued a press release announcing its fourth quarter and full-year 2018 preliminary selected financial results. Therein, due to the increased scrutiny of its illicit sales practices, the Company forecasted a slowdown in sales of Korlym, projecting full-year 2019 revenue of $285 million to $315 million, well below the $328 million expected by analysts. ¶282. On this news, Corcept's share price fell $1.15, more than 10%, to close at $10.08 on February 1, 2019, on unusually heavy trading volume. ¶283.

## ARGUMENT

To state a claim under Section 10(b) of the Exchange Act, the complaint must allege: (1) a material misrepresentation or omission; (2) in connection with the purchase or sale of a security; (3) scienter; (4) reliance; (5) economic loss; and (6) loss causation. *In re Atossa Genetics, Inc. Sec. Litig.,* 868 F.3d 784, 793 (9th Cir. 2017).[11] On a motion to dismiss, all factual allegations must be accepted as true and all reasonable inferences drawn in Plaintiff's favor. *In re Snap Sec. Litig.,* 2018 WL 2972528, at *3-4 (C.D. Cal. June 7, 2018).

**I. PLAINTIFF HAS ADEQUATELY ALLEGED DEFENDANTS ENGAGED IN A PERVASIVE, COMPANY-WIDE OFF-LABEL MARKETING SCHEME USING A UNIFORM OFF-LABEL MARKETING MESSAGE**

Plaintiff alleges Defendants orchestrated a pervasive, Company-wide off-label marketing scheme throughout the Class Period whereby Corcept sales representatives and hired-gun physicians promoted Korlym, Corcept's only approved drug product comprising 100% of its revenue, for off-label use under a comprehensive and uniform off-label marketing strategy. To facilitate the scheme, Corcept sales representatives targeted less knowledgeable Non-Specialist Endocrinologists, Internists and Family Medicine physicians with the Off-Label Marketing Message, advising them to administer a single DST to every patient who was pre-diabetic, had uncontrolled diabetes, was insulin-resistant, obese or had a Cushingoid appearance (¶180), and if the DST was positive or in the "grey area" to immediately start the patient on Korlym.[12] ¶¶183, 185, 191, 196, 202, 204,

---

[11] Defendants challenge falsity, scienter and loss causation and, thus, concede the remaining elements.

[12] Defendants claim Plaintiff provides no support for the distinction between Specialist and Non-Specialist Endocrinologists. DB at 7-8. Plaintiff defines a Specialist Endocrinologists as a subset of endocrinologists who specialize in diagnosing Cushing's Syndrome (¶7)—**the same definition Defendants used**. ¶6 (targeting 300 endocrinologists who specialize in diagnosing and treating 70% of endogenous Cushing's Syndrome patients). The CWs, many of whom are endocrinologists, agree. ¶205. Moreover, while endocrinologists by their training are uniquely qualified to diagnose ECS, because ECS is so rare, only a subset *specialize* in its diagnosis. Thus, Plaintiff does not, as Defendants claim (DB at 8), concede *all* endocrinologists are well-suited to diagnose Cushing's Syndrome.

206, 210, 215, 220. If the patient improved while on Korlym, the rep told physicians they should conclude the patient has a confirmed case of ECS. ¶¶191, 196, 202, 204, 206, 210, 215, 220. These instructions constituted an improper off-label marketing message because it instructed physicians to: (i) use Korlym as a first line treatment; (ii) bypass any further testing needed to properly diagnose ECS (despite Endocrine Society Guidelines and FDA Guidance requiring "a multitude of laboratory and radiologic tests" to properly diagnose ECS (¶¶75, 88, 90, 95-96)) and, instead, rely on the patient's response *after* being placed on Korlym); and (iii) administer Korlym even if the patient did not have the required comorbidities—type 2 diabetes mellitus or glucose intolerance.  Corcept sales representatives also told physicians to use Korlym in patients with adrenal masses as a bridge to surgery to "pre-treat" them. This, too, was an off-label message because the FDA only approved Korlym for use in patients who have failed or are not candidates for surgery. Thus, "pre-treating" with Korlym *in anticipation of surgery* is clearly prohibited.

CWs from ten states (California, Massachusetts, Nebraska, New York, Ohio, Oklahoma, Pennsylvania, South Carolina, Texas and West Virginia) representing five of Corcept's six sales regions (Northeast, Southeast, South, Central, West) confirmed that they each received the identical Uniform Off-Label Marketing Message from Corcept sales representatives throughout the Class Period, with some are still receiving it today. These 10 states represent 43%, or $24 million, of the Company's Medicare Part D sales (¶182) and 15% of total sales in 2017.[13] This off-label message was being promoted in doctors' offices, at dinners headlined by paid-for physicians, in hospitals, and at medical conventions. ¶¶184, 189, 195, 198, 204.  According to PE, CW8 and CW10, the off-label messages were also promoted in Corcept's marketing materials in tear sheets and case studies inserted into promotional materials during the Class Period. ¶¶190, 214, 220.

The result of this off-label marketing scheme was profound. Plaintiff alleges that as a result of Defendants' uniform and pervasive off-label marketing message, at least 111 patients received Korlym off-label during the Class Period, which generated a total of $20-$23 million in revenue for Corcept.[14] ¶¶188, 221, 239.

---

[13] Medicare Part D data is only available through 2017. In 2017, Medicare Part D sales accounted for approximately 35% of Corcept's total revenue.

[14] Plaintiff calculated the total estimated off-label patients as follows: 2 from CW2, 1 from CW10, 21 for Jerry Back, 17 for Norman Crabb, 11 for Joseph Mathews, 11 for Roberto Pabalate and 48 for Hanford Yau/Orlando VA Clinic. These values, other than alleged by CWs, are based on the number of prescriptions written by a particular doctor according to Medicare Part D and the SIRF Report, less the

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Specifically, CW2 and CW10 both stated they prescribed Korlym twice and once, respectively, based on Defendants' improper off-label marketing message. ¶¶188, 221. Moreover, according to the Medicare Part D data for 2017, Dr. Back, an internist practicing in North Charleston, SC, and Dr. Mathews, a Non-Specialist Endocrinologist practicing in Summerville, SC, collectively submitted 200 insurance claims for Korlym and prescribed Korlym to at least 32 patients without a confirmed ECS diagnoses pursuant to the same off-label marketing scheme. Dr. Back, the most prolific prescriber of Korlym on Medicare nationwide, generated approximately 5% of total Medicare Part D claims with a total drug cost of $3.6 million, and Dr. Mathews, the second highest prescriber, generated 3.6% of total claims totaling $2.1 million. CW1, who shared the same Corcept sales rep with Drs. Back and Mathews, said Rep 1 told CW1 Dr. Mathews prescribed Korlym to between 30 to 40 patients in 2018. ¶246.

