QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Corey Worcester (admitted *Pro Hac Vice*)
  coreyworcester@quinnemanuel.com
  Renita Sharma (admitted *Pro Hac Vice*)
  renitasharma@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 443-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Terry L. Wit (SBN 233473)
  terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendants Corcept Therapeutics Incorporated, Joseph K. Belanoff, Charles Robb, and Sean Maduck*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>Defendants. | CASE NO. 5:19-CV-01372-LHK<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS LEAD PLAINTIFFS' CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)**<br><br>Judge:           Hon. Lucy H. Koh<br>Courtroom:     8, 4th Floor<br>Hearing Date:  October 8, 2020<br>Hearing Time:  1:30 p.m. |

# TABLE OF CONTENTS

**Page**

ARGUMENT .................................................................................................................... 1

I.      PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION .............. 1

        A.      Plaintiffs Fail To Allege An Off-Label Promotion Scheme ................................... 1

        B.      The Alleged Misstatements Are Not Made Misleading By Corcept's
                Conduct ................................................................................................................. 3

II.     PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ................... 4

        A.      Plaintiffs' CWs Do Not Establish A Strong Inference of Scienter ......................... 5

        B.      "Core Operations" Theory Does Not Support A Strong Inference of
                Scienter ................................................................................................................. 6

                1.      Plaintiffs Fail To Plead "Actual Access" To Contradictory
                        Information ................................................................................................. 6

                2.      It Was Not "Absurd" For The Individual Defendants To Lack
                        Knowledge Of The Non-Existent Off-Label Marketing Scheme ................. 7

        C.      The Remaining Allegations Do Not Support A Strong Inference Of Scienter ....... 10

        D.      Plaintiffs' Allegations Fail Under A Holistic Analysis.......................................... 11

III.    PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION .................................................. 13

CONCLUSION ................................................................................................................... 15

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Acadia Pharm. Inc. Sec. Litig.*,
    2020 WL 2838686 (S.D. Cal. 2020) ........................................................................................ 8

*In re Actimmune Mktg. Litig.*,
    614 F. Supp. 2d 1037 (N.D. Cal. 2009) ............................................................................ 12, 13

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................................ 10, 11

*Badger v. Grubb & Ellis Co.*,
    1992 U.S. Dist. LEXIS 3648 (N.D. Cal. 1992) .......................................................................... 4

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ................................................................................................................ 14

*In re Blue Earth, Inc. Sec. Litig.*,
    2015 WL 12001274 (C.D. Cal. 2015) ...................................................................................... 13

*In re BofI Holding, Inc. Sec. Litig.*,
    302 F. Supp. 3d 1128 (S.D. Cal. 2018) .................................................................................... 13

*Boles v. Merscorp, Inc.*,
    2008 WL 5246038 (C.D. Cal. 2008) .......................................................................................... 5

*Bonanno v. Cellular Biomedicine Grp., Inc.*,
    2016 WL 4585753 (N.D. Cal. 2016) ........................................................................................ 13

*Brown v. Ambow Educ. Holding Ltd.*,
    2014 WL 523166 (C.D. Cal. 2014) .......................................................................................... 15

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................................. 7, 8

*Di Donato v. Insys Therapeutics Inc.*,
    2017 WL 3268797 (D. Ariz. 2017) ........................................................................................ 9, 10

*In re Downey Secs. Litig.*,
    2009 WL 736802 (C.D. Cal. 2009) .......................................................................................... 11

*Eng v. Edison Int'l*,
    2018 WL 1367419 (S.D. Cal. 2018), *aff'd*, 786 F. App'x 685 (9th Cir. 2019) ........................ 15

*Fadia v. FireEye, Inc.*,
    2016 WL 6679806 (N.D. Cal. 2016) ........................................................................................... 7

*Freeney v. Bank of Am. Corp.*,
    2015 WL 12535021 (C.D. Cal. 2015) ......................................................................................... 6

*Glazer Capital Mgmt. LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ................................................................................................. 8, 9

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 12732428 (C.D. Cal. 2015) ...................................................................................... 13

*Inchen Huang v. Higgins*,
  2019 WL 1245136 (N.D. Cal. 2019).......................................................................................... 11

*In re Intrexon Corp. Sec. Litig.*,
  2017 WL 732952 (N.D. Cal. 2017)............................................................................................ 13

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014).................................................................................................... 14

*Mandalevy v. Bofi Holding, Inc.*,
  2018 WL 6436723 (S.D. Cal. 2018) .................................................................................... 13, 14

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008)................................................................................................ 5, 15

*Meyer v. Greene*,
  710 F.3d 1189 (11th Cir. 2013) ................................................................................................ 14

*Miller v. PCM, Inc.*,
  2018 WL 5099722 (C.D. Cal. 2018).................................................................................... 13, 14

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018).................................................................................................... 15

*In re Nektar Therapeutics*,
  2020 WL 3962004 (N.D. Cal. 2020).......................................................................... 7, 8, 13, 14

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020)................................................................................................... 1, 2

*In re Nvidia Corp. Secs. Litig.*,
  2010 WL 4117561 (N.D. Cal. 2010)............................................................................................ 8

*In re Nvidia Corp. Secs. Litig.*,
  768 F.3d 1046 (9th Cir. 2014).................................................................................................. 5, 8

*In re Ocera Therapeutics, Inc. Sec. Litig.*,
  806 F. App'x 603 (9th Cir. 2020).............................................................................................. 15

*Plichta v. SunPower Corp.*,
  790 F. Supp. 2d 1012 (N.D. Cal. 2011) ...................................................................................... 7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)............................................................................................ 5, 6, 7, 9

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014)...................................................................................................... 9

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012).............................................................................................. 11, 12

*Rihn v. Acadia Pharm. Inc.*,
  2016 WL 5076147 (S.D. Cal. 2016) ............................................................................................ 9

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ........................................................................................ 6

*In re Sanofi Secs. Litig.*,
    155 F. Supp. 3d 386 (S.D.N.Y. 2016) ........................................................................... 4

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ........................................................................ 5

*In re Solarcity Corp. Securities Litig.*,
    274 F. Supp. 3d 972 (N.D. Cal. 2017) ........................................................................ 10

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
    33 F. Supp. 3d 1107 (N.D. Cal. 2014) *aff'd in relevant part, rev'd in part on
    other grounds*, 669 F. App'x 878 (9th Cir. 2016) ...................................................... 10

*Veal v. LendingClub Corp.*,
    423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................................... 8

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    2009 WL 1458211 (N.D. Cal. 2009) ........................................................................... 13

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...................................................................................... 12

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................. 6, 10, 11

## Statutes

21 U.S.C. § 396 ................................................................................................................. 12

## Other Authorities

Broder, M. S. *et al.*, *Incidence of Cushing's syndrome and Cushing's disease in commercially-insured patients <65 years old in the United States*, 18(3) *Pituitary* 283, June 2015 ................. 3

Case No. 19-CV-01372-LHK
DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

Plaintiffs ask this Court to assume—based primarily on the allegations of a handful of anonymous, non-employee witnesses—that Defendants orchestrated a multiyear and ongoing nationwide campaign to dupe "unsuspecting" physicians into prescribing Korlym in contravention of its FDA-approved indication. But "the PSLRA neither allows nor requires [this Court] to check [its] disbelief at the door." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020). Because nothing in Plaintiffs' opposition brief changes the fact that the SAC fails to plead actionable misrepresentations, scienter, or loss causation (even after multiple amendments), the SAC should be dismissed with prejudice.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION

#### A.    Plaintiffs Fail To Allege An Off-Label Promotion Scheme

The SAC does not allege any misrepresentation or omission with the required specificity. Instead, Plaintiffs' Complaint embroiders a legal irrelevancy (namely, allegations of off-label *sales*, which Plaintiffs conflate with off-label *promotion*) with logical fallacy upon logical fallacy.

*First*, Plaintiffs have not established off-label promotion. Plaintiffs argue that Corcept promoted Korlym for off-label use because Corcept "instructed [physicians] to employ a single test [the DST] to screen for Cushing's Syndrome," SAC ¶ 12, when "Diagnostic and FDA Guidelines" "prohibit" Corcept from marketing in that manner, Opp. 16. Corcept did not do so. However, even if Corcept had instructed physicians to use only the DST, reliance on the DST does not indicate an off-label use because Korlym's FDA-approved label does not include *any* limitation on—or even mention of—appropriate diagnostic tools. *See* Decl. Ex. A (Korlym's FDA Label).[1] While Plaintiffs purport to rely on the FDA's Summary Review for Regulatory Action, it goes without saying that the Review is not the label. Even if it were, that Review also does not "prohibit" use of

---

[1] The fact that Korlym's FDA-approved label is silent as to the type of test to be used is notable, because the FDA regularly includes such limitations in pharmaceutical labels. For example, Herceptin's label states that "[d]etection of HER2 protein overexpression is necessary" and should be assessed via "FDA-approved tests for the [patient's] specific tumor type." Ex. B to Decl. Keytruda's label states that it is indicated for, *inter alia*, patients "expressing PD-L1 [protein] … as determined by an FDA-approved test." Ex. C to Decl. Unlike these drugs, Korlym's label does not require that physicians test for any particular biochemical marker—using the DST or otherwise.

the DST because it explicitly notes that "the laboratory and radiologic tests used to diagnose Cushing's syndrome [are] beyond the scope of this memo." SAC ¶ 75. As such, even if Plaintiffs were correct about Corcept's marketing (and they are not), such marketing would not be "off-label."

*Second*, even if Plaintiffs had established off-label promotion, they have not established that Corcept engaged in a widespread scheme. Plaintiffs' claim of a widespread scheme is based on two sources: improper statistical analysis and a handful of anonymous, non-Corcept sources. Both fail.

While Plaintiffs recite the purported claims of their CWs, they are unable to provide any support for them—*even where such support should exist*. For example, Plaintiffs allege that their anonymous CWs were given "off-label messages ... in Corcept's marketing materials[,] in tear sheets and case studies inserted into promotional materials during the Class Period." Opp. 12. Conspicuously, however, Plaintiffs neither attach nor quote such materials—not even one. This is true even though Plaintiffs' Opposition (though not their SAC) alleges that their CWs are "*still receiving*" Corcept's "Uniform Off-Label Marketing Message" "*today*." Opp. 12 (emphases added). That is, to say the least, unusual in an off-label marketing complaint. The Ninth Circuit recently dismissed a Section 10(b)(5) claim where allegations of confidential witnesses were "high on alarming adjectives" but "short on facts." *Endologix*, 962 F.3d at 416. So too here.

Plaintiffs' statistics fare no better. Plaintiffs argue that Corcept promoted Korlym for off-label use because absent such marketing, Corcept's prescription numbers are statistically improbable. *See* Opp. 9. But Plaintiffs' conclusion is based upon a series of unsupported factual assertions. Where, as here, plaintiffs ask this court to draw a conclusion that "does not make a whole lot of sense," their complaint should be dismissed. *Endologix*, 962 F.3d at 415.

Plaintiffs' Complaint first claims that "[t]he incidence of endogenous Cushing's Syndrome ranges from .7 to 2.4 per million population per year." SAC ¶ 85; *see also* Opp. 13. However, Plaintiffs provide no citation for that rate, nor for the claim that it is "indisputabl[e]."[2] *Id.*

---

[2] Far from it. Indeed, a recent medical study concluded that "the annual incident of [Cushing's Syndrome] in individuals under 65 years old was nearly 49 cases per million." Broder, M. S. *et al.*, *Incidence of Cushing's syndrome and Cushing's disease in commercially-insured patients <65 years old in the United States*, 18(3) *Pituitary* 283, June 2015.

Plaintiffs then try to build a monument of allegations upon that slender reed.  For example, Plaintiffs claim that based upon this purported incidence rate, the "combined populations of the towns where [two Korlym prescribers] work ... is approximately 826,000 people, meaning the expected number of ECS patients in the area is just 1 or 2 patients."  Opp. 13.  But such population figures are also unsupported.  Embroidering further, Plaintiffs apply this "expected number" to all physicians.  *Id.*  Plaintiffs allege that five prescribed "at least 111 patients ... Korlym off-label," a figure arrived at by deducting from each physician's patient total "the two patients estimated as likely Cushing's diagnoses per year."  Opp. 12-13, n.14.  But Plaintiffs do not explain how or why this Court should conclude that disparate physicians such as  Dr. Hanford Yau (who practices in the major metropolitan area of Orlando) and Dr. Norman Crabb (who practices in the small town of Ingleside, Texas) were each "estimated as likely" to see two "diagnoses per year."  *Id.*

*Third*, even if Plaintiffs had sufficiently alleged both off-label promotion and statistically anomalous prescription patterns, they have not sufficiently alleged that those prescription patterns were *caused* by Corcept's marketing.  Plaintiffs do not dispute that physicians are permitted to prescribe pharmaceuticals for "off-label" uses (*see* MTD 7 n.5) in accordance with their medical judgment.  To circumvent this reality, Plaintiffs allege that Corcept "dup[ed]" and "induc[ed]" unsuspecting physicians and enticed them to prescribe Korlym off-label through honoraria payments.  SAC ¶¶ 1, 130.  But Plaintiffs do not—and cannot—allege why this Court should accept the tenuous inference (or the SAC's conclusory allegations) that physicians acted at the behest of Corcept, instead of in accordance with their oaths and professional obligations.

**B.    The Alleged Misstatements Are Not Made Misleading By Corcept's Conduct**

Even if Plaintiffs had sufficiently alleged a material off-label promotion scheme (they have not), their arguments regarding falsity are insufficient to withstand a motion to dismiss.

*First*, Plaintiffs argue that they "allege Defendants' statements are false because [Corcept] told investors Corcept only marketed Korlym for on-label use" and that "99% of [prescriptions] are on label."  Opp. 17-19.[3]  As discussed, *supra*, Corcept did not engage in a widespread off-label

---

[3]  Plaintiffs also allege that Corcept "misrepresented that 'we believe our marketing materials

marketing scheme to promote off-label use.  Even if it did, however, that conduct would render misleading only a small fraction of the alleged misstatements in Plaintiffs' Exhibit A.[4]

*Second*, Plaintiffs allege that Corcept's statements about revenue are misleading.  However, "[t]he allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability." *In re Sanofi Secs. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016).

*Third*, Plaintiffs allege that Corcept represented that it "was still 'focus[ing] on the endocrinologists who treat most patients with hypercortisolism,'" and that this was false because "Corcept had long abandoned this strategy" and begun marketing to Non-Specialist Endocrinologists.  Opp. 21.  Setting aside that Plaintiffs' construct of "Non-Specialist Endocrinologists" is makeweight, Corcept's efforts to market Korlym to endocrinologists—whom Plaintiffs describe as "uniquely qualified to … treat [the disease]" (SAC ¶ 7)—is not an illegal act and therefore does not establish falsity.

*Fourth and finally*, Plaintiffs' belated effort to assert an omissions theory is unavailing.  Plaintiffs claim that their "entire theory is predicated on a pervasive off-label marketing scheme that … was not disclosed."  Opp. 17 n.21.  Where plaintiffs claim that defendants omitted the truth that a challenged statement misrepresents, the case is about misrepresentations, not omissions.  *See Badger v. Grubb & Ellis Co.*, 1992 U.S. Dist. LEXIS 3648, *15 (N.D. Cal. 1992) (omissions are not properly pled merely by "emphasizing facts that the misrepresentations did not state").

## II.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiffs' arguments fail to demonstrate that the SAC adequately pled scienter—or contemporaneous facts demonstrating that each Individual Defendant made the allegedly false statements intentionally or with deliberate recklessness.  *See Metzler Inv. GMBH v. Corinthian*

---

and training programs … ***do not constitute 'off-label' promotion***," Opp. 17 (emphasis in original).  However, Plaintiffs do not refute that these are statements of belief, and likewise have failed to establish that they are not non-actionable "expressions of opinion."  *See* MTD 14-15 (citing cases).

[4]   For statements that are not rendered misleading by Plaintiffs' allegations of off-label marketing, *see, e.g.*, SAC Ex. A at Statements 8, 10, 13 (related to sources of revenue); 1, 4, 7 (regarding speaker and education programs).

*Colleges, Inc.*, 540 F.3d 1049, 1066 (9th Cir. 2008).  As such, Plaintiffs' claims should be dismissed.

### A.    Plaintiffs' CWs Do Not Establish A Strong Inference of Scienter

CWs can establish scienter only when they offer "firsthand knowledge regarding what the individual defendants knew or did not know."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (internal citation omitted) ("*Intuitive*"); *In re NVIDIA Corp. Secs. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014).  The Opposition cannot elide this fundamental failure:  the CWs do not and cannot explain what the Individual Defendants allegedly knew or how they came to know it.  *See Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148-49 (N.D. Cal. 2017) (CW allegations "do not separately give rise to any inference of scienter" where they "do not permit the Court to conclude that any CW had personal knowledge of the … [d]efendants' state of mind[,]" since "[c]ritically, none of the CWs report communicating directly with [defendants]").

In *In re Countrywide*, the lone case Plaintiffs cite to address this fundamental flaw (Opp. 23), the court inferred knowledge of a bank-wide failure to follow underwriting standards through 14 CWs, all former underwriters or vice presidents of Countrywide who experienced firsthand the massive decline in such standards and in certain instances discussed them contemporaneously, including with senior management.  554 F. Supp. 2d. 1044, 1051 (C.D. Cal. 2008).  Here, *none* of the CWs ever worked for Corcept (let alone currently or during the Class Period) or ***even interacted*** (at any time) with the Individual Defendants.  Because the CWs were not privy to evidence of the Individual Defendants' state of mind, and their outside, third-party experiences cannot be used to impute knowledge of an internal, companywide practice at Corcept, *In re Countrywide* is inapposite.

Moreover, the SAC's single, fleeting reference to a purported off-label "tear sheet" that CWs contend was "inserted in promotional materials provided to physicians," Opp. 23, is similarly unavailing.  Tellingly, not a single tear sheet or off-label marketing document has been quoted or put before this Court, even though Plaintiffs allege such conduct is ongoing.  Opp. 12.  Allegations based upon documents the Court has not been permitted to see and whose authenticity Defendants challenge, are insufficient to survive a motion to dismiss.  *See Boles v. Merscorp, Inc.*, 2008 WL 5246038 at *3 n.3 (C.D. Cal. 2008) (declining to consider document at motion to dismiss stage "since the authenticity of the document is in dispute"); *Freeney v. Bank of Am. Corp.*, 2015 WL

12535021 at *17 (C.D. Cal. 2015) (same).

### B.   <u>"Core Operations" Theory Does Not Support A Strong Inference of Scienter</u>

Lacking particularized allegations about the when, what, and how of the Individual Defendants' scienter, Plaintiffs offer a weak string of "must-have-known" arguments premised on the "core operations" theory.  However, that theory applies in "exceedingly rare" cases.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008).  "Proof under this theory is not easy." *Intuitive*, 759 F.3d at 1062 (citation omitted).  Plaintiffs have not demonstrated its application here.

This Court may infer that the Individual Defendants knew of all facts related to Corcept's "core operations" only if (1) the Individual Defendants made "specific admissions ... of detailed involvement in the minutia of [Corcept's] operations" or if "witness accounts demonstrat[ed] that [the Individual Defendants] had actual involvement in creating false reports," *Intuitive*, 759 F.3d at 1062; or (2) in "rare circumstances," where the alleged falsity "is patently obvious" and "prominent enough that it would be 'absurd to suggest' that [the Individual Defendants were] unaware of [it]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009).  Plaintiffs' allegations come nowhere close to meeting either stringent requirement.  Opp. 24.

### 1.   <u>Plaintiffs Fail To Plead "Actual Access" To Contradictory Information</u>

To demonstrate the Individual Defendants' detailed involvement in the minutia of Corcept's purported off-label operations, plaintiffs must allege they had "actual access" to material contradicting the alleged misrepresentations, or that witness accounts demonstrate their direct involvement in the pervasive, companywide off-label marketing scheme alleged in the SAC. *S. Ferry*, 542 F.3d at 786.  Plaintiffs cannot do either.

Parroting the language in *Intuitive*, Plaintiffs allege that "Defendants *admittedly* had access" to "*detailed* sales data," including "off-label prescription and patient data."  Opp. 23-24 (emphases added).  Plaintiffs provide no citation for this allegation, nor do they otherwise specify *which* statements they claim are "specific admissions." *Intuitive*, 759 F.3d at 1062.  Assuming that Plaintiffs intend to refer to statements regarding (1) Corcept's knowledge of "where … every single tablet goes" (*see* SAC ¶¶ 302-07), or (2) that Korlym *patients* (not prescriptions) increase by "1s and 2s" (*id.* ¶ 240), however, such statements are patently insufficient.  Statements regarding

Corcept's understanding of who has been prescribed Korlym in no way establish that those prescriptions were based upon off-label marketing.

It is for this reason that in *Fadia v. FireEye, Inc.*, the court declined to apply the core operations theory where plaintiff failed to allege specific facts as to what countervailing facts defendants were exposed to and why those facts supported an inference of scienter.  2016 WL 6679806 at *16 (N.D. Cal. 2016); *see also Plichta v. SunPower Corp.*, 790 F. Supp. 2d 1012, 1020 (N.D. Cal. 2011) (statements that executives "closely monitored the company's finances" were not "an admission that [they] monitor[ed] recordkeeping and accounting functions down to the level of detail where the falsification allegedly occurred").

Moreover, courts have previously found that statements by executives regarding the *outcomes* of company operations do not constitute "specific admissions ... of detailed involvement in the minutia of [those] operations."  *Intuitive*, 759 F.3d at 1062.  For instance, in *In re Nektar Therapeutics*, the court declined to apply the core operations theory where plaintiffs alleged that executives made misrepresentations regarding the outcome of clinical trials, finding that the executives' statements about the *results* of the clinic trials did not constitute "specific admissions ... of detailed involvement" in the trials themselves.  2020 WL 3962004 at *12 (N.D. Cal. 2020).

Because the SAC "come[s] nowhere close to identifying 'hard numbers' or specific admissions of Defendants that they knew of allegedly undisclosed information" concerning off-label marketing, the core operations theory simply does not apply.  *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012) (Koh, J.).[5]

**2.    It Was Not "Absurd" For The Individual Defendants To Lack Knowledge Of The Non-Existent Off-Label Marketing Scheme**

Failing to satisfy the theory's first prong, Plaintiffs next ask this Court to apply the core operations theory based upon Korlym's importance to Corcept.  Opp. 24-25.  But knowledge may only be inferred where it would be "absurd to suggest" that the defendant did not know of the

---

[5]  Plaintiffs' effort to allege scienter based on the Individual Defendants' job responsibilities, SAC ¶¶ 320-22, is similarly unavailing.  "Pointing to Defendants' statements or their professional backgrounds does not suffice under [core operations] theory."  *In re Nektar*, at *12.

Case No. 19-CV-01372-LHK
DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

*particular* facts at issue.  Here, however, Plaintiffs have failed to adequately plead an off-label marketing scheme.  Thus, it is hardly absurd to infer that the Defendants were never aware of one. *In re Nvidia Corp. Secs. Litig.*, 2010 WL 4117561 at \*10 (N.D. Cal. 2010) ("Without sufficiently alleging actual falsity, ... plaintiffs cannot rely on the concept of core operations to infer scienter."); *City of Royal Oak Ret. Sys.*, 880 F. Supp. at 1068.

Plaintiffs' assertion that "Corcept's ***only source of revenue*** during the Class Period came from its sales of Korlym, [thus] representing the Company's 'core operations,'" SAC ¶ 323 (emphasis in original), is insufficient without allegations that the Individual Defendants were "specific[ally] involv[ed]" in the "details of the purported misrepresentations" (i.e., that they had knowledge of the alleged off-label scheme and subsequently failed to disclose it).  *In re Nektar*, at \*13; *see also In re NVIDIA*, 768 F.3d at 1063 (core operations unavailable without additional allegations of specific information actually conveyed to management related to the alleged fraud). The Ninth Circuit has also squarely rejected the argument that scienter should be inferred because Corcept sells a single product.  *Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008) (dismissal despite allegations that defendant was "a small company which sold a relatively small number of [products] to a limited number of customers"); *see also Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817 (N.D. Cal. 2019) (fact that product was "one of [defendant's] main revenue sources … does not make every piece of information within the Company that relates to [the product] critical to the business's core operations").

None of the cases cited by Plaintiffs are to the contrary.  In *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 WL 2838686 at \*8 (S.D. Cal. 2020) (Opp. 24), which did not involve a core operations theory, an inference of scienter was supported where defendants did not deny tracking data about the company's "only product" that "clearly showed red flags" that were inconsistent with the challenged statements.  Here, Plaintiffs fail to allege what precise data was tracked, where, by whom, and what it revealed about off-label marketing (as opposed to mere off-label prescriptions by physicians, which are not illegal and which in any event Plaintiffs do not show either).

In *Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147 at \*9 (S.D. Cal. 2016) (*id.*), a strong inference of scienter was found where the defendants likely had knowledge (and access to specific

information) that rendered their statements false.  Unlike *Rihn*—which involved a much more direct nexus between the alleged misstatements regarding the regulatory approval process and defendants' knowledge of their failure to complete certain steps in that process at the time they made the statements—Plaintiffs here do not even establish that off-label marketing data exists, let alone that such data was in Defendants' possession.

*Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) (*id.*) is similarly inapposite, because there the individual defendant at issue not only "bridged the scienter gap herself by referencing the [underlying] data directly" in her alleged misstatements, thus distinguishing *Glazer*, but also had received a Corrective Action Order from regulators—neither of which is alleged here.  *Reese*, 747 F.3d at 572, 576-77 (original quotations, citations and modifications omitted).  Indeed, the Ninth Circuit highlighted the importance of such "actual access" to the underlying information when it *rejected* an inference of scienter under the core operations theory and affirmed dismissal as to a different individual defendant who *lacked* such access.  *Id.* at 577.

Finally, in *Di Donato v. Insys Therapeutics Inc*., 2017 WL 3268797 at *15 (D. Ariz. 2017) (*id.*), the court held that it "is absurd to think" that the president of a pharmaceutical company lacked knowledge of an illegal off-label scheme given, *inter alia*, the "glaringly high" revenue the company realized from one of its drugs as compared to "comparable" products.[6]  Here, unlike Insys (which sold a drug facing extreme competition in the pharmaceutical market), the SAC concedes that Corcept had market exclusivity over Korlym (and, thus, no competitors) during the Class Period (i.e., from August 2, 2017 and January 31, 2019), and therefore no reason for the company to suspect that its growing revenue figures were inflated.  *See, e.g.*, SAC ¶ 344 ("Korlym's marketing exclusivity … expired [after the Class Period ended] on February 17, 2019.").  As set forth *infra*, a more plausible interpretation of Korlym's revenue growth is that the Company increasingly worked to achieve sales consistent with its FDA-approved label within a market that Corcept dominated

---

[6]   Moreover, the president specifically admitted that he was involved in "the minutia of [the] company's operations," *Intuitive*, 759 F.3d at 1062, through his participation in daily meetings which discussed the drug's fraudulently obtained revenue.  *Insys*, 2017 WL 3268797 at *15.

throughout the entire Class Period.[7]

Taken together, Plaintiffs' own-cited cases demonstrate that it is far from "patently obvious" that Defendants should have known about an alleged off-label campaign, the existence of which the SAC does not even plausibly allege. *Zucco*, 552 F.3d at 1001. In sum, establishing the "absurdity" prong of the core operations theory is a "rare circumstance" this Court has previously rejected based on far more detailed allegations, *see In re Solarcity Corp. Securities Litig.*, 274 F. Supp. 3d 972, 1012-13 (N.D. Cal. 2017) (Koh, J.), and the same result should obtain here.

### C.   The Remaining Allegations Do Not Support A Strong Inference Of Scienter

*Revenue*. On January 31, 2019, the same date the class period ends, Corcept announced (i) "[p]reliminary 2018 revenue [of] $251.2 million," and (ii) 2019 revenue guidance "projecting full-year 2019 revenue of $285 - $315 million," a substantial year-on-year increase of more than 13%. SAC ¶ 282. As the MTD demonstrates (at 4-5)—and Plaintiffs fail to refute—positive financial performance undermines not just a "core operations" inference but a finding of scienter. *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1136 (N.D. Cal. 2014) (defendant's "financial results were, overall, positive" which "undermine[d] the core operations inference"), *aff'd in relevant part, rev'd in part on other grounds*, 669 F. App'x 878 (9th Cir. 2016).

*Physician Payments*. Plaintiffs distort *Amgen* by claiming that the mere "creation of a 'speakers program' where physicians are paid in honoraria can be indicative of 'actual knowledge'" of an off-label scheme. Opp. 25. However, in *In re Amgen Inc.*, the court found scienter because the defendants created a speakers program designed to pay physicians to "talk about off-label uses." 544 F. Supp. 2d 1009, 1029 (C.D. Cal. 2008). Here, there is no allegation that Corcept created its speakers program for such purpose. Moreover, Plaintiffs still fail to present any facts demonstrating

---

[7] *Insys* is also inapposite because plaintiffs there alleged that Insys sales representatives were specifically instructed to "deliberately avoid[]" marketing the subject medication to oncologists and pain specialists even though the on-label use was for breakthrough cancer pain. *Insys*, 2017 WL 3268797 at *12. Here, Plaintiffs concede that the vast majority of Corcept's marketing was to endocrinologists—the very specialists qualified to prescribe Korlym for on-label use—and make no allegations that Corcept was deliberately seeking to avoid them. *See* MTD 9 (noting that "while Corcept was allegedly 'prey[ing] on' non-endocrinologists, it spent approximately *eighty-five percent* of … funds [marketing to] endocrinologists" and that "more than half of these payments by quantity … [went] to endocrinologists" as opposed to non-endocrinologists) (emphasis in original).

that legal honoraria establish, or even suggest, knowledge of off-label marketing.

*Motive*.  The Opposition does not dispute that the Individual Defendants lacked a personal motive to commit fraud.  Compare MTD 25-26 with Opp. 26-27.  Instead, Plaintiffs offer two theories of corporate motive:  that Corcept used profits from Korlym to fund new drug development programs, and that Corcept sought to realize significant Korlym sales before the drug's market exclusivity period expired.  These theories ignore the Ninth Circuit's holding that "allegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).[8]

### D.   Plaintiffs' Allegations Fail Under A Holistic Analysis

Under *Tellabs*, the Court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991.  "Even if … allegations may create an inference … greater than the sum of its parts, it must still be [cogent and] at least as compelling as an alternative innocent explanation." *Id.* at 1006.  As the MTD amply demonstrates (at 14-17), any inference of scienter is overwhelmed by the innocent inferences to be drawn from exculpatory facts properly before the Court.  Plaintiffs' significant efforts to evade the import of these facts (or ignore them altogether) are all without merit.

*First*, there were no stock sales, a point the Opposition is forced to concede.  Opp. 27.  The absence of improper stock sales or other tangible, personal benefit to Defendants as a result of the alleged misstatements weighs against an inference of scienter.  *Webb v. Solarcity Corp.*, 884 F.3d

---

[8]   Plaintiffs have abandoned the scienter argument regarding Dr. Fishman's resignation, SAC ¶ 319, presumably because "[r]esignations … by themselves do not support a strong inference of scienter." *In re Downey Secs. Litig.*, 2009 WL 736802 at \*10 (C.D. Cal. 2009); *Zucco*, 552 F.3d at 1002 ("[P]laintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one.").  In any case, where Dr. Fishman is not a defendant and his resignation adds nothing to the scienter analysis, it should not be considered.  *Inchen Huang v. Higgins*, 2019 WL 1245136 at \*14 (N.D. Cal. 2019) (rejecting "the resignations ... of two non-Defendants[s]" as "evidence of scienter" because "Plaintiffs do not rely on the[m] in their opposition").

DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS

844, 856 (9th Cir. 2018); *In re Rigel Pharm.*, 697 F.3d at 884-85.

*Second*, as an orphan drug, Korlym received "seven years of marketing exclusivity," SAC ¶ 60, a fact Plaintiffs themselves describe as a "lifeline," *id.* ¶ 53. Plaintiffs also allege that it is not until expiration (i.e., 2019) that "the door to price competition from generic competitors" would open. *Id.* ¶ 9. Yet, the purported off-label campaign supposedly began years before any threat would ever materialize (and despite Corcept's development of relacorilant, the company's successor to Korlym). *Id.* ¶ 119 n.22. The equally, if not more plausible, interpretation of the record is that Corcept's successful on-label promotion of Korlym has benefited the company and ensured that relacorilant is well-positioned to enter the market and experience similar results.

*Third*, while Plaintiffs allege that "[i]nsurance companies caught on to the off-label scheme" and tightened reimbursement requirements, Plaintiffs concede that "many insurance companies ha[d] not caught wind" and "only two ... changed their guidelines during the Class Period." Opp. 15 n.18. Plaintiffs provide no evidence from which this Court could conclude that the behavior of *two* insurance companies was motivated by concerns regarding off-label marketing (or even of the short and distort campaign against the company by short sellers)—much less evidence from which this Court could conclude that such anomalous behavior should be used as evidence of scienter.

*Fourth*, it is undisputed that physicians "may lawfully prescribe drugs for 'off-label' indications." *In re Actimmune Mktg. Litig.*, 614 F. Supp. 2d 1037, 1041 n.1 (N.D. Cal. 2009), *aff'd*, 464 F. App'x 651 (9th Cir. 2011).[9] Plaintiffs' attempts to circumvent this well-established tenet in both the legal and medical fields through a manufactured claim that Corcept "induced" physicians to prescribe off-label, without establishing that Defendants orchestrated a companywide off-label scheme or even possessed off-label marketing materials, is not as compelling as the more obvious inference: Corcept markets on-label to physicians who, in their independent professional and medical judgment, may lawfully prescribe Korlym "for 'off-label' indications to achieve therapeutic

---

[9] *See also, e.g.*, 21 U.S.C. § 396 ("Nothing in this chapter [of the Federal Food, Drug, and Cosmetic Act] shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.").

goals other than those for which the drug was approved" by the FDA. *Id.* at 1041 n.1.

Simply put, "there are many allegations in this case, but they fare no better when read in combination than when read independently." *In re VeriFone Holdings, Inc. Sec. Litig.*, 2009 WL 1458211 at \*10 (N.D. Cal. 2009). Here, no CW alleges that Defendants knew of the supposed off-label marketing scheme when the challenged statements were made. Thus, the only reasonable inference to draw from a holistic review of the allegations is that Corcept believed in the truth and accuracy of such statements, particularly in view of the equally compelling innocent explanations, many of which Plaintiffs cannot (and have not even tried to) refute.

## III.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION

Finally, Plaintiffs make five arguments in support of their loss causation claim. Each fails.

*First*, Plaintiffs argue that the question of whether the SIRF Report collected only previously-public information is "inappropriate for decision on a motion to dismiss." Opp. 27-28. However, numerous cases in the Ninth Circuit have granted dismissal on precisely this basis.[10]

*Second*, Plaintiffs allege that the Report contained non-public data in the form of "previously undisclosed data obtained through an FDA FOIA request." Opp. 28. But "information available through FOIA is publicly available," *Mandalevy v. Bofi Holding, Inc.*, 2018 WL 6436723 at \*10 (S.D. Cal. 2018)—which is, obviously, why the SIRF Report authors were able to obtain it. Plaintiffs' fallback argument is that the SIRF Report contained "non-public information from at least three [additional] different sources." Opp. 28. But the three sources Plaintiffs list are *public*:

_____

[10]   *See, e.g. In re Nektar*, at \*18 (granting dismissal where alleged disclosure "was prepared with publicly-available data" and "[t]hus … cannot constitute new information unknown to the market"); *In re Intrexon Corp. Sec. Litig.*, 2017 WL 732952 at \*7 (N.D. Cal. 2017) (same where alleged disclosure "only collected and opined on already public information"); *Bonanno v. Cellular Biomedicine Grp., Inc.*, 2016 WL 4585753 at \*1 (N.D. Cal. 2016) (same where alleged disclosure "does not constitute new information"); *Miller v. PCM, Inc.*, 2018 WL 5099722 at \*11-12 (C.D. Cal. 2018) (same where alleged disclosure "was gleaned entirely from public filings and information"); *In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1132 (S.D. Cal. 2018) (same where alleged disclosure "relied on publicly available information, and offered no analysis not generally available to the rest of the market"); *In re Blue Earth, Inc. Sec. Litig.*, 2015 WL 12001274 at \*2 (C.D. Cal. 2015) (same where alleged disclosure was "a compilation of publicly available information"); *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428 at \*4, 6 (C.D. Cal. 2015) (same where alleged disclosure relied upon "information readily obtainable from Herbalife's public filings and other publicly available documents").

Open Payments data, Medicare Part D data, and Corcept's own disclosures. *Id.* Because Plaintiffs do not and cannot identify any non-public information in the SIRF Report, it "cannot constitute new information unknown to the market" and is not a corrective disclosure. *In re Nektar*, at \*18.

*Third*, Plaintiffs allege that the SIRF Report is a corrective disclosure because it is an "expert['s]" "synthesi[s]" of "disparate … information." Opp. 28, 29. However, Plaintiffs' invocation of efficient market theory to plead reliance (*see* SAC ¶¶ 362-63) has "a dire—and indeed fatal—effect on their ability to demonstrate loss causation" in this manner. *Meyer v. Greene*, 710 F.3d 1189, 1195 (11th Cir. 2013).

Efficient market theory is based upon the "premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988); *see also Mandalevy*, 2018 WL 6436723 at \*10 (efficient market theory presumes that all publicly-disclosed information is considered to have been "incorporated into the market price"); *see also Miller v. PCM, Inc.*, 2018 WL 5099722 at \*11 (C.D. Cal. 2018). Because the market price "reflects all publicly available information," *Basic*, 485 U.S. at 246, where a security trades in an efficient market, nothing is "revealed" by a purported corrective disclosure "derived entirely from public filings and other publicly available sources of which the stock market was presumed to be aware." *Loos v. Immersion Corp.*, 762 F.3d 880, 889 (9th Cir. 2014). "The efficient market theory ... is a Delphic sword: it cuts both ways. [Plaintiffs] cannot contend that the market is efficient for purposes of reliance and then cast the theory aside when it no longer suits their needs for purposes of loss causation." *Meyer*, 710 F.3d at 1198-99. Plaintiffs' reliance on efficient market theory therefore dooms their claim that the SIRF Report constitutes a corrective disclosure.

*Fourth*, Plaintiffs allege that the Report was a corrective disclosure because it "did not disclose a 'risk' of fraudulent conduct," but was "the publication of a conclusion … showing that fraud had been occurring." Opp. 29. It is not, however, a conclusion. It is, on its face, an inference. And as in *Metzler*, the Report did not disclose facts, but opinions, and then drew "unwarranted inferences," which this Court "is not required to indulge … in order to save a complaint from dismissal." 540 F.3d at 1064-65.

*Fifth and finally*, Plaintiffs belatedly argue that the January Press Release constituted both a "corrective disclosure" *and* evidence of "the materialization of [an] undisclosed risk." Opp. 29. But the Press Release is not a corrective disclosure as it did not "render untrue" any at-issue statements. MTD 30. Instead, it merely announced growing revenue numbers that certain market participants allegedly perceived as disappointing,[11] which is insufficient. *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166 at *9 (C.D. Cal. 2014) ("Without a revelation of some wrongdoing to the market, an ensuing decline in stock price cannot be attributed to the alleged fraud.")

Apparently conceding this argument (since they do not respond to it), Plaintiffs now claim that the January Press Release was "the materialization of [an] undisclosed risk." Opp. 29. Plaintiffs did not plead a "materialization of the risk" theory (MTD 27) and cannot amend a deficient pleading through arguments opposing Defendants' motion. "When plaintiffs plead a causation theory based on market revelation of the fraud, this court naturally evaluates whether plaintiffs have pleaded or proved the facts relevant to their theory." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018); *see also Eng v. Edison Int'l*, 2018 WL 1367419 at *2 (S.D. Cal. 2018), *aff'd* 786 F. App'x 685 (9th Cir. 2019) (court appropriately evaluated whether plaintiff pled a corrective disclosure where "Plaintiff himself advanced this sole theory of loss causation").

### CONCLUSION

For the foregoing reasons, the SAC should be dismissed without leave to amend.

DATED:  July 27, 2020                    QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP


                                            /s/ Corey Worcester
                                         Corey Worcester
                                         *Attorneys for Defendants Corcept*
                                         *Therapeutics Incorporated, Joseph K*
                                         *Belanoff, Charles Robb, and Sean Maduck*

---

[11]   Plaintiffs claim the January Press Release disclosed revenues that were "well below [those] expected by analysts." SAC ¶ 282. A failure to meet the expectations of unspecified analysts cannot suffice to plead loss causation. The Ninth Circuit recently noted that "the suggestion that the analysts' opinions of what the shares might be worth … represented the shares' true value" was "too speculative to plead [loss causation] with particularity." *In re Ocera Therapeutics, Inc. Sec. Litig.*, 806 F. App'x 603, 605 (9th Cir. 2020) (affirming dismissal of Section 10(b) claim).