QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Corey Worcester (admitted *Pro Hac Vice*)
  coreyworcester@quinnemanuel.com
  Renita Sharma (admitted *Pro Hac Vice*)
  renitasharma@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:      (212) 849-7000
Facsimile:      (212) 443-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Terry L. Wit (SBN 233473)
  terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendants Corcept Therapeutics*
*Incorporated, Joseph K. Belanoff, Charles Robb,*
*and Sean Maduck*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>Defendants. | CASE NO. 5:19-CV-01372-LHK<br><br>**DEFENDANTS' STATEMENT OF RECENT DECISION** |

Pursuant to Civil Local Rule 7-3(d)(2), Defendants Corcept Therapeutics Incorporated, Joseph K. Belanoff, Charles Robb, and Sean Maduck ("Defendants") respectfully submit this Statement of Recent Decision to bring to the Court's attention the Ninth Circuit's recent decision in *In re BofI Holding, Inc. Sec. Litig.*, No. 18-55415, 2020 WL 5951150 (9th Cir. Oct. 8, 2020), a true and correct copy of which is attached hereto as Exhibit A. The decision was filed on October 8, 2020, after Defendants submitted their reply in support of Defendants' Motion to Dismiss the Second Amended Class Action Complaint on July 27, 2020 (*see* ECF No. 109), and is relevant to Plaintiffs' claims for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, specifically on the issue of loss causation.

DATED:  October 9, 2020                    Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

_____/s/ Corey Worcester_____
Corey Worcester
*Attorneys for Defendants Corcept Therapeutics Incorporated, Joseph K Belanoff, Charles Robb, and Sean Maduck*

# EXHIBIT A

KeyCite history available

2020 WL 5951150
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

IN RE BOFI HOLDING, INC. SECURITIES LITIGATION,
Houston Municipal Employees Pension System, Plaintiff-appellant,
v.
BofI Holding, Inc.; Gregory Garrabrants; Andrew J. Micheletti; Paul J. Grinberg; Nicholas A. Mosich; James S. Argalas, Defendants-Appellees.

No. 18-55415
|
Argued and Submitted January 7, 2020 Pasadena, California
|
Filed October 8, 2020

**Attorneys and Law Firms**

Michael J. Miarmi (argued) and Daniel P. Chiplock, Lieff Cabraser Heimann & Bernstein LLP, New York, New York; Richard M. Heimann, Katherine C. Lubin, and Michael K. Sheen, Lieff Cabraser Heimann & Bernstein LLP, San Francisco, California; for Plaintiff-Appellant.

John P. Stigi III (argued), Sheppard Mullin Richter & Hampton LLP, Los Angeles, California; Polly Towill, Sheppard Mullin Richter & Hampton LLP, Los Angeles, California; for Defendants-Appellees.

Appeal from the United States District Court for the Southern District of California, Gonzalo P. Curiel, District Judge, Presiding, D.C. Nos. 3:15-cv-02324-GPC-KSC 3:15-cv-02486-GPC-KSC

Before: Paul J. Watford, Mark J. Bennett, and Kenneth K. Lee, Circuit Judges.

Partial Concurrence and Partial Dissent by Judge Lee

OPINION

WATFORD, Circuit Judge:

To recover damages in a private securities fraud action, the plaintiff must establish a causal connection between the defendant's fraudulent conduct and the plaintiff's economic loss—an element known as loss causation. One way to prove loss causation is to show that the defendant's fraud was revealed to the market through one or more "corrective disclosures" and that the company's stock price declined as a result. In this case, the plaintiff alleged loss causation by relying on two corrective disclosures: a whistleblower lawsuit filed by a former company insider and a series of blog posts offering negative reports about the company's operations. The district court dismissed the case after concluding that neither the whistleblower lawsuit nor the blog posts could qualify as corrective disclosures. We agree as to the blog posts but reach a different

conclusion with respect to the whistleblower lawsuit.

I

**\*2** The company sued in this case, BofI Holding, Inc., is the holding company for BofI Federal Bank, a federally chartered savings association. (We refer to both entities collectively as BofI, although they now operate under a different corporate name.) In the years before this lawsuit was filed, BofI reported strong earnings growth and its stock price rose handsomely. Between August 2015 and February 2016, however, the price of the stock dropped by more than 47%. BofI shareholders filed multiple securities fraud suits against the company and several of its officers and directors. The suits were consolidated into this class action, brought on behalf of all BofI shareholders who purchased publicly traded shares between September 4, 2013, and February 3, 2016. The district court appointed the Houston Municipal Employees Pension System as lead plaintiff to represent the class.

The shareholders allege that BofI executives committed securities fraud by falsely portraying the company as a safer investment than it actually was. In particular, as relevant for this appeal, the shareholders allege that defendants made false or misleading statements touting the bank's conservative loan underwriting standards, its effective system of internal controls, and its robust compliance infrastructure.

The shareholders bring this action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. To state a claim, they must adequately plead six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014). In a series of rulings preceding the order on appeal, the district court held that the shareholders have adequately alleged the first five elements of their claim, at least as to some of the challenged misstatements. In the order challenged on appeal, however, the court ultimately dismissed the operative Third Amended Complaint on the basis that the shareholders failed to adequately plead the last element, loss causation. We summarize the court's rulings below.

As to the first element, falsity, the district court dismissed many of the alleged misstatements as non-actionable. But the court ruled that the shareholders have adequately pleaded falsity with respect to two categories of misstatements, concerning (1) the bank's underwriting standards and (2) its system of internal controls and compliance infrastructure. Representative of the misstatements regarding underwriting standards are the following:

> • "We continue to maintain our conservative underwriting criteria and have not loosened credit quality to enhance yields or increase loan volumes."

> • "We continue to have an unwavering focus on credit quality of the bank and have not sacrificed credit quality to increase origination."

> • "[W]e continue to originate only full documentation, high credit quality, low loan-to-value, jumbo single-family mortgages and have not reduced our loan rates for these products."

The court also found actionable two misstatements regarding internal controls and compliance infrastructure:

> • "We have made significant investments in our overall compliance infrastructure over the past several quarters, including BSA [Bank Secrecy Act] and AML [anti-money laundering] compliance."

> • "We have spent a significant amount of money on BSA/AML compliance upgrades and new systems and new personnel. We have also been beefing up our compliance teams."[1]

**\*3** The shareholders predicated their showing of falsity on allegations attributed to confidential witnesses who used to work at BofI. The district court concluded that the witnesses' allegations were reliable and based on personal knowledge, as our circuit's case law requires. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Assuming the

witnesses' allegations were true, the court found "ample evidence," with respect to underwriting standards, to suggest that "BofI was not adhering to high credit quality standards and that it had, in fact, begun to 'sacrifice credit quality to increase origination.' " Likewise, with respect to internal controls and compliance infrastructure, the witnesses' allegations plausibly suggested that "BofI had not adequately staffed its BSA and AML compliance along with other internal control departments."

As to the second element, scienter, the district court again ruled partially in the shareholders' favor. The shareholders were required to allege facts giving rise to a strong inference that the defendants acted "either intentionally or with deliberate recklessness." *In re Verifone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 698, 701 (9th Cir. 2012); *see also* 15 U.S.C. § 78u-4(b)(2). The court held that the shareholders failed to satisfy this standard for four of the five individual defendants, but concluded that the allegations of scienter were adequate as to BofI's Chief Executive Officer, Gregory Garrabrants, and thus as to the company as well. The court based this conclusion on the confidential witness allegations mentioned above.

BofI did not contest that the shareholders satisfied the third, fourth, and fifth elements of their Rule 10b-5 claim. The alleged misstatements were plainly made in connection with the purchase or sale of a security, as they were made in BofI's public filings and on earnings calls with investors. To establish reliance, the shareholders invoked the "fraud-on-the-market" presumption, which is premised on the theory that "the price of a security traded in an efficient market will reflect all publicly available information about a company," including materially false or misleading statements. *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 458, 461–62, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). As a result, a plaintiff who purchases shares at an inflated price is presumed to have done so in reliance on any material misstatements reflected in the stock's price. *Id.* at 462, 133 S.Ct. 1184. And with respect to economic loss, the shareholders indisputably lost money on their investment when BofI's stock lost nearly half its value by the end of the class period.

That leaves the sixth and final element, loss causation. After the district court issued the rulings described above, BofI filed a motion for judgment on the pleadings, in which it argued for the first time that the shareholders had not adequately alleged loss causation. The district court agreed and dismissed the shareholders' Second Amended Complaint with leave to amend.

The shareholders filed the operative Third Amended Complaint in response to the district court's ruling. To establish loss causation, the complaint relies on two corrective disclosures. The shareholders allege that these disclosures revealed the falsity of the company's statements regarding underwriting standards, internal controls, and compliance infrastructure and that the market reacted by driving down the price of BofI's stock.

The first corrective disclosure is a whistleblower lawsuit filed against BofI by Charles Erhart, a former mid-level auditor at the company, on October 13, 2015. *See Erhart v. BofI Holding Inc.*, No. 15-cv-2287 (S.D. Cal. Oct. 13, 2015). Erhart's suit—the details of which were disclosed in a *New York Times* article published that same day—alleged rampant and egregious wrongdoing at the company, including that BofI had doctored reports submitted to the bank's primary regulator, the Office of the Comptroller of the Currency (OCC), and that BofI had made high-risk and illegal loans to foreign nationals. Erhart also alleged that his attempts to raise these compliance issues within the company led to retaliation and eventually to his termination. By the close of trading the next day, the price of BofI's shares had fallen by 30.2% on extremely high trading volume.

**\*4** The second corrective disclosure consists of a group of eight blog posts published by anonymous authors on *Seeking Alpha*, a crowd-sourced online resource for investors, between August 2015 and February 2016. The blog posts argued that things at BofI were not as rosy as they seemed. The posts' specific charges varied, ranging from allegations of potential regulatory violations to evidence of risky loan origination partnerships. Each post stated that it was based on information derived from publicly available sources and that the author was "short" BofI. According to the complaint, BofI's stock price fell on each day that one of the blog posts appeared.

BofI filed a motion to dismiss the Third Amended Complaint, and in the ruling now on appeal, the district court held that the shareholders failed to plausibly allege loss causation. The court reasoned that, because the Erhart lawsuit contained only "unconfirmed accusations of fraud," it could not have disclosed to the market that BofI's alleged misstatements were actually false. To qualify as a corrective disclosure, the court held, the Erhart lawsuit had to be followed by "a subsequent confirmation" of the fraud, which the shareholders have not alleged.

As for the *Seeking Alpha* blog posts, the district court concluded that they cannot serve as corrective disclosures because each of them relies entirely on publicly available information. In the court's view, the blog posts could not have "revealed" anything to the market because the information they disclosed was presumably already known to market participants and thus reflected in BofI's stock price.

Having identified fatal deficiencies in the shareholders' loss causation allegations, the district court dismissed the action with prejudice after concluding that yet another opportunity to amend the complaint was unwarranted.

II

We agree with the district court that the shareholders have adequately alleged falsity and scienter with respect to misstatements concerning BofI's underwriting standards, internal controls, and compliance infrastructure. The dispositive issue on appeal is whether the shareholders have also adequately alleged loss causation. Before tackling that question, we begin with a brief overview of the loss causation requirement, with the aim of illuminating the function this element serves in a private securities fraud action.

Like any other tort plaintiff who seeks to recover damages, a plaintiff in a securities fraud suit must plead and ultimately prove that the defendant's wrongful conduct caused the plaintiff's injury. Congress codified that requirement in the Private Securities Litigation Reform Act. Under the heading "Loss causation," the Act provides: "In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). Courts have likened this requirement to the showing of proximate causation required in ordinary tort actions. *See, e.g.*, *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343–46, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

In fraud-on-the-market cases like this one, the plaintiff's theory of loss causation begins with the allegation that the defendant's misstatements (or other fraudulent conduct) artificially inflated the price at which the plaintiff purchased her shares—meaning the price was higher than it would have been had the false statements not been made. Merely purchasing shares at an inflated price, however, does not cause an investor to suffer economic loss as a result of the fraud. *Dura Pharmaceuticals*, 544 U.S. at 342, 125 S.Ct. 1627. If the defendant's fraud remains concealed, the price will usually remain inflated, allowing the plaintiff to sell her shares and recoup the inflationary component she paid. *See id.*; *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1315 (11th Cir. 2011).

**\*5** To establish loss causation in a fraud-on-the-market case, the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) "the truth became known," and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated. *Dura Pharmaceuticals*, 544 U.S. at 347, 125 S.Ct. 1627; *see FindWhat*, 658 F.3d at 1310. At that point, the plaintiff has suffered an economic loss caused by the misstatements because she is no longer able to recoup in the marketplace the inflationary component of the price she originally paid. *FindWhat*, 658 F.3d at 1311; Madge S. Thorsen et al., *Rediscovering the Economics of Loss Causation*, 6 J. Bus. & Sec. L. 93, 98 (2006).

The most common way for plaintiffs to prove that "the truth became known" is to identify one or more corrective disclosures. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753–54 (9th Cir. 2018) (per curiam); *Lloyd*, 811 F.3d at 1209. A corrective disclosure occurs when "information correcting the misstatement or omission that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1) (using that event to establish a statutory cap on damages).

Although deciding what qualifies as a corrective disclosure has proved more challenging than might have been expected, a few basic ground rules can be sketched out. First, a corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency. *See Metzler Investment GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 (9th Cir. 2008). A corrective disclosure can instead come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters. *Norfolk County Retirement System v. Community*

*Health Systems, Inc.*, 877 F.3d 687, 695 (6th Cir. 2017); *Public Employees' Retirement System of Mississippi v. Amedisys, Inc.*, 769 F.3d 313, 322 (5th Cir. 2014). Second, a corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures. *Amedisys*, 769 F.3d at 322–24; *In re Williams Securities Litigation—WCG Subclass*, 558 F.3d 1130, 1137–38 (10th Cir. 2009). Third, to be corrective, a disclosure "need not precisely mirror the earlier misrepresentation." *Williams*, 558 F.3d at 1140. It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading. *Amedisys*, 769 F.3d at 321–22.

Even if the true facts concealed by the fraud are revealed to the market, the plaintiff must still show that the disclosure of the truth caused the company's stock price to decline. For a subsequent decline in price could be attributable to factors unrelated to the fraud, such as a change in economic circumstances or investor expectations. *Dura Pharmaceuticals*, 544 U.S. at 343, 125 S.Ct. 1627. The securities laws do not protect against ordinary investment losses of that sort. *See id.* at 345, 125 S.Ct. 1627. We have explained that loss causation does not require a showing "that a misrepresentation was the *sole* reason for the investment's decline in value." *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005). Rather, "as long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement." *Id.* The determination of whether there is a causal link includes a temporal component—a disclosure followed by an immediate drop in stock price is more likely to have caused the decline—but timing is not dispositive. *See In re Gilead Sciences Securities Litigation*, 536 F.3d 1049, 1058 (9th Cir. 2008) ("A limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible.").

## III

**\*6** With that background in mind, we turn to the specific corrective disclosures at issue in this case. We address the Erhart lawsuit first, followed by the *Seeking Alpha* blog posts.

## A

As discussed above, to prove loss causation by relying on one or more corrective disclosures, a plaintiff must show that: (1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate. At the pleading stage, the plaintiff's task is to allege with particularity facts "plausibly suggesting" that both showings can be made. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see Oregon Public Employees Retirement Fund v. Apollo Group, Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) (holding that allegations of loss causation must satisfy Federal Rule of Civil Procedure 9(b)'s heightened "particularity" requirement).

The shareholders pleaded facts with particularity that plausibly suggest they can make the first showing. The allegations of egregious wrongdoing in the Erhart lawsuit, if accepted as true, unquestionably revealed to the market that at least some of BofI's alleged misstatements were false.[2] For example, Erhart recounted an instance in which he relayed to his superiors a third-party vendor's report on BofI's operations. Erhart alleged that he personally prepared a memorandum summarizing the vendor's findings, which identified roughly 30% of BofI's customers as "bad," meaning the customers had red flags such as suspiciously high cash balances, social security numbers that did not match any public records, and, in one instance, the social security number of a dead person. Erhart further alleged that when he gave the list to his superior, Senior Vice President John Tolla, Tolla demanded that the audit committee alter the list and give the altered version to the OCC. Erhart also claims that his thorough work and his attempts to report potential compliance violations earned him retaliation rather than praise. These and other similar allegations, if true, render BofI's prior assertions about the strength of its underwriting

standards, internal controls, and compliance infrastructure false or misleading.[3]

As to the second showing, the shareholders allege that BofI's stock price fell by more than 30% on extremely high trading volume immediately after the market learned of Erhart's allegations. The shareholders have plausibly alleged that this drop constituted a dissipation of the inflation attributable to BofI's misstatements instead of a reaction to some other negative news unrelated to the alleged fraud.

**\*7** To plead loss causation here, the shareholders did not have to establish that the allegations in Erhart's lawsuit are in fact true. Falsity and loss causation are separate elements of a Rule 10b-5 claim. The shareholders adequately alleged that BofI's misstatements were false through the allegations attributed to confidential witnesses. In analyzing loss causation, we therefore begin with the premise that BofI's misstatements *were* false and ask whether the market at some point learned of their falsity—through whatever means. Viewed through that prism, the relevant question for loss causation purposes is whether the market reasonably *perceived* Erhart's allegations as true and acted upon them accordingly. *See Norfolk County*, 877 F.3d at 696 (inquiry when evaluating an alleged corrective disclosure is "whether the market could have perceived it as true"). If the market recalibrated BofI's stock price on the assumption that Erhart's allegations are true—and thus that BofI's prior misstatements were false—then the drop in BofI's stock price represented dissipation of inflation rather than a reaction to other non-fraud-related news.

The shareholders alleged facts with particularity that plausibly suggest the market perceived Erhart's allegations as credible and acted upon them on the assumption that they were true. Erhart's descriptions of wrongdoing are highly detailed and specific, and they are based on firsthand knowledge that he could reasonably be expected to possess by virtue of his position as a mid-level auditor at the company. True, Erhart's motivations for coming forward may not have been entirely pure, as he lodged his allegations in a lawsuit seeking money from BofI. But that is just one factor among many that market participants would have weighed in deciding how much credence his claims deserved. The fact that BofI's stock price plunged by more than 30% on extremely high trading volume immediately after the market learned of Erhart's allegations bolsters the inference that the market regarded his allegations as credible. A price drop of that magnitude would not be expected in response to whistleblower allegations perceived as unworthy of belief, and the drop is not readily attributable to non-fraud-related factors that might have moved BofI's stock price that day.

The district court nonetheless held that allegations in a lawsuit, standing alone, can never qualify as a corrective disclosure because they are just that—allegations, as opposed to "truth." The court concluded that, to adequately plead loss causation, the shareholders had to identify an additional disclosure that confirmed the truth of Erhart's allegations.

We join the Sixth Circuit in rejecting any such categorical rule. *Norfolk County*, 877 F.3d at 696. To be sure, allegations in a lawsuit do not provide definitive confirmation that fraud occurred. But short of an admission by the defendant or a formal finding of fraud—neither of which is required, *see Amedisys*, 769 F.3d at 324–25; *Metzler*, 540 F.3d at 1064—any corrective disclosure will necessarily take the form of contestable allegations of wrongdoing. As the Sixth Circuit observed, "every representation of fact is in a sense an allegation, whether made in a complaint, newspaper report, press release, or under oath in a courtroom." *Norfolk County*, 877 F.3d at 696. What matters for loss causation purposes "is that some [representations] are more credible than others and thus more likely to be acted upon as truth." *Id.* If the market treats allegations in a lawsuit as sufficiently credible to be acted upon as truth, and the inflation in the stock price attributable to the defendant's misstatements is dissipated as a result, then the allegations can serve as a corrective disclosure. The plaintiff must, of course, prove that the defendant's misstatements *were* false, but that can be done through proof other than the corrective disclosure itself.

The two cases on which the district court relied most heavily are not to the contrary. In *Loos v. Immersion Corp.*, 762 F.3d 880 (9th Cir. 2014), the defendant company announced that it was conducting "an internal investigation into certain previous revenue transactions in its Medical line of business." *Id.* at 885 (quoting the company's press release). We held that the plaintiff could not rest his theory of loss causation on the announcement of this investigation standing alone. Quoting the Eleventh Circuit's decision in *Meyer v. Greene*, 710 F.3d 1189 (11th Cir. 2013), we noted that "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Loos*, 762 F.3d at 890. Such an announcement does not reveal to the market any *facts* that could call into question the veracity of the company's prior statements; all the market could react to was "speculation" about "what the investigation will ultimately reveal." *Id.*

**\*8** Our case presents a different situation. Erhart's lawsuit disclosed facts that, if true, rendered false BofI's prior statements about its underwriting standards, internal controls, and compliance infrastructure. No speculation on that score was required.

The second case on which the district court relied, *Curry v. Yelp Inc.*, 875 F.3d 1219 (9th Cir. 2017), is also distinguishable. There, the plaintiffs accused Yelp of falsely representing that the reviews it posted were authentic and independent. *Id.* at 1222. The plaintiffs alleged that the falsity of this representation was revealed to the market when the Federal Trade Commission disclosed some 2,000 complaints the agency had received "from businesses claiming that Yelp had manipulated reviews of their services" in various ways. *Id.*

We rejected the plaintiffs' loss causation allegations as inadequate. *Id.* at 1225. Critically for our purposes, the customers who filed complaints in *Curry* were outsiders who lacked any firsthand knowledge of Yelp's practices. Thus, they could not attest to whether Yelp was actually engaged in manipulating reviews, nor to whether the reviews the company posted were authentic and independent. *See id.* at 1223. We refused to allow the plaintiffs to allege loss causation "merely by resting on a number of customer complaints and asserting that where there is smoke, there must be fire." *Id.* at 1225.

Here, by contrast, Erhart is a former insider of the company who had personal knowledge of the facts he alleged. Those facts revealed that a number of BofI's alleged misstatements were false. If the market regarded his factual allegations as credible and acted upon them on the assumption that they were true, as the shareholders have plausibly alleged here, Erhart's allegations established fire and not just smoke.[4]

One final point bears mentioning. In ruling against the shareholders, the district court emphasized that a plaintiff in a securities fraud action must plead loss causation "with particularity" under Rule 9(b). *See Apollo Group*, 774 F.3d at 605. When applied to allegations of loss causation, however, Rule 9(b)'s particularity requirement usually adds little to the plaintiff's burden. The plaintiff must plausibly allege a causal connection between the defendant's misstatements and the plaintiff's economic loss, and to succeed in doing so the plaintiff will always need to provide enough factual content to give the defendant "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals*, 544 U.S. at 347, 125 S.Ct. 1627. That effort "should not prove burdensome," *id.*, for even under Rule 9(b) the plaintiff's allegations will suffice so long as they give the defendant "notice of plaintiffs' loss causation theory" and provide the court "some assurance that the theory has a basis in fact." *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 989–90 (9th Cir. 2008). The shareholders pleaded loss causation here with sufficient particularity to accomplish those twin aims.

B

**\*9** We turn next to the *Seeking Alpha* blog posts. We agree with the district court that the shareholders failed to plausibly allege that these posts constituted corrective disclosures, although we disagree somewhat with the district court's rationale.

As noted earlier, each of the blog posts asserts that the information it discloses was derived from publicly available sources. Because this is a fraud-on-the-market case, that assertion makes it more difficult for the shareholders to rely on the posts as corrective disclosures. BofI's stock is deemed to trade in an efficient market in which all publicly available information about the company, both positive and negative, is quickly incorporated into the stock price. *See Amgen*, 568 U.S. at 461–62, 133 S.Ct. 1184. So its stock price should already reflect whatever public information a blog post might be based upon. A corrective disclosure, though, must by definition reveal new information to the market that has not yet been incorporated into the price.

To rely on a corrective disclosure that is based on publicly available information, a plaintiff must plead with particularity facts plausibly explaining why the information was not yet reflected in the company's stock price. The district court interpreted this requirement to mean that the shareholders had to allege facts explaining why "other market participants *could not* have done the same analysis and reached the same conclusion" as the authors of the blog posts. (Emphasis added.) We think that sets the bar too high. For pleading purposes, the shareholders needed to allege particular facts plausibly suggesting that other market participants *had not* done the same analysis, rather than "could not." If other market participants had not

done the same analysis, then it is plausible that the blog posts disclosed new information that the market had not yet incorporated into BofI's stock price.

Prior cases reflect the understanding that some information, although nominally available to the public, can still be "new" if the market has not previously understood its significance. For example, in *In re Gilead Sciences Securities Litigation*, 536 F.3d 1049 (9th Cir. 2008), a pharmaceutical company represented that demand for an HIV drug was strong and that the company complied with federal and state regulations, despite knowing that unlawful off-label marketing was the reason for strong demand. *Id.* at 1051. The company then received a warning letter from the Food and Drug Administration (FDA) about its off-label marketing of the drug. *Id.* at 1052–53. The company's stock price did not incorporate the information disclosed in the letter until three months after the letter had been publicly released, when the company reported a major earnings miss attributable to decreased demand for the HIV drug. *Id.* at 1053–54. We concluded that the plaintiffs plausibly alleged the drop in stock price was caused by the FDA warning letter. *Id.* at 1058. Given the letter's subtle relationship to the company's alleged misstatements—"it did not contain enough information to significantly undermine [the company's] pronouncements concerning demand"—the letter itself "would not necessarily trigger a market reaction." *Id.* Thus, it was "not unreasonable that physicians ... would respond to the Warning Letter" by issuing fewer prescriptions and lowering demand for the drug, "while the public failed to appreciate its significance" until its impact on revenue was made plain from the earnings release. *Id.* Despite the three-month gap between the FDA letter and the drop in stock price, the plaintiffs' allegations were enough to plead loss causation.

**\*10** Similarly, in *Public Employees' Retirement System v. Amedisys, Inc.*, 769 F.3d 313 (5th Cir. 2014), a *Wall Street Journal* article analyzed publicly available Medicare records to conclude that Amedisys, a home health services company, was engaging in Medicare fraud. *Id.* at 318. The defendant unsuccessfully pressed the same argument that BofI advances here: "[B]ecause the article proclaims on its face that its analysis was 'based on publicly available Medicare records,' ... [it] does not reveal any new information to the marketplace." *Id.* at 323. The Fifth Circuit rejected such a rule, holding instead that "it is plausible that complex economic data understandable only through expert analysis may not be readily digestible by the marketplace." *Id.* The underlying information, although publicly available, "had little to no probative value in its native state"; someone needed to put the pieces together before the market could appreciate its import. *Id.*

Contrary to the bright-line rule BofI urges us to adopt, these cases endorse a flexible approach to evaluating corrective disclosures. A disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure. The ultimate question is again one of plausibility: Based on plaintiffs' particularized allegations, can we plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price? The fact that the underlying data was publicly available is certainly one factor to consider. But other factors include the complexity of the data and its relationship to the alleged misstatements, as in *Amedisys* and *Gilead*, and the great effort needed to locate and analyze it, as the shareholders allege here. Courts must assess these and other factors on a case-by-case basis. We therefore decline to categorically disqualify the *Seeking Alpha* blog posts as potential corrective disclosures.[5]

Even judged against this more forgiving standard, the shareholders' allegations concerning the eight blog posts do not pass muster. We address each of the eight posts that were followed by a decline in stock price.

*The August 28, 2015, blog post.* The author of this post claimed to have "analyzed hundreds of BofI's loans," and on the basis of that review the author levied a host of allegations against BofI: that its loan-to-value ratios were often higher than advertised; that the bank faced personnel turnover in the audit department; that it made risky loans to foreign nationals; and that the Securities and Exchange Commission (SEC) was possibly investigating the company.

*The October 29, 2015, blog post.* This post compared BofI's transcript of an earnings call with the transcripts prepared by news agencies, and it noted potentially important discrepancies. The shareholders claim that the discrepancies show BofI's "lack of internal controls over financial reporting and risk management."

*The November 10, 2015, blog post.* This post chronicles BofI's alleged relationships with two risky lenders, Quick Bridge and OnDeck Capital. According to the author, through these relationships, BofI originated bad loans, reaped the origination fees, and then sold the loans to its partner to keep the loans off its books. The author asserts that the loans involved are frequently the subjects of collection actions and bankruptcy proceedings, and points to court filings suggesting that "many

borrowers appear to have never been capable of" repaying the loans. This information potentially undermines the veracity of BofI's statements regarding its conservative underwriting standards, particularly the statement that BofI had "not sacrificed credit quality to increase origination."

**\*11** *The November 18, 2015, blog post*. This post states that the author's "research suggests that [BofI] has employed a former felon for over 5 years in a very senior and pivotal role," but does not name the individual. The author postulates that BofI "had to have known of the executive's prior criminality" and therefore was probably "in violation of Section 19 of the Federal Deposit Insurance Act." The author concedes he is not "100% certain" that BofI's executive is the former felon, but states his analysis—which included comparing a mugshot photo to a LinkedIn photo, and comparing signatures and birth dates on public documents—was fairly rigorous. The author comments on the regulatory penalties BofI could face if it did not obtain a waiver from the Federal Deposit Insurance Corporation before employing a convicted felon. The post also notes that BofI made loans to the same executive shortly after he filed for bankruptcy.

*The November 19, 2015, blog post*. In this post, the author claims to have uncovered evidence that BofI provides financing to a "Special Purpose Entity" called Center Street Lending Fund IV, LLC. According to the author, Center Street offers "no doc" and "no FICO" loans and is a named defendant in litigation alleging that it participated in a Ponzi scheme. These alleged facts, documenting BofI's indirect financing of "no doc" loans, potentially contradict the company's claim to "originate only full documentation" loans.

*The December 8, 2015, blog post*. This post asserts that BofI is financing another Special Purpose Entity, WCL Holdings I, LLC, that was first mentioned in the post of November 10. In the earlier post, the author claimed that BofI assigned the loans it originated with Quick Bridge to WCL, although it was unclear at that point whether BofI was also financing WCL. This post purports to show that BofI is indeed lending to WCL. BofI's alleged financing of an off-book entity to buy back BofI's own risky loans potentially contradicts BofI's statement that it achieved "strong loan growth ... while maintaining high credit quality standards."

*The January 6, 2016, blog post*. This post unearths evidence that BofI made a roughly $32 million loan to Encore Capital, a San Diego-based debt collector. Encore's then-Chief Financial Officer, Paul Grinberg, was also the Chair of BofI's Audit Committee. The loans allegedly allowed Encore to make a major acquisition, which led to Grinberg's promotion. According to the author, BofI never disclosed this loan, as the SEC requires for related-party transactions, and indeed omitted the loan from the bank's 2014 disclosures of loans made to board members. These revelations potentially contradict BofI's statements about the robustness of its compliance infrastructure.

*The February 3, 2016, blog post*. This post details BofI's opening of a new Nevada branch and links it to BofI's acquisition of H&R Block's lending products. The shareholders imply that the post contradicts BofI's statements about its underwriting standards and compliance infrastructure.

The fact that each of these blog posts relied on nominally public information does not, on its own, preclude them from qualifying as corrective disclosures. Some of the posts required extensive and tedious research involving the analysis of far-flung bits and pieces of data. The authors arrived at their conclusions after scouring through hundreds of Uniform Commercial Code filings, bankruptcy court documents, and other companies' registration documents. While other investors undoubtedly could have reviewed registration documents, they likely would not have known to investigate Quick Bridge, On Deck, or Encore precisely because BofI had hidden its relationships with those entities. *Cf. Norfolk County*, 877 F.3d at 697. The time and effort it took to compile this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available. *Cf. Amedisys*, 769 F.3d at 323.

**\*12** We nonetheless conclude that the shareholders have not plausibly alleged that these posts constituted corrective disclosures. Even if the posts disclosed information that the market was not previously aware of, it is not plausible that the market reasonably perceived these posts as revealing the falsity of BofI's prior misstatements, thereby causing the drops in BofI's stock price on the days the posts appeared. The posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made "no representation as to the accuracy or completeness of the information set forth in this article." A reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt.[6]

Therefore, the shareholders have not plausibly alleged that any of the *Seeking Alpha* blog posts constituted a corrective disclosure. The district court did not abuse its discretion in denying further leave to amend, as the court had already pointed out the deficiencies in the shareholders' loss causation allegations concerning the blog posts and had given them an opportunity to correct those deficiencies. *See Loos*, 762 F.3d at 890–91.

IV

Finally, we take up the new category of misstatements that the shareholders alleged for the first time in the Third Amended Complaint, concerning government and regulatory investigations. We agree with the district court that the shareholders failed to plausibly allege the falsity of any of the alleged misstatements in this new category. All but three of the challenged statements are expressions of opinion, not statements of fact "capable of objective verification." *Apollo Group*, 774 F.3d at 606. For example, Garrabrants told investors that regulatory review "is beyond a nonissue" and that "[w]e have great regulatory relations." These vague assurances reflect Garrabrants's opinions and predictions, which are not actionable. *See In re Cutera Securities Litigation*, 610 F.3d 1103, 1111 (9th Cir. 2010). The shareholders have not plausibly alleged falsity with respect to the three remaining statements. On an earnings call, Garrabrants told investors that: (1) there was "nothing ongoing" with the OCC; (2) there was "no continuity" to any of Erhart's complaints submitted to the OCC; and (3) there were no "regulatory issues of any kind that have arisen from Mr. Erhart's contact with the OCC." These statements were accurate. Although the SEC was investigating BofI at the time, it is unclear whether anyone at BofI was aware of that fact when Garrabrants spoke, and his statements were specifically limited to the OCC in any event. The shareholders do not argue that Garrabrants had an independent duty to disclose the SEC investigation. Without such a duty, Garrabrants was under no obligation to mention it. *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Retail Wholesale & Department Store Union Local 338 Retirement Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017).

* * *

The shareholders have adequately pleaded a viable claim under § 10(b) and Rule 10b-5 for the two categories of misstatements the district court found actionable, with the Erhart lawsuit serving as a potential corrective disclosure. We reverse the district court's judgment dismissing the action with prejudice and remand for further proceedings consistent with this opinion.[7]

**\*13** Appellant's Motion for Judicial Notice (Dkt. No. 12) is **GRANTED**.

**REVERSED and REMANDED.**

LEE, Circuit Judge, concurring in part III.B. in judgment and dissenting in part III.A.:

Philosophers have long debated the question, "If a tree falls in the forest but no one is around to hear it, does it make a sound?" This case perhaps presents the converse of that conundrum: If there is no fraud, can a securities fraud lawsuit still proceed?

The majority holds that a former employee's allegations of fraud in a whistleblower lawsuit may count as a "corrective disclosure" under Rule 10b-5's loss causation requirement as long as they are plausible — even if there is no additional evidence or disclosure corroborating them. I agree with much of the analysis in the majority's thoughtful opinion, which attempts to balance carefully competing concerns on a very difficult issue.

But I still fear that the decision will have the unintended effect of giving the greenlight for securities fraud lawsuits based on unsubstantiated assertions that may turn out to be nothing more than wisps of innuendo and speculation. And even meritless securities fraud lawsuits impose an exorbitant cost on companies. I would thus require additional external confirmation of fraud allegations in a whistleblower lawsuit for them to count as a "corrective disclosure." Doing so comports with our case law and common sense. I thus respectfully dissent from the majority's holding that plausible insider allegations, standing alone, can qualify as a corrective disclosure (part III.A.).

\* \* \* \*

Charles Erhart, a mid-level auditor at BofI, sued his former employer after being terminated, claiming that it was retaliation for whistleblowing. His lawsuit against BofI will go to trial sometime next year.

The majority believes that Erhart's allegations in his separate whistleblower lawsuit against BofI are plausible enough to constitute a "corrective disclosure" under Rule 10b-5's loss causation requirement. The majority opinion thus allows shareholders in this lawsuit to piggyback off of Erhart's whistleblower lawsuit against his former employer. It may well be that Erhart's allegations in his lawsuit are true. His allegations, if true, paint a company rife with corruption and mismanagement. And many corporate schemes of malfeasance have unraveled after a whistleblower exposed the wrongdoing.

But what if it turns out that Erhart's allegations in his lawsuit are bunk? What if he is mistaken? Perhaps he misconstrued certain information because, as a fairly junior-level employee, he did not understand or have access to all the facts. Or what if (as BofI suggests) he is a loose cannon who has a messianic zeal for seeing wrongdoing where none exists? At this point, we simply do not know, especially with no other evidence or disclosure to corroborate Erhart's claims in his lawsuit.

But we do know that BofI has not issued any financial disclosures that would confirm Erhart's allegations that he first aired in 2015. BofI has not done so, even though the U.S. Department of Justice, the Securities and Exchange Commission, and the Treasury Department have reportedly investigated BofI. And apparently at least one SEC investigation that began in 2015 has already closed with no action.

**\*14** Put another way, *five years* have passed since Erhart first disclosed allegations of misconduct at BofI, and multiple government agencies commenced investigations into BofI. Yet so far, we have not seen any external evidence corroborating Erhart's allegations. So it may turn out that there may be smoke but no fire. But based solely on a mid-level employee's self-interested allegations in a separate lawsuit, we are allowing a securities fraud lawsuit to move forward. It is premature to do so. Erhart may ultimately be vindicated, and perhaps the government investigations will eventually expose fraud, but we should not let a securities fraud lawsuit proceed when, at this point, there may no there there. We may end up with a scenario in which Erhart loses his whistleblower trial, and the government agencies end their investigations without any action — and yet BofI may end up settling a securities fraud case for millions of dollars to avoid litigation costs.

The majority notes that not every insider allegation in a lawsuit will count as a corrective disclosure; only "plausible" ones will survive a dismissal. While the plausibility standard under *Iqbal/Twombly* has rooted out many meritless cases at the pleading stage, such a standard will likely be less useful in a securities fraud lawsuit based on insider allegations in a whistleblower lawsuit. An insider account will almost always have a patina of plausibility because it will likely be based on some non-public allegation that cannot be easily disputed or rebutted at the pleading stage. Indeed, like any good conspiracy theory, an insider's story often has some element of truth to it, even if it is largely mistaken or misguided. In the end, the plausibility standard will likely stave off only lawsuits based on insider accounts that even Mulder and Scully would find unbelievable. In short, the plausibility standard provides little comfort to companies that may face securities fraud lawsuits based on unsubstantiated insider allegations.

What's the harm of letting a securities fraud lawsuit go forward if the company can eventually vindicate itself at trial? Plenty. According to Cornerstone Research, approximately 8.9% of all public companies listed on a U.S. securities exchange were the target of a securities class action in 2019. *See* Cornerstone Research, *Securities Class Action Filings: 2019 Year in Review*, 11 (Jan. 29, 2020), https://bit.ly/2TpajjY. And in 2018, the median cost of a securities class-action settlement was $13 million, according to one estimate. *See* Chubb, *From Nuisance to Menace: The Rising Tide of Securities Class Action Litigation* (June 2019), https://bit.ly/3cvbIx4. If a securities fraud lawsuit survives a motion to dismiss, it likely will lead to a

settlement to the tune of millions of dollars. In the past quarter-century or so, only *six* securities fraud cases apparently have been tried to verdict. *See* Jeffrey A. Barrack, *A Primer on Taking A Securities Fraud Class Action to Trial*, 31 Am. J. Trial Advoc. 471, 476 (2008). In a time when trials are rare, securities fraud trials are virtually extinct. That is why the loss causation requirement acts as a critical bulwark against frivolous securities fraud lawsuits. It guards against lawsuits being used as an "*in terrorem* device" to bludgeon companies into settling claims to "avoid the cost and burden of litigation." *Meyer v. Greene*, 710 F.3d 1189, 1196 (11th Cir. 2013) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347–48, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

It is true that BofI's shares plummeted 30% after Erhart publicly accused his former employer of fraud. But that does not necessarily mean Erhart's allegations revealed the "truth" and acted as a corrective disclosure. Rather, it is better construed as a disclosure of "an added *risk* of future corrective action." *Meyer*, 710 F.3d at 1201 (ruling that an announcement of an SEC investigation by itself is not a corrective disclosure but signals an added risk of it).

**\*15** Our decision in *Loos v. Immersion Corp.* is instructive. There, Immersion announced an internal investigation into revenue recognition practices of its medical line of business. *Loos*, 762 F.3d 880, 885 (9th Cir. 2014). The company's stock price plummeted 23% after this disclosure. *Id.* A shareholder lawsuit inevitably followed. We affirmed the district court's dismissal of the securities fraud lawsuit, ruling that the company's announcement of potential problems with revenue recognition was not a corrective disclosure. While the disclosure was "ominous," it "simply put[ ] investors on notice of a *potential* future disclosure of fraudulent conduct." *Id.* at 890.

Similarly, in *Curry v. Yelp Inc.*, Yelp's stock price dropped after the FTC disclosed more than 2,000 complaints from businesses alleging that Yelp had manipulated reviews. 875 F.3d 1219, 1222 (9th Cir. 2017). We acknowledged that a plaintiff "need not allege an outright admission of fraud," but we affirmed the dismissal of the lawsuit because the "mere 'risk' or 'potential' for fraud is insufficient to establish loss causation." *Id.* at 1225 (quoting *Loos*, 762 F.3d at 889).

Likewise here, Erhart's allegations are certainly "ominous," and may in fact be true. But at this time, the drop in BofI's share price "can only be attributed to market speculation about whether fraud has occurred." *Loos*, 762 F.3d at 890. And this "type of speculation cannot form the basis of a viable loss causation theory." *Id.* Before plaintiffs can establish loss causation based on an unsubstantiated whistleblower complaint, another shoe has to drop. It has not yet.

In short, if a securities fraud lawsuit turns on insider allegations of wrongdoing in a whistleblower lawsuit, I would prefer a bright-line rule that requires an external disclosure or evidence that confirms those allegations. It need not be a *mea culpa* from the company, but perhaps a surprise restatement of earnings, an unexplained announcement about an increase in reserves, or some other information that confirms those allegations and thus acts as a corrective disclosure.[1]

Finally, I agree with the majority that the anonymous *Seeking Alpha* posts are not corrective disclosures. I would, however, base our decision on the grounds that the *Seeking Alpha* posts contain public information only, and that we should not credit anonymous posts on a website notorious for self-interested short-sellers trafficking in rumors for their own pecuniary gain. *See, e.g.*, Jeff Katz & Annie Hancock, *Short Activism: The Rise of Anonymous Online Short Attacks*, Harvard Law School Forum on Corporate Governance (Nov. 27, 2017), https://bit.ly/3kqF3fi (noting the rise of short shellers engaging in anonymous attacks and explaining that a "short seller need only prove that a fraction of the allegations is true, while the company must disprove each and every allegation").

I thus concur in judgment in part III.B. and respectfully dissent as to part III.A.

**All Citations**

--- F.3d ----, 2020 WL 5951150

Footnotes

[1]    In light of its ruling on loss causation, the district court declined to address whether certain alleged misstatements are actionable. On remand, the district court will need to determine which of the remaining misstatements are actionable, but it appears that at least some of them are, such as BofI's assertions that its "disclosure controls and procedures were effective," and that "[a]ll

significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" had been disclosed.

2    We take judicial notice of the contents of the complaint filed in *Erhart v. BofI Holding Inc.*, No. 15-cv-2287 (S.D. Cal. Oct. 13, 2015), but not of the truth of the allegations asserted therein, which BofI vigorously contests. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001).

3    The district court held in its order dismissing the Second Amended Complaint that none of the allegations in the Erhart lawsuit relate back to the subject matter of the specific misstatements the court had found actionable. We disagree with that ruling. As noted above, a corrective disclosure need not be a mirror image of the prior misstatement. *See Williams*, 558 F.3d at 1140.

4    BofI contends that the shareholders cannot plead loss causation because they cannot plausibly allege that the bank ever suffered an adverse financial event, such as losses from its loan portfolio or a spike in its reserves. But this misconstrues the significance of BofI's alleged misstatements. According to the shareholders, BofI misrepresented itself as a safe investment when in fact it was far riskier. The shareholders contend that, before the corrective disclosures, the price of BofI's stock was inflated by the market's belief that the company's statements were true, and that the price declined when the market learned that BofI's statements were false. On this account, the shareholders suffered an economic loss caused by the misstatements because they purchased their shares at an inflated price and are now unable to recoup the inflationary component in the market. That remains true regardless of whether the risks concealed by BofI's misstatements ever materialized and harmed the bank's bottom line.

5    We acknowledge that the Eleventh Circuit has adopted the bright-line rule BofI advocates. *See Meyer*, 710 F.3d at 1198 ("[T]he fact that the sources used in the Einhorn Presentation were already public is fatal to the Investors' claim of loss causation."). And it is true that we cited *Meyer* approvingly when we held that the mere announcement of an investigation is insufficient to plead loss causation. *See Loos*, 762 F.3d at 889–90. But the *Loos* court had no occasion to adopt *Meyer*'s holding about public information, and its discussion of that portion of *Meyer* is therefore *dicta*. We decline to extend it here.

6    Some of the posts suffer from other deficiencies. For example, the October 29, 2015, post, comparing transcripts, did not require any special expertise or effort. And most of the misdeeds alleged in the August 28, 2015, and February 3, 2016, posts are not tethered to any actionable misstatements.

7    Because the shareholders have alleged a viable claim under § 10(b), the district court on remand should reinstate their claims under § 20(a) against the individual defendants.

1    Some may argue that such a requirement may create perverse incentives for a company not to make a corrective disclosure. Perhaps it might in the short run, but a wrongdoer can balance its house of cards for only so long until it ultimately collapses. Insider allegations of wrongdoing almost always lead to governmental investigations, and the truth ultimately comes out under scrutiny.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.