QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Corey Worcester (admitted *Pro Hac Vice*)
  coreyworcester@quinnemanuel.com
  Renita Sharma (admitted *Pro Hac Vice*)
  renitasharma@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 443-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Terry L. Wit (SBN 233473)
  terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone:    (415) 875-6331
Facsimile:    (415) 875-6700

*Attorneys for Defendants Corcept Therapeutics, Inc.,*
*Joseph K. Belanoff, Charles Robb, and Sean Maduck*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   vs.<br><br>CORCEPT THERAPEUTICS INC., JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>      Defendants. | CASE NO. 5:19-CV-01372-LHK<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS LEAD PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)**<br><br>Judge:         Hon. Lucy H. Koh<br>Courtroom:   8, 4th Floor<br>Hearing Date:  June 10, 2021<br>Hearing Time:  1:30 p.m. |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .......................................................... 1

RELEVANT FACTUAL BACKGROUND ............................................................................ 2

    A.    Corcept And The Development Of Korlym To Treat Cushing's Syndrome ............ 2

    B.    Corcept Is Targeted By Short Sellers ..................................................................... 2

    C.    This Litigation ........................................................................................................ 3

LEGAL STANDARD ............................................................................................................. 4

ARGUMENT .......................................................................................................................... 4

I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION ............. 4

    A.    Plaintiffs Have Not Adequately Alleged An Off-Label Marketing Scheme ........... 4

        1.    Plaintiffs' Confidential Witnesses ................................................................ 4

        2.    Corcept's Physician Education Programs ..................................................... 9

        3.    Diagnosis Rates of Cushing's Syndrome ................................................... 10

        4.    Insurance Reimbursement .......................................................................... 11

        5.    "Off-Label" Marketing ............................................................................... 11

    B.    The Alleged Misstatements Are Not Made Misleading by
        Corcept's Conduct ................................................................................................ 12

        1.    Speaker and Education Programs
            (Statements 1, 7, 11, 16, 21, 25, 27) ......................................................... 12

        2.    Marketing and Promotional Materials
            (Statements 2, 8, 12, 17, 22, 28) ............................................................... 12

        3.    Compliance with FDA Regulations
            (Statements 3, 9, 13, 18, 23, 29) ............................................................... 13

        4.    Korlym Revenue and Sales Growth
            (Statements 4-6, 10, 14, 15, 19, 20, 24) ................................................... 13

        5.    On-Label Use of Korlym (Statement 26) .................................................. 13

II.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ................. 13

    A.    Plaintiffs Fail To Plead Direct Evidence Of Scienter .......................................... 14

1.    CW Allegations Of An Off-Label Marketing Scheme Do Not Plead An Intent To Defraud ................................................................. 14

2.    Knowledge of Prescriptions Does Not Plead Intent To Defraud ............... 16

3.    Allegations That Corcept Attempted to Guarantee Insurance Approval Do Not Suffice To Plead An Intent To Defraud ....................... 17

4.    Corcept's Revenue Does Not Suffice To Plead An Intent To Defraud ............................................................................................. 18

5.    Corcept's Alleged Failure To Follow Industry Guidelines Does Not Suffice To Plead An Intent To Defraud ..................................... 19

6.    Honoraria Payments to Physicians Do Not Plead An Intent To Defraud ............................................................................................. 20

7.    Corcept's Limited Number of Sales Regions and Sales Representatives Does Not Plead an Intent To Defraud ............................. 20

8.    Sales Representatives Awards Do Not Plead An Intent To Defraud .......... 21

9.    Dr. Fishman's Resignation Does Not Plead an Intent To Defraud ............. 21

B.    Plaintiffs' Scienter Allegations Fail Under A Holistic Review ............................. 22

C.    Plaintiffs' Core Operations Allegations Are Insufficient ..................................... 22

III.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ........................................................ 23

A.    The SIRF Report Is Not A Corrective Disclosure ................................................ 23

B.    The January Press Release Is Not A Corrective Disclosure ................................. 25

IV.   PLAINTIFFS FAIL TO PLEAD A SECTION 20(A) CLAIM ........................................ 25

CONCLUSION ........................................................................................................................... 26

## TABLE OF AUTHORITIES

**Page**

### Cases

*In re Allied Nev. Gold Corp.*,
  2016 WL 4191017 (D. Nev. 2016) .................................................................................... 5, 21

*In re Am. Apparel, Inc. S'holder Litig.*,
  855 F. Supp. 2d 1043 (C.D. Cal. 2012) ................................................................................. 4

*In re Amgen Securities Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. 2008) ................................................................................. 9

*Applestein v. Medivation, Inc.*,
  861 F. Supp. 2d 1030 (N.D. Cal. 2012) .............................................................................. 19

*In re BofI Hldg., Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................................... 23, 24

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ............................................................................................... 13

*Costabile v. Natus Med. Inc.*,
  293 F. Supp. 3d 994 (N.D. Cal. 2018) .................................................................................. 5

*Curry v. Hansen Med., Inc.*,
  2011 WL 3741238 (N.D. Cal. 2011) ................................................................................... 17

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .............................................................................................. 5

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. 2009) ..................................................................................... 5

*In re Gilead Sciences Sec. Litig.*,
  2005 WL 181885 (N.D. Cal. 2005) ....................................................................................... 8

*Hampton v. Aqua Metals, Inc.*,
  2020 WL 6710096 (N.D. Cal. 2020) .............................................................................. 14, 15

*In re Immersion Corp. Sec. Litig.*,
  2011 WL 871650 (N.D. Cal. 2011) ..................................................................................... 16

*In re Herbalife, Ltd. Sec. Litig.*,
  2015 WL 12732428 (C.D. Cal. 2015 .................................................................................. 25

*Inchen Huang v. Higgins*,
  2019 WL 1245136 (N.D. Cal. 2019) ......................................................................... 2, 4, 5, 13

Case No. 19-CV-01372-LHK
DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 4555794 (C.D. Cal. 2008)................................................................................ 17

*Kipling v. Flex Ltd.*,
  2020 WL 2793463 (N.D. Cal. 2020) ....................................................................... 5, 6, 20

*Lloyd v. CVB Fin. Corp.*,
  811 F3d. 1200 (9th Cir. 2016) ................................................................................... 23, 25

*Mallen v. Alphatec Holdings, Inc.*,
  2013 WL 1294640 (S.D. Cal. 2013), *aff'd*
  *sub nom.* 607 F. App'x 694 (9th Cir. 2015) ........................................................... 17, 19

*McCasland v. FormFactor Inc.*,
  2009 U.S. Dist. LEXIS 59996 (N.D. Cal. 2009) ...................................................... 17

*McGovney v. Aerohive Networks, Inc.*,
  367 F. Supp. 3d 1038 (N.D. Cal. 2019) .................................................................. 5, 16

*Mendell v. Greenberg*,
  927 F.2d 667 (2d Cir. 1990), *as amended*, 938 F.2d 1528 (2d Cir. 1990)......................... 12, 13

*In re Metawave Communs. Corp. Sec. Litig.*,
  298 F. Supp. 2d. 1056 (W.D. Wash. 2003) ...............................................................6, 16, 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ...............................................................................10, 12, 14

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014) ................................................................................ 15

*Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) .................................................................................. 25

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  2012 WL 1868874 (N.D. Cal. 2012) ....................................................................... 14

*In re Rackable Sys., Inc. Sec. Litig.*,
  2010 WL 199703 (N.D. Cal. 2010) ......................................................................... 17

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) .................................................................................. 18

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. 2018)........................................................................... 10

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................. 16

Case No. 19-CV-01372-LHK
DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

*Shurkin v. Golden State Vintners Inc.*,
    471 F. Supp. 2d 998 (N.D. Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) ...................... 17

*In re Silicon Image, Inc. Sec. Litig.*,
    2007 WL 2778414 (N.D. Cal. 2007), *aff'd*, 325 Fed. Appx. 560 (9th Cir. 2009) ............... 16, 18

*Bao v. Solarcity Corp.*,
    2016 WL 54133 (N.D. Cal. 2016) ....................................................................................... 19

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ........................................................................................... 20

*Zucco Part., LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009), *as amended* (Feb. 10, 2009) .............................................. *passim*

**Rules / Statutes**

21 U.S.C. § 396 ................................................................................................................................ 2

15 U.S.C. § 77o ............................................................................................................................. 25

15 U.S.C. § 78t .............................................................................................................................. 25

Fed. R. Civ. P. 12(b)(6) .................................................................................................................. 1

P.S.L.R.A. 9(b) ................................................................................................................................ 4

Rule 10(b)(5) ................................................................................................................................. 14

Section 10(b) ......................................................................................................................... 4, 22, 25

Section 20(a) .................................................................................................................................. 25

### <u>NOTICE OF MOTION AND MOTION</u>

PLEASE TAKE NOTICE THAT on June 10, 2021 at 1:30 p.m. before the Honorable Lucy H. Koh in Courtroom 8, 4th Floor, 280 South 1st Street, San Jose, California, Defendants Corcept Therapeutics Incorporated ("Corcept") and Joseph K. Belanoff, Charles Robb, and Sean Maduck (collectively, the "Individual Defendants") will move this Court for an order dismissing the Third *Amended* Complaint (ECF No. 127 ("TAC")) filed by Lead Plaintiffs. This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6) and is based upon the following Memorandum; Defendants' Request for Judicial Notice, filed concurrently herewith; the argument of counsel; and any additional material as may be submitted to the Court before decision. Defendants seek an order dismissing the TAC with prejudice for failure to state a claim upon which relief can be granted.

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Despite four attempts, Plaintiffs remain unable to plead the existence of any widespread off-label marketing campaign by Defendants. This Court's Order granting Defendants' motion to dismiss the Second Amended Complaint clearly identified the deficiencies in Plaintiffs' pleading. Order Granting Defs.' Mot. To Dismiss SAC (ECF No. 124, hereinafter "Op."). Yet Plaintiffs have been unable to remedy them.

*First*, Plaintiffs have "failed to allege that sales representatives were instructed by regional or district managers to engage in off-label marketing to physicians or that there was any coordinated effort to engage in a company-wide off-label marketing scheme." *Id.* at 18-19. Even if Plaintiffs had adequately pled such a coordinated campaign, Plaintiffs have not alleged that it rendered false any of Corcept's statements. These failures are fatal to Plaintiffs' claims.

*Second*, the TAC does not plead scienter because Plaintiffs fail to plead particularized facts showing the purported mental states of the Individual Defendants at the time each allegedly false statement was made and also fail to plead facts showing a specific corporate intent to commit fraud.

*Third*, the TAC does not plead loss causation because neither of the two alleged corrective disclosures pled by Plaintiffs establish a market revelation of any fraud.

For each of these three reasons, Plaintiffs fail to state a claim under Section 10(b) or Section 20(a). Defendants therefore respectfully request that the Court dismiss the TAC with prejudice.

# RELEVANT FACTUAL BACKGROUND

### A.    Corcept And The Development Of Korlym To Treat Cushing's Syndrome

Corcept is a publicly-traded specialty pharmaceutical company engaged in the discovery and development of drugs that regulate the effects of the stress hormone cortisol. TAC ¶ 38. The company, headquartered in Menlo Park, California, is an industry leader in the development of orphan-status rare disease drugs, including an FDA-approved medication called Korlym.

Korlym is used to treat certain symptoms of Cushing's Syndrome, a deadly and debilitating disorder most commonly caused by a tumor that increases the production of cortisol (or pre-cortisol) in the adrenal or pituitary glands. *Id.* ¶ 61. Approximately 20,000 people in the U.S. have been diagnosed with the disease. *Id.* ¶ 4. Patients with suspected or diagnosed Cushing's are commonly referred to endocrinologists, who "specialize[] in diagnosing and treating conditions that affect the body's adrenal[]" and pituitary glands and are "uniquely qualified to treat Cushing's Syndrome." *Id.* ¶ 62. To educate physicians on Cushing's Syndrome, Corcept engages in marketing directed primarily at endocrinologists. Over half of Corcept's marketing payments were made to endocrinologists (TAC ¶ 274), and Corcept has consistently spent more marketing dollars on endocrinologists than any other group of physicians (*Id.* ¶ 281).

Physicians may exercise their discretion and medical knowledge to prescribe Korlym for uses beyond those that the FDA has approved for inclusion on the product's label (known as "off-label" uses).[1] However, insurers will largely only reimburse patients for "on-label" prescriptions. *Id.* ¶¶ 26, 75. Given the cost of Korlym (*id.* ¶ 82), such reimbursements are crucial to many patients' ability to access Korlym and its long-term health benefits.

### B.    Corcept Is Targeted By Short Sellers

Over time, Corcept's success attracted speculators who sought to enrich themselves by first "short selling" the company's stock, then publicizing allegations designed to drive down its price. One outlet for such allegations appears to be the Southern Investigative Reporting Foundation

---

[1]    *Inchen Huang v. Higgins*, 2019 WL 1245136, at *1 (N.D. Cal. 2019) ("*Higgins*") ("[H]ealth care practitioners may also prescribe the product for 'off-label' uses, meaning uses not approved by the FDA.") (citing 21 U.S.C. § 396).

("SIRF"), which published a report on January 25, 2019 alleging that Corcept *may* have paid doctors to prescribe Korlym off-label in violation of FDA marketing regulations (the "SIRF Report"). *Id.* ¶¶ 27, 343-348; *see also* Ex. A (SIRF Report).[2]  The data relied upon by the Report is drawn from public-source material (Op. 44) which it used to "hypothesize[]" that certain prescriptions were off-label; ask if adverse events "signal[ed] off-label marketing;" and "question[] the geographic clustering" of patients.  TAC ¶¶ 343-347.  On January 31, 2019, a Corcept press release announced preliminary 2018 financial results and 2019 revenue guidance.  *Id*. ¶ 349.  Despite SIRF's attack, and contrary to Plaintiffs' allegations that the release "forecasted a slowdown" (TAC ¶ 349), that press release announced "[p]reliminary 2018 revenue [of] $251.2 million" and "project[ed] 2019 revenue of $285 - $315 million"—a substantial year-on-year *increase of more than 13%*.  Ex. B (SEC Form 8-K January 31, 2019, at EX-99.1 ("2019 Press Release")).

### C.    This Litigation

Attracted by the short-sellers and the "stock drop" they induced, Plaintiffs filed their Complaint and First *Amended* Complaint, alleging that certain of Corcept's public disclosures were false and misleading.  After Defendants moved to dismiss, Plaintiffs *amended*, largely to add allegations sourced from additional anonymous "confidential witnesses" ("CWs").  *Compare* First Am. Compl. (ECF No. 91) *with* Second Am. Compl. (ECF No. 100 ("SAC")).  Defendants moved to dismiss the SAC, and on November 20, 2020, the Court granted Defendants' motion to dismiss. The Court found that Plaintiffs failed to adequately allege actionable misrepresentations, failed to adequately allege scienter, and failed to adequately allege loss causation.  Op. 16.  Because the Court did not find that an amendment would be futile or cause undue delay or prejudice, this Court granted leave to amend.  *Id*. at 47.  However, the Court ordered that, "[i]f Plaintiffs choose to file an *amended* complaint, they must attach a redlined copy comparing the Third *Amended* Complaint with the Second *Amended* Complaint."  *Id*.

On December 21, 2020, Plaintiffs filed their Third *Amended* Complaint.  As with the three prior complaints, the gravamen of the TAC is that Corcept engaged in a "pervasive Company-wide

---

[2]    All Exhibit citations refer to the Exhibits to the Declaration of Renita Sharma, Declaration of Renita Sharma filed concurrently in support of Defendants' Motion to Dismiss.

off-label marketing scheme" to "dupe unsuspecting physicians" "into inappropriately prescribing Korlym." TAC ¶ 1. In response to the Court's holding that Plaintiffs failed to allege that any sales representatives were instructed to engage in off-label marketing (Op. 17), Plaintiffs added allegations relying on the statements of four additional CWs. However, the TAC still fails to state a claim for securities fraud. In addition, the TAC fails to attach the redlined copy ordered by this Court (*see* Op. 47); as such, Defendants attach such a redline as Exhibit C.

<b><u>LEGAL STANDARD</u></b>

To state a securities fraud claim, Plaintiffs must allege particularized facts showing (1) a misrepresentation or omission of a material fact; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1066 (C.D. Cal. 2012) (collecting cases). All elements of a claim under Section 10(b) are subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Op. 13-14.

<b><u>ARGUMENT</u></b>

**I.      <u>PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION</u>**

Plaintiffs allege Defendants made a series of false and misleading statements due to their failure to disclose an allegedly widespread and illegal scheme of marketing Korlym for off-label use. TAC ¶¶ 1, 31. Because "[t]he foundational premise of Plaintiffs' claims ... is that [Corcept] engaged in off-label marketing," and because physicians are permitted to prescribe off-label, Plaintiffs must sufficiently allege, with particularity, that Corcept was engaged in a "widespread off-label marketing campaign." *Higgins* at *5, *9. Plaintiffs fail to do so. Further, even if Plaintiffs had done so, Plaintiffs have failed to allege a material misrepresentation.

        **A.      <u>Plaintiffs Have Not Adequately Alleged An Off-Label Marketing Scheme</u>**

                **1.      <u>Plaintiffs' Confidential Witnesses</u>**

In dismissing Plaintiffs' SAC, this Court considered allegations by ten CWs and found them "insufficient to plausibly allege an off-label marketing scheme," because Plaintiffs "failed to allege that sales representatives were instructed by regional or district managers to engage in off-label marketing to physicians or that there was any coordinated effort to engage in a company-wide off-

label marketing scheme." Op. 18-19. Plaintiffs' TAC retained the allegations of CWs 1-10 without significant revision (*see* Ex. C (Redline) at 77-87); for the reasons stated in this Court's Order, the allegations of CWs 1-10 do not establish falsity (Op. 17-20). This Court should dismiss Plaintiffs' TAC for failure to plead falsity because the addition of CWs 11-14 (collectively, the "New CWs") does not support any credible assertion of any coordinated effort to engage in a company-wide off-label marketing scheme.

A complaint relying on statements from confidential witnesses must first show "sufficient particularity to establish their reliability and personal knowledge." *Zucco Part., LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (Feb. 10, 2009); *see also Kipling v. Flex Ltd.*, 2020 WL 2793463, at *15 (N.D. Cal. 2020). The statements must "support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* (*quoting In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005)); *see also In re Allied Nev. Gold Corp.*, 2016 WL 4191017, at *11 (D. Nev. 2016) ("[S]tatements of a confidential witness are disregarded if lacking in specificity or based on hearsay, rumor, or speculation") (citations omitted); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *9 (C.D. Cal. 2009) (same). "To determine whether a confidential witness has the requisite knowledge, courts look to the 'level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Kipling* at *15 (*quoting Zucco*, 552 F.3d at 995); *In re Daou Sys*, 411 F.3d at 1015; *see also McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019). The statements by the New CWs are insufficiently particularized to establish their reliability and personal knowledge of the facts they allegedly discuss.

*First,* this Court should disregard hearsay statements made by the New CWs. As this Court has noted, "vague hearsay…is not enough to satisfy [the Ninth Circuit's] reliability standard." *Kipling* at *10 (quoting *Zucco*, 552 F.3d at 997). Courts should disregard hearsay statements where CWs do not "(1) specify who gave them this alleged information; (2) provide dates or details of the discussions; and (3) explain how these colleagues knew the information." *Id.* at *11*; see also Costabile v. Natus Med. Inc.*, 293 F. Supp. 3d 994, 1010, 1015 (N.D. Cal. 2018) (CW statements

-5-                    Case No. 19-CV-01372-LHK

regarding a contract were not sufficient where CW was not employed at the company at the time the contract was executed and the CW learned about the details of the contract from undisclosed source at an undisclosed time); *In re Metawave Commc'ns. Corp. Sec. Litig.*, 298 F. Supp. 2d. 1056, 1074 (W.D. Wash. 2003).

For example, CW11's "conversations with at least two other clinical specialists who were let go during the Class Period for refusing to market Korlym off-label" (TAC ¶ 194) rely entirely on hearsay and speculation. The TAC recites that a "former co-worker told CW11 that she was fired from Corcept for refusing to promote Korlym off-label despite being a strong performer at the Company." TAC ¶ 194. However, the TAC does not identify either the speaker or the alleged Corcept employee who fired the speaker; provide dates or details of the speaker's conversation with CW11; or explain how the speaker knew she was "fired … for refusing to promote Korlym off-label." *Id.*; *see Zucco*, 552 F.3d at 996-97. Similarly, the TAC states that "around January 2019, CW11 had a conversation with a former Corcept clinical specialist ('Rep No. 3')," who "told CW11 that Burke fired Rep No. 3 in July 2019 for refusing to continue to market Korlym off label." TAC ¶ 194. Again, the purported hearsay statement provides no details about the alleged conversations with Burke (which itself would be an additional layer of hearsay), nor does it "explain how [Rep No. 3] knew the information" about why s/he was fired. *See Kipling* at *10.

*Second*, this Court should also disregard the New CWs' statements because they lack the requisite indicia of reliability. The New CWs purport to have knowledge of events that occurred hundreds or thousands of miles from where they worked, without stating *how* they knew the information they claim. For example, CW11 claims that "Individual Defendants, along with the Chairman of the Board and Tom Burke reviewed every prescription enrollment form" and "CW11 recalled that the Individual Defendants, along with other senior management, would wait by the fax machine when a prescription was coming in and celebrate each enrollment form that came in with a round of 'high fives.'" TAC ¶ 267. CW11 further stated that "the number of new prescriptions … was discussed *at every meeting* and during *every conference call*." TAC ¶ 270 (emphasis added). But CW11 is a "former Corcept clinical sales specialist in the region comprised of **Ohio, Kentucky, and Tennessee** from November 2012 through July 2016 responsible for marketing and managing

sales of Korlym to physicians in CW11's sales region." TAC ¶ 175. CW11's departure **was well before the relevant class period.** That alone is fatal to Plaintiffs' reliance on him. But even more fundamentally, the TAC does not provide any particularity as to how a sales representative for "Ohio, Kentucky, and Tennessee" *knew* the "Chairman of the Board and Tom Burke reviewed every prescription enrollment form," or that "Individual Defendants…would wait by the fax machine" at Corcept's head office in California. That simply is not plausible.

CW12 stated that "new prescriptions were tracked at Corcept on a daily basis," that "[d]efendants would watch the fax machine daily," and that "each clinical specialist … received a spreadsheet that tracked their individual prescriptions." TAC ¶ 268. CW12 was a "Clinical Specialist in the Pacific Northwest region from July 2014 to August 2016 responsible for marketing and managing sales of Korlym to physicians in CW12's sales region." *Id.* ¶ 177. As with CW11, CW12 does not explain how s/he was or could be aware of what was tracked at Corcept's head office; of who "watch[ed] the fax machine daily;" or of what *each* clinical specialist received. CW12 does not allege that he or she was responsible for or involved in tracking prescriptions, receiving faxes, or sending spreadsheets to clinical specialists.

Similarly, CW13 stated that Maduck received updates on prescriptions "every week;" that "Belanoff went out to speak with either Dr. Back or Mathews in 2018;" and that "it was common knowledge at Corcept among the sales staff that Drs [*sic*] Back and Mathews were the type of physicians they should be looking for." TAC ¶¶ 269, 197. CW13 is a "former clinical sales specialist in the Philadelphia region from September 2016 until February 2019 and then the Florida region until CW13's departure in July 2019." *Id.* ¶ 188. The TAC does not allege that CW13 had responsibilities outside those regions, and acknowledges that neither Drs. Back nor Mathews fell within CW13's region. *Id.* ¶ 197. As such, the TAC fails to explain how or why CW13 would be aware of updates received by Maduck; of any visits by Belanoff that he was not present for; or of what was "common knowledge at Corcept among the sales staff." Put simply, the New CWs' allegations are not plausible.

*Third*, even if accepted as reliable, the New CWs' statements fall far short of the illustrative examples provided by this Court's Order. In *In re Gilead Sciences Securities Litigation*, 2005 WL

181885, at *8 (N.D. Cal. 2005), "confidential witnesses alleged that they personally 'attended various meetings at which Gilead's sales and marketing team received specific instructions to market Viread off-label.'" Op. 18. Here, the New CWs allege only that senior management tracked prescriptions (TAC ¶¶ 197, 267-270) and that sales representatives who made more sales were considered "top-performing" (*id.* ¶ 374)—no surprise, since they were paid, in part, on commission (*id.* ¶ 268). While CW12 alleges that Carl Balzanti told CW12 to "target those sub-clinical ***Cushing's patients*** to get more sales" (*id.* ¶ 178 (emphasis added), *see also* ¶¶ 179-182), this statement does not contemplate off-label marketing, since it is limited to patients with Cushing's Syndrome. Even if this was off-label marketing, (which it is not), Balzanti was not an executive, a member of senior management, or even a "regional or district manager[]" (Op. 18); he was only a colleague of CW12. CW12 conspicuously fails to allege that any Corcept manager or executive confirmed Balzanti's alleged message; instead, CW12 states that s/he "understood Maduck's [alleged praise of Balzanti] to be insinuating that the other clinical specialist needed to be more like" him. TAC ¶ 183. This falls conspicuously short of alleging that Maduck knew Balzanti was doing something improper, let alone amounts to "specific instructions to market [Korlym] off-label." *See* Op. 18.

*Fourth*, and again even assuming the New CWs are accepted as reliable, their statements regarding "marketing materials" allegedly distributed to clinical specialists still fail to support any "instruct[ion] by regional or district managers to engage in off-label marketing." Op. 19. The "marketing materials" described by the New CWs include peer reviewed articles (TAC ¶¶ 206-08), PowerPoint presentations, including patient case studies (*id.* ¶¶ 209, 211-12), and a "tear sheet" (*id.* ¶ 257). The TAC does not allege that Corcept had any involvement in peer reviewed articles, each of which was published in an independent and recognized medical journal. *Id.* ¶¶ 206-08. And the excerpted PowerPoint presentations, far from promoting an off-label message, in fact, *explicitly support Corcept's on-label marketing*. For example, the TAC describes only a single patient case study, and characterizes it as showing that the physician "never even considered" surgery. TAC ¶ 211. But that case study explicitly directs the reader to "Please see Important Safety Information and full Prescribing Information." TAC ¶ 211. Another PowerPoint slide that Plaintiffs characterize

as "off-label marketing" states that patients will have "biochemical evidence of adrenal hyperfunction" (*i.e.*, a positive DST test) and that the prevalence of disease "depends on the diagnostic protocol"—each of these statements is supported by reference to a medical resource independent of Corcept. TAC ¶ 209. And in the PowerPoint slide that Plaintiffs characterize as "recommend[ing] ... start[ing patients] on Korlym if the DST was positive," *the slide explicitly says "NO Cushing Syndrome [if] DST cortisol <1.8 ug/mL."* TAC ¶ 212 (emphasis added). For such patients, the treatment is listed as "Watch and wait"—*not 'prescribe Korlym.'* *Id.* And finally, despite the fact that Defendants and this Court highlighted the failure previously, Plaintiffs continue to conspicuously refuse to provide a copy of, or any detail regarding, the alleged "tear sheet that promoted Korlym as a front line therapy." TAC ¶ 257; *see* Op. 18 (noting that tear sheets and case studies "are not described in any detail or quoted").

This Court directed Plaintiffs to provide allegations of what "sales and marketing staff were instructed to say or do by Defendants." Op. 20. Yet, far from supporting Plaintiffs' allegations, the marketing materials referenced in the TAC demonstrate only that Corcept instructed its sales staff to provide accurate advice supported by peer-reviewed sources.

### 2. Corcept's Physician Education Programs

Next, this Court found that Plaintiffs' allegations regarding "increased spending through a marketing strategy that targeted non-specialist endocrinologists and primary care physicians" failed to allege falsity because "Plaintiffs fail to sufficiently connect any of these payment trends with increased physician prescriptions of Korlym off-label." Op. 20-21. The Court contrasted this to *In re Amgen Inc. Securities Litigation*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008), where a CW "explained that Amgen would sponsor speakers programs for doctors, clinic managers and pharmaceutical directors *in order to advance off-label uses*." Op. 21.

The TAC fails to introduce any new statements that connect Corcept's spending with increased physician prescriptions of Korlym off-label. Plaintiffs spill much ink analyzing "payment

trends" (TAC ¶¶ 267-82) and "increased physician prescriptions"[3] (*id.* ¶¶ 293-94).  However, the TAC fails to meet this Court's instruction that Plaintiffs connect that data to *off-label prescriptions.*

Plaintiffs purport to do so by characterizing all prescriptions—*other than those written by Specialist Endocrinologists*—as off-label.  *See* TAC ¶ 292 (the "marked increase in prescriptions written by [] non-Specialist Endocrinologists" was a "direct result of the off-label scheme").  Plaintiffs make this claim on the basis of the statement that "Specialist Endocrinologists were not fooled by Corcept's off-label marketing" (*id.* ¶ 274) while other physicians were "more susceptible" (*id.* ¶¶ 281-82).  *First*, there is no support for this claim:  Plaintiffs do not—and cannot—allege that any Corcept employee ever said this or that there is any empirical support for it.  This Court "is not required to indulge unwarranted inferences in order to save a complaint from dismissal."  Op. 46 (quoting *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064-65 (9th Cir. 2008).  *Second*, it is contradicted by Plaintiffs' own allegations: Plaintiffs acknowledge that any "endocrinologist is uniquely qualified to both diagnose and treat Cushing's Syndrome," and that all primary care physicians are qualified to treat "a broad array of diseases," including Cushing's Syndrome.  TAC ¶¶ 7, 136 n.32.  And *third and crucially*, the claim is not new; while the TAC adds paragraphs and tables analyzing Corcept's spending, it continues to rely on the same bald accusation to "connect any of these payment trends to ... off-label marketing."  Ex. C (Redline) at 90-95.  Therefore, just as they did in the SAC, Plaintiffs' allegations fail.

### 3.   Diagnosis Rates of Cushing's Syndrome

In the TAC, Plaintiffs continue to allege that Defendants' off-label marketing scheme is confirmed by diagnosis rates of particular physicians, specifically Dr. Back and Dr. Mathews.  In

---

[3]   Plaintiffs' TAC continues to make much of their invented distinction between "Specialist" and "non-Specialist" endocrinologists and physicians.  TAC ¶¶ 6, 274, 293 n.46.  But it is not illegal for a pharmaceutical company to market to its primary constituency: Plaintiffs acknowledge that *all* endocrinologists are "uniquely qualified to both diagnose and treat Cushing's," and that all physicians may treat Cushing's Syndrome.  TAC ¶ 7; *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at \*7 (S.D.N.Y. 2018) (allegations that defendant "sought to cultivate relationships with doctors—no doubt because its business model depended on physicians prescribing [defendants'] drugs"—did not establish illegal scheme).  Nor is such marketing "off-label;" the FDA Label does not mention endocrinologists, much less distinguish between them—as Plaintiffs do—based on "U.S. News rankings."  *See* TAC ¶ 292 n.46.

DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

the SAC, this Court found that Plaintiffs' allegations were insufficient because Plaintiffs "failed to provide any factual allegations that support" "that Defendants marketed Korlym to Dr. Back and Dr. Mathews for off-label use." Op. 21-22. The TAC fails to provide any additional information regarding Drs. Back or Mathews. *See, e.g.,* Ex. C (Redline) at 10-11, 99-102. As such, Plaintiffs' allegations regarding Dr. Back and Dr. Mathews remain insufficient to establish falsity.

### 4.      <u>Insurance Reimbursement</u>

Similarly, Plaintiffs' TAC continues to allege that changes in insurance reimbursement spurred Defendants' off-label marketing scheme. In the SAC, this Court found that Plaintiffs' allegations were insufficient because "even if the Court were to assume that there was a connection between these events, that allegation does not adequately demonstrate that Defendants were engaged in an off-label marketing scheme." Op. 23. That remains true; while the TAC adds allegations regarding additional *insurance companies* (*see* TAC ¶¶ 338-39), it still fails because Plaintiffs have not and cannot demonstrate that any "connection" between changes in insurers' prior authorization requirements and any off-label marketing scheme. As such, Plaintiffs' allegations regarding insurance reimbursement remain insufficient to establish falsity.

### 5.      <u>"Off-Label" Marketing</u>

Finally, Plaintiffs failed to establish falsity because even if Plaintiffs alleged Corcept sales representatives were directed to market Korlym for prescriptions based on a single DST (which they have not, *see supra* § (I)(A)(1)-(4)), Plaintiffs have not alleged such marketing would be "off-label."

Korlym's FDA label states that Korlym is "indicated to control hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery." TAC ¶ 75. Plaintiffs claim that the marketing scheme they allege is "off-label" because Corcept sought to "target ... subclinical patients with DST scores below the industry guidelines, *in direct violation of the FDA label*." TAC ¶ 11 (emphasis added).

Whether or not use of the DST is an appropriate diagnostic tool (and at what level) is a factual dispute. *See* Op. 17. However, whether or not use of the DST is *off-label* is not a factual dispute: it can be decided by this Court on a motion to dismiss by reference to the FDA Label itself.

DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

A review of that Label demonstrates that it does not mention laboratory tests or other diagnostic tools. *See* Ex. D (FDA Label). Moreover, even the FDA's Summary Review notes that "[t]he diagnosis of Cushing's Syndrome requires a multitude of laboratory and radiologic tests whose discussion extends beyond the scope of [the Summary Review]." TAC ¶ 81. Because the FDA Label does not prohibit the use of the DST or require the use of other laboratory tests, Plaintiffs have not pled that the marketing scheme they allege would be "off-label." As such, Plaintiffs fail to establish any widespread off-label marketing scheme.

**B.      The Alleged Misstatements Are Not Made Misleading by Corcept's Conduct**

Even if Plaintiffs had sufficiently alleged a material off-label promotion scheme (they have not), Plaintiffs have also again failed to plead a material omission or misstatement. In the TAC, Plaintiffs plead a total of 29 false statements (from 37 in the SAC), separated into five categories: (1) marketing and promotional materials; (2) compliance with FDA regulations; (3) Korlym revenue and sales growth; (4) speaker and educational programs; (5) on-label use of Korlym. Plaintiffs have added no new false statements, and their attempts at bolstering their allegations of falsity continue to fail because Plaintiffs remain unable to plead facts indicating why the alleged statements at issue were false at the time they were made. *See* Op. 23-24.

**1.      Speaker and Education Programs (Statements 1, 7, 11, 16, 21, 25, 27)**

Plaintiffs' allegations related to speaker and education programs fail because they have still failed to plead "specific facts indicating why" the statements at issue—for example, that Corcept had "developed and continue to refine and expand programs to educate the medical community and patients about diagnosis of this syndrome and to increase awareness" (TAC Ex. A at FS 1, 7)—were false. Op. 24-25; *Metzler*, 540 F.3d at 1070. Plaintiffs claim that "CW11 and CW12 confirmed that Corcept provided them with multiple off-label case studies," and that Corcept increased payments to physicians. TAC Ex. A at 2; TAC ¶¶ 205-212. Even if true, however, that does not prove falsity. Moreover, defendants "need not disclose the[ir] underlying motivations." *Mendell v. Greenberg*, 927 F.2d 667, 674 (2d Cir. 1990), *amended*, 938 F.2d 1528 (2d Cir. 1990).

**2.      Marketing and Promotional Materials (Statements 2, 8, 12, 17, 22, 28)**

Plaintiffs' allegations regarding Corcept's marketing and promotional material statements

-12-                                    Case No. 19-CV-01372-LHK

DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

still fail because Plaintiffs still have not sufficiently alleged either that Corcept had a material amount of off-label sales, *or* that such sales were the result of "sales representatives [] being instructed by Defendants to market" off-label.  Op. 26; *see Higgins* at *9.  Plaintiffs' additional allegations, based on the statements of New CWs, do not establish a widespread off-label marketing scheme.  *See supra*, § 1.  As such, Plaintiffs' allegations fail.

### 3.  Compliance with FDA Regulations (Statements 3, 9, 13, 18, 23, 29)

Plaintiffs have not identified misleading statements regarding Defendants' belief that Corcept's marketing materials were in compliance with FDA guidelines.  As this Court held, these statements are non-actionable statements of opinion, and Plaintiffs cannot establish that these opinions "lack[] any reasonable basis" because Plaintiffs have failed to "plead a company-wide off-label marketing scheme."  Op. 28; *see City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615 (9th Cir. 2017).  Plaintiffs have added no allegations regarding Defendants' beliefs (*see* TAC Ex. A), and therefore these statements remain non-actionable.

### 4.  Korlym Revenue and Sales Growth (Statements 4-6, 10, 14, 15, 19, 20,24)

Plaintiffs have not identified misleading statements regarding the growth in Korlym sales.  Plaintiffs continue to focus on solely on the ***percentage*** increase in Corcept's marketing spending, ignoring that their own TAC establishes that Corcept made over half of its payments to endocrinologists (TAC ¶ 274) and has consistently spent more on endocrinologists than any other group (*id.* ¶ 281).  Defendants' statements regarding Korlym's revenue are thus consistent with the facts that (i) Corcept's spending on doctors was predominately directed toward endocrinologists, and (ii) Corcept's revenue was predominately derived from endocrinologists.

### 5.  On-Label Use of Korlym (Statement 26)

Finally, Plaintiffs' allegations fail because they have not identified misleading statements regarding on-label usage.  As discussed, *supra* § I(A)(5), Plaintiffs have not adequately alleged that "Korlym prescriptions ... based only on a single DST result" (TAC Ex. A at FS 26) are "off label."

## II.  PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

Plaintiffs still do not overcome the "two hurdles" identified by the Ninth Circuit to state a Rule 10(b)(5) claim that relies on CWs to establish scienter: "(a) the [CW] statements introduced

to establish scienter must be described with sufficient particularity to establish his or her reliability and personal knowledge, and (b) those statements must themselves be indicative of scienter." *Hampton v. Aqua Metals, Inc.*, 2020 WL 6710096 at \*14 (N.D. Cal. 2020) (citing *Zucco*, 552 F.3d at 995). To establish scienter in the context of false or misleading statements, plaintiffs must plead contemporaneous facts demonstrating that ***each Defendant*** made such statements intentionally or with deliberate recklessness. *See Metzler*, 540 F.3d at 1066 (complaint "must [allege] specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made") (citation omitted). "The 'particularity' requirement ... requires pleading the who, what, where, when, and how regarding each Defendant's access to the relevant information." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 2012 WL 1868874, at \*19 (N.D. Cal. 2012), *aff'd*, 759 F.3d 1051 (9th Cir. 2014). Despite three opportunities to amend, Plaintiffs still do not meet this standard.

### A.   Plaintiffs Fail To Plead Direct Evidence Of Scienter

The Court has already rejected Plaintiffs' scienter allegations as to CWs 1-10, and the TAC does not present any new particularized allegations as to these CWs. As such, Corcept focuses on the allegations from CWs 11-14, which also fail to raise a strong inference of scienter.

#### 1.   CW Allegations Of An Off-Label Marketing Scheme Do Not Plead An Intent To Defraud

In prior Complaints, Plaintiffs only attempted to allege direct evidence of scienter as to Maduck—allegations that this Court dismissed for failure to offer "*any document or statement* that would demonstrate that [he] was aware of the alleged off-label marketing scheme." Op. 36 (emphasis added). Now, the TAC—through the New CWs—attempts to impute scienter to all three Individual Defendants (i.e., Maduck, Belanoff, and Robb). These attempts fare little better.

Specifically, the TAC uses the New CWs to place the Individual Defendants at various weekly, annual, and other periodic meetings where routine objectives were discussed (*e.g.*, sales goals, performance, and practices), then tries to morph this ordinary activity into a company-wide off-label marketing scheme. As evidence of such scheme, Plaintiffs allege: (i) that "Corcept shifted to an off-label marketing approach when Tom Burke was promoted to VP of Sales in early 2016"

and that "Burke reported to defendant Maduck throughout the Class Period" (TAC ¶ 175); (ii) Belanoff put high-performing sales specialists on stage during Annual Sales Meetings "as the 'direction of the Company,'" which "effectively served as a Company directive to continue to, and increase, off-label marketing of Korlym" (*id.* ¶¶ 187-89); (iii) Belanoff, Maduck, and "others" held "Balzanti and Franklin up as examples," which one CW understood to "insinuat[e]" that other clinical specialists should "be more like Balzanti and Franklin" (*id.* ¶¶ 183, 187); and (iv) the Individual Defendants attended "numerous ... meetings with management ... in which management promoted Corcept's off-label message" (*id.* ¶ 184). These assertions are disposed of in sequence:

*First*, Plaintiffs "fail[] to allege with particularity facts supporting its assumptions that the confidential witnesses were in a position to be personally knowledgeable of the information alleged." *Hampton*, 2020 WL 6710096 at *14 (citing *Zucco*, 552 F.3d at 996). CW11 is identified as a "former Corcept clinical sales specialist in the region comprised of Ohio, Kentucky, and Tennessee" (TAC ¶ 175) and CW12 is identified as "a former Clinical Specialist in the Pacific Northwest region" (*id.* ¶ 177). At all relevant times, Belanoff and Maduck were based in California.

*Second,* Plaintiffs cannot impute scienter to Maduck by virtue of his supervision of Burke. *Id.* ¶ 175. A reporting relationship is insufficient to ascribe particularized knowledge or scienter. *See, e.g.*, *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) (statement that CW's "boss's status in HP's corporate hierarchy" meant he must have had relevant communications was insufficient to establish scienter). Moreover, Plaintiffs claim that Burke participated in "every aspect" of the scheme, primarily by encouraging other employees to "do what" high-performers were doing to increase sales. *Id.* ¶¶ 201, 444. Not only do these allegations fail to establish a company-wide off-label marketing scheme, they are hardly indicative of *Maduck's* scienter.

*Third*, even assuming *arguendo* that (i) Belanoff and Maduck attended each Annual Sales Meeting and (ii) Belanoff and Maduck praised Franklin and Balzanti, these allegations all fail to show particularized knowledge of off-label marketing by any Individual Defendant (or its

promotion) when the challenged statements were made. TAC ¶ 444 (emphasis added).[4] **None** of the CWs (including CW14) reported interacting with Belanoff or Maduck at these Annual Meetings, nor can they offer any particularized (or even general) insight into their state of mind (as to off-label marketing or otherwise). Indeed, the TAC alleges that Burke—**not Maduck or Belanoff**— "was the primary speaker at the Annual National Sales Meetings and quarterly management meetings" where the Company's so-called "new [off-label marketing] directive" was discussed. *Id*. For these reasons, the TAC's allegations are insufficient. *See, e.g.*, *In re Immersion Corp. Sec. Litig.*, 2011 WL 871650, at *5 (N.D. Cal. 2011) (CW "allegations ... that certain of the defendants attended quarterly or weekly management meetings are insufficient" to plead scienter).

### 2.     Knowledge of Prescriptions Does Not Plead Intent To Defraud

Equally inadequate are the conclusory assertions from CW11 and CW12 that Belanoff and Maduck "closely monitored and tracked each Korlym prescription," including that they "would wait by the fax machine" and "celebrate each enrollment form that came in with a round of 'high fives.'" TAC ¶¶ 375-76; *see also id*. ¶¶ 23, 199. *First*, neither CW claims to have been present to witness this. *See, e.g.*, *Metawave*, 298 F. Supp. 2d at 1068 ("The Court must be able to tell whether a confidential witness is speaking from personal knowledge or 'merely regurgitating gossip and innuendo.'"); *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053-54 (N.D. Cal. 2019) (rejecting CW allegations as "unreliable" where "the complaint does not articulate why CW1 would have [the] knowledge [attributed to him]"). Indeed, based on locations and job responsibilities, it is difficult to understand *how* either CW could have been present to witness the arrival of "each ... form." *Second*, even if the CWs had experienced this, their employment at Corcept ended almost a full year before the Class Period.[5] *Third*, the TAC does not allege how the

---

[4]   CW12's perception that Balzanti was placed on the stage because prescriptions could only be achieved through off-label techniques is not sufficient to "support a strong inference of scienter on their own." Op. 34 (citing and quoting *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (CW allegations were insufficient because "[c]ritically, none of the CWs report communicating directly with" the individual defendants).

[5]   *See In re Silicon Image, Inc. Sec. Litig.*, 2007 WL 2778414, at *2 (N.D. Cal. 2007), *aff'd*, 325 Fed. Appx. 560 (9th Cir. 2009) (rejecting CW scienter assertions about events that post-date the term of CW's employment); *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1015 (N.D.

enrollment forms indicated off-label ***marketing***.  As a result, Plaintiffs fail to demonstrate what specific information Belanoff and Maduck possessed by virtue of these enrollment forms that rendered the challenged statements false.  *Cf. McCasland v. FormFactor Inc.*, 2009 WL 2086168, at *5-6 (N.D. Cal. 2009) (rejecting a finding of scienter where CW failed to specify what was specifically provided to defendants that contradicted any particular public statement).

CW13 and CW14 fare no better.  These witnesses claim that "at each Annual National Sales Meeting, Defendants displayed a Ranking Report of all clinical specialist[s]" by sales.  TAC ¶ 377.  *First*, Plaintiffs do not identify *who* displayed or had knowledge of the so-called Report.  *See, e.g.*, *Mallen v. Alphatec Holdings, Inc.*, 2013 WL 1294640, at *10 (S.D. Cal. 2013), *aff'd sub nom.* 607 F. App'x 694 (9th Cir. 2015) (rejecting CW allegations that did not indicate "who else participated in these conference calls, when they occurred relative to the challenged statements, and what [was] discussed").  *Second*, the TAC does not allege that reports tracked sales traceable to off-label ***marketing***.  *See Curry v. Hansen Med., Inc.,* 2011 WL 3741238, at *5 (N.D. Cal. 2011) (allegation that sales data was discussed at weekly meetings did not support scienter).  *Third*, the conclusory allegation that Franklin "was known throughout Corcept as marketing Korlym off-label" does not impute knowledge of off-label marketing to the Individual Defendants.  TAC ¶ 414.  *Cf. In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *17-18 (C.D. Cal. 2008) (CW allegation that CEO and CFO "must have known" of improper practice because it was a "poorly kept secret within the company" was gossip, not personal knowledge, and failed to raise a strong inference of scienter).

### 3.    Allegations That Corcept Attempted to Guarantee Insurance Approval Do Not Suffice To Plead An Intent To Defraud

The TAC also advances a new theory of scienter, based on Corcept training clinical specialists on patient enrollment forms. Specifically, Plaintiffs claim that: (i) Belanoff, Maduck and Robb attended a meeting in June 2015, before the Class Period, where Balzanti "demonstrated to the clinical specialists how to fill out the insurance forms" (TAC ¶ 213); (ii) "Belanoff would occasionally ... flag incorrect ICD-10 codes on enrollment forms" and return them to physicians to

---

Cal. 2006), *aff'd*, 303 F. App'x 431 (9th Cir. 2008) (CW whose employment ended before class period lacked personal knowledge of activities during class period); *In re Rackable Sys., Inc. Sec. Litig.*, 2010 WL 199703, at *8 (N.D. Cal. 2010) (rejecting scienter assertions where CWs were not employed by company during class period).

"fix" (*id.* ¶ 379); and that (iii) "CWs 2, 7, 8 and 9 all had their clinical specialists attempt to fill out Korlym insurance forms on behalf of the prescribing physician" (*id.* ¶ 213).  Taking the allegations as true, it is hardly remarkable that Corcept would provide information to physicians to assist them in obtaining reimbursement for their patients of an "extremely expensive" drug.  *Id.* ¶ 26.[6]

### 4.    Corcept's Revenue Does Not Suffice To Plead An Intent To Defraud

This Court has already held that the "vague assertion that Defendants must have been aware that absent off-label prescriptions, growth of the kind [that] Corcept experienced could not be achieved" is insufficient to plead scienter.  Op. 35-36 (citing *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001)).  The TAC adds allegations from the New CWs that Corcept's growth was "mainly driven by prescriptions to subclinical Cushing's patients resulting from Corcept's off-label marketing" and that "approximately 50% of the Korlym prescriptions came from three physicians"—Drs. Back, Crabb, and Anderson—who "were well known prescribers of Korlym for off-label subclinical indications."  TAC ¶ 392.  These allegations are insufficient to cure Plaintiffs' pleading deficiency.

*First*, the claims are conclusory, silent as to the Individual Defendants' state of mind, and imprecise as to time.  *In re Silicon Image,* 2007 WL 2778414, at *2 (dismissing complaint with prejudice where plaintiffs "fail[ed] to provide a factual basis for the conclusory opinions assertedly provided to plaintiffs by [confidential witnesses]").  *Second*, CW14 was a "former Regional Manager on the East Coast ... responsible for overseeing clinical specialists and managing customer sales *in CW14's region*."  TAC ¶ 198 (emphasis added).  Notably, the TAC alleges that Drs. Back, Crabb, and Anderson were located *outside of CW14's region* during the Class Period (TAC ¶ 318), and thus fails to establish how CW14 could possess the information s/he purports to provide.  *Zucco*, 552 F.3d at 996.  *Third*, even assuming *arguendo* that these doctors were "well known" for *prescribing* Korlym off-label, that fact is insufficient to establish the Individual Defendants' knowledge of a company-wide off-label *marketing* scheme.

---

[6]    CW11 also alleges that "these practices eventually led to an investigation of Corcept by the California Department of Insurance in 2019."  TAC ¶¶ 214-15.  CW11 was not employed by Corcept in 2019, and thus lacks firsthand knowledge of the motivation for any such investigation.  *See Zucco*, 552 F.3d at 996 (CWs who left before the class period had, at best, "only secondhand information").

**5.    Corcept's Alleged Failure To Follow Industry Guidelines Does Not Suffice To Plead An Intent To Defraud**

In its Dismissal Order, the Court also held that Plaintiffs failed to establish scienter because they "failed to sufficiently allege that Individual Defendants instructed Corcept sales representatives to give ... instructions [regarding diagnostic procedures], or even that [they] were aware that these instructions were being given." Op. 37.  In a futile attempt to cure this defect, the TAC relies upon CW13's "rec[ollection] that Corcept management, including Defendant Maduck and Tom Burke, told clinical specialists that if the DST was in the grey area, to try and get the physical to 'run a trial' of Korlym with their patients." TAC ¶ 195.  These allegations are unreliable, as they do not identify "when in [CW13's] tenure [the allegedly contradicting events] occurred; if they occurred before the relevant time period, they cannot establish simultaneity." *Bao v. Solarcity Corp.*, 2016 WL 54133, at *6 (N.D. Cal. 2016); *see also Mallen*, 2013 WL 1294640, at *10 (rejecting CW allegations that did not indicate "who else participated" in discussions and "when they occurred").

The TAC also asserts that "CW14 and other *regional managers* would consistently question Burke and Defendant Maduck about how it was possible for these physicians to be prescribing so much Korlym without going off-label," and "*[i]n response*, Maduck and Burke told *clinical specialists* they just needed to find physicians who were willing to prescribe Korlym when the DST came back below the 1.8 medical guidelines." TAC ¶ 398 (emphases added).  This sleight of hand attempts to conflates different conversations (*i.e.*, with regional managers and clinical specialists) to circumvent a glaring hearsay problem.  In any event, the TAC offers no particularized support for the claim that Maduck and Burke provided such instructions; indeed, CW14 is not a clinical specialist, and the TAC does not identify a single clinical specialist to whom these instructions were given. *See, e.g.*, *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1037 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) (rejecting CW allegations where plaintiffs "fail to adequately allege that the confidential witnesses were in a position to have the knowledge they profess").

Likewise, this Court should reject the allegation that "Burke and Defendant Maduck [collectively] told the regional managers that the clinical specialists needed to find a physician who was willing to prescribe Korlym where the DST was below the 1.8 guidelines" (TAC ¶ 374) as that is contradicted by the very documents that the TAC excerpts, including a Corcept slide deck

-19-

DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

expressly stating that a "DST cortisol < 1.8" indicates "**NO** CUSHING'S SYNDROME" (*id.* ¶ 212). Such inconsistent and contradictory allegations should not be credited, as they plainly undermine claims of a ***company-wide*** scheme to promote off-label. *See, e.g.*, *Kipling* at *18 (refusing to credit CW allegations because they contradicted other allegations in the complaint); *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295-96 (9th Cir. 1998) (courts "are not required to accept as true conclusory allegations ... contradicted by documents referred to in the complaint").

### 6. <u>Honoraria Payments to Physicians Do Not Plead An Intent To Defraud</u>

The TAC's honoraria allegations suffer the same fate. As this Court held in regards to the SAC, Plaintiffs "fail[] to allege any specific facts that demonstrate that the purpose or intent of honoraria payments was to facilitate or promote off-label prescriptions of Korlym." Op. 37. Plaintiffs have merely recycled their allegations regarding honoria payments in the TAC, and have failed to add facts that demonstrate any purpose or intent. *See* Ex. C (Redline) at 135.[7]

### 7. <u>Corcept's Limited Number of Sales Regions and Sales Representatives Does Not Plead an Intent To Defraud</u>

This Court already held that "Plaintiffs have not alleged that Individual Defendants actually accessed any sales or performance data." Op. 38. To cure this defect, the TAC attempts to establish Maduck's scienter by virtue of his attendance at sales meetings that are either imprecise as to time or fall squarely outside of the Class Period. *See* TAC ¶¶ 190, 269, 374. However, these allegations do not establish that any Individual Defendants actually accessed any sales or performance data.

*First*, the allegations do not support Plaintiffs' claim that Maduck received ***off-label marketing data***; even if Maduck discussed sales and prescriptions as alleged, ***none*** of the CWs allege that Corcept tracked sales attributable to off-label marketing (or even off-label prescriptions). *Second*, CW13 admits that his/her knowledge is limited to sales data presented at weekly meetings "with CW13's regional manager and other clinical specialists in CW13's region," TAC ¶ 269, not meetings attended by any Individual Defendant. Absent particularized facts, Plaintiffs' claim that

---

[7]   While CW11 alleges that "Corcept used honoraria payments to speakers as a means to facilitate off-label marketing," TAC ¶ 412, this allegation is conclusory, not the type of "specific fact[]" requested by this Court, Op. 37. Moreover, as explained *supra*, CW11 cannot substantiate actions that occurred during the Class Period, as CW11's employment was terminated a year prior.

Case No. 19-CV-01372-LHK
DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

Individual Defendants received internal data reflecting off-label marketing is conclusory.

**8.   Sales Representatives Awards Do Not Plead An Intent To Defraud**

The TAC still fails to plead facts establishing that, by rewarding sales performance, Corcept exceeded routine business objectives.  In an attempt to bolster the SAC's deficient allegations, the TAC adds two claims:  that (i) "CW11 recalled Franklin received a $1 million dollar bonus in 2017, which based on CW11's experience could only be possible if 90% of Franklin's sales were off-label," TAC ¶ 421, and (ii) "[a]ccording to CW11, Defendants Maduck and Belanoff set the sales quotas along with Tom Burke and the Individual Defendants," *id.* ¶ 421 n.57.  These allegations are unreliable.  *First*, because Corcept terminated CW11's employment in 2016, he lacks firsthand knowledge as to what Franklin was paid in 2017 (or why) or what, if any, sales quotas were set during the Class Period.[8]  *Second*, CW11 does not and cannot allege how or why his/her "experience" would show that such a bonus was "only possible" if 90% of sales were off-label.  *And third*, there is no evidence for Plaintiffs' conclusory allegation that "sales quotas" necessitated off-label marketing; as such, even if true, the existence of quotas could not establish scienter.

**9.   Dr. Fishman's Resignation Does Not Plead an Intent To Defraud**

It is axiomatic that "a plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." *Zucco*, 552 F. 3d at 1002.  Plaintiffs have still failed to do so regarding the departure of Corcept's Chief Medical Officer, Dr. Fishman.  This Court held that the SAC "failed to allege that Fishman had any knowledge of Maduck's [alleged mis]statement," "that Fishman's departure was connected to off-label marketing," or that Fishman "was [not] nearing retirement age." Op. 38.  In response, the TAC simply adds that Dr. Fishman "had not yet reached retirement age and was just 56 years old." TAC ¶ 426.  That is insufficient.

The Ninth Circuit has held that, absent factual allegations demonstrating that a departure "was accompanied by suspicious circumstances," any inference of scienter "will never be as cogent or as compelling as the inference that the employees resigned or were terminated for unrelated

---

[8]   Likewise, the TAC does not establish how CW11 could have firsthand knowledge of whether prescriptions attributed to Franklin were off-label, and thus such allegations should be disregarded. *See, e.g.*, *Metawave*, 298 F. Supp. 2d at 1068; *In re Allied*, 2016 WL 4191017 at *11.

personal or business reasons." *Zucco*, 552 F.3d at 1002. The TAC still presents no facts establishing that Dr. Fishman had knowledge of the challenged statements or off-label marketing, much less that he resigned because of them. Thus, his departure does not support a strong inference of scienter.

### B. Plaintiffs' Scienter Allegations Fail Under A Holistic Review

As demonstrated, *supra*, each of Plaintiffs' scienter allegations fails on review. This is also true when viewed holistically; as with the SAC, while Plaintiffs may have alleged that "individual Corcept *sales representatives* [including Franklin and Balzanti, and any others identified by CW11, CW12, CW13, and CW14] may have engaged in off-label marketing," the "plausible alternative inference" of their allegations remains that the Individual Defendants "were not engaged in a secret, company-wide off-label marketing scheme." Op. 40 (citing *Zucco*, 552 F.3d at 1007) (emphasis added). Plaintiffs' allegations rely heavily on the New CWs, but do not "support the probability that a person in the position occupied by the [New CWs] would possess the information alleged." *Zucco*, 552 F.3d at 1015. As such, "Plaintiffs' allegations remain no more than an unconnected series of vague allegations as to what Individual Defendants may have done or known." Op. 40.

### C. Plaintiffs' Core Operations Allegations Are Insufficient

Finally, even if this case could present the "rare" circumstance warranting application of the core operations doctrine, Plaintiffs cannot prove scienter under such theory because the TAC does not adequately allege a company-wide off-label marketing scheme for Korlym. *See* Op. 42. Assuming, as this Court must, that "Korlym accounts for 100% of Corcept's revenue," *id.* at 41, a company-wide off-label marketing scheme involving Korlym would only "be of such prominence that it would be absurd to suggest that management was without knowledge," *id.* at 41 (citation omitted), *if a company-wide scheme was adequately alleged*. However, for the reasons stated *supra* at § (I)(A)(1)-(4), the TAC merely repeats and repackages vague, conclusory, and generalized allegations already deemed insufficient to demonstrate a company-wide fraud.

Because the TAC fails to plead scienter on the part of any Individual Defendant, despite guidance from the Court's Dismissal Order, and Plaintiffs have not cured these deficiencies in *any* of their seriatim *amended* pleadings, their Rule 10(b) claims should be dismissed with prejudice.

### III.   PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION

Plaintiffs' TAC maintains their reliance on a market revelation of fraud theory, which requires Plaintiffs to allege "that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (citation omitted); *see also* Op. 43, TAC § VI.  Plaintiffs' allegations fail.  The SIRF Report's information was reflected in the company's stock price and, at best, it disclosed only a "risk" of fraud.  Moreover, Plaintiffs have adduced no additional facts to "support the allegation that the market understood the January Press Release as a revelation of Corcept's allegedly fraudulent conduct."  Op. 46.

### A.   The SIRF Report Is Not A Corrective Disclosure

The SIRF Report is not a "corrective disclosure" that resulted in market revelation of any fraud for at least three reasons.  *First*, the SIRF Report relies entirely on publicly-available data (Op. 44) and Plaintiffs have not "plausibly explain[ed] why the [SIRF Report's] information was not yet reflected in the company's stock price," *In re BofI Hldg., Inc. Sec. Litig.*, 977 F.3d 781, 794 (9th Cir. 2020).  In an effort to do so, the TAC alleges that while the SIRF Report relied on public FDA FAERS, Medicare and Open Payments data, it "analyzed and pieced together" that data such that the Report disclosed "new information."  TAC ¶¶ 455-62.  The Report did no such thing.

Plaintiffs allege that (i) "FDA FAERS data is only available through letter request and it takes weeks to receive a response," and (ii) FAERS data is "not understandable by the average investor" because an investor would need "to research Cushing's Syndrome and the Korlym label," understand "that Cushing's Syndrome is more prevalent in women than men," and understand the meaning of an "unknown" diagnosis.  TAC ¶ 456-57.  Neither of these is true.

The SIRF Report directly cites FAERS data only for "the number of deaths recorded for Korlym" and the fact that for certain of those deceased patients, Korlym was reported as "used for [an] unknown indication."  Ex. A (SIRF Report) at 3.  Far from taking "weeks to receive," these categories of data are *immediately available* on the FDA's FAERS Public Dashboard website.  *See* Ex. E (FAERS Data).  While it is true that certain "longer form FAERS reports" must be obtained through FOIA, the SIRF Report explicitly disclaims any citation to that information, and states that

these longer form reports were considered only for "context and data" and they are "not official reports." Ex. A (SIRF Report) at 3-4.  As such, not only did the SIRF Report rely on immediately-accessible information—not information "only available through letter request"—the SIRF Report relied on categories of data (*i.e.* the number of deaths and the reported indication) that are readily "understandable by the average investor."  TAC ¶ 456.

Plaintiffs' allegations regarding Open Payments and Medicare data fare no better.  Both Open Payments and Medicare data are immediately accessible online.  For example, Plaintiffs point out that "the SIRF Report uncovered that Corcept had compensated a specific Florida doctor, Hanford Yau, $95,139.66 in 2017."  TAC ¶ 459.  That information is easily accessible on the CMS website; *indeed, the SIRF Report links directly to the CMS website.*  Ex. A (SIRF Report) at 6.

Plaintiffs' claim that "Corcept's off-label marketing scheme was not plausibly understood by the market until the SIRF Report analyzed and pieced together data" (TAC ¶ 461) relies on Plaintiffs' inaccurate characterization of FAERS, Open Payments and Medicare data as inaccessible and difficult to understand.  The data is neither, and as such Plaintiffs cannot "plausibly explain why" any information contained in the SIRF Report "was not yet reflected in [Corcept's] stock price."  *In re BofI*, 977 F.3d at 794.

*Second*, the SIRF Report is not a corrective disclosure because Plaintiffs cannot "allege particular facts plausibly suggesting that other market participants had not done the same analysis." *In re BofI,* 977 F.3d at 794.  Plaintiffs allege that "not a single analyst report issued, nor any analyst commentary or questions during Corcept's quarterly earnings calls during the Class Period made any mention of off-label marketing, the FOIA FAERS data, Corcept's excessive payments to physicians or the Medicare or Open Payments data."  TAC ¶ 462.  That is untrue.  On Corcept's November 2, 2017 earnings call (the source of Plaintiffs' alleged False Statements 4, 5, and 6), Bank of America analyst Peter Stapor asked Corcept, "*I'm on the FDA adverse events reporting system portal right now* and I see that Korlym has 91 death cases associated with it. Could you talk about whether those are drug related and what the cause might be?"  Ex. F (Earnings Call Transcript) at 13 (emphasis added).  As such, not only did analysts rely on the same source of data as did SIRF, they relied on the same category of data:  reports of death while prescribed Korlym.  Because market

-24-

Case No. 19-CV-01372-LHK

DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

participants had done the same analysis as that contained in the SIRF Report, the SIRF Report is not a corrective disclosure.

*Third*, the SIRF Report is not a corrective disclosure because it disclosed only "a 'risk' or 'potential' for widespread fraudulent conduct," not proof of the same. *In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12732428, at *2 (C.D. Cal. 2015). Information that discloses only the potential of fraudulent conduct must be "coupled with a subsequent revelation of the inaccuracy of [the alleged] misrepresentation" to "serve as a corrective disclosure." *Lloyd*, 811 F.3d at 1203. Plaintiffs cannot point to any such revelation, because Corcept was not and is not engaged in off-label marketing.

## B.   The January Press Release Is Not A Corrective Disclosure

Plaintiffs also maintain their reliance on the January Press Release, claiming that the Release "forecasted a sharp slowdown in sales … likely due to insurance companies tightening approval guidelines after getting wind of the off-label marketing and physicians starting to become wise to Defendants' improper marketing tactics." TAC ¶ 464. This Court found that the January Press Release was not a corrective disclosure because "Plaintiffs ha[d] done little to substantiate this allegation" in the SAC. Op. 46. Indeed, "Plaintiffs' allegations [we]re little more than conjecture," because there were "certainly no facts alleged in the SAC that support the allegation that the market understood the January Press Release as a revelation of Corcept's allegedly fraudulent conduct." *Id.*

The TAC made only one change to Plaintiffs' allegations regarding the January Press Release: it downgraded Plaintiffs' conjecture about insurance companies' motivations from "presumably" to "likely." Ex. C (Redline) at 149. Despite this Court's directive, Plaintiffs adduced no additional facts supporting their conjecture that the market understood the January Press Release as a revelation of fraud. As such, Plaintiffs' allegations still fail because the January Press Release did not "call[] into question" or render "untrue" any "statements made by the Defendants." *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 608 (9th Cir. 2014); *see also* Op. 46.

## IV.   PLAINTIFFS FAIL TO PLEAD A SECTION 20(A) CLAIM

To plead a control person claim under Section 20(a) of the Exchange Act, Plaintiffs must adequately plead a primary violation of Section 10(b). 15 U.S.C. §§ 77o, 78t; Op. 46. Because Plaintiffs have failed do so, the Section 20(a) claim should also be dismissed.

-25-

## CONCLUSION

For the foregoing reasons, the TAC should be dismissed without leave to amend.

DATED:  February 19, 2021

QUINN EMANUEL URQUHART &
SULLIVAN, LLP


*/s/ Corey Worcester*
Corey Worcester

*Attorneys for Defendants Corcept
Therapeutics Inc., Joseph K Belanoff,
Charles Robb, and Sean Maduck*

Case No. 19-CV-01372-LHK
DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT