**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Sebastiano Tornatore (admitted *pro hac vice*)
Michael J. Keating (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiff the*
*Ferraro Family Foundation, Inc. and*
*James L. Ferraro*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>Defendants. | Case No. 19-CV-01372-LHK<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>Judge: Hon. Lucy H. Koh<br>Courtroom: 8, 4th floor<br>Hearing Date: June 10, 2021<br>Hearing Time: 1:30 p.m. |

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................................1

FACTUAL BACKGROUND ..............................................................................................................3

    I.    CORCEPT'S ONLY PRODUCT IS A SECONDARY TREATMENT FOR A RARE DISEASE IN A SMALL PATIENT POPULATION.........................................................3

    II.    CORCEPT MANAGEMENT DIRECTS THE COMPANY'S OFF-LABEL PUSH......3

    III.    TWO PARTIAL DISCLOSURES EXPOSE THE COMPANY'S OFF-LABEL SCHEME ................................................................................................................6

ARGUMENT ......................................................................................................................................6

    I.    THE TAC PLEADS ACTIONABLE MISSTATEMENTS AND OMISSIONS.............7

        A.    False Statements Regarding Speaker and Education Programs...........................7

        B.    False Statements Regarding Marketing and Promotional Materials....................9

        C.    False Statements Regarding Compliance with FDA Regulations ......................10

        D.    False Statements Regarding Corcept's Historical Revenue Growth ..................11

        E.    False Statements that "99%" of Korlym Prescriptions Were "On Label"..........12

    II.    THE TAC PLAUSIBLY ALLEGES A STRONG INFERENCE OF SCIENTER........13

        A.    The Core Business Operations Theory Supports Scienter...................................14

        B.    Management Told Staff to Use a Uniform Off-Label Marketing Message........15

        C.    Defendant Belanoff Personally Visited Physicians and Communicated the Uniform Off-Label Marketing Message ...............................................................16

        D.    Defendants Instructed Corcept Personnel to Distribute Off-Label Marketing Materials to Physicians to Perpetuate the Off-Label Marketing Scheme ...........17

        E.    Defendants Closely Tracked All Korlym Prescriptions in Quarterly Reports and Monitored the Fax Machine as Corcept Received New Prescriptions ...............17

        F.    Defendants' Excessive Payments to Physicians Indicate Scienter .....................18

        G.    Defendants Were Motivated to Engage in the Off-Label Marketing Scheme....19

        H.    Defendants Offer No Compelling Opposing Inference ......................................20

    III.    THE TAC PLEADS LOSS CAUSATION..................................................................20

        A.    The January 25, 2019 SIRF Report.....................................................................21

        B.    The January 31, 2019 Press Release ...................................................................25

    IV.    THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 20(A) .........25

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

CONCLUSION........................................................................................................................................26

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

## TABLE OF AUTHORITIES

**Cases**

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
554 F.3d 342 (3d Cir. 2009)............................................................................................. 25

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ...................................................................................... 7, 12

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
964 F. Supp. 2d 1128 (N.D. Cal. 2013) .......................................................................... 25

*City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011).............................................................................. 23

*Di Donato v. Insys Therapeutics, Inc.*,
2017 WL 3268797 (D. Ariz. Aug. 1, 2017)....................................................... 15, 18, 19

*Galbraith v. County of Santa Clara*,
307 F.3d 1119 (9th Cir. 2002) ....................................................................................... 23

*Garcia v. Guo*,
2016 WL 102213 (C.D. Cal. Jan 7, 2016) ...................................................................... 24

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ......................................................................................... 21

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ............................................................................ 13

*Howard v. Everex Sys.*,
228 F.3d 1057 (9th Cir. 2000) ....................................................................................... 25

*Huang v. Higgins, et. al.*,
2019 WL 1245136 (N.D. Cal. Mar. 18, 2019)................................................................... 9

*In re Acadia Pharm. Inc. Sec. Litig.*,
2020 WL 2838686 (S.D. Cal. June 1, 2020) ................................................................... 14

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................... 13, 15

*In re Amgen Inc. Sec. Litig.*,
544 F. Supp. 2d 1009 (C.D. Cal. 2008) ........................................................... 9, 13, 16, 18

*In re Apollo Grp., Inc. Sec. Litig.*,
2010 WL 5927988 (9th Cir. June 23, 2010) ................................................................... 24

*In re Banc of Cal. Sec. Litig.*,
2017 WL 3972456 (C.D. Cal. Sep. 6, 2017).................................................................... 24

*In re BofI Hldgs, Inc., Sec. Litig.*,
977 F.3d 789 (9th Cir. 2020) ......................................................................................... 21

**Case No. 19-CV-01372-LHK**

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. Aug. 19, 2008)................................................................ 20

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d. 1044 (C.D. Cal. May 14, 2008) ............................................................ 16

*In re Daou Systems, Inc.*,
411 F. 3d 1006 (9th Cir. 2005) ........................................................................................ 18

*In re Finisar Corp. Sec. Litig.*,
2017 WL 1549485 (N.D. Cal. May 1, 2017) ................................................................... 16

*In re Gilead Sci. Sec. Litig.*,
2005 WL 181885 (N.D. Cal. Jan. 26, 2005) ...................................................................... 7

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................................... 7

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................... 16, 17

*In re Questcor Secs. Litig.*,
2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) .................................................................... 13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ..................................................................................... 13, 18

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)............................................................................................. 17

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ............................................................................................ 7

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ........................................................................................... 23

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ..................................................................................... 7, 13

*Mendell v. Greenberg*,
927 F.2d 667 (2d Cir. 1990), amended, 938 F.2d 1528 (2d Cir. 1990) ............................ 9

*Milton Arbitrage Partners, LLC v. Syncor Int'l Corp.*,
239 Fed. Appx. 318 (9th Cir. 2007).............................................................................. 9, 12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ........................................................................................... 25

*Murphy v. Precision Castparts Corp.*,
2017 WL 3084274 (D. Or. 2017)...................................................................................... 12

*Nguyen v. Radient Pharms. Corp.*,
2011 WL 5041959 (C.D. Cal. Oct. 20, 2011)................................................................... 19

*No. 84 Employer-Teamster v. America West Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ............................................................................... 15, 20, 25

v    **Case No. 19-CV-01372-LHK**

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) ............................................................................................. 25

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.,*
    780 F. App'x 480 (9th Cir. 2019) ........................................................................................... 6

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................................... 9

*Public Employees' Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d at 313 (5th Cir. 2014) ........................................................................................... 24

*Reese v. Malone,*
    747 F.3d 557 (9th Cir. 2014) ............................................................................................... 14

*Rihn v. Acadia Pharm. Inc.,*
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ..................................................................... 15

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................................................. 7

*SEC v. Wash. Inv. Network*,
    475 F.3d 392 (D.C. Cir. 2007) ............................................................................................. 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................................... 6, 13, 20

*U.S. v. Laurienti*,
    611 F.3d 530 (9th Cir. 2010) ................................................................................................. 7

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff the Ferraro Group ("Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendants' motion to dismiss the Third Amended Complaint ("TAC"). [1]

## **PRELIMINARY STATEMENT**

The Court dismissed the Second Amended Complaint ("SAC") with leave to amend, citing Plaintiff's failure to allege the existence of a Company-wide off-label marketing scheme. *See* November 20, 2020 Order (the "Order") (ECF 124). The TAC adds allegations from multiple former Corcept employees, showing management's supervision of the off-label scheme. The TAC pleads with particularity additional facts showing the falsity of Defendants' statements, scienter, and loss causation. As the TAC addresses the deficiencies in the SAC, Defendants' motion to dismiss should be denied.

As to falsity, the TAC further alleges with particularity details of: **(i)** the 2016 shift in marketing focus directed by Corcept management to push Korlym as a first-line treatment for patients without confirmed Endogenous Cushing's Syndrome (ECS), including for treatment of diabetes, obesity, and depression (¶¶176-77); **(ii)** Corcept management's directive to sales staff to push for Korlym prescriptions on the basis of a single dexamethasone suppression test ("DST") result at or above 1.0 ug/dL, despite the Diagnosis and Treatment Guidelines for ECS establishing a 1.8 ug/dL threshold (¶176); **(iii)** Corcept Senior Medical Director Dr. Andreas Moraitis instructing clinical specialists to promote using Korlym as a diagnostic tool (¶185); **(iv)** Corcept's acquisition of a list of physicians prescribing an insulin drug and the instruction to clinical specialists to push these doctors to use Korlym to lower glucose levels, regardless of an ECS diagnosis (¶191); **(v)** Corcept firing members of its sales team who refused to go along with the off-label marketing scheme (¶¶192-94); **(vi)** the Company's distribution of off-label studies and literature to clinical specialists for use in sales pitches to drive home the purported benefits of Korlym outside of ECS (¶¶204-12); and **(vii)** confirmation from a former Corcept employee that the Company paid off high-prescribing physicians in the form of honoraria to encourage off-label marketing of Korlym to other physicians (¶302).

---

[1] "¶_" refers to paragraphs in the TAC. Unless otherwise noted, capitalized terms have the same meaning as in the TAC. "S__" refers to statements in the false statements chart attached as Ex. A to the TAC. Citations to "DB" are to pages in Defendants' Notice of Motion and Motion to Dismiss the TAC (ECF 130). Unless otherwise noted, all emphasis has been added and all citations omitted. Plaintiff apologizes for inadvertently omitting a redline of the TAC when it was filed.

1                                            **Case No. 19-CV-01372-LHK**

As to scienter, the TAC adds particularized allegations showing Defendants' culpable state of mind through direct evidence of their knowledge, participation in, and oversight of the off-label marketing scheme, including that: **(i)** Company management, including each of the Individual Defendants, monitored all incoming prescriptions in real-time and sent congratulatory emails to clinical specialists for sales (¶267); **(ii)** Defendant Belanoff personally went on sales calls with clinical specialists (including one of Plaintiff's confidential witnesses) and delivered off-label marketing messages in disregard of FDA restrictions (¶370); **(iii)** Company management, including certain of the Individual Defendants, held out two of Corcept's top performing clinical specialists at annual sales meetings and on conference calls as models to emulate although each was well known for targeting non-Endocrinologists with off-label marketing, and one going as far as to teach other clinical specialists how to manipulate information submitted on insurance forms to ensure payment (¶¶181-83, 213); and **(iv)** Defendant Belanoff and other members of Corcept management monitored all incoming Korlym prescriptions to ensure their completion in a manner most likely to gain insurance approval, when necessary sending the forms to Dr. Moraitis to change the diagnosis codes "to what the doctors really meant" (¶214). The Individual Defendants' actual knowledge or reckless disregard of the off-label scheme only strengthens the TAC's allegations of scienter and makes it clear that each Individual Defendant was closely plugged into the sales staff's day-to-day operations.

Finally, the TAC plausibly pleads loss causation from two January 2019 partial disclosures: **(i)** the release of the investigative SIRF Report's analysis publicizing Corcept's off-label scheme, which served as a Rosetta Stone for interpreting disparate pieces of difficult-to-access and scientifically dense information not previously conducted by any other market participant and triggered a market correction (¶¶450-65); and **(ii)** Corcept's decreased forecasts for future sales growth that manifested the undisclosed risk of insurers tightening pre-approval requirements (¶328-37) – a continuing trend as additional insurers responded to Corcept's off-label marketing scheme and runaway Korlym costs (¶¶338-39).

For these reasons, the Court should deny Defendants' motion to dismiss in its entirety.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

**FACTUAL BACKGROUND**

**I.    CORCEPT'S ONLY PRODUCT IS A SECONDARY TREATMENT FOR A RARE DISEASE IN A SMALL PATIENT POPULATION**

Since 1998, Corcept has sought to commercialize drug treatments involving modulation of the hormone cortisol. ¶58. The Company pivoted focus in 2007 to ECS – a rare disease affecting just 20,000 people in the United States. ¶¶4, 57-59, 91.

In 2012, the FDA approved Korlym – the Company's only commercially-approved offering – to treat ECS in patients with hyperglycemia who have type 2 diabetes or glucose intolerance and have failed or are ineligible for surgery. ¶¶67-75. The FDA declined to issue the broad indication sought by the Company (¶¶74-75, 85) and noted Korlym demonstrated only limited efficacy for treating hyperglycemia in ECS patients before warning that "the observed effects should not be extrapolated beyond this patient population and it would be inappropriate to consider the use of Korlym in the management of diabetes unrelated to hypercortisolism due to [ECS]." ¶79.

**II.    CORCEPT MANAGEMENT DIRECTS THE COMPANY'S OFF-LABEL PUSH**

With Specialist Endocrinologists favoring other ECS treatments and prescribing Korlym only as a last resort, Corcept hatched a plan to artificially expand its market by targeting non-Specialist Endocrinologists, Internists, and Family Medicine physicians with an off-label marketing message. This would generate cash needed to fund the Company's R&D costs (which tripled from 2016 to 2018) (¶¶125, 131-138) and allow Corcept to exploit Korlym's orphan drug marketing exclusivity before it expired in February 2019. ¶¶125-30.

*First*, Corcept promoted Defendant Maduck to Senior Vice President of Commercial to usher in a new "direction of the Company" where the "the goal [was] to stop making [ECS] sound as rare as it is." ¶¶137, 184, 187. This was a seismic shift away from the Company's previous strategy of marketing specifically to the 300 Specialist Endocrinologists who treat 70% of U.S. ECS cases. ¶271.

*Second*, Corcept fired its longtime specialty pharmacy (Dohmen), claiming an illusory breach of contract when Dohmen became "uncomfortable" with processing off-label Korlym prescriptions. ¶¶159-70. Corcept replaced Dohmen with Optime, a captive specialty pharmacy created to satisfy FDA requirements and facilitate Corcept's off-label marketing scheme. ¶¶138-50.

3                              **Case No. 19-CV-01372-LHK**
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

*Third*, as described by four former employees who are confidential witnesses (CWs 11-14), Corcept's management instructed its sales staff to aggressively target non-Specialist Endocrinologists who would be more susceptible to off-label marketing manipulation given their unfamiliarity with ECS. These physicians were pushed to: (i) prescribe Korlym to all patients with a general Cushingoid appearance, subclinical Cushing's Syndrome, "Pre-Cushing," or poorly controlled diabetes with *any* elevated cortisol levels following a DST, even without a confirmed ECS diagnosis; and (ii) use Korlym as a first-line therapy with no consideration of surgery, or as a bridge to surgery. ¶173. These CWs recount a systematic, uniform message from Company management to focus on off-label opportunities:

- **CW11** was a Corcept clinical sales specialist from November 2012 to July 2016 responsible for marketing Korlym in Ohio, Kentucky, and Tennessee. CW11 stated Corcept began focusing on off-label marketing of Korlym with the elevation of Tom Burke to VP of Sales in early 2016. ¶175. CW11 stated Burke (who reported to defendant Maduck) pushed sales personnel to market Korlym as a first-line treatment for obesity, diabetes, or "mild" or "subclinical" Cushing's syndrome, and where the DST was 1.0 or higher. ¶176. CW11 stated Corcept was trying to lower the threshold needed for a "positive" DST test from 1.80 ug/dL to 1.0 ug/dL to further increase the odds of a Korlym prescription. *Id*. CW11 approached Burke and Defendant Belanoff about his concern with medical risks associated with over-prescribing Korlym only to have Burke tell him to "sit down and shut up." *Id*. CW11 also accompanied Defendant Belanoff on one of his sales calls and witnessed Belanoff pitching the off-label use of Korlym. ¶370. After departing the Company, CW11 learned that Corcept fired a number of employees who raised concerns about the off-label focus or otherwise refused to promote the off-label message. ¶¶192-94.

- **CW12** was a Corcept clinical specialist in the Pacific Northwest region from July 2014 to August 2016. During his employment, the witness spoke with Carl Balzanti, a high-performing colleague, at the direction of his regional manager. Balzanti instructed CW12 to target Internal Medicine doctors (who were less likely to insist on rigorous testing) with an off-label marketing pitch. Balzanti also instructed CW12 on a surefire method for securing insurance approval even without a confirmed ECS diagnosis. ¶177. According to CW12, Defendant Maduck and others held out the Company's two top performing salespeople (Balzanti and Tyler Franklin, each of whom CW12 knew were marketing off-label using the standardized pitch) as models for all clinical specialists at the Company. ¶¶182-83.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

- **CW13** was a Corcept clinical sales specialist in the Philadelphia region from September 2016 until February 2019, and then the Florida region until July 2019. CW13 stated that Burke, Maduck, and other Corcept management pushed clinical specialists to find physicians willing to prescribe Korlym as a first-line treatment despite DST results in the "grey area" below 1.8. CW13 also said Corcept's philosophy was to "go to rural areas and find someone" (i.e., non-endocrinologists more receptive to the pitch) and "run with it." ¶188.

- **CW14** was a Corcept regional manager on the east coast from April 2016 to May 2019. CW14 confirmed physicians were prescribing Korlym where the DST result was below the 1.8 guideline, including as low as 0.7, and that this was happening "a lot." ¶198. According to CW14, it was "clear as day" that a proper diagnosis of ECS required a DST test result of 1.8 or greater. *Id*. CW14 believed prescribing Korlym for patients with a DST below 1.8 was "pushing the envelope" and "likely off-label." *Id*. This witness recalled discussing the astronomical sales numbers for clinical specialists in "performing regions" at each quarterly meeting of regional managers – numbers only achievable by convincing physicians to use Korlym off-label. ¶200.

CWs 11, 12, and 13 all received off-label marketing materials from the Company pushing the use of Korlym for non-ECS elevated cortisol. ¶¶204-12. According to CWs 11 and 12, clinical specialists were to provide these materials to physicians to induce off-label discussions and use. ¶205. These materials included discussions of using Korlym's main ingredient to reduce insulin resistance; treating patients with "mild" hypercortisolism, while explicitly excluding those patients with "overt" hypercortisolism; and PowerPoints recommending Korlym as an equal treatment option to surgery. ¶¶206, 208-212. At the direction of Corcept management, the sales staff took the off-label message into the field. ¶¶216-66 (11 physicians from 10 different states encompassing 5 out of Corcept's 6 sales regions recalling Corcept clinical specialists' use of off-label sales pitch, including through distribution of tear sheets and off-label studies during office visits, Company-sponsored dinners, and conferences).

To convert off-label prescriptions into insurance reimbursements and revenue, clinical specialists learned to manipulate paperwork to guarantee "the insurance carriers [would not] look at the numbers," even if the DST results came in below the medically accepted threshold for ECS. ¶181; *see also* ¶213 (top performing Corcept clinical specialist Balzanti presented at a national sales meeting

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

instructing colleagues on how to fill out the insurance forms to ensure reimbursement). Clinical specialists then deployed these tactics, coaching physicians on similar practices and even offering to fill out the required paperwork on their behalf. ¶¶224, 244, 249, 255. In addition, Corcept instituted a failsafe procedure of internally "fixing" undetermined or incorrect ICD-10 codes[2] on incoming forms to "what the doctors really meant" to facilitate reimbursement. ¶214.

### III.   TWO PARTIAL DISCLOSURES EXPOSE THE COMPANY'S OFF-LABEL SCHEME

The truth began to emerge on January 25, 2019 when the SIRF Report revealed Corcept's reliance on off-label prescriptions driven by a pay-to-play scheme with certain high prescribing physicians. ¶¶343-47. Following the release of the SIRF Report, Corcept's stock fell $1.52, or more than 11%, to close at $12.29 per share on January 25, 2019 on unusually heavy trading volume. ¶348.

Then, on January 31, 2019, Corcept issued a press release announcing its fourth quarter and full-year 2018 preliminary selected financial results. Therein, due to increased scrutiny of its illicit off-label sales practices, the Company forecasted a slowdown of Korlym sales to well below analyst estimates. ¶349. On this news, Corcept's share price fell $1.15, or more than 10%, to close at $10.08 on February 1, 2019 on unusually heavy trading volume. ¶350.

### ARGUMENT

On a Fed. R. Civ. P. 12(b)(6) motion, courts consider the complaint in its entirety, accept all factual allegations as true, and construe them in plaintiff's favor. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Plaintiff has squarely addressed the Court's finding that the SAC did not allege facts showing that "leadership within the company" instructed Corcept clinical specialists to engage in off-label marketing. Order at 17-19. The TAC adds additional allegations based on information from three former Corcept clinical specialists and a former regional sales manager[3] who each confirmed that: **(i)** the

---

[2] ICD-10 codes are the codes used to identify the diagnosis prompting the prescription.

[3] Defendants feebly attempt to discredit the former employees cited in the TAC (CWs 11-14) by fabricating a standard at odds with controlling and instructive caselaw. ***First***, there is no categorical bar to CW allegations based on hearsay (if it is even hearsay to begin with). *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.,* 780 F. App'x 480, 485 n.5 (9th Cir. 2019) ("Instead, we examine a confidential witness's hearsay report to determine if it is sufficiently reliable, plausible, or coherent.");

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

Company's senior management (including the Individual Defendants) instructed clinical specialists to increase sales by marketing Korlym off-label; **(ii)** management communicated the off-label directive at annual Company-wide sales meetings and quarterly regional sales meetings; **(iii)** clinical specialists were given marketing materials containing off-label case studies to show physicians; and **(iv)** clinical specialists were directed to emulate certain peers at Corcept who were known to successfully market Korlym off-label. ¶¶176, 178-180, 184-185,191 192, 195, 198, 200. By alleging the existence of an off-label marketing scheme, the TAC establishes the factual predicate to Plaintiff's Section 10(b) claim.

## I.    THE TAC PLEADS ACTIONABLE MISSTATEMENTS AND OMISSIONS

"A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Only if reasonable minds could not disagree… should the district court dismiss under 12(b)(6)." *Immune Response Sec. Litig.*, 375 F. Supp. 2d at 1018. Rule 10b-5 prohibits telling a "material half-truth[]," *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010), which is the failure "to state a material fact necessary in order to make the statements made… not misleading." *Id*. "Once defendants choose to tout positive information" they cannot do so misleadingly and must disclose "adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1009 (9th Cir. 2018).

### A.    False Statements Regarding Speaker and Education Programs

Defendants falsely represented that Corcept was educating physicians about proper diagnosis of ECS. In particular, Corcept's quarterly and annual reports throughout the Class Period stated:

> Because many people who suffer from Cushing's syndrome are undiagnosed or inadequately treated, we have developed and continue to refine and expand programs ***to educate physicians and patients about diagnosis of this syndrome*** and the role cortisol modulators can play in treating the disease.

---

*Lloyd v. CVB Fin. Corp.,* 811 F.3d 1200, 1208 (9th Cir. 2016) (same). **Second**, the TAC establishes these witnesses' reliability as they are former members of Corcept's sales staff who personally interacted with several of the Individual Defendants and other members of Corcept's senior management, or received instructions from these individuals at national sales meetings. ¶¶372-73; *see In re Gilead Sci. Sec. Litig.*, 2005 WL 181885, at *8 (N.D. Cal. Jan. 26, 2005). Because falsity and scienter are "inferred from the same set of facts," *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005), each CW's recollection of the Individual Defendants' misconduct also supports the inference of scienter. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001) (falsity and scienter are "single inquiry").

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

S7, *see also* S1, S11, S16, S21, S25, and S27. This statement was false because Corcept purposefully misled physicians on ECS diagnosis protocols and instructed clinical specialists and regional sales managers to convey an off-label marketing message designed to induce Korlym prescriptions with no confirmed ECS diagnosis. ¶¶173-270. The TAC also pleads numerous facts that demonstrate the existence of a Company-wide off-label marketing scheme, further rendering the statement false.

*First*, Corcept management instructed clinical specialists to use an off-label marketing pitch targeting non-Specialist Endocrinologists to elicit prescriptions for Korlym without a confirmed ECS diagnosis, as recalled by former Corcept employees. *See, e.g.*, ¶¶176 (VP of Sales Burke pressured sales personnel to market Korlym as first-line medical treatment for obesity, poorly controlled diabetes, and "subclinical" Cushing's for individuals with a DST of 1.0 or higher); ¶185 (Senior Medical Director Moraitis instructing clinical specialists to present Korlym as a risk-free diagnostic tool); ¶195 (Defendant Maduck among management pushing clinical specialists to employ the "Korlym trial" sales pitch); ¶197 (Defendant Belanoff personally visited high-prescribing physicians identified by Corcept as ideal because they prescribed Korlym as a first-line treatment for subclinical patients with no confirmed ECS).

*Second*, CW11 confirmed Corcept compensated physicians through honoraria for facilitating off-label marketing to other physicians. ¶¶302, 412. CW1 corroborated CW11's assertion, as this physician attended a dinner talk in January 2018 where Dr. Back gave multiple personal accounts of using Korlym to treat patients with diabetes and insulin resistance, but no confirmed ECS. ¶220. It was widely known throughout Corcept that Dr. Back and Dr. Mathews (clients of Corcept "poster boy" Tyler Franklin (¶¶196-97)) were the type of physicians clinical specialists should target based on a willingness to prescribe Korlym off-label. ¶197.[4]

Accordingly, the statement that the Company "continue[s] to refine and expand programs to educate physicians and patients about diagnosis of this syndrome" is false and misleading given the TAC's well-

---

[4] Indeed, in 2017, Dr. Back and Dr. Mathews respectively submitted 115 and 85 Medicare Part D claims for Korlym (the first and second most), for a total drug cost of $3,562,308.06 and $2,053,739.20. ¶¶19, 21. In return, Defendant Belanoff personally visited one of them in 2018. ¶197. Corcept paid Dr. Back $55,454.60 and $86,553.76 in 2017 and 2018 for food, beverage and honoraria. ¶¶19, 301. Corcept paid Dr. Mathews $73,777 in 2017 for the same. ¶305.

8    **Case No. 19-CV-01372-LHK**

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

pleaded allegations of Corcept's extensive off-label marketing efforts.[5]

## B. False Statements Regarding Marketing and Promotional Materials

Every quarter during the Class Period, Defendants falsely represented in its quarterly reports that Corcept only marketed Korlym on-label for its approved indication:

> ***In the United States, we market Korlym for treatment of hyperglycemia secondary to hypercortisolism in adult patients with endogenous Cushing's syndrome who have type 2 diabetes mellitus or glucose intolerance and have failed surgery or are not candidates for surgery*** and provide promotional materials and training programs to physicians ***regarding the use of Korlym for this indication.***

*See* S2, S8, S12, S17, S22, and S28. This statement was materially false and misleading because a reasonable investor would have understood Defendants' statements to mean that Corcept was promoting Korlym exclusively for the FDA-approved indication when the opposite was true. *See In re Amgen Inc. Sec. Litig.,* 544 F. Supp. 2d 1009, 1032-1034 (C.D. Cal. 2008) (statements that Amgen marketed drugs for "their approved indications" "consistent with the FDA" label misleading when promoting the drug for off label uses); *Milton Arbitrage Partners, LLC v. Syncor Int'l Corp.*, 239 Fed. Appx. 318, 320 (9th Cir. 2007) (when defendants attribute "success solely to legitimate practices, defendants implicitly (and falsely) warrant [] that there were no illegal practices contributing to that success").

Defendants' argument in opposition (DB at 12-13) is baseless. The TAC makes clear that Defendants' statements are false because they told investors that Corcept only marketed Korlym for its FDA-approved indication while Corcept management orchestrated an undisclosed Company-wide scheme to market Korlym for off-label use pursuant to a uniform marketing message.[6] *Omnicare, Inc.*

---

[5] Defendants' reliance on *Mendell* (DB at 12) is misguided. The full quote cropped by Defendants states, "a proxy statement need not disclose the underlying motivations of a director or major shareholder so ***long as all the objective material facts relating to the transaction are disclosed***." *Mendell v. Greenberg,* 927 F.2d 667, 674 (2d Cir. 1990), *amended*, 938 F.2d 1528 (2d Cir. 1990). Here, Defendants did not disclose all "objective material facts" relating to Corcept's education program, i.e., that the program was promoting Korlym for off-label uses.

[6] A fair reading of the TAC shows it is distinguishable from the dismissed complaint in *Huang v. Higgins,* 2019 WL 1245136 (N.D. Cal. Mar. 18, 2019). Unlike *Higgins,* Plaintiff alleges that a large portion of Corcept's revenue came from off-label sales by pointing to, *inter alia*, the Ingleside, Texas physician group prescribing more Medicare Part D Korlym alone than any other state and orders of magnitude larger than the expected number given the rarity of ECS (¶¶318-320), yielding over $7.3 million in insurance reimbursements to Korlym in 2018 (¶321); Dr. Back and Dr. Mathews accounting

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

*v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), provides no shield where Defendants' purported belief that Corcept's marketing was all on-label was not honestly held and lacked any reasonable basis because Defendants knew or recklessly disregarded: **(i)** Korlym's improbable sales growth for a drug treating a rare disease; **(ii)** the large and improbable geographic clusters of Korlym patients around the highest Corcept-paid physicians; **(iii)** every state's Medicare Part D data reporting Korlym prescriptions nearly double the expected total; and **(iv)** Corcept implementing a comprehensive nationwide strategy to push a uniform off-label message to increase sales. *See* Point II, *infra*.

### C.    False Statements Regarding Compliance with FDA Regulations

Defendants further misrepresented in Corcept's quarterly and annual reports that "we believe our marketing materials and training programs for physicians ***do not*** constitute 'off-label' promotion of Korlym." S3; *see also* S9, S13, S18, S23, and S29. This was false and misleading because Corcept management actively promoted marketing Korlym for off-label uses. In addition to allegations that Corcept senior management established and directed the off-label marketing scheme, CWs 11 and 12 stated that Belanoff accompanied clinical specialists on visits to "important" physicians and provided off-label messaging because, according to Defendant Belanoff, "I can say what I want." ¶¶370-71.

The Court should reject Defendants' invitation to determine whether Corcept's practice of pushing physicians to prescribe Korlym based on the result of a single DST constitutes off-label marketing. DB at 11-12. The Court previously noted that whether instructing physicians to use a DST as a diagnostic tool is an off-label use "involves a factual dispute and is therefore not appropriately resolved on a motion to dismiss." Order at 17.[7] Indeed, former Corcept employees stated that a patient with DST results under 1.8 ug/dL is unlikely to have ECS. *See* ¶195 (promoting Korlym in this manner was "crossing the line"); ¶198 ("clear as day" a proper diagnosis of ECS required a test result of 1.8 or greater). For the same reason, the Court should disregard Defendants' efforts to inaccurately simplify

---

for over $5.5 million in claims to Corcept in 2017 (¶¶21, 298); CW11 estimating that 60% of Corcept's annual sales came from off-label prescriptions; and CW14 stating that 50% of all Korlym prescriptions came from Drs. Back, Crabb, and Anderson – physicians well known for prescribing Korlym off-label. ¶392.

[7] The Court's prior findings are supported by the fact that Defendants' DST-based diagnosis regimen flies in the face of established clinical guidelines and the FDA's own notation that "[t]he diagnosis of Cushing's Syndrome requires a multitude of laboratory and radiologic tests." TAC ¶81.

10                                   **Case No. 19-CV-01372-LHK**

the in-depth and particularized allegations in the TAC concerning "off label" marketing to the fact that the Company pushed for the use of the DST.

### D.    False Statements Regarding Corcept's Historical Revenue Growth

The TAC alleges that Corcept was only able to report the "strong growth in Korlym revenue" claimed in its Class Period earnings calls because of the pervasive off-label marketing scheme. *See* S4, S5, S6, S10, S14, S15, S19, S20, and S24. While the FDA label restricts Korlym's use to fewer than 5,000 patients, Corcept's clinical specialists marketed Korlym for broader off-label use with no confirmed ECS diagnosis and/or as a bridge to surgery. Due to the rarity of ECS, Defendant Belanoff conceded that new on-label prescriptions of Korlym would only result in the Company "adding to [its] enrollment total by 1s and 2s." ¶¶300, 394, 422. Thus, Corcept's substantial revenue growth could not possibly have been attributable to on-label Korlym use.

The TAC not only establishes a pervasive off-label scheme, but also quantifies the portion of Corcept's revenue attributable to it. CWs 11, 12, and 13 confirmed the massive increase in Corcept's sales growth was from enrollments of patients with subclinical Cushing's Syndrome (and no confirmed ECS diagnosis)[8] because of the off-label marketing scheme. ¶285. Moreover, based upon reports CW11 saw and discussed at regular sales meetings, CW11 stated 60% of all Korlym sales were off label. ¶286. CW11 also estimated that Tyler Franklin's sales were 90% off-label[9] based on bonuses he received. *Id*.

The Court previously dismissed Plaintiff's argument that Defendants' failure to disclose Corcept's targeting of non-Specialist Endocrinologists and Family Medicine physicians was an actionable omission because Plaintiff did not allege why this "created a state of affairs that differed from reality." Order at 31. The TAC addresses this, with CWs 11, 12, 13, and 14 confirming that the increase in Korlym prescriptions was the result of Corcept's sales representatives inducing less knowledgeable

---

[8] Defendants' efforts to paint "subclinical Cushing's" as ECS (DB at 8) is incorrect and, at best, a question of fact improper for consideration at this juncture. The TAC makes clear "subclinical" patients did not meet the DST threshold for an ECS diagnosis (¶24), that such markers of "Subclinical Cushing's" can be associated with myriad non-ECS diagnoses (¶173 n.35), and that Corcept has never conducted or submitted clinical trial data to the FDA for Korlym use with these individuals (*id.*).

[9] CW11 also attended national sales meetings where Franklin promoted his off-label sales methods (¶187) and CW12 had two different conversations with Franklin wherein Franklin discussing having physicians instantly start patients on Korlym absent a confirmed ECS diagnosis (¶184).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

non-Specialist Endocrinologists and Internal or Family Medicine physicians to prescribe Korlym under the Company's off-label marketing scheme. *See, e.g.*, ¶¶180, 190, 195, 200. Thus, the reason that Corcept's revenue increased was not because physicians were becoming *more* aware of ECS, but because Corcept was targeting physicians who were *less* aware of appropriate diagnosis and treatment guidelines. Defendants failed to disclose this.

It is misleading for a company to discuss the reasons for its sales growth "without disclosing that a material portion . . . resulted from an unsustainable practice." *Murphy v. Precision Castparts Corp.,* 2017 WL 3084274, *9 (D. Or. 2017); *Syncor Int'l Corp.*, 239 Fed. Appx. at 321 (when defendant attributes "success solely to legitimate practices, defendants implicitly (and falsely) warrant [] that there were no illegal practices contributing to that success."); *Berson,* 527 F.3d at 987 (where defendant made positive statements about a backlog it was unlikely to complete, "once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors.").

Defendants' argument that their statement is consistent with Corcept's revenue coming from prescriptions by endocrinologists (DB at 13) mischaracterizes their misstatement and the allegations in the TAC. The misstatement *distinguishes* between the subset of endocrinologists experienced in treating ECS from the broader population of all endocrinologists collectively less experienced doing so, as Defendants admit and CWs confirmed. ¶¶171, 205. As Plaintiff alleges, Corcept focused on less knowledgeable, non-Specialist Endocrinologists who were more susceptible to an off-label marketing message to boost Korlym sales. *See, e.g.*, ¶¶180, 195.

### E.    False Statements that "99%" of Korlym Prescriptions Were "On Label"

Defendant Maduck falsely represented on the Company's November 1, 2018 earnings call that "99% of our Korlym [] prescription[s] [] are on-label and we continue to see favorable insurance reimbursement." S26. In addition to pleading the existence of the off-label scheme, the TAC further alleges that at least 60% of Korlym prescriptions were off label. ¶286.

Plaintiff alleges the Company received 15-19% of its total revenue for 2017 and 2018 from Medicare Part D reimbursements in states where Corcept was known to be marketing Korlym off-label.

12                                    **Case No. 19-CV-01372-LHK**
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

¶¶289-91.[10] Thus, Defendants' statement that "99% of our Korlym patients are on-label" is false because 99% of Korlym prescriptions were not actually on-label, as Defendants knew because they admittedly "know where . . . every single tablet goes." ¶¶378, 381; *see also Amgen, Inc.*, 544 F. Supp. 2d at 1033-1034 (statements Amgen marketed drugs for "their approved indications" and "consistent with the FDA" label were misleading when Amgen was promoting these drugs for off-label uses).

Because of Corcept's off-label marketing scheme, insurance companies tightened the criteria for Korlym approval starting in July 2018, requiring paperwork demonstrating multiple diagnostic tests to confirm an ECS diagnosis where surgery failed or was not a treatment option. ¶¶328-39. Contrary to Defendants' public statements, Corcept was thus receiving more stringent and *less* favorable insurance reimbursements, resulting in a material slowdown in Corcept's revenue growth, which declined from 75% in Q3 2018 to 12.4% by Q1 2019. ¶356; *see In re Questcor Secs. Litig.,* 2013 WL 5486762, at *23 (C.D. Cal. Oct. 1, 2013) (finding statements on the stability of insurance reimbursement rates were misleading when the company engaged in a marketing scheme that, if revealed, would result in insurance coverage being declined).

## II.    THE TAC PLAUSIBLY ALLEGES A STRONG INFERENCE OF SCIENTER

Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 551 U.S. 308, 314 (2007). Plaintiff need not allege Defendants "actually knew" they were making false statements. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). Recklessness is sufficient. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (defendants "on notice of facts" supporting recklessness). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1162 (N.D. Cal. 2015). A scienter inference is "strong" if it is "at least as likely as any plausible opposing inference." *Tellabs*, 551 U.S. at 323, 328-329. "[T]he tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, *8 (C.D. Cal. Aug. 4, 2014). Here, Plaintiff alleges particularized facts that

---

[10] This does not include revenue from private insurance, meaning that the actual proportion of revenue attributable to states where the Company was known to be marketing Korlym off-label is likely higher.

13    **Case No. 19-CV-01372-LHK**

establish that Defendants either knew of, or were deliberately reckless to, the falsity of their statements.

### A.    The Core Business Operations Theory Supports Scienter

The Ninth Circuit permits an inference of scienter where the alleged fraud concerns a company's core business operations. *Reese v. Malone,* 747 F.3d 557, 575 (9th Cir. 2014). Under the core business doctrine, a plaintiff "may independently satisfy the PSLRA where [the allegations] are particular and suggest that defendants had actual access to the disputed information" or "where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Id.* Indeed, the Court held in the Order at page 41 that Plaintiff could allege scienter under the core business operations theory:

> The Court agrees with Plaintiffs that this could be one of the "rare circumstances" where "such allegations may be sufficient, without accompany particularized allegations," because "the nature of the relevant facts is of such prominence that it would be 'absurd' to suggest that management was without knowledge."

Plaintiff easily satisfies the requirements for pleading scienter under the core business operations theory. Defendants had access to the off-label prescription and patient data (including the tracking of this data for clinical specialist commission payments and sending of congratulatory emails). Given that Korlym ***comprised 100% of Corcept's revenue***, it would be absurd to suggest that Defendants were unaware of Corcept's off-label marketing scheme, particularly where it emanated from senior leadership.[11] *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 WL 2838686, at *8 (S.D. Cal. June 1, 2020)

---

[11] Defendants attempt to minimize the anomalous nature of Tyler Franklin's sales performance and the fact that his production should have necessarily raised a red flag for the Individual Defendants as "conclusory allegations" (DB at 17), ignoring the rarity of ECS and Defendant Belanoff's own admission that the disease lent itself to adding to the Company's patient base in "1s and 2s." ¶300. In aggrandizing Franklin, Defendants either embraced or purposefully looked the other way to his bragging about his sales techniques. ¶306. Further, CW14 stated that at "every" quarterly meeting during the Class Period, this witness ***and other regional managers*** would ask Defendant Maduck about the astronomical numbers for some sales representatives, including Tyler Franklin and Carl Balzanti. ¶200. Maduck's response was that clinical specialists needed to find physicians willing to prescribe Korlym to individuals with DST results below 1.8 – i.e., without a confirmed ECS diagnosis and as part of the "Korlym trial." Defendants' attempt to contort these allegations in their favor (DB at 19) fails where the TAC makes clear: **(i)** that VP of Sales Burke and Defendant Maduck stated to CW14 and other regional managers that this was the strategy that clinical specialists *should* employ, and then **(ii)** that this strategy was actually articulated to clinical specialists, with CW13 recalling Defendant Maduck, Burke, and other members of Corcept management pressed the witness and other clinical specialists to push Korlym on

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

(finding the fact that NUPLAZID was Acadia's only drug product, "supports the inference of scienter"); *Rihn v. Acadia Pharm. Inc.,* 2016 WL 5076147, \*9 (S.D. Cal. Sept. 19, 2016) (scienter pleaded where drug "was critical to the success of the company"); *Di Donato v. Insys Therapeutics, Inc.*, 2017 WL 3268797,\*15 (D. Ariz. Aug. 1, 2017) (inferring scienter where Subsys accounted for 98% of the company's revenue, noting "it is absurd to think [the CFO] knew about Subsy's anomalous market dominance but did not know how the company had pulled off the feat").[12]

As for Defendant Robb, it would be "absurd to think" that as the CFO of a company with a limited legitimate market for its sole drug product, he did not know how Corcept managed to drastically increase its revenue well beyond the scope of any realistic revenue targets, absent off-label sales. *No. 84 Employer-Teamster v. America West Holding Corp.,* 320 F.3d 920, 943 n.21 (9th Cir. 2003) (rejecting argument that high-ranking individual defendants were unaware of major business events likely to have significant impact on company's financial condition as "patently incredible"). Further, sales information from Corcept's only source of revenue would "fall squarely within" the CEO's and CFO's "bailiwick." *In re Amgen,* 2014 WL 12585809, at \*12 (finding it "compelling" that the VP of Clinical Development would be aware of reports that presented potential hazards of the drug).

### B.    Management Told Staff to Use a Uniform Off-Label Marketing Message

Four former Corcept employees, ten physician CWs, and Plaintiff's physician expert confirmed that the Company's clinical specialists used the same off-label marketing message at the direction of

---

non-endocrinologists and espouse the supposed benefits of running a trial for those patients with "grey area" DST results. ¶195. The fact the conversations between CW13, Defendant Maduck, and Burke might have happened prior to the Class Period in no way makes them any less relevant. *Demarco v. Depotech Corp*., 149 F.Supp.2d 1212, 1223 n.6 (S.D. Cal. 2001) ("statements made prior to class period relevant to scienter and falsity "because they may prove insight into what the defendants knew during the class period."); *Zelman v. JDS Uniphase Corp*., 376 F.Supp. 2d. 965, 970 (N.D. Cal. 2005) (class period dates only define the class and do not "restrict the universe of relevant or actionable facts[.]").

[12] *Higgins*, 2019 WL 1245136, at 12 (N.D. Cal. 2019) (DB at 23) is factually distinguishable. There, the court found it was not "absurd to suggest" that defendants "were unaware of how the company managed to increase prescriptions and sales" of a drug constituting 60% of the Company's revenue because plaintiffs provided only "one vague account of two representatives marketing off-label." Here, the TAC establishes that Corcept management directed the sales staff's actions, physicians across the country received the same off-label message from Corcept clinical specialists, the pleading includes multiple specific examples of off label-marketing, and sales of Korlym represented 100% of the Company's total revenue. ¶¶57, 183, 185, 191, 196, 202, 204, 206, 210, 215, 220.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

Corcept management. ¶¶183, 185, 191, 196, 202, 204, 206, 210, 215, 220.[13] Tear sheets and studies inserted into promotional materials contained the same message. ¶¶227, 251, 257. The fact that Corcept employed a consistent off-label marketing message emanating from the highest levels of management supports an inference of the Individual Defendants' scienter.[14] *In re Countrywide Fin. Corp. Derivative Litig.,* 554 F. Supp. 2d. 1044, 1065 (C.D. Cal. May 14, 2008) (inferring scienter from "a companywide culture that encouraged unchecked deviations from underwriting standards" that would "fatally affect the company's continued financial performance"); *In re Finisar Corp. Sec. Litig*., 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) ("[E]ven if [the CEO and board chairman] were not directly involved in these negotiations, they were either aware or should have been aware of this materially relevant business information. And if for some reason they were not, …as the leaders of the company, both [defendants] had access to it and could have sought it out.").[15]

## C.     Defendant Belanoff Personally Visited Physicians and Communicated the Uniform Off-Label Marketing Message

The TAC alleges Defendant Belanoff personally traveled to South Carolina to speak with either Dr. Back or Dr. Mathews in 2018. ¶197. CW11 accompanied Defendant Belanoff on the road to meet with "important" physicians about prescribing Korlym (a practice corroborated by CW12 (¶371)) on at

---

[13] The fact that CWs 11 and 12 left Corcept shortly before the Class Period does not change the scienter analysis (DB at 16-17). The two other CW employees who stayed at Corcept and the 11 physicians who made clear that the off-label message persisted corroborate CWs 11 and 12. *See In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1145 (9th Cir. 2017) (accepting statements by CW who was not employed at company during Class Period but had personal knowledge of defendants' real-time access to reports).

[14] Among other facts, **(i)** CW11 recounted visits to physicians alongside Defendant Belanoff (a practice corroborated by CW12), where Belanoff made off-label pitches (¶¶370-371); **(ii)** Belanoff participated in a practice wherein Dr. Moraitis changed codes on insurance forms to facilitate reimbursement (¶214); and **(iii)** CW14 attended regional sales meetings with Defendant Maduck and VP of Sales Burke and discussed the off-label marketing message (¶200). Further, the TAC does not seek to establish Defendant Maduck's scienter solely through the reporting relationship with Burke (DB at 15). Instead, CWs recalled Maduck furthering the off-label scheme by, *inter alia*, telling regional sales managers that clinical specialists needed to convince physicians to embrace the "Korlym trial" to reach the numbers of high performing sales representatives Franklin and Balzanti. ¶200.

[15] The inclusion of a single line in one PowerPoint presentation (DB at 19-20) does not negate the myriad other facts supporting Defendants' instruction to market Korlym off-label. In fact, Defendants' efforts to "ostensibly repudiate[] off-label promotion" at the same time the Company was providing its sales staff with studies and other presentations supporting Korlym for non-ECS patients further makes this action similar to *Amgen*, 544 F. Supp. 2d at 1033.

16                                                              **Case No. 19-CV-01372-LHK**

least two occasions in 2016, during which Defendant Belanoff made off-label marketing pitches to physicians in CW11's presence and flippantly shrugged off any concerns. ¶370. Defendant Belanoff also directly sent insurance reimbursement forms to Dr. Moraitis to change diagnosis codes to ensure insurance reimbursement. ¶214. Defendant Belanoff's direct participation in the proliferation of the off-label scheme and disregard for its consequences supports an inference of his scienter. *Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 269 (3d Cir. 2009) ("[T]he most powerful evidence of scienter is the content and context of [the defendants'] statements themselves.").

### D.    Defendants Instructed Corcept Personnel to Distribute Off-Label Marketing Materials to Physicians to Perpetuate the Off-Label Marketing Scheme

In addition to instructing Corcept's sales staff how to best deliver the off-label marketing message, Defendants and other members of Corcept's management team provided off-label marketing material to bolster that message, including studies touting the benefits of Korlym for non-ECS patients. ¶¶204-12. Defendants' provision and access to contemporaneous information that directly belied their statements concerning the Company's compliance with off-label marketing restrictions supports an inference of scienter. *In re Quality Sys.,* 865 F.3d at 1145 ("[P]articularized allegations that defendants had actual access to the disputed information… raise a strong inference of scienter.").

### E.    Defendants Closely Tracked All Korlym Prescriptions in Quarterly Reports and Monitored the Fax Machine as Corcept Received New Prescriptions

The TAC alleges how the Individual Defendants conveyed or accessed information relevant to the off-label marketing scheme throughout the Class Period, addressing the Court's prior concerns. *See* Order at 35. According to former clinical specialists CW11 and CW12, Defendants Belanoff and Maduck would "wait by the fax machine" for enrollment forms and send congratulatory emails to the clinical specialists who obtained the prescription.[16] ¶¶267-68, 283, 375. Additionally, CW13 confirmed

---

[16] Contrary to Defendants' assertions (DB at 8), the former employee witnesses did not "only" claim that senior management tracked prescriptions. Instead, these witnesses stated how Defendant Belanoff would ride with clinical specialists, including with CW11, to promote Korlym for off-label purposes because Belanoff believed "[he] can say what [he] want[s]." ¶¶370-71. CW13 confirmed that Defendant Maduck, VP of Sales Burke, and other management pushed clinical specialists to find a physician to "run with" the Korlym trial by targeting Family Medicine physicians and Internists. ¶195. The Company

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**

that Defendant Maduck received information on Korlym prescriptions and sales from weekly meetings with this witness' regional manager. ¶269. Defendant Belanoff admitted during the November 2, 2017 earnings call that "[w]e know where…*essentially, every single [Korlym] tablet goes*" (¶381), meaning that Defendants were keenly aware of every single patient on Korlym and the patient's specific underlying symptoms and condition. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1231 (9th Cir. 2004) (finding strong inference of scienter where defendant CEO stated "*we know exactly how much we have sold in the last hour around the world*"); *Insys,* 2017 WL 3268797, at \*15 (CEO's statement that "I can tell you how many [prescriptions] we did yesterday" supports scienter); *In re Daou Systems, Inc.,* 411 F. 3d 1006, 1022-23 (9th Cir. 2005) ("specific admissions from top executives that they are involved in every detail of the company and that *they monitored portions of the company's database*" supports a strong inference of scienter). The TAC alleges in detail the Individual Defendants' efforts to closely track each Korlym prescription. *See, e.g.*, ¶¶376, 381-90, 398, 421-22. In conjunction with their knowledge, direction, and use of the off-label message, this supports the inference of scienter. *See VeriFone Holdings,* 704 F.3d at 708  ("Recklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b–5.").[17]

### F.    Defendants' Excessive Payments to Physicians Indicate Scienter

The creation of a "speakers program" where physicians are paid so-called honoraria can be indicative of "actual knowledge" by company executives of an off-label marketing scheme. *Amgen, Inc.*, 544 F. Supp. 2d at 1029 (that "Amgen marketed off label uses via a speakers program, where Amgen paid 'experts' to talk about off-label uses of Aranesp to physicians and other speakers in attendance" supported finding of "actual knowledge" and scienter). Plaintiff alleges that Corcept regularly made

also acquired physician lists for a non-ECS drug and instructed clinical specialists to target these doctors with an off-label message. ¶191.

[17] Defendants' claim the TAC does not allege how the enrollment forms indicated off-label marketing (DB at 16-18) is a disingenuous attempt to sever allegations from context. The TAC makes clear Balzanti gave specific instructions to CW12, at the direction of his regional manager, on how to manipulate insurance reimbursement paperwork to increase the likelihood of approval. ¶180. CW11 recalled that prior to sending the form to the specialty pharmacy, a Corcept employee, including Defendant Belanoff, would have the diagnosis codes on the forms changed to facilitate insurance payments for Korlym. ¶214. Thus, monitoring enrollment forms that met the Individual Defendants' expectations for prescriptions flowing from the off-label marketing message would necessarily apprise Defendants of the Corcept sales team's activities.

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**

payments to physicians to give off-label dinner talks, such as those attended by CWs 1 and 2. ¶¶220, 226. Additionally, a "glaringly high amount" of payments to "a small number of [] prescribers" is indicative of Defendant Robb's scienter, because, as CFO, he "almost certainly" approved the payments. *Insys*, 2017 WL 3268797 at *15. Here, as in *Insys*, Corcept paid a small number of prescribers a large amount of money for promoting and writing a significant number of off-label Korlym prescriptions.[18] ¶¶301, 305. Starting in 2017, Corcept's marketing budget doubled, primarily consisting of honoraria and consulting payments to a small group of high-prescribing physicians. ¶307. This "glaringly high amount" of payments to "a small number of [] prescribers" who provided the highest number of Medicare Korlym prescriptions is indicative of scienter.[19] The use of such honoraria to bolster the off-label message rises well above conjecture and speculation. Indeed, the TAC cites CW11, who confirmed the purpose of the honoraria was to facilitate off-label marketing of Korlym to other physicians. ¶302.

## G.    Defendants Were Motivated to Engage in the Off-Label Marketing Scheme

Defendant Belanoff stated that "the best way to think of Corcept" is as "a self-funding company with a vibrant clinical platform." ¶433. In 2017, Corcept was conducting multiple clinical trials, including for its new drug, Relacorilant. ¶434. Corcept was "entirely dependent on the sale of Korlym" to "fund [its] operations and development programs," ¶432, supporting an inference of scienter. *Nguyen v. Radient Pharms. Corp.,* 2011 WL 5041959, at *9 (C.D. Cal. Oct. 20, 2011) (holding that a CEO "desperate for operating cash" and "[the company's] ability to continue operating was dependent upon raising additional capital" combined with additional "red flags" supported inference of scienter).

Moreover, the FDA designated Korlym an "orphan drug" in 2007, giving Corcept certain benefits, including a marketing exclusivity period until February 2019. ¶¶59, 428. After this period's expiration, generic competition could (and were preparing to) enter the market. ¶¶128, 429. Given

---

[18] Defendants cite no cases in support of their defense of the honoraria payments (DB at 20) and fail to address the fact that three of the top five physicians receiving honoraria payments from Corcept in 2017 gave off-label instructions at dinners and/or were themselves prescribing Korlym off-label. ¶¶184, 189.
[19] Defendants' argument that honoraria and food and beverage payments are typical business practices that, alone, do not support an off-label marketing scheme (DB at 8-9) ignores the fact that that the highest payments were made to physicians who wrote the most prescriptions, and that the highest paid recipients were Dr. Back (an Internist) and Dr. Mathews (a non-Specialist Endocrinologist) – neither of whom specialize in diagnosing ECS.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

Korlym's exorbitant cost, any generic product would severely cut into Corcept's profits. ¶82. In the Company 10-Ks from 2012 to 2017, Corcept acknowledged that it "rel[ies] on [] the exclusive marketing rights" to "protect [its] market for Korlym." ¶430. The impending expiration of Corcept's exclusive marketing period and the lack of endocrinologist adoption of Korlym motivated Defendants to engage in their off-label marketing scheme. *In re Bristol Myers Squibb Co. Sec. Litig.,* 586 F. Supp. 2d 148, 167 (S.D.N.Y. Aug. 19, 2008) (Bristol Myers motivated to commit fraud where exclusivity period for drug was threatened). Thus, Plaintiff has sufficiently alleged motive and Defendants' lack of stock sales is not dispositive of scienter. *America West Holding Corp.,* 320 F.3d at 944.

### H.    Defendants Offer No Compelling Opposing Inference

The TAC makes clear that Defendants were at least reckless in issuing their false and misleading statements while disregarding Corcept management's role in (i) crafting and cultivating the off-label marketing message for use by the sales staff, and (ii) creating the structure to enable insurance approval[20] and reimbursement of off-label prescriptions.[21] Defendants offer no competing inference that is more compelling. *Tellabs*, 551 U.S. at 314 (competing inferences must be "rationally drawn from the facts alleged"). Further, the Court's inference in the Order at pages 40 to 41 that the Individual Defendants were ignorant of sales strategies has been rebutted by CWs 11, 12, 13, and 14's recollection that the off-label marketing directive emanated from the highest levels of Corcept management.

### III.    THE TAC PLEADS LOSS CAUSATION

To plead loss causation, "plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Hldgs, Inc., Sec. Litig.*, 977 F.3d

---

[20] Defendants mischaracterize the TAC as to the insurance reimbursement allegations (DB 17-18). Plaintiff does not allege Defendant Belanoff returned forms to the prescribing physicians, but that he instead used Corcept's Senior Medical Director Moraitis to "correct" the form and streamline insurance approval *without discussing with the physician*. ¶214. Further, Balzanti specifically instructed CW12 on how to gain insurance approval *when the patient in question would not otherwise qualify under normal circumstances* (¶181) and performed a similar demonstration at an annual sales meeting (¶213).

[21] The TAC also includes additional indicia of scienter, including Chief Medical Officer Robert Fishman's sudden and unexpected departure just days after Defendant Maduck asserted that "99% of [the Company's] Korlym patients are on label," (¶¶423-27), and the Company's relatively small size. (¶¶417-20).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

789 (9th Cir. 2020) (citing *Dura Pharmaceuticals*, 544 U.S. at 347). While disclosure of the truth must be a "substantial cause" of the stock price decline, it does not have to be the sole reason. *Id*. at 790. So long as the complaint alleges facts that establish loss causation are taken as true, a Rule 12(b)(6) dismissal is inappropriate. *Id*. at 791. Moreover, a corrective disclosure can "come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id*.

Plaintiff alleges two corrective disclosures: **(i)** the January 25, 2019 SIRF Report revealing for the first time Defendants' improper off-label marketing scheme; and **(ii)** the January 31, 2019 Press Release announcing a "slow-down" in current and projected Korlym sales, revealing the manifestation of the undisclosed risk that insurance companies had become aware of, and were cracking down on, Corcept's off-label marketing scheme. ¶¶450-65.

### A.    The January 25, 2019 SIRF Report

The TAC pleads with particularity that other market participants had not done the same analysis as the SIRF Report because: **(i)** the SIRF Report connected disparate non-public and public data not readily available to the market into a coherent illustration of Defendants' off-label marketing scheme (¶¶455-61); **(ii)** no other market analyst demonstrated knowledge of, or reliance on, the information underlying the SIRF Report's conclusions (¶462); and **(iii)** Corcept never directed investors to the sources cited in the SIRF Report (*id.*).

Authored by a well-respected investigative journalist with no financial interest in Corcept[22] who is known for the accuracy and thoroughness of his research (¶¶451-53), the SIRF Report relied on non-public longer form FAERS reports not readily available to the market and accessible only through a written FOIA request. *See Hanon v. Dataproducts Corp*., 976 F.2d 497, 503 (9th Cir. 1992) (what the market understands depends on "intensity and credibility" of information); *In re Unisys Corp. Sec. Litig*.,

---

[22] Defendants' efforts to incorrectly tarnish SIRF as a "short seller" (DB at 2-3) have no impact on the Court's loss causation analysis. *See Scott v. ZST Digital Networks, Inc*., 2012 WL 538279, *11 (C.D. Cal. Feb. 14, 2012) (upholding loss causation allegations stemming from short seller report on *Seeking Alpha* despite similar allegations appearing on same website six months earlier in article by a different short seller); *Scott v. ZST Digital Networks, Inc*., 2012 WL 12884888, at *3 (C.D. Cal. Apr. 23, 2012) (denying motion for interlocutory appeal on loss causation grounds); *Snellink v. Gulf Res., Inc*., 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report… to allege falsity at the pleading stage.").

2000 WL 1367951, at *4 (E.D. Pa. 2000) (rejecting a truth-on-the-market defense on a motion to dismiss where defendants omitted key details from an unclear government contract that was "not readily available on [the government's] website," and which required that "an investor [] pass through two other websites to see" it). The FAERS reports underlying the SIRF Report included information well beyond what is available on the FDA website, including Korlym dosage, the patient's basic health datapoints, and initial diagnosis and duration on Korlym, each of which provided SIRF with "valuable context and data" critical to concluding that "17 of the 103 death reports" were without a confirmed ECS diagnosis:

> To present a more nuanced view of patient deaths on Korlym, the Southern Investigative Reporting Foundation obtained longer form FAERS reports via the Freedom of Information Act. While not official reports, they do provide valuable context and data, such as dosage, basic health datapoints, initial diagnosis and the duration of Korlym use. Accordingly, any instances where the circumstances of a patient's death suggested that a reaction to Korlym was secondary were eliminated.

SIRF Report, Ex. A to the Decl. of Renita Sharma in Support of Defendants' Motion to Dismiss ("Sharma Decl.") at pp.3-4 (ECF No. 131-1).[23] Moreover, the SIRF Report's analysis was otherwise outside the expertise of an ordinary investor where the conclusions required research regarding Korlym, its label, ECS, and FAERS. ¶457.[24]

The fact that no analyst reported on the longer form FAERS data during the Class Period demonstrates that others did not have the same data and had not done the same analysis, and that Corcept's stock price did not yet reflect such information. ¶462. Defendants' reliance on an incomprehensible question during a November 2017 earnings call (DB at 24) is misplaced when the exchange is read in context:

> **Peter Stapor**: Hi, guys. This is Peter Stapor on for Tazeen. Thanks for taking my question. First question, I'm on the FDA adverse events report system order right now. See the Korlym has 91 that case associated with it. You could you talk about whether those are drug related and what the cost might be?
>
> **Joseph Belanoff**: I'm not sure exactly what you're looking at. So I can't really refer to what's specifically, but patients with Cushing's syndrome are a very ill group of patients, some of them have cancer and some of them die in their own, but to say, be more specific

---

[23] As the longer form FAERS data was clearly integral to the SIRF Report's conclusion, Defendants' contention that "the SIRF Report explicitly disclaims any citation to [the longer form FAERS reports]" (DB at 23-24) is disingenuous.

[24] *See also* Sharma Decl., Ex. A (ECF 131-1) (citing, among others, research from websites about Korlym's primary ingredient, ECS and Korlym's label).

22                                                    **Case No. 19-CV-01372-LHK**

on that, I can't really refer to it, I'm not sure. I'm not sure what exactly what you're referring to.[25]

Stapor's response shows that he and analysts covering Corcept: (i) did not understand the basic FAERS data available on the FDA website; (ii) had not made any effort to obtain the longer form data, which includes the "cost" information the analyst was apparently seeking; and (iii) did not conduct any analysis relating to the number of patient deaths caused by Korlym, or determine whether those patients had confirmed ECS diagnoses. *See BofI Hldgs, Inc. Sec. Litig.*, 977 F.3d at 794-95 ("[S]ome information, although nominally available to the public, can still be 'new' if the market has not previously understood its significance"); *City of Roseville Emples. Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 415 (S.D.N.Y. 2011) (being publicly available does not mean information is "so manifestly well-known that it was, as a matter of law, already part of the total mix of information available to investors"); *SEC v. Wash. Inv. Network*, 475 F.3d 392, 405 (D.C. Cir. 2007) ("The existence of the bar order may have been public information, but it was not information that was so widely disseminated that an average small investor could be expected to be aware of it.").

The SIRF Report also relied on non-public data obtained through a FOIA request to the Office of Veterans Administration, which revealed that a single VA clinic wrote 50 prescriptions to new patients in 2017 alone. ¶¶355-62. The SIRF Report concluded that these prescriptions were the product of off-label marketing because: **(i)** there was no other explanation for such a high number of prescriptions in one year, particularly when 91% of the prescriptions were written for men, but ECS is five times more likely to affect women; and **(ii)** according to the FOIA data, combined with data from the U.S. Government's Open Payments database, Corcept paid VA physician Dr. Hanford Yau $95,139.66 in 2017. ¶459. To develop these conclusions, the SIRF Report's author pored over thousands of lines of data from Open Payments, Medicare Part D data, scientific research cites, and FOIA

---

[25] *See* Sharma Decl., Ex. F (ECF 131-6) at 13. Plaintiff submits that this transcript is dehors the TAC and inappropriate for judicial notice on a motion to dismiss where the operative pleading cites only unrelated statements from Defendants made on that analyst call and the call is not otherwise referred to extensively. However, to the extent the Court takes notice of this document or any other document subject to reasonable dispute, it should be solely for its existence and not the truth of its contents. *See Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002).

**Case No. 19-CV-01372-LHK**
LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

documents. ¶455.

Thus, even though the SIRF Report contained some public information alongside non-public information from at least two different sources, SIRF was the first to synthesize this disparate material to illustrate that Corcept was engaging in off-label marketing. Not a single analyst report or analyst participating in Corcept's earnings calls indicated they had done the same analysis prior to or during the Class Period. ¶¶461-62. Defendants do not cite *any* report or market analysis to the contrary. Similarly, Defendants never directed investors to any of the websites or information in the SIRF Report. ¶462.

The Ninth Circuit has held where, as here, there are opaque facts that require investors to connect the dots, an analyst report that does so can serve as a corrective disclosure. *In re Apollo Grp., Inc. Sec. Litig.*, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010) (reversing trial court's judgment as a matter of law because "[t]he jury could have reasonably found that the UBS reports following various newspaper articles were 'corrective disclosures' providing additional or more authoritative fraud-related information that deflated the stock price"); *see also Garcia v. Guo*, 2016 WL 102213, at *11 (C.D. Cal. Jan 7, 2016) ("[T]he court cannot hold as a matter of law that the [corrective disclosure] does not qualify as a corrective disclosure on the basis that it did not reveal any new information to the market" and that it is an issue "better addressed at trial"); *Public Employees' Ret. Sys. v. Amedisys, Inc.*, 769 F.3d at 313, 323 (5th Cir. 2014) (finding underlying Medicare information, although publicly available, "had little to no probative value in its native state" and that someone needed to interpret it for the market to appreciate its import).

Defendants also distort the SIRF Report in asserting that it merely disclosed a "risk" or "potential for widespread fraudulent conduct" (DB at 25), disregarding the fact that the SIRF Report drew from historical activities demonstrating past and ongoing fraud. *See In re Banc of Cal. Sec. Litig.*, 2017 WL 3972456, at *9 (C.D. Cal. Sep. 6, 2017) (rejecting loss causation attack on a corrective disclosure via a *Seeking Alpha* article based on conclusions drawn from public information). The fact that Corcept's common stock fell $1.52, or more than 11% (¶463), upon publication of the SIRF Report further supports a finding both that Defendants' alleged misstatements and omissions were material and that Corcept's stock price did not previously reflect this information. *See America West Holding Corp.*, 320 F.3d at 949 ("the fact that a firm's stock price does significantly change is strong evidence of

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

materiality"); *Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 352 (3d Cir. 2009) ("And, of course, the materiality of the alleged misrepresentations is self-evident when we look at the market's negative reaction – to the tune of a nine-percent drop in stock price in three days . . . .").

### B.    The January 31, 2019 Press Release

On January 31, 2019, the Company issued full year 2019 projections well below analyst estimates. This disclosure was the manifestation of undisclosed risk associated with Defendants' off-label marketing scheme, as several insurance companies changed their Korlym approval guidelines following the exponential growth in prescriptions (and reimbursement cost) for the drug, impacting Corcept's sales expectations for the future. ¶¶328-39, 464 (four insurance companies instituted stringent approval requirements for Korlym in the wake of the off-label scheme); *see Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1146 (N.D. Cal. 2013) (manifestation of a risk is an acceptable method for proving loss causation). Upon the news, Corcept's common stock fell $1.15, or more than 10%, on unusually heavy trading volume. ¶464. "A [p]laintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the *very facts* that were a substantial factor in causing the plaintiff's economic loss." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). The corrective disclosure does not need to explicitly disclose the fraud. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013) ("Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss"). The TAC also pleads additional allegations connecting the decreased projections with the undisclosed off-label scheme and related insurance industry recoil through five additional insurance companies that recently tightened their pre-approval process related to Korlym. ¶¶338-39.

### IV.    THE INDIVIDUAL DEFENDANTS ARE LIABLE UNDER SECTION 20(A)

The TAC states a Section 20(a) claim where it alleges a 10(b) violation and Defendants Belanoff, Robb and Maduck exercised control over Corcept's internal operations and public statements. ¶45. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000).[26]

---

[26] In the event the Court dismisses some or all of the claims alleged, Plaintiff respectfully requests leave to replead. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.


Dated: April 20, 2021

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/Sebastiano Tornatore*

Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel: (415) 373-1671
Email: aapton@zlk.com
Email: amccall@zlk.com

Shannon L. Hopkins (admitted *pro hac vice*)
Sebastiano Tornatore (admitted *pro hac vice*)
Michael J. Keating (to be admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: stornatore@zlk.com

*Counsel for Lead Plaintiff the Ferraro Family Foundation, Inc. and James L. Ferraro*

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT