QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Corey Worcester (admitted *Pro Hac Vice*)
   coreyworcester@quinnemanuel.com
   Renita Sharma (admitted *Pro Hac Vice*)
   renitasharma@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:     (212) 849-7000
Facsimile:     (212) 443-7100

QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Terry L. Wit (SBN 233473)
   terrywit@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

*Attorneys for Defendants Corcept Therapeutics Incorporated, Joseph K. Belanoff, Charles Robb, and Sean Maduck*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>     vs.<br><br>CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>            Defendants. | CASE NO. 5:19-CV-01372-LHK<br><br>**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS LEAD PLAINTIFFS' CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6)**<br><br>Judge:          Hon. Lucy H. Koh<br>Courtroom:      8, 4th Floor |

# TABLE OF CONTENTS

**Page**

ARGUMENT ....................................................................................................................... 1

I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION ............. 1

A.    The New CWs Are Unreliable And Should Be Disregarded In Their Entirety ...................................................................................................... 2

B.    The Alleged Misstatements Are Not Made Misleading By Corcept's Conduct ..................................................................................................... 4

1.    The Statements Regarding Speaker And Education Programs .................... 4

2.    Statements Regarding Corcept's Marketing Materials ............................... 5

3.    Statements Regarding Compliance With FDA Regulations ........................ 5

4.    Statements Regarding Corcept's Revenue And Sales Growth..................... 6

5.    Statements Regarding On-Label Use ......................................................... 6

II.   PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER ................... 7

A.    Plaintiffs' CWs Do Not Establish A Strong Inference Of Scienter ......................... 7

B.    "Core Operations" Theory Does Not Support A Strong Inference Of Scienter ...................................................................................................... 8

1.    Plaintiffs Fail To Plead "Actual Access" To Contradictory Information ................................................................................................ 9

2.    It Was Not "Absurd" For The Individual Defendants To Lack Knowledge Of The Non-Existent Off-Label Marketing Scheme ............... 10

C.    The Remaining Allegations Do Not Support A Strong Inference Of Scienter ....... 12

III.  PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION ................................................. 13

A.    The SIRF Report Is Not A Corrective Disclosure.................................................. 13

B.    The January Press Release Is Not A Corrective Disclosure................................... 15

CONCLUSION ........................................................................................................................ 15

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*In re Acadia Pharm. Inc. Sec. Litig.*,
   2020 WL 2838686 (S.D. Cal. 2020) ....................................................................................... 11

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (C.D. Cal. 2008) ............................................................................. 4, 13

*Applestein v. Medivation, Inc.*,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012) ................................................................................... 4

*In re BofI Hldg., Inc. Sec. Litig.*,
   977 F.3d 781 (9th Cir. 2020) ........................................................................................... 14, 15

*Boles v. Merscorp, Inc.*,
   2008 WL 5246038 (C.D. Cal. 2008) ........................................................................................ 9

*In re Bristol Myers Squibb Co. Sec. Litig.*,
   586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................................... 13

*Brodsky v. Yahoo! Inc.*,
   592 F.2d 1192 (N.D. Cal. 2008) .............................................................................................. 7

*In re Cisco Sys. Inc. Sec. Litig.*,
   2013 WL 1402788 (N.D. Cal. 2013) ....................................................................................... 7

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) ................................................................................. 10

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   860 F. Supp. 2d 1062 (C.D. Cal. 2012) ................................................................................... 8

*Di Donato v. Insys Therapeutics Inc.*,
   2017 WL 3268797 (D. Ariz. 2017) ................................................................................... 11, 12

*Glazer Capital Mgmt. LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ................................................................................................. 11

*McGovney v. Aerohive Networks, Inc.*,
   367 F. Supp. 3d 1038 (N.D. Cal. 2019) ................................................................................... 3

*In re Medicis Pharm. Corp. Sec. Litig.*,
   689 F. Supp. 2d 1192 (D. Ariz. 2009) ..................................................................................... 6

*In re Nektar Therapeutics*,
   2020 WL 39262004 (N.D. Cal. 2020) ................................................................................... 10

*In re Nvidia Corp. Secs. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ............................................................................................... 10

*In re Nvidia Corp. Secs. Litig.*,
   2010 WL 4117561 (N.D. Cal. 2010) ..................................................................................... 10

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014).........................................................................................7

*In re Questcor Secs. Litig.*,
  2013 WL 5486762 (C.D. Cal. 2013)...............................................................................7

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014).........................................................................................11

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012)..........................................................................................13

*Rihn v. Acadia Pharm. Inc.*,
  2016 WL 5076147 (S.D. Cal. 2016) ..............................................................................11

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001)............................................................................................7

*South Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)............................................................................................9

*Schaffer v. Horizon Pharma PLC*,
  2018 WL 481883 (S.D.N.Y. 2018) ..................................................................................5

*In re Silicon Image, Inc. Sec. Litig.*,
  2007 WL 2778414 (N.D. Cal. 2007)................................................................................7

*In re Solarcity Corp. Sec. Litig.*,
  274 F. Supp. 3d 972 (N.D. Cal. 2017) ...........................................................................12

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
  33 F. Supp. 3d 1107 (N.D. Cal. 2014), *aff'd in relevant part, rev'd in part on
  other grounds*, 669 F. App'x 878 (9th Cir. 2016).........................................................12

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ...........................................................................11

*Zucco Part., LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009)................................................................................... 2, 3, 12

## Statutory Authorities

15 U.S.C. §78u-4(b)(1) ........................................................................................................7

# INTRODUCTION

The Court was clear in granting Defendants' motion to dismiss the SAC (ECF No. 124, hereinafter "Op."), that Plaintiffs must "cure the deficiencies identified in this Order and in Defendants' motion to dismiss." Op. 47. Yet, even after three opportunities to amend, Plaintiffs have not pled a widespread off-label marketing campaign by Defendants. The TAC substitutes obfuscation and innuendo for particularized facts, and recycles hearsay through confidential witness sources. Given Plaintiffs' inability to cure the deficiencies identified by the Court, the TAC merits the same disposition mandated for the SAC, this time without further leave to amend.[1]

*First*, Plaintiffs' falsity allegations suffer from the same deficiencies as those in the SAC. Despite adding four new witnesses, including clinical sales specialists and a regional manager, the TAC still does not "allege that sales representatives were instructed by regional or district managers to engage in off-label marketing … or that there was any coordinated effort to engage in a company-wide off-label marketing scheme." *Id.* at 19. And even had Plaintiffs done so, they have not alleged that such efforts rendered false even one of the challenged statements.

*Second*, the TAC does not plead scienter because Plaintiffs' allegations "remain no more than an unconnected series of vague allegations as to what Individual Defendants might have done and known." Op. 40. Because Plaintiffs fail to plead particularized facts showing the purported mental states of each Individual Defendant at the time each allegedly false statement was made and facts showing a specific corporate intent to commit fraud, their claims should be dismissed.

*Third*, the TAC does not plead loss causation because neither of the two alleged corrective disclosures pled by Plaintiffs establishes a market revelation of any fraud.

For each of these reasons, Plaintiffs fail to state a claim under Section 10(b) or Section 20(a), and Defendants respectfully request that the Court dismiss the TAC with prejudice.

# ARGUMENT

## I.  PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISREPRESENTATION

Plaintiffs do not dispute that their claims necessarily require sufficient allegations of a

---

[1]  Op. 47 ("Failure to … cure the deficiencies identified … will result in dismissal of Plaintiffs' deficient claims with prejudice.").

widespread off-label scheme.  Opp. 6-7.  To attempt to meet this burden, Plaintiffs rely on four "new" witnesses, CWs 11-14 (the "New CWs").  Opp. 6.  Plaintiffs do not contest that for the Court to credit *any* of the allegations of a New CW, the Court must deem the allegations of that New CW to be reliable and based on personal knowledge.  *See Zucco Part., LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), *as amended* (complaint relying on CWs must be pled with "sufficient particularity to establish [the CWs'] reliability and personal knowledge.").

But, as demonstrated below, the New CWs—many of whom did not work at Corcept during the Class Period—make allegations that are speculative, implausible, and contradicted by Plaintiffs' other allegations.  Thus, the New CWs' claims should be rejected outright.[2]  However, even if the New CWs are not rejected, Plaintiffs still fail to cure the defects the Court previously identified.

### A.      The New CWs Are Unreliable And Should Be Disregarded In Their Entirety

The New CWs make a host of implausible and unsupportable allegations, rendering them unreliable as a matter of law.  *First*, they purport to allege facts that cannot be within their personal knowledge.  For example, CW 11 claims to have knowledge regarding the thoughts and motivations of both Corcept and third parties.  *See, e.g.*, TAC ¶ 170 (alleging "Dohmen became 'uncomfortable' with processing off-label prescriptions"); TAC ¶ 193 (alleging knowledge regarding Corcept's motivation for allegedly terminating "any[]" employees who did not market off-label); TAC ¶ 215 (alleging that Corcept's "practices eventually led to an investigation of Corcept by the California Department of Insurance in 2019"—years after CW 11 was no longer employed at Corcept).  Plaintiffs do not explain how CW 11, a clinical sales specialist in Ohio, Kentucky, and Tennessee, could have knowledge regarding the state of mind of Corcept's specialty pharmacy.  Similarly, CWs 11 and 12—neither of whom allege that they worked in the same office as Corcept's executives—claim to have first-hand knowledge that Belanoff and Maduck "waited by the fax machine and exchanged 'high fives' for *each new enrollment* received.'"  TAC ¶¶ 267-68; Br. 6 (emphasis added).  Plaintiffs do not explain how either of these CWs could possibly know where Defendants'

---

[2]  Plaintiffs' claim that Defendants "fabricated" a "categorical bar" on hearsay testimony by CWs is a straw man.  Opp. 6.  While not a categorical bar, reliance on hearsay "may indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to warrant further consideration."  *Zucco*, 552 F.3d at 998.  Plaintiffs have no rejoinder to that self-evident point.

senior executives stood during the day or what celebratory gesture they utilized *each time* Corcept was notified of a new enrollment. *See McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053–54 (N.D. Cal. 2019) (Koh, J.) (rejecting CW allegations as "unreliable" because "[i]n particular, the complaint does not articulate why" CWs would have the knowledge attributed to them). While these examples may seem trivial, the New CWs' willingness to testify to fantastical allegations undercuts their "reliability and personal knowledge." *Zucco*, 552 F.3d at 998.

*Second*, the New CWs allege facts that contradict other allegations in the TAC. For example, CW 11 alleges that "60% of Corcept's annual sales [during his tenure from 2012 to 2016] came from off-label prescriptions." Opp. 10 n.6 (citing TAC ¶ 392). But this is at odds with Plaintiffs' allegation that, prior to 2016, Corcept's marketing focused on Specialist Endocrinologists—who were unwilling to prescribe "off-label" and "not fooled" by Corcept's marketing. TAC ¶¶ 8, 274. If Plaintiffs' allegation—that prior to 2016, Corcept focused its marketing on hard-to-fool *Specialists*—is credited, then CW 11 cannot be reliable when he alleges that during that period, "60% of Corcept's annual sales came from off-label prescriptions." TAC ¶ 392.

Similarly, Plaintiffs rely on an allegation from CW 14 that "50% of all Korlym prescriptions came from Drs. Back, Crabb, and Anderson." Opp. 10 n. 6 (citing TAC ¶ 392). But this, like CW 11's allegation, is contradicted by Plaintiffs' own pleading. Specifically, while CW 14 implausibly (and incorrectly) claims these three doctors accounted for 50% of total prescriptions, Plaintiffs allege that Dr. Back accounted for **5%** of all claims submitted for Medicare reimbursement in 2017, which Plaintiffs allege was "*the highest* of any physician submitting Korlym claims to Medicare Part D in 2017," and that "the second highest prescriber" (Dr. Mathews) accounted for 3.6%. TAC ¶¶ 19-21 (emphasis added). If Drs. Crabb and Anderson wrote fewer prescriptions than Dr. Mathews—as Plaintiffs allege—it borders on impossibility for Drs. Back, Crabb and Anderson to account for 50% of the total Korlym prescriptions—as CW 14 alleges.

*Third*, the New CWs' allegations contradict documents cited elsewhere in the TAC. CWs 13 and 14 allege that Corcept pushed Korlym as a first-line treatment for patients whose DST results were below 1.8. Opp. 5 (citing TAC ¶¶ 188, 199-200). Although Plaintiffs argue that the New CWs "received off-label marketing materials from the Company pushing use of Korlym for non ECS

-3-

elevated cortisol," Opp. 5 (citing TAC ¶¶ 204-12), the very marketing materials selectively excerpted by Plaintiffs show the opposite. Specifically, rather than promoting Korlym for those whose DST results are below 1.8, the purportedly "off-label marketing materials" state unequivocally that a DST below 1.8 means there is "**NO** CUSHING'S SYNDROME." TAC ¶ 212 (emphasis in original). Indeed, those supposedly "off-label" materials disclose that a patient with a DST between 1.8-5.0 **_may not_** have Cushing's syndrome.[3] *Id.* These materials thus demonstrate that (i) Corcept was *not* engaging in off-label marketing; and (ii) the New CWs are unreliable.

Because the New CWs are unreliable, their allegations must be disregarded. *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1039 (N.D. Cal. 2012), *aff'd,* 561 F. App'x 598 (9th Cir. 2014) ("[T]he questionable basis for the information of each of the [CWs], and the contradictory statements … render [them] unreliable for purposes of demonstrating falsity[.]"). And absent the New CWs, Plaintiffs are left with only those allegations this Court has already deemed insufficient.

### B.    The Alleged Misstatements Are Not Made Misleading By Corcept's Conduct

Even if the New CWs' allegations are not disregarded as unreliable, those allegations still fail to establish that Corcept's statements are actionable or false.

### 1.    The Statements Regarding Speaker And Education Programs

Statements regarding internal motivations for speaker and education programs are not actionable because Defendants were not required to disclose their motivations. Br. 12. Plaintiffs attempt to evade that rule by arguing that the statements were misleading for failing to disclose the alleged off-label scheme. However, the allegations Plaintiffs cite are insufficient and unreliable (even assuming the New CWs themselves are found to be reliable). For example, Plaintiffs rely on the allegation that Corcept personnel "pressured sales personnel to market Korlym … for individuals with a DST of 1.0 or higher" or as a first-line treatment for people with DST scores below 1.8. Opp.

---

[3]  Plaintiffs suggest that the marketing materials' inconsistency "makes this action similar to" *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008). Opp. 16 n.15. They do not. In *In re Amgen*, a sales aid was "prepared to discuss any off-label topic;" here, the materials explicitly contradict off-label marketing. Plaintiffs also overlook that the New CWs claimed Corcept's *materials themselves* constituted off-label marketing—when they directly contradict such claims. Materials that state a DST below 1.8 means "**NO** CUSHING'S SYNDROME" cannot be interpreted to "push[] use of Korlym for non ECS elevated cortisol." Opp. 5.

-4-

8. But, as noted above, *supra* I.A., the *actual marketing materials that Plaintiffs selectively included in the Complaint contradict this suggestion*. Plaintiffs also argue "Belanoff personally visited high-prescribing physicians" and "compensated physicians through honoraria," which, according to the unreliable New CWs, was done to "facilitat[e] off-label marketing." Opp. 8. But the New CWs provide no basis for their allegation that any visit or honoraria were done to *facilitate off-label marketing*, and there is nothing inherently improper in Corcept seeking "to cultivate relationships with doctors—no doubt because its business model depended on physicians prescribing [defendants'] drugs." *Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at \*7 (S.D.N.Y. 2018).

### 2.      Statements Regarding Corcept's Marketing Materials

Plaintiffs' allegations regarding marketing and promotional materials fail because the TAC still fails to allege that Corcept had a material number of off-label sales, or that such sales were the result of "sales representatives [] being instructed by Defendants to market" off-label. Br. 12-13 (citing Op. 26). Plaintiffs cite allegations from CWs 11 and 14 that 60% of Corcept's sales came from off-label prescriptions and 50% of Korlym prescriptions were filled by three doctors, Opp. 10 n.6, but neither allegation is credible and both are contradicted by the TAC. *See supra* I.A.[4]

### 3.      Statements Regarding Compliance With FDA Regulations

Plaintiffs do not dispute that statements regarding FDA compliance are statements of opinion that are not actionable unless they "'lack[] any reasonable basis'" and Plaintiffs establish "a company-wide off-label marketing scheme.'" Br. 13 (citing Op. 28). In an attempt to meet this burden, Plaintiffs rely upon the New CW allegations that Belanoff accompanied unnamed specialists to visit unnamed "important" physicians and that Belanoff purportedly provided unspecified "off-label messaging." Opp. 10. But the lack of specific content in this purported conversation dooms its credibility. *See In re Medicis Pharm. Corp. Sec. Litig.*, 689 F. Supp. 2d 1192, 1210 (D. Ariz. 2009) (not crediting CW allegation regarding "voic[ing] concerns" over accounting treatment because "[t]he Amended Complaint does not specify when alleged conversations with the

---

[4]   Plaintiffs also reference Korlym's "'impossible' sales numbers." TAC ¶ 398. But this allegation was already considered and rejected in the prior motion to dismiss briefing, and in any event Plaintiffs do not explain why Korlym's sales growth was "improbable," or how such growth is evidence that the marketing and promotional materials included off-label marketing.

-5-

Defendants took place; nor does it provide details about the content of those conversations.").

Plaintiffs also argue that the use of a DST constitutes off-label marketing.  But they do not engage with the FDA label itself, which neither prohibits the use of the DST or mandates the use of any other laboratory tests.  Br. 11-12.  Without establishing that the FDA label discusses the use of a DST, Plaintiffs *cannot* establish that any particular DST metric is off- (or on-) label.  Further, despite the conversations Plaintiffs allege the New CWs had with Corcept management, Plaintiffs notably never allege that any Defendant, or indeed any Corcept executive, ever told patients or clinical specialists to rely solely on a single DST test.  Plaintiffs' "off-label marketing" by Korlym salespeople does not match the "off-label marketing" purportedly instructed by Corcept.

### 4. Statements Regarding Corcept's Revenue And Sales Growth

Plaintiffs concede that in order to render statements regarding revenue and sales growth misleading, they must explain why the alleged "targeting of non-Specialist Endocrinologists … 'created a state of affairs that differed from reality.'"  Opp. 11 (quoting Op. 31).  Plaintiffs claim they met this burden by including the New CWs' estimates regarding the amount of sales that were off-label.  Opp. 11.  But, as noted above, the New CWs' allegations regarding the percentage of off-label sales are inconsistent with Plaintiffs' own TAC and are therefore unreliable.  *See supra* I.A.

### 5. Statements Regarding On-Label Use

Finally, Plaintiffs once again point to CW 11's unreliable allegation that 60% of Korlym prescriptions were off-label and argue that Maduck's statement that "99% of our Korlym [] prescription[s] are on-label and we continue to see favorable insurance reimbursement" was therefore a misstatement.  Opp. 12.  However, because CW 11's 60% allegation is (i) from before the Class Period (when CW 11 allegedly worked at Corcept) and (ii) contradicted by Plaintiffs' own allegations as to when the off-label campaign started, it cannot support the argument that Maduck's statement was untrue.  *Supra* I.A.  Further, Plaintiffs concede that the insurance reimbursement rates still allowed for Corcept to *grow its revenues*.  Opp. 12.  Thus, Plaintiffs cannot plausibly contend that it was false and misleading to describe the insurance reimbursement rates as "favorable."[5]

---

[5]  Plaintiffs' reliance on *In re Questcor Secs. Litig.,* 2013 WL 5486762 (C.D. Cal. 2013) fails because there, unlike here, the plaintiff adequately alleged an improper marketing scheme.

-6-                                                    Case No. 19-CV-01372-LHK

## II.    PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER

It is unnecessary for this Court to reach the TAC's new scienter allegations, because where—as here—Plaintiffs have not adequately pled falsity, "*a fortiori* they have not established that defendants knew [that their] statements were false." *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *7 (N.D. Cal. 2013) (citation omitted).  However, even assuming *arguendo* that the TAC sufficiently pleads falsity, the scienter allegations remain critically deficient.

### A.    Plaintiffs' CWs Do Not Establish A Strong Inference Of Scienter

At the threshold, CWs can establish scienter only when they offer "firsthand knowledge regarding what the individual defendants knew or did not know." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc*., 759 F.3d 1051, 1063 (9th Cir. 2014) (internal citation omitted).  The statements and actions of *non-party* sales specialists and physicians relayed by the New CWs (*see, e.g.*, TAC ¶¶ 177-82, 184), even if credited, cannot bind or substitute for the Individual Defendants.

At best, all the New CWs offer are impermissibly vague and/or conclusory allegations, including that (i) Belanoff and Maduck "closely monitored and tracked each Korlym prescription that came in" (*id.* ¶ 375); (ii) Belanoff and Maduck "lauded" certain "high performers" and encouraged other sales specialists to achieve comparable results (*id.* ¶ 373); (iii) Belanoff made so-called "off-label representations"[6] to an unnamed number of physicians during two unidentified physician visits that pre-date the Class Period[7] (*id.* ¶ 370); and (iv) unidentified "[Corcept] management promoted Corcept's off-label message" through statements made by *non-defendant* Tom Burke (*id.* ¶¶ 176, 184, 187, 194, 201) and statements collectively attributed to Burke and the Individual Defendants (*id.* ¶¶ 195, 200, 202, 267, 374, 398).  Even if the New CW allegations are

---

[6]  *But see Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001) (holding that under the PSLRA, "the complaint must contain allegations of *specific contemporaneous* statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made") (cited at Op. 36).

[7]  This allegation was attributed to CW 11, who Plaintiffs do not dispute was not employed at Corcept during the Class Period.  *But see In re Silicon Image Sec. Litig.*, 2007 WL 2778414, at *2 (N.D. Cal. 2007) (rejecting scienter allegations by CW about events post-dating their employment); *see also Brodsky v. Yahoo! Inc.*, 592 F.2d 1192, 1201 (N.D. Cal. 2008) ("[A] temporal mismatch between a CW's statement and a Defendant's statement results in a failure to plead with particularity 'the reason or reasons why the statement is misleading.'") (quoting 15 U.S.C. §78u-4(b)(1)).

not rejected as vague and unreliable, *see supra* I.A., they fail to establish Defendants' knowledge of a pervasive off-label marketing scheme at any point during the Class Period.

Failing to plead the who, what, where, when, and how of each Individual Defendant's state of mind, Plaintiffs fall back on *In re Countrywide*, claiming that "consistent off-label marketing message[s] *emanating* from *the highest levels of management* supports an inference of the Individual Defendants' scienter." Opp. 16 (emphases added). But *Countrywide* does not save the TAC. *First*, unlike here, in *Countrywide* the CW accounts establishing falsity and scienter "span[ned] different levels of the Company hierarchy" (and comprised five different types of internal sources), including the very same "longtime executives," "vice president[s]," and members of "senior management" directly responsible for promoting and perpetuating the companywide culture. *Id.* at 1059. No such high-level witnesses exist in the TAC (nor does anyone admit to off-label marketing at Defendants' request). *Second*, the falsity of Countrywide's challenged statements was pled on the face of the complaint—something the TAC still fails to do. *Third and finally*, the CW accounts there were "'described … with sufficient particularity to support the probability that a person in the[ir] position … would possess the [facts] alleged.'" *Id.* at 1058. Here, the TAC fails to allege how clinical specialists (CWs 11, 12, and 13) and one regional manager (CW 14) were privy to *any* particularized facts giving rise to a strong inference of *Defendants'* scienter. *See supra* at I.A.[8]

Because the CWs fail to offer contemporaneous facts demonstrating the purported mental states of the Individual Defendants at *any* time—let alone when *each allegedly false statement was made*—their allegations do not give rise to a strong inference that the purported off-label marketing fraud was widespread and "not isolated indiscretions by a few low level employees." *Id.*

**B.      "Core Operations" Theory Does Not Support A Strong Inference Of Scienter**

The Court previously rejected Plaintiffs' core operations theory where they "fail[ed] to

---

[8]   The *In re Countrywide* court also inferred knowledge of a bank-wide scheme via 14 CWs, all former employees of Countrywide who experienced *firsthand* massive declines in standards, some of whom discussed them contemporaneously with senior management. *Id.* at 1051. Here, despite much innuendo, "insinuati[on]," and "suspicio[n]" attributed to the Individual Defendants (e.g., their "hold[ing] Balzanti and Franklin up as [an] example[]"), *not one* CW alleged (i) that an Individual Defendant admitted the alleged off-label scheme or instructed them to market off-label, or (ii) that they personally followed those Defendants' advice to do so. TAC ¶¶ 183, 186.

adequately allege a company-wide off-label marketing scheme." Op. 42. The TAC fares no better.

### 1. Plaintiffs Fail To Plead "Actual Access" To Contradictory Information

Tellingly, even with the aid of New CWs and revised theories of liability, Plaintiffs still have not alleged (nor can they) that the Individual Defendants had "actual access" to material *contradicting* the challenged statements, or that they were directly involved in a pervasive, companywide off-label scheme. *South Ferry LP No. 2 v. Killinger*, 542 F.3d 776 at 786.[9]

Abandoning their prior theory that Defendants "admittedly had access" to "detailed sales data," including "off-label prescription and patient data," ECF 108 at 24, the TAC pivots to alleging that Defendants had "access to internal … information regarding in [sic] the off-label marketing scheme and were closely monitoring and tracking the Korlym prescriptions as they came in[]." TAC ¶ 380. Such "internal … information [purportedly] … showed Korlym was being *prescribed* off-label *as a result of* the Company's pivot in sales strategies." *Id.* ¶ 391 (emphases added). However, the TAC's new theory still fails to point to a *single* document (*e.g.*, an enrollment form, marketing brochure, sales report, or otherwise)[10] that (i) each Individual Defendant had "actual access to"[11] *and* (ii) featured (a) the purported "off-label marketing message," (b) sales attributable to off-label

---

[9] Plaintiffs contend that the TAC offers "information *relevant* to the off-label marketing scheme," in an attempt to "address[] the Court's prior concerns." Opp. 17. But fatal to these new allegations is that *none* of this so-called "information" *contradicts* the challenged statements.

[10] The TAC's fleeting reference to an off-label "tear sheet," Opp. 16, is unavailing. Plaintiffs still fail to quote or attach such a document. Allegations based upon documents the Court has not been permitted to see and whose authenticity Defendants challenge are insufficient. *See Boles v. Merscorp, Inc.*, 2008 WL 5246038 at *3 n.3 (C.D. Cal. 2008) (declining to consider document at pleading stage "since the authenticity of the document is in dispute").

[11] As to Maduck, TAC alleges that "as head of commercial operations, [he] *would have to have* been aware of the marketing materials provided to his sales staff" and "*would have* regularly reported on the Company's marketing strategies to the other Individual Defendants [and thus] it is reasonable to infer that the other Individual Defendants had access to the same information." TAC ¶¶ 402, 404. This conjecture hardly meets the exacting standard of the core operations doctrine and was already rejected by the Court. *See, e.g.*, Op. 36 ("The vague allegation that Maduck oversaw sales and marketing does not provide the 'who, what, where, when, and how regarding [Maduck's] access to the relevant information that belies fraudulent intent.'") (internal citation omitted).

As to Robb, the TAC infers that "as the CFO of a company with a limited legitimate market," he must have known "how Corcept managed to drastically increase its revenue." Opp. 15. But simply "[p]ointing to Defendants' … professional backgrounds does not suffice under [the core operations] theory," *In re Nektar Therapeutics*, 2020 WL 3962004 at *12 (N.D. Cal. 2020), and even if Corcept's sales reflected off-label *prescriptions*, that does not establish off-label *marketing*.

*marketing* (as opposed to off-label use), or (c) any other information that contradicts the challenged statements. Because the TAC lacks "specific allegations that relevant information was conveyed to the Individual Defendants," Plaintiffs' theory should be rejected once again. *See* Op. 35.

Unable to demonstrate "actual access," Plaintiffs now claim that Defendants *personally* (i) communicated the pervasive off-label marketing message "emanat[ing] from the highest levels of management" (Opp. 16-17); and (ii) compelled sales staff to distribute off-label materials (*id.* 17). Because this "come[s] nowhere close to identifying 'hard numbers' or specific admissions of Defendants that they knew of allegedly undisclosed information," core operations does not apply. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1068 (N.D. Cal. 2012).

**2.    It Was Not "Absurd" For The Individual Defendants To Lack Knowledge Of The Non-Existent Off-Label Marketing Scheme**

Failing to satisfy the theory's first prong, Plaintiffs ask this Court to apply the core operations theory based upon Korlym's importance to Corcept. Opp. 14-15. But knowledge may only be inferred where it would be "absurd to suggest" that the defendant did not know of the *particular* facts at issue. As demonstrated *supra*, Plaintiffs have failed to adequately plead an off-label marketing scheme; thus, it is hardly absurd to infer that the Defendants were never aware of one. *See In re Nvidia Corp. Secs. Litig.*, 2010 WL 4117561 at *10 (N.D. Cal. 2010) ("Without sufficiently alleging actual falsity, ... plaintiffs cannot rely on the concept of core operations to infer scienter.").

That "Corcept's ***only source of revenue*** … came from … Korlym, [thus] representing the Company's 'core operations,'" TAC ¶ 405, is also insufficient without allegations that Defendants were "specific[ally] involv[ed]" in "details of the purported misrepresentations" (*i.e.*, that they had knowledge of the alleged off-label scheme and failed to disclose it). *In re Nektar*, at *13; *see also In re Nvidia*, 768 F.3d at 1063 (core operations unavailable without additional allegations of specific information actually conveyed to management related to the alleged fraud).[12] The Court already rejected this once and should do so again. *See* Op. 36-37 ("Plaintiffs do not connect this fact [that Korlym is Corcept's sole FDA-approved drug] to their argument in support of scienter for the

---

[12]    The Ninth Circuit has also rejected the argument that scienter should be inferred because Corcept sells a single product. *See Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 746-47 (9th Cir. 2008); *see also Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 817 (N.D. Cal. 2019).

Individual Defendants, and the Court will not manufacture arguments on behalf of Plaintiffs.").

None of Plaintiffs' cases are to the contrary. For instance, in *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 WL 2838686 (S.D. Cal. 2020) (Opp. 24), which did not involve a core operations theory, an inference of scienter was shown where defendants did not deny tracking data about the company's "only product" that "clearly showed red flags" inconsistent with the challenged statements. Here, there are no comparable "red flags" in any alleged data source, as the TAC does not credibly allege that Corcept tracked sales attributable to off-label marketing.[13]

In *Rihn v. Acadia Pharm*. Inc., 2016 WL 5076147 at *9 (S.D. Cal. 2016) (*id*.), a strong inference of scienter was found where defendants likely had knowledge (and access to specific information) that rendered their statements false. Unlike *Rihn*, Plaintiffs here still do not establish that off-label marketing data existed, let alone that such data was in Defendants' possession.

*Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) (*id.*) is similarly inapposite, because there the individual defendant not only "bridged the scienter gap herself by referencing the [underlying] data directly" in her alleged misstatements, thus distinguishing *Glazer*, but also received a Corrective Action Order from regulators—neither of which the TAC alleges. *Reese*, 747 F.3d at 572, 576-77. Indeed, the Ninth Circuit highlighted the importance of such "actual access" to the underlying information when it *rejected* an inference of scienter under the core operations theory and affirmed dismissal as to a different defendant who *lacked* such access. *Id.* at 577.

Finally, in *Di Donato v. Insys Therapeutics Inc*., 2017 WL 3268797 at *15 (D. Ariz. 2017), the court held that it was "absurd to think" that the president of a pharmaceutical company (who admitted to attending daily meetings on the drug's revenue) lacked knowledge of an illegal off-label scheme given, *inter alia*, the "glaringly high" revenue realized from one drug as compared to "*comparable*" products. Here, unlike Insys (which sold a drug facing extreme competition in the pharmaceutical market), the TAC concedes that Corcept had market exclusivity over Korlym during the Class Period (and, thus, no competitors), and therefore no reason to conclude that its revenue

---

[13] Mere allegations that Defendants *must have known* that off-label marketing was responsible for sales and revenue growth, in light of (i) the Company's so-called "uniform marketing message" and (ii) Korlym's so-called "limited legitimate market," are conclusory and false. Opp. 15.

was inflated (which it was not).  *See, e.g.*, TAC ¶ 428 ("Korlym's marketing exclusivity … expired [after the Class Period] on February 17, 2019.").[14]

Taken together, Plaintiffs' cases demonstrate it is far from "patently obvious" that Defendants should have known of any alleged off-label marketing.  *Zucco*, 552 F.3d at 1001.  Establishing the "absurdity" prong of the core operations theory is a "rare circumstance" this Court has previously rejected on far more detailed allegations.  *In re Solarcity Corp. Securities Litig.*, 274 F. Supp. 3d 972, 1012-13 (N.D. Cal. 2017) (Koh, J.).  The same outcome is warranted here.

**C.**     **The Remaining Allegations Do Not Support A Strong Inference Of Scienter**

***Revenue and Financial Performance***.  Plaintiffs refuse to wrestle with the fact that the day the Class Period ends, Corcept announced (i) its "full-year 2018 preliminary selected financial results" (and revenue of $251.2 million),[15] and (ii) 2019 revenue guidance "projecting full-year 2019 revenue of $285 - $315 million," a year-on-year increase of more than 13%.  TAC ¶ 349.  Positive financial performance undermines not only a "core operations" inference but any finding of scienter.  *See In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1136 (N.D. Cal. 2014) (defendant's "financial results were, overall, positive" which "undermine[d] the core operations inference"), *aff'd in relevant part, rev'd in part on other grounds*, 669 F. App'x 878 (9th Cir. 2016).

***Sales Performance.***   Plaintiffs insist that "the anomalous nature of … Franklin's sales performance … should have necessarily raised a red flag" given "the rarity of ECS."  Opp. 14 n.11.  But these figures are consistent with Corcept's public statements that it "continue[s] to refine and expand programs to educate the medical community and patients … and *to increase awareness*," and thus, do not raise a strong inference of scienter.  TAC Ex. A at FS 1, 7 (emphasis added).

***Physician Payments***.  Plaintiffs distort *Amgen* by claiming the mere "creation of a 'speakers

---

[14]   *Insys* is also inapposite because plaintiffs alleged Insys sales representatives were instructed to "deliberately avoid[]" marketing the subject medication to oncologists and pain specialists even though the on-label use was for pain.  *Insys*, 2017 WL 3268797 at *12.  Here, Open Payments data confirms Corcept always has and continues to target endocrinologists.  *See* TAC ¶¶ 271-82.

[15]   *Compare* SAC ¶ 282 (reporting "[p]reliminary 2018 revenue [of] $251.2 million") with TAC ¶ 349 (omitting 2018 figure in order to pivot to an argument that Corcept "forecasted [a] slowdown in sales of Korlym" for 2019, which presumably betrayed analysts' rosier expectations). Plaintiffs' omission does not make Corcept's 13% projected revenue increase any less fatal to their claims.

program' where physicians are paid in honoraria can be indicative of 'actual knowledge.'" Opp. 18. But *Amgen* found scienter where defendants created that program to pay physicians to "talk about off-label uses." 544 F. Supp. 2d at 1029. The TAC lacks such allegations as to Corcept.[16]

*Motive*. The TAC offers two unavailing theories of corporate motive: that Corcept (i) used profits from Korlym to fund new drug development, and (ii) sought to realize significant Korlym sales before its market exclusivity expired. Each ignores the Ninth Circuit's holding that "allegations of routine corporate objectives … are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *In re Rigel Pharm., Inc. Sec. Litig*., 697 F.3d 869, 884 (9th Cir. 2012). Moreover, *In re Bristol*, cited to suggest that a company or its executives may be "motivated to commit fraud where exclusivity period for [their] drug was threatened" (Op. 20), is inapposite because the challenged statements and fraud in *Bristol* centered on the drug's exclusivity and Defendants' attempts to protect it. *In re Bristol Myers Squibb Co. Sec. Litig*., 586 F. Supp. 2d 148, 167 (S.D.N.Y. 2008). Clearly, no such parallels are presented by the TAC, as *none* of the challenged statements center on Korlym's exclusivity. *See* TAC Ex. A [Dkt. No. 127-1].

## III.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION

Finally, the TAC fails to state a claim because Plaintiffs have not identified corrective disclosures. The SIRF Report's information was reflected in Corcept's stock price, and Plaintiffs have not cured the defects that this Court recognized regarding the January Press Release. Op. 46.

### A.   The SIRF Report Is Not A Corrective Disclosure

The SIRF Report is not a corrective disclosure because it relies entirely on publicly-available data (Op. 44) and Plaintiffs have not "plausibly explain[ed] why the [Report's] information was not yet reflected in the company's stock price," *In re BofI Hldg., Inc. Sec. Litig*., 977 F.3d 781, 794 (9th Cir. 2020). Plaintiffs make three claims regarding the Report: (i) that it "connected disparate non-

---

[16] Plaintiffs complain that Defendants fail to "cite [any] cases in support of their defense of the honoraria payments." Opp. 19 n.18. But this Court has previously held that Plaintiffs "failed to sufficiently allege that … payments … in the form of honoraria … were intended to facilitate off-label promotion," Op. 15, and "Plaintiffs have failed to allege any specific facts that demonstrate that the purpose or intent of honoraria payments was to facilitate or promote off-label prescriptions of Korlym, *id.* 37. Nothing presented within the TAC changes that fundamental reality.

-13-                                    Case No. 19-CV-01372-LHK
DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS
THE THIRD AMENDED COMPLAINT

public and public data;" (ii) that "no other market analyst demonstrated knowledge of, or reliance on, [its] information;" and (iii) that "Corcept never directed investors to the sources cited in the … Report." Opp. 21.  Plaintiffs' first and second claims are untrue, and the third is irrelevant.  Analysts *did rely* on the same information cited in the Report, which was publicly available, accessed, and understood.  Therefore, the Report does not constitute a corrective disclosure.

*First*, the SIRF Report did not "connect disparate non-public and public data." Opp. 21.  As this Court previously found, "[e]ach of the[] sources of information [relied upon by the SIRF Report] are publicly available." Op. 44.  What Plaintiffs appear to mean when they characterize data as "non-public" is that certain types of data were available through FOIA requests.  Such data is, of course, nonetheless *available to the public*—that is how SIRF obtained it.

Moreover, Plaintiffs greatly overstate the use of FOIA-obtained data in the SIRF Report.  Plaintiffs claim that "longer form FAERS data was *clearly integral* to the SIRF Report's conclusion," but cannot show how.  Opp. at 21 n.23 (emphasis added).  The only FAERS data cited by the SIRF Report is "the number of deaths recorded" and "unknown indication" report.  MTD Ex. A (SIRF Report) at 3.  This FAERS data—like the Open Payments and Medicare data cited by Plaintiffs—was *accessible online*.  "[L]onger form" data was used solely for "context." *Id*.

*Second*, the SIRF Report did not "synthesize" data that was "otherwise outside the expertise of an ordinary investor." Opp. 24.  Plaintiffs claim that the Report's "conclusions required research regarding Korlym, its label, ECS, and FAERS" (Opp. 22) and required "a degree of expert knowledge about how the FAERS works and the specific condition being reported on" (TAC ¶ 457).  But Plaintiffs concede that the author of the SIRF Report did not have that knowledge; Mr. Boyd is alleged to be a financial journalist without any scientific or medical training.  TAC ¶¶ 451-52.  Moreover, the public data collated in the SIRF Report was not of a technical nature; it included payment amounts (SIRF Report at 6), "the number of deaths recorded for Korlym," (*id.* at 3), Corcept's income statement (*id.* at 4), and the number of physicians who wrote Korlym prescriptions (*id.* at 5).  These pieces of information were non-technical and easily understood.

*Third and finally*, Plaintiffs misrepresent the record when they claim that "no other market analyst demonstrated knowledge of, or reliance on, [the] information" in the SIRF Report.  In fact,

-14-

FAERS data was accessed and understood by analysts covering Corcept, including Bank of America's Peter Stapor, who asked a question on a 2017 earnings call about that data. Plaintiffs attempt to dismiss this in two ways: *first*, by claiming the question was "incomprehensible," and *second*, by claiming that this Court should disregard the transcript entirely. Neither excuse suffices.

Far from being incomprehensible, Mr. Stapor clearly asked Corcept about the "91 death cases associated with" Korlym, as reflected on FAERS. MTD Ex. F (Earnings Call Tr.) at 13. Not only did Mr. Stapor clearly reference FAERS, he relied upon the *exact same category of data* relied upon by SIRF. While Plaintiffs attempt to discount Mr. Stapor's question based on Corcept's failure to reference FAERS data in its response, Plaintiffs' objection misses the mark. The issue for this Court is whether information was understood by the market and "reflected in the company's stock price," *In re BofI*, 977 F.3d at 794. Mr. Stapor's question demonstrates that it was.

Having failed to discredit Mr. Stapor's question, Plaintiffs request that this Court disregard the transcript entirely. While Plaintiffs admit that they rely upon statements from *that very same* call, they allege that "the call is not otherwise referred to extensively" in their pleading. Opp. 23 n.25. Plaintiffs cannot have their cake and eat it too—their own citation is fatal to their claims.

### B.    The January Press Release Is Not A Corrective Disclosure

While Plaintiffs also maintain their reliance on the January Press Release as a corrective disclosure, they make little attempt to defend their theory in the Opposition. In its Opinion, this Court found that the January Press Release was not a corrective disclosure because Plaintiffs' attempt to tie allegedly-decreased earnings to "insurance companies tightening approval guidelines after getting wind of the off-label marketing" was "little more than conjecture." Op. 46. While this factual allegation remains unchanged (*compare* SAC ¶ 366 *with* TAC ¶ 464), Plaintiffs attempt to remedy the deficiency by relying on a new allegation that "five additional insurance companies … recently tightened their pre-approval process related to Korlym." Opp. at 25. Even if credited, those allegations relate to changes made in April, July, August and December 2020. TAC ¶¶ 338-39. Plaintiffs do not, and cannot, explain how those changes could provide support for a loss causation argument based on earnings forecast released at least *fifteen months earlier*, on January 31, 2019.

### CONCLUSION

For the foregoing reasons, Plaintiffs fail to state a claim under Section 10(b) and thus under Section 20(a), and Defendants respectfully request that the Court dismiss the TAC with prejudice.

DATED:  June 4, 2021

QUINN EMANUEL URQUHART & SULLIVAN, LLP


_____/s/ *Corey Worcester*_____
Corey Worcester
*Attorneys for Defendants Corcept Therapeutics Incorporated, Joseph K Belanoff, Charles Robb, and Sean Maduck*

Case No. 19-CV-01372-LHK
DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE THIRD AMENDED COMPLAINT