ECS is indisputably a rare condition with an incidence rate of 1 to 2 people per million per year. The combined populations of the towns where Drs. Back and Mathews work, North Charleston and Summerville, is approximately 826,000 people, meaning the expected number of ECS patients in the area is just 1 or 2 patients. The existence of an ECS "cluster" of this magnitude in a location with such a low population is statistically improbable.  The only conclusion is that, between 2017 and 2018, all but maybe 3 or 4 of the approximately 70 patients in the state were put on Korlym because of the same off-label marketing message from Rep No. 1. Indeed, at a January 2018 dinner, CW1 witnessed firsthand Dr. Back recounting multiple instances where he prescribed Korlym off-label for his patients with diabetes and insulin resistance to purportedly reduce high doses of insulin and help patients lose weight. ¶184. CW1 also spoke with Dr. Mathews who brushed off CW1's concerns regarding his prescribing Korlym off-label without a confirmed ECS diagnosis ¶246. Thus, it is no surprise that Drs. Back and Mathews were two of the largest recipients of purported honoraria payments from Corcept.[15]

---

two patients estimated as likely Cushing's diagnoses per year. Similarly, the total dollar value is based on the revenue generated from these physicians based on Medicare Part D and the SIRF Report. Outside of these 5 prescribers (Back, Mathews, Pabalate, Crabb, Yau) the average number of patients per prescriber of Korlym on Medicare is between 1 and 2 patients, a number in line with the true incidence of ECS. *See* https://data.cms.gov/Medicare-Part-D/Medicare-Provider-Utilization-and-Payment-Data-201/77gb-8z53/data

[15] The fact that Dr. Back purportedly specializes in diabetes and Dr. Mathews is an endocrinologist (DB at 11-12) does not belie their participation in the off-label scheme. Diabetes, alone, does not warrant

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Further evidencing the widespread nature of Corcept's off-label marketing scheme is that every state listed in the Medicare Part D data reported higher prescriptions of Korlym than would be expected statistically given the rarity of ECS, with a majority of states reporting more than double their expected patient total based on total state Medicare Part D populations. ¶251. Finally, FDA adverse event data shows that, during the Class Period, there were 17 patients that died who were prescribed Korlym for an "unknown indication" indicating they were not confirmed ECS patients. ¶258.[16] All this demonstrates that Corcept's off-label marketing scheme was widespread and pervasive.

Courts have found similar allegations sufficient to allege an off-label marketing scheme. *See, e.g. In re Amgen Inc. Sec. Litig.*, 544 F. 2d Supp. 1009, 1033-34 (C.D. Cal. 2008) (off-label marketing scheme sufficiently alleged where scheme was widespread and three CW sales reps described studies and presentation materials containing off-label messages, Amgen sponsored speaker programs where it advanced off-label uses and affirmatively stated it only promoted drug in accordance with FDA label); *Di Donato v. Insys Therapeutics Inc.,* 2017 WL 3268797, at **21-22 (D. Ariz. Aug. 1, 2017) (off-label marketing scheme sufficiently alleged where company instituted sales plan that did not target the physicians they claimed to be targeting, the drug represented 98% of the company's revenue, and the company had a fraudulent speakers' program).[17]

---

treatment with Korlym. Rather, it must be type 2 diabetes mellitus where an ECS diagnosis is <u>confirmed</u> **and** the patient does not qualify for surgery. The FDA label explicitly warns against treatment of diabetes "unrelated to endogenous Cushing's Syndrome" with Korlym. Dr. Mathews is not a Specialist Endocrinologist and admitted to CW1 that he prescribed Korlym off label. ¶246. Moreover, Defendants are wrong that Plaintiff does not cite a single witness who spoke to Dr. Back about his prescription practices. DB at 12. CW1 attended a dinner where Dr. Back spoke of his off-label practices. ¶184.

[16] Defendants' contention that Plaintiff has not alleged "even one doctor prescribed Korlym based upon a DST test alone" (DB at 10, fn. 6) is false and ignores CW2 and CW10's statements that they did just that, as well as the fact Drs. Back and Mathews shared the same rep with CW1, and both admitted in front of CW1 that they prescribed Korlym off-label. Defendants' reliance on CW10 observing visible signs of Cushing's Syndrome does not change the fact CW10 prescribed Korlym without a confirmed Cushing's Syndrome diagnosis based on a single DST at the instruction of a company sales representative.

[17] Defendants' attempts to distinguish *Amgen* and *Gilead* from this case fails. DB at 11. Indeed, the facts in *Amgen* are very similar to those here. Amgen was alleged to have provided sales reps with studies and power points discussing off-label uses. 544 F. Supp. 2d at 1033. Similarly, Corcept provided sales reps with tear sheets and studies the reps then gave to doctors containing the same off-label marketing message regarding using Korlym as a first-line treatment. ¶¶183, 185, 191, 196, 202, 204, 206, 210, 215, 220. In *Amgen*, the court found evidence the marketing scheme "emanated from its national office." *Id.* So too here where Plaintiff alleges Defendants received prescription reports from Optime (¶311) and

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Defendants' off-label marketing scheme allowed Corcept to report astronomical revenue growth during the Class Period of 96% in 2017 and 58% in 2018 (the same year insurance carriers caught wind of the scheme and began implementing stricter approval requirements). ¶24. Belanoff's statement that "[w]e know where. . . essentially, every single tablet goes" and Defendant Maduck's statement he knew "99% of our Korlym…prescription…are on-label," were made with knowledge or reckless disregard of Corcept's off-label marketing scheme, particularly when coupled with the fact that Korlym was Corcept's only drug product and the sharp increase in prescriptions for Korlym was inconsistent with the rarity of ECS. *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 WL 2838686, at *6 (S.D. Cal. June 1, 2020) (finding defendants "had access" to adverse event data and "were likely aware" Acadia was making large payments to physicians that prescribed drug demonstrated falsity and scienter of off-label marketing scheme); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231-32 (9th Cir. 2004) (defendant stating "we know exactly how much we have sold in the last hour around the world" and that the defendant "was involved in an awful lot of these deals" demonstrated falsity and scienter).

Insurance companies caught on to the off-label scheme, prompting them to require documentation of a confirmed case of ECS using *multiple* tests. This crackdown caused Corcept's quarter over quarter revenue growth to decline from 124% in Q4 2017, to only 12.4% by Q1 2019. ¶273. Corcept's revenue growth has not reached the same growth since.[18]

Without citing a single source, Defendants erroneously contend that Corcept's off-label message is a

---

Defendant Maduck was Corcept's Chief Commercial Officer responsible for "educating really about the people, about the disease throughout the country," "[ran] the whole Cushing's syndrome franchise" and admitted to visibility into all patients on Korlym stating "99% of our Korlym... prescription…are on-label." ¶¶307, 320. Moreover, in *Amgen*, **as here**, the drugs at issue comprised 100% of Amgen's revenue, the scheme was alleged to be widespread, and Amgen similarly used speaker engagements to promote off label use. *Id.* Plaintiff here alleges **more** than the plaintiff in *Gilead*. In addition to the above facts, Plaintiff alleges accounts of 11 witnesses as compared to only two in *Gilead*, and similarly alleges the minimum amount of prescriptions (111) and sales ($20-23 million) from off-label marketing, as in *Gilead* (75% to 95% attributable to off-label). 2005 WL 2649200, at *3.

[18] Defendants argue that **any** quarter over quarter revenue growth despite insurance companies tightening their requirements shows that Defendants were not engaged in an off-label marketing scheme because otherwise, revenue would have declined. DB at 12. Not so. Many insurance companies have not caught wind of Defendants' improper marketing and thus have not changed their guidelines. Plaintiff alleges only two companies—Blue Cross Blue Shield of South Carolina (July 2018) and Independence Blue Cross in Philadelphia, PA (January 2019)—changed their guidelines during the Class Period, but the Company's expectation of future changes caused Defendants to reduce their forecasts.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

mere disagreement about the proper method of diagnosing ECS. DB at 9. Defendants' argument misses the mark. Plaintiff alleges that, regardless of whether the DST is sufficient, alone, to diagnose ECS (it is not and the Diagnostic and FDA Guidelines prohibit it), Corcept is prohibited from marketing Korlym *as a first-line therapy* and *without a confirmed ECS diagnosis*, as Defendants did here.[19]

Next, Defendants claim the SAC does not quantify the amount of Corcept's sales attributed to the off-label marketing scheme. DB at 13. But this Circuit does not require Plaintiff to allege the exact amount of revenue generated from off-label marketing. *Mauss v. NuVasive, Inc.,* 2015 WL 10857519, at *9 (S.D. Cal. Aug 28, 2015) (holding that the specificity of how much of the company's revenue was generated from illegal sales is not required because "a reasonable investor could find it material that the company's profitability was partially attributable to illegal activities"). Even so, Plaintiff has done so here.[20]

---

[19] Defendants' other argument—that marketing Korlym as a treatment prior to surgery is not off-label because the FDA label allows patients who are not surgical candidates to be placed on Korlym—is unpersuasive. DB at 10, n. 7. Defendants were not marketing Korlym as a treatment for patients who were not surgical candidates. Rather, they marketed Korlym to patients who *were* surgical candidates to "pre-treat" patients "as a bridge to surgery" to surgery.

[20] The cases Defendants rely upon (DB at 10-13) are distinguishable because in those cases, unlike here, the plaintiff did not allege specific details of the "who, what, and when" of the scheme, that the company actually promoted off-label use, the subject drug was not the company's only commercial drug product and/or there were no corroborating details of the scheme. *See Huang v. Higgins, et. al.*, 2019 WL 1245136, at *7-8 (N.D. Cal. Mar. 18, 2019) (granting MTD where drug was 62% of sales and "FEs' accounts lack the 'specific[ity] in time, content, and details" to allege an off-label scheme, did not work at the company the whole class period and plaintiff alleged no corroborating evidence such as an FDA letter, sales aids or speaker engagements or quantify off-label sales); *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *7-8 (S.D.N.Y. Jan. 18, 2018) (granting MTD where two CWs who left "early" in the class period, did not provide details of "who, when, or how" to demonstrate a "company-wide practice" and plaintiff only alleged one surgeon who spoke at a Horizon national sales meetings who received $18k in in fees submitted many prescriptions over an unspecified period); *In re Galena Biopharma, Inc. Sec. Litig.*, 2019 WL 5957859, at *14-15 (D.N.J. Nov. 12, 2019) (granting MTD where plaintiff did not allege Galena actually marketed the drug off-label or that any alleged off-label marketing resulted in prescriptions); *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228 (1st Cir. 2015) (out of circuit case granting MTD where plaintiff failed to show the amount of revenue from the off-label product, the amount of revenue from off-label prescription, and the amount of off-label prescription that was the result of off-label marketing).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

## II.   THE COMPLAINT ALLEGES MATERIALLY FALSE AND/OR MISLEADING STATEMENTS *AND OMMISSIONS* [21]

"A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Only if reasonable minds could not disagree . . . should the district court dismiss under 12(b)(6)." *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1021-22 (S.D. Cal. 2005). Rule 10b-5 prohibits telling a "material half-truth[]," *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010), which is the failure "to state a material fact necessary in order to make the statements made…not misleading." *Id.* "Once defendants choose to tout positive information" they cannot do so misleadingly and must disclose "adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1009 (9th Cir. 2018). Even "literally true [statements] can be misleading and thus actionable under the securities laws." *Cunha v. Hansen Natural Corp.,* 2012 WL 12886194, *3 (C.D. Cal. 2012).

### A.   Defendants Falsely Represented that Corcept Marketed Korlym Only for On-Label Use and for the Indication Approved by the FDA

Every quarter during the Class Period, Defendants falsely represented that Corcept only marketed Korlym on-label for the exact indication on the FDA-approved label:

> In the United States, we market Korlym for treatment of hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery and provide promotional materials and training programs to physicians *regarding the use of Korlym for this indication.*

*See* S2, 10, 17, 23, 29, 36. Defendants further misrepresented that "we believe our marketing materials and training programs for physicians *do not constitute 'off-label' promotion* of Korlym" (S3, 11, 18, 24, 30, 37) and that "[b]ecause many people who suffer from Cushing's syndrome are undiagnosed or inadequately treated, we have developed and continue to refine and expand programs *to educate physicians and patients about diagnosis of this syndrome* and the role cortisol modulators can play in treating the disease." (S16, 22, 28, 35). A reasonable

---

[21] Defendants' disingenuous contention that Plaintiff does not allege any material omissions and that this is solely an affirmative misrepresentations case (DB at 16 n.10) is a transparent attempt to set up their loss causation argument with respect to the January 31, 2019 earnings disclosure. It is beyond dispute that Plaintiff's entire theory is predicated on a pervasive off-label marketing scheme that Plaintiff contends was *not disclosed* to the investing public, rendering Defendants' Class Period statements false and misleading. *See, e.g.*, S4, 5, 6, 7, 9, 12, 13, 14, 15, 19, 20, 21, 25, 26, 27, 31.

17                                                              **Case No. 19-CV-01372-LHK**

investor would have understood Defendants' statements to mean Corcept was promoting Korlym *exclusively* for on-label uses. *See Amgen, Inc.*, 544 F. Supp. 2d at 1033-1034 (statements that Amgen marketed drugs for "their approved indications" and in a manner "consistent with the FDA" label misleading when Amgen was promoting the drug for unapproved, off-label uses).

Contrary to Defendants' public statements, at least $20-$23 million of Corcept's revenue for 2017 arose from Defendants' uniform, Company-wide off-label marketing scheme under which Corcept's sales representatives promoted Korlym as a diagnostic tool and/or a bridge to surgery. ¶¶184, 189, 195, 198. Courts have found similar statements that a drug is being marketed solely for the FDA-approved indication and not off-label use misleading where, as here, plaintiff alleges an undisclosed pervasive off-label marketing scheme. *Amgen Inc.,* 544 F.Supp. 2d at 1033-34*; Milton Arbitrage Partners, LLC v. Syncor Int'l Corp.*, 239 Fed. Appx. 318, 320 (9th Cir. 2007) (when a defendant attributes "success solely to legitimate practices, defendants implicitly (and falsely) warrant [] that there were no illegal practices contributing to that success").

Defendants make two baseless arguments. First, they claim the alleged marketing statements are not false because Defendants are not required to disclose "the underlying motivations" for their actions, relying on *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990). DB at 14. But Plaintiff is not asking for disclosure of Defendants' motivations. Rather, Plaintiff alleges Defendants' statements are false because they told investors Corcept only marketed Korlym for on-label use when, in fact, according to numerous CWs , Corcept's sales representatives had an undisclosed Company-wide practice of marketing Korlym for off-label use pursuant to a uniform marketing message.[22] Second, Defendants' purported belief that Corcept's marketing was all on-label (DB at 14-15) was not honestly held and lacked any reasonable basis, *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), because Defendants knew or recklessly disregarded: (i) the improbable sales growth for a drug treating such a rare disease, (ii) the large cluster of Korlym patients in South Carolina prescribed by the highest Corcept-paid physicians, (iii) that every state in the Medicare Part D data reported Korlym prescriptions nearly double the expected total for such a rare disease, and (iv) that Corcept implemented a

---

[22] Defendants' reliance on *Mendell* is also misguided. The full quote cited by Defendants stated, "a proxy statement need not disclose the underlying motivations of a director or major shareholder **so long as all the objective material facts relating to the transaction are disclosed."** *Mendell,* 927 F.2d at 674. Here, all "objective material facts" relating to Corcept's education program were not disclosed, i.e. that the program was promoting Korlym for off-label uses.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

comprehensive nationwide strategy to push a uniform off-label message in order to increase sales of Korlym.

### B.  Defendants' False Statements that "99%" of Korlym Prescriptions Were "On Label" and Received "Favorable Insurance Reimbursement"

Despite Corcept's pervasive undisclosed off-label marketing scheme, as confirmed by ten CWs, five of which stated they had either personally prescribed or observed Korlym being prescribed for off-label use, Defendants represented that "***99% of our Korlym patients are on label*** -- prescription, sorry, are on-label and we ***continue to see favorable insurance reimbursement***." S34. Nowhere in their brief do Defendants deny that this statement is false. As Plaintiff alleges, at least 111 and 26-36 prescriptions for 2017 and 2018, respectively, were the result of off-label marketing, accounting for at least $20 to $23 million in sales for 2017 through Medicare Part D. ¶¶188-89, 221, 231-32, 246.[23] *See* Section III.A., *supra*. Thus, Defendants' statement is actionable because 99% of Korlym prescriptions were not on-label, as Defendants admittedly knew when stating they "know where…every single tablet goes." ¶303; *see also Amgen, Inc.*, 544 F. Supp. 2d at 1033-1034 (statements Amgen marketed drugs for "their approved indications" and "consistent with the FDA" label misleading when Amgen was promoting these drug for unapproved, off-label uses).

Moreover, as a result of Corcept's off-label marketing scheme, starting in July 2018, insurance companies such as Blue Cross/Blue Shield tightened the criteria for Korlym approval, requiring paperwork demonstrating multiple diagnostic tests were performed to confirm an ECS diagnosis where surgery failed or was not a treatment option. Thus, contrary to Defendants' public statements, Corcept was receiving more stringent and *less* favorable insurance reimbursement, resulting in a material slowdown in Corcept's revenue growth, which declined from 75% in Q3 2018 to 12.4% by Q1 2019. ¶273; *see also In re Questcor Secs. Litig.*, 2013 WL 5486762, at **23 (C.D. Cal. Oct. 1, 2013) (finding statements on the stability of "insurance reimbursement rates" were misleading when the company was engaged in a marketing scheme that, if revealed, would result in insurance coverage being declined).

### C.  False Statements Regarding Corcept's Historical Revenue Growth

As the SAC alleges, Corcept was only able to report "strong" quarterly revenue growth from Korlym because of Defendants' undisclosed pervasive off-label marketing scheme. Yet Defendants falsely attributed

---

[23] Importantly, this is just the floor, as it only includes revenue from Medicare Part D and not private insurance.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Corcept's purported "organic" growth every quarter during the Class Period to two "trends in medical practice that are driving Korlym uptake:" the "growing understanding among physicians that for many patients Korlym is a very effective medication coupled with increasing willingness of physicians to screen patients for Cushing's syndrome" and "more and more physicians . . . screening more aggressively for [Cushing's Syndrome]." S4, 6, 12, 14, 15, 19, 20, 21, 25-27, 31.

Defendants omitted from their public statements that Corcept's revenue growth was actually driven by its undisclosed off-label marketing of Korlym. While the FDA label restricted Korlym's use to a small subset of ECS of less than 5,000 patients, Corcept's representatives were marketing Korlym for broader off-label use in patients with diabetes and those suffering from obesity (as well as other conditions) with no confirmed ECS diagnosis and/or as a bridge to surgery. Due to its rarity, Defendant Belanoff conceded that new prescriptions of Korlym to treat the on-label indication of ECS would only result in the Company "adding to [its] enrollment total by 1s and 2s everywhere" it sold. ¶240. Thus, Corcept's revenue growth could not possibly have been attributable strictly to on-label use of Korlym, and CWs confirmed it was not, with some admitting they prescribed Korlym off-label based on Corcept's off-label marketing message.

Accordingly, Korlym's "uptick" was not, as Defendants claimed, due to increased physician awareness and willingness to prescribe Korlym due to its efficacy. Rather, the increase in Korlym prescriptions was the result of Corcept's sales representatives preying on and inducing less knowledgeable Non-Specialist Endocrinologists and Internal or Family Medicine physicians to prescribe Korlym pursuant to a uniform off-label message. An analysis of the Medicare Part D data further confirms Plaintiff's theory, showing that the number of Korlym prescriptions drastically increased at the same time Corcept began targeting Non-Specialist Endocrinologists, and the percentage increase to those physicians far outweighed that of the original 300 Specialty Endocrinologists Corcept said it was targeting. ¶¶168-169, 251. In 2013, the first full year Korlym was available, Corcept made payments to 298 physicians, primarily consisting of the 300 Specialist Endocrinologists Defendants stated Corcept was targeting. ¶168. However, starting in 2017, Corcept made payments to 2,305 physicians, of which only 43% (989) were listed as endocrinologists, the first year Corcept made payments to more non-endocrinologists than endocrinologists. ¶168. This trend continued in 2018, where endocrinologists made up only 44% of physicians receiving payment from Corcept. ¶168. Moreover, given that, as Corcept admits, only 300 endocrinologists specialize in the treatment of ECS, the remaining payments to endocrinologist

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

represent Non-Specialists such as Dr. Mathews, who are either confirmed or likely to have prescribed Korlym off-label based on Corcept's off-label marketing.

Where, as here, a company discusses the reasons for its sales growth, it is misleading to do so "without disclosing that a material portion…resulted from an unsustainable practice." *Murphy v. Precision Castparts Corp.,* 2017 WL 3084274, *9 (D. Or. 2017); *Syncor Int'l Corp.*, 239 Fed. Appx. at 321 (when defendant attributes their "success solely to legitimate practices, defendants implicitly (and falsely) warrant [] that there were no illegal practices contributing to that success."); *Neborsky v. Valley Forge Composite Techs., Inc.,* 2014 WL 3767011, at *6 (S.D. Cal. Jul. 29, 2014) ("[B]ased on defendants' disclosures as to the source of Valley Forge's revenues, investors were misled to believe that Valley Forge was engaged in legal activity, when in fact, much-if not all-of the company's success was attributable to the illegal exportation of semiconductors"). *Berson v. Applied Signal Tech.,* 527 F.3d 982, is instructive. There, Applied Signal made positive statements about its backlog without disclosing that the backlog included stopped work unlikely to ever be completed. The Ninth Circuit held that "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors." *Id.* at 987.[24] The same is true here.

### D.    False Statements Regarding Targeting Specialist Endocrinologists

At that time Korlym was approved, the Company's espoused marketing strategy was to purportedly target the 300 endocrinologists who handled 70% of all Cushing's Syndrome patients in the United States. However, given the rare and limited indication for which Korlym was approved, and the numerous safety and efficacy issues of the drug resulting in Specialty Endocrinologists being unwilling to prescribe Korlym except as a last resort therapy in ECS patients, the market for Korlym quickly dried up. To increase sales, Corcept expanded its target group beyond the small group of Specialist Endocrinologists who were familiar with how to diagnose ECS, to a much broader pool of Non-Specialist Endocrinologists, Internists and Family Medicine physicians.

Yet Defendants represented to the market during the Class Period that Corcept was still "***focus[ing] on the endocrinologists who treat most patients with hypercortisolism***" (S5) when, in fact, Corcept had long abandoned this strategy of targeting the 300 endocrinologists who treat 70% of Cushing's syndrome patients and

---

[24] Defendants' interpretation of *In re Sanofi Secs. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) (DB at 15), is, at best, incomplete. While the S.D.N.Y. has held that past statements of revenue are themselves insufficient to be actionable under Section 10(b), the court went on to say that statements which "put the sources of [the defendant's] revenue at issue" ***do give rise to liability*** under Section 10(b). *Id.*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

was mainly targeting less knowledgeable physicians using a pervasive off-label marketing message to induce Korlym prescriptions. ¶¶164, 168, 171; *see*, *Insys*, 2017 WL 3268797, at \*13 (statement "no one [] wants to see anyone taking [Subsys] for anything other than [on-label reasons]" was actionable because the company was actively avoiding Oncologists, the physicians who would normally be prescribing Subsys for on-label uses).

Defendants argue that this statement is not false because it is consistent with the fact that Corcept's revenue was derived from prescriptions written by endocrinologists. DB at 14. But that is not what Defendants' statement says. Rather, Defendants' statement *distinguishes* between the smaller subset of endocrinologists who are experienced in treating ECS with the broader population of all endocrinologists, most of whom, as Defendants admit and as the CWs confirmed, are ***not*** experienced in either diagnosing or treating ECS. ¶¶164, 205. As Plaintiff adequately alleges, Corcept was mainly focusing on less knowledgeable, Non-Specialists who would be more susceptible to an off-label marketing message to boost Korlym sales than Specialist Endocrinologists knowledgeable about treating ECS, who would resist Defendants' efforts to have them improperly prescribe Korlym off-label and without following the established ECS diagnosis protocol and standard of care.

## III.    PLAINTIFF PLAUSIBLY ALLEGES A STRONG INFERENCE OF SCIENTER

Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 314 (2007). Plaintiff need not allege Defendants "*actually knew*" they were making false statements. *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 708 (9th Cir. 2012) (emphasis in original). Recklessness is sufficient. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (defendants "on notice of facts" supporting recklessness). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Hatamian v. Advanced Micro Devices, Inc.,* 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). The scienter analysis requires facts be "***taken collectively***." *Tellabs,* 551 U.S. at 322-323. A scienter inference is "strong" if it is "at least as likely as any plausible opposing inference." *Id.* at 324, 328-329. "[T]he tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.,* 2014 WL 12585809, \*8 (C.D. Cal. 2014).

**Defendants' Admissions that they Closely Monitored All Korlym Prescriptions Support Scienter:** Defendant Belanoff admitted during the November 2, 2017 earnings call that "**[**w**]**e know where…***essentially, every single [Korlym] tablet goes.***" ¶303. Thus, Defendants admit they were keenly aware of every single patient

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

on Korlym and the patient's specific underlying symptoms and their condition, *Oracle Corp.,* 380 F.3d at *1231 (finding strong inference of scienter where defendant CEO stated "***we know exactly how much we have sold in the last hour around the world***"); *Insys,* 2017 WL 3268797, at *15 (CEO statement that "I can tell you how many [prescriptions] we did yesterday" supports scienter); *Police Ret. Sys. v. Intuitive Surgical, Inc.,* 759 F.3d 1051, 1062 (9th Cir. 2014) (one may infer that corporate officers had "knowledge of the critical core operation of their companies" when there are "admissions by the [executives] of detailed involvement in the minutia of a company's operations"); *In re Daou Systems, Inc.,* 411 F. 3d 1006, 1022-23 (9th Cir. 2005) ("specific admissions from top executives that they are involved in every detail of the company and that *they monitored portions of the company's database"* supports a strong inference of scienter).[25]

**Corcept's Consistent Company-wide Marketing Message Supports Scienter:** CWs from five of Corcept's six sales regions who are physicians with firsthand knowledge of Corcept's marketing message confirmed that the Company's sales representatives employed the same Uniform Off-Label Marketing Message to: (1) test patients with diabetes and/or obesity with a single DST and if the test was even borderline positive, to then put the patient on Korlym and if the patient improved, the patient had ECS; and (2) "pre-treat" patients with adrenal masses with Korlym as a "bridge to surgery." ¶¶183, 185, 191, 196, 202, 204, 206, 210, 215, 220. This same message was also contained in Corcept tear sheets and studies inserted in promotional materials provided to physicians. ¶¶190, 214, 220. That Corcept employed a consistent off-label marketing message across the country supports an inference of the Individual Defendants' scienter. *In re Countrywide Fin. Corp. Derivative Litig.,* 554 F. Supp. 2d. 1044, 1065 (C.D. Cal. May 14, 2008) (finding an inference of scienter on the defendant board of directors for "a companywide culture that encouraged unchecked deviations from underwriting standards" that would "fatally affect the company's continued financial performance").

**That Corcept's Reported Revenue Growth Far Exceeded Achievable Revenue for the "Rare" Disease and Narrow Available Market Supports Scienter:** Starting in Q3 2017 shortly after switching specialty pharmacies to Optime, Corcept's revenue growth began exponentially increasing, with quarter over quarter revenue growth of at least 98% for three straight quarters (Q3 2017 to Q2 2018). ¶273. Given the rarity

---

[25] Defendants claim that Plaintiff has only provided "general allegations of [D]efendants' 'hands-on' management style" and are therefore insufficient. DB at 22-23. But Defendants Belanoff and Maduck could only make the statements above if they were intimately aware of the detailed sales data for Korlym. *Oracle Corp.,* 380 F.3d at 1231.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

of ECS, and Korlym's limited indication restricting it to fewer than 5,000 patients nationwide (¶79), as well as Defendant Belanoff's own admission Korlym would typically only increase by "1s and 2s" (¶240), Corcept's claimed near 100% revenue growth was well beyond what was achievable and, thus, it would be "absurd to think" that Defendants were unaware such growth was driven by off-label marketing. *Insys,* 2017 WL 3268797, at *15 (it would be "absurd" for Defendants to "not know how the company had pulled off the feat" of increasing revenue from Subsys, which accounted for 98% of the company's revenue, because the revenue was glaringly high among comparable fentanyl products"). Indeed, the Medicare Part D data further supports a finding that Corcept's revenue growth was the result of off-label marketing where the reported claims for every state in 2017 far exceeded the expected number of label-conforming patients given the disease's rarity. *See* Section IV.*B,* *supra*.

**The Core Business Operations Theory Supports Scienter:** The Ninth Circuit permits an inference of scienter where, as here, the alleged fraud concerns a company's core business operations. *Reese v. Malone,* 747 F.3d 557, 575 (9th Cir. 2014). Under the core business doctrine, a plaintiff "may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information" or "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* Plaintiff here meets both criteria—Defendants admittedly had access to the off-label prescription and patient data and, given that Corcept employed a uniform off-label marketing message Company-wide for a drug that ***comprised 100% of its revenue***, it would be absurd to suggest Defendants were unaware of Corcept's off-label marketing scheme. *Acadia Pharm.*, 2020 WL 2838686, at *8 (S.D. Cal. June 1, 2020) (finding that NUPLAZID was Acadia's only drug product, "support[ing] the inference of scienter"); *Rihn v. Acadia Pharm. Inc.,* 2016 WL 5076147, *9 (S.D. Cal. Sept. 19, 2016) (scienter adequately pled where drug "was critical to the success of the company"); *Insys*, 2017 WL 3268797 at *15 (finding core operations supported scienter where Subsys accounted for 98% of the company's revenue and "it is absurd to think [the CFO] knew about Subsy's anomalous market dominance but did not know how the company had pulled off the feat."); *Roberti v. OSI Sys. Inc.,* 2015 WL 1985562 at *13 (C.D. Cal. Feb. 27, 2015) (defendants had knowledge of "largest and most profitable division.").[26]

---

[26] Defendants' reliance on *Higgins* 2019 WL 1245136, at 12 (N.D. Cal. 2019), (DB at 23) is misplaced.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

As for Defendant Robb, it would be "absurd to think" that as the CFO of a company with a limited total addressable market for its sole drug product, he did not know how Corcept managed to drastically increase its revenue well beyond the scope of any realistically achievable revenue targets absent off-label sales. *No. 84 Employer-Teamster v. America West Holding Corp.,* 320 F.3d 920, 943 n.21 (9th Cir. 2003) (rejecting argument, when made by high-ranking individual defendants, that they were unaware of major business events likely to have a significant impact on the company's financial condition as "patently incredible"). Further, the sales information of Corcept's only source of revenue would "fall squarely within" the CEO's and CFO's "bailiwick". *In re Amgen Inc. Sec. Litig.,* 2014 WL 12585809, at **12 (C.D. Cal. Aug. 4, 2014) (finding "compelling" that the VP of Clinical Development would be aware of reports that presented potential hazards of the drug).

**Defendants' Disproportional Payments to Physicians Who Write the Most Prescriptions of Korlym is Indicative of Scienter:**  The creation of a "speakers program" where physicians are paid in honoraria can be indicative of "actual knowledge" by company executives of an off-label marketing scheme. *Amgen, Inc.*, 544 F. Supp. 2d at 1029 (finding a "speakers program" that paid physicians $1,000 to host a dinner to discuss using a drug in an off-label manner sufficiently demonstrates "actual knowledge"). Plaintiff alleges Corcept regularly made payments, typically for $2,000, to physicians to give similar off-label dinner talks, such as the ones attended by CWs 1 and 2. ¶¶184, 189. Additionally, a "glaringly high amount" of payments to "a small number of [] prescribers" is indicative of the CFO's scienter who "almost certainly" was required to approve the payments. *Insys*, 2017 WL 3268797 at *15. Here, as in *Insys*, Corcept paid a small subsection of prescribers a large amount of money for promoting and writing a significant number of off-label Korlym prescriptions.[27] ¶¶241, 245. Starting in 2017, Corcept's marketing budget nearly doubled, primarily consisting of honoraria and consulting payments. ¶247. The top three recipients from Corcept in 2017 (Drs. Hanford Yau, Jerry Back and Joseph Mathews) received $224,371.45, or 29% of the annual spend, representing nearly 60% of what Corcept

The *Higgins* court failed to find it "absurd to suggest" the defendants "were unaware of how the company managed to increase prescriptions and sales" because the product accounted for only 62% of sales and the Plaintiff did not establish that sales representatives were "instructed to, or actually made" any off-label statements. Here, unlike *Higgins,* Plaintiff has established Korlym represented *100%* of Corcept's revenue and that physicians across the country received the same off-label message from Corcept sales representatives. ¶¶57, 183, 185, 191, 196, 202, 204, 206, 210, 215, 220.

[27] Defendants cite no cases in support of their defense of the honoraria payments, and fail to address the fact that three of the top five physicians receiving honoraria payments from Corcept in 2017 were giving off-label instructions at dinners and/or were prescribing Korlym off-label. ¶¶184, 189.

25                                                                              Case No. 19-CV-01372-LHK

spent on physicians in 2016.[28] This "glaringly high amount" of payments to "a small number of [] prescribers" who also provided the highest number of Medicare Korlym prescriptions of any other physicians nationwide is indicative of scienter.[29]

**Defendants Were Motivated to Engage in a Widespread Off-Label Marketing Scheme to Fund Their Clinical Trials:** Belanoff believes "the best way to think of Corcept" is as "a self-funding company with a vibrant clinical platform." ¶349. In 2017, Corcept was conducting multiple clinical trials, including a trial for Relacorilant. ¶350. Corcept was "entirely dependent on the sale of Korlym" to "fund [its] operations and development programs," including for Relacorilant. ¶348. Defendants' reliance on Korlym sales as its only source to fund drug development and operations supports scienter. *Nguyen v. Radient Pharms. Corp.,* 2011 WL 5041959, at *9 (C.D. Cal. Oct. 20, 2011) (holding that a CEO that was "desperate for operating cash" and "[the company's] ability to continue operating was dependent upon raising additional capital" combined with additional "red flags" was sufficient for scienter).

**Defendants Were Motivated to Engage in the Alleged Fraud Because Corcept's Market Exclusivity Period Was About to Expire:** Korlym was designated an "orphan drug" by the FDA in 2007, which gave Corcept certain benefits in developing Korlym. ¶60. This was important to Corcept as Korlym's underlying ingredient, mifepristone, was no longer covered by its composition of matter patent. ¶345.  Korlym was ultimately approved in 2012 and, as a result, Corcept's market exclusivity period ran until February 2019. ¶119. At expiration, any competitor could make a generic version of Korlym. Given Korlym's exorbitant cost ($190,000 to $760,000 a year) any generic product would severely cut into Corcept's profits. ¶76. In the Company 10-K's from 2012 to 2017, Corcept stated it "rel[ies] on [] the exclusive marketing rights" to "protect [its] market for Korlym." ¶346. With those rights set to expire, and the 300 endocrinologists who treat 70% of Cushing's

---

[28] https://openpaymentsdata.cms.gov/company/100000000247

[29] Defendants' argument that honoraria and food and beverage payments, alone, do not support an off-label marketing scheme because this is simply a typical business practice (DB at 8-9) ignores that the highest payments were made to physicians who wrote the most prescriptions, and that the highest paid recipient was Dr. Back, an Internist and Dr. Mathews, a Non-Specialist Endocrinologist—neither of whom specialize in diagnosing Cushing's Syndrome. Moreover, Defendants impermissibly ask the Court to ignore the 266% and 366%, respectively, increase in payments to Family Medicine and Internal Medicine physicians because such payments were previously so low that it is more accurate to look at the whole numbers. DB at 8-9. This is a factual dispute about materiality not appropriate for a motion to dismiss. *Great Am. Ins. Co. v. Chang,* 2012 WL 3660005 (N.D. Cal. Aug. 24, 2012).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Syndrome patients not adopting Korlym, Defendants were motivated to engage in their off-label marketing scheme. *See* Section III, *supra*; *see also In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F. Supp. 2d 148, 167 (S.D.N.Y. Aug. 19, 2008) (Bristol Myers had motive to commit fraud because the exclusivity period for its drug was threatened). Indeed, Teva and Sun Ltd. brought new drug applications to make a generic version of Korlym. ¶345. Thus, Plaintiff has sufficiently alleged motive and Defendants' lack of stock sales is not dispositive of scienter. *America West Holding Corp.,* 320 F.3d at 944.

## IV.    PLAINTIFF ADEQUATELY ALLEGES LOSS CAUSATION

To plead loss causation in the Ninth Circuit, "the plaintiff must demonstrate a causal connection between the deceptive acts and the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Hartman v. Gilead Scis., Inc.,* 536 F.3d 1049, 1055 (9th Cir. 2008). While the alleged misrepresentation must be a "substantial cause" of the stock price decline, it does not have to be the sole reason. *Id.* So long as the "complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate." *Id.* at 1057.

Plaintiff alleges two corrective disclosures: (1) the market learned Defendants' prior statements that Corcept only marketed Korlym for on-label use in accordance with the FDA label primarily to Specialist Endocrinologists and, thus, "99%" of Korlym prescriptions were on-label, were false upon issuance of the SIRF Report which uncovered Defendants' improper off-label marketing scheme; and (2) the January Press Release announced a "slow-down" in current and projected Korlym sales, revealing the materialization of the undisclosed risk that insurance companies had become aware of, and were cracking down on, Corcept's off-label marketing scheme. ¶¶246-63.

Defendants erroneously contend that Plaintiff cannot establish loss causation for either alleged corrective disclosure because they have not demonstrated a "market revelation of [any] fraud." DB at 28. First, with respect to the SIRF Report, Defendants argue loss causation fails because: (i) everything in the SIRF Report was already publicly available; (ii) the SIRF Report disclosed only a "'risk' or 'potential' for widespread fraudulent conduct" and "not proof of the same"; and (iii) the SIRF Report is not a Company disclosure. DB at 28-30. Each argument lacks merit.

Defendants' claim that the SIRF Report is a collection of previously disclosed public information is, in essence, a truth-on-the-market-defense. It is well-settled that a truth-on-the-market defense is fact-specific and,

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

thus, inappropriate for decision on a motion to dismiss. *See Amgen,* 2014 WL 12585809, at *18 (C.D. Cal. Aug. 4, 2014) (the court is "unwilling[] to consider a truth-on-the-market defense at this early stage of the litigation"); *Rubin v. Trimble,* 1997 WL 227956, at *7 (N.D. Cal. Apr. 28, 1997) ("As the truth-on-the-market defense raises factual issues, it is generally a question for summary judgment or trial, not for a motion to dismiss.").

Moreover, Defendants are flatly wrong that all information in the SIRF Report was publicly available. The SIRF Report brought to light previously undisclosed data obtained through an FDA FOIA request that had not yet entered the market because such data can only be obtained by letter request. The data SIRF obtained from its FDA FOIA request revealed that at least seventeen Korlym-related deaths during the Class Period were in patients *without* a confirmed ECS diagnosis and the relationship between Dr. Hanford Yau and Corcept. Based on these uncovered facts, along with other data SIRF was able to piece together in its investigation, such as Open Payments data, Medicare Part D data and Corcept's improbable revenue growth, SIRF revealed for the first time its conclusion that the Company was engaged in an off-label marketing scheme to increase Korlym sales. So, even though the SIRF Report contained *some* public information, alongside non-public information from at least three different sources, SIRF was the first to synthesize all this disparate public and non-public information to reach its conclusion that Corcept was improperly marketing Korlym off-label. Courts in this Circuit have held that where, as here, there are opaque facts that require investors to "connect the dots," an analyst report that does so can serve as a corrective disclosure. *In re Apollo Group, Inc. Secs. Litig.,* 2008 WL 3072731, at *3 (D. Ariz. Aug. 4, 2008) (holding that in situations where "the pertinent facts are obfuscated in such a way, or are of such complexity, as to require someone to connect the dots for a bewildered market" allows for analyst reports compiling the information to serve as a corrective disclosure); *Garcia v. Guo,* 2016 WL 102213, at *11 (C.D. Cal. Jan 7, 2016) (holding that "the court cannot hold as a matter of law that the [corrective disclosure] does not qualify as a corrective disclosure on the basis that it did not reveal any new information to the market" and that it is an issue "better addressed at trial").

Defendants alternatively claim the SIRF Report cannot serve as a corrective disclosure because it merely disclosed a "risk" or "potential for widespread fraudulent conduct."[30] DB 29. Defendants intentionally

---

[30] Defendants' reliance on *Curry* is misplaced. *Curry v. Yelp Inc.,* 875 F.3d 1219, 1225 (9th Cir. 2017); DB at 29. The challenged corrective disclosure in *Curry* was the release of consumer complaint reports from the FTC. *Id.* Complaints from citizens, without any analysis or review, is not analogous to a report that took information from various federal sources and discovered an existing fraudulent scheme.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

miscategorized the information in the SIRF Report to fit this narrative. The SIRF Report did not disclose a "risk" of fraudulent conduct, it exposed that fraudulent conduct had been occurring since at least 2017. The SIRF Report synthesized existing facts to show that physicians like Dr. Hanford Yau had over **50 new prescriptions** in a single year, despite working at a clinic whose patient base was 91% male, and that Dr. Yau was handsomely paid by Corcept to the tune of almost $100,000 in 2017 for this massive increase in  Korlym prescriptions (which represented 9.1% of Corcept's revenue for the year). ¶¶276-278. The SIRF Report further uncovered from the FDA FAERS data that 17 patients had died while on Korlym for an "unknown indication." ¶279. This is a far cry from a "risk" of fraudulent conduct, nor is it an announcement of an investigation. It is the publication of a conclusion based on actual facts showing that fraud has been occurring at Corcept since 2017.

Finally, that the SIRF Report was created by an analyst is not fatal to its status as a corrective disclosure. An analyst report can constitute a corrective disclosure if, as here, it reveals additional or more authoritative fraud-related information that deflated the stock. *In re Apollo Group, Inc. Sec. Litig.,* 2010 WL 5927988 (9th Cir. June 23, 2010); *see also Hanon v. Dataproducts Corp.,* 976 F.2d 497, 503 (9th Cir. 1992) (what market understands depends on "intensity and credibility" of information). t was produced by an expert. The SIRF Report is like the investor report in *Apollo*. The average reasonable investor unlikely has the expertise to question Defendants' statements, determine which data sources could be used to invalidate those statements, then use the data obtained to "connect the dots" in such a way to uncover that Corcept had been engaged in an off-label marketing scheme, as the SIRF Report did here. Thus, the SIRF Report provided this information to investors through a more "authoritative source."

Upon publication of the SIRF Report, Corcept's common stock fell $1.52, or more than 11%, on unusually heavy trading volume. ¶26; *see In re BofI Holding, Inc. Secs. Litig.,* 2017 WL 5973340, at *3 (S.D. Cal. Dec. 1, 2017) ("It is the ***exposure to the fraudulent representation that is the critical component of loss causation***) (quoting *In re Bristol Myers Squibb Co. Secs. Litig.,* 586 F. Supp 2d at 165); *Gilead,* 536 F.3d at 1053-54 (same).

The second corrective disclosure on January 31, 2019, revealed the impact of Defendants' off-label scheme on Corcept's revenue and the materialization of the undisclosed risk insurance companies would learn Corcept was engaging in an off-label marketing scheme and crack down on approval requirements, resulting in the reported material slowdown in Korlym sales and the expectation it would continue into the future. ¶366; *see*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.,* 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013) (materialization of the risk an acceptable method for proving loss causation). Corcept's sales growth decreased from 25.5% in Q4 2018 to just 12.4% in Q1 2019, a steep decline from 108.9% just one year prior, and Corcept's revenue projections failed to meet the consensus analyst projections. Upon the news, Corcept's common stock fell $1.15, or more than 10%, on unusually heavy trading volume. ¶366. "A Plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the Plaintiff's economic loss." *Mineworkers' Pension Scheme v. First Solar Inc.,* 881 F.3d 750, 753 (9th Cir. 2018). The corrective disclosure does not need to explicitly disclose the fraud. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda,* 730 F.3d 1111, 1120 (9th Cir. 2013) ("Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss").

## V.  DEFENDANTS ARE LIABLE UNDER SECTION 20(A)

Plaintiff has adequately stated a Section 20(a) claim where he has adequately alleged a Section 10(b) violation and that Defendants Belanoff, Robb and Maduck were Corcept's executives who directly participated in the management of Corcept and exercised control over its internal operations and public statements. ¶41. *Howard v. Everex Sys.,* 228 F.3d 1057, 1065 (9th Cir. 2000).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motion in its entirety.

Dated: June 25, 2020                                          Respectfully submitted,


                                                             **LEVI & KORSINSKY, LLP**


                                                             */s/Sebastiano Tornatore*
                                                             Adam M. Apton (SBN 316506)
                                                             Adam C. McCall (SBN 302130)
                                                             388 Market Street, Suite 1300
                                                             San Francisco, CA 94111
                                                             Tel: (415) 373-1671
                                                             Email: aapton@zlk.com
                                                             Email: amccall@zlk.com


                                                             Shannon L. Hopkins

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

(to be admitted *pro hac vice*)
Sebastiano Tornatore (admitted *pro hac vice*)
Michael J. Keating (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiff the Ferraro Family
Foundation, Inc. and James L. Ferraro*

**Case No. 19-CV-01372-LHK**
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

**PROOF OF SERVICE**

I hereby certify that on June 25, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/Sebastiano Tornatore*
Sebastiano Tornatore

32                                        **Case No. 19-CV-01372-LHK**
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT