**Pages 1 - 20**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

NICHOLAS MELUCCI, Individually and on    )
Behalf of All Others Similarly Situated,  )
                                          )
         Plaintiff,                       )
                                          )
   VS.                                    )   **NO. C 19-01372 JD**
                                          )
CORCEPT THERAPEUTICS INCORPORATED,        )
JOSEPH K. BELANOFF, CHARLES ROBB, and     )
SEAN MADUCK,                              )
                                          )
         Defendants.                      )
_____ )

San Francisco, California
Thursday, June 8, 2023

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

LEVY & KORSINSKY, LLP
1111 Summer Street, Suite 403
Stamford, Connecticut 06905
BY: **SHANNON L. HOPKINS, ATTORNEY AT LAW**

For Defendants:

QUINN, EMANUEL,URQUHART & SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
BY: **COREY WORCESTER, ATTORNEY AT LAW**

QUINN, EMANUEL, URQUHART & SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111
BY: **CHARLES B. STRAUT II, ATTORNEY AT LAW**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**Thursday - June 8, 2023**                                        **10:34 a.m.**

**P R O C E E D I N G S**

**---o0o---**

THE CLERK:  Calling Civil 19-1372, Melucci vs. Corcept Therapeutics Incorporated.

Counsel?

MS. HOPKINS:  Good morning, Your Honor.  This is Shannon Hopkins with Levi & Korsinsky for the plaintiffs.

THE CLERK:  Use the microphone.

MR. WORCESTER:  Corey Worcester from Quinn, Emanuel, Urquhart & Sullivan on behalf of the defendants, Your Honor.

MR. STRAUT:  Charles Straut, also from Quinn Emanuel.

THE COURT:  Whenever you're at counsel's table, you appear.  All right?  You're not just a cipher.  You should be loud and proud.  Make your appearance.  Okay?  All right.

Ms. Hopkins, I'm just a little unclear.  I've got a couple of questions.

How much is each class member going to get on average?

MS. HOPKINS:  Your Honor, that's really hard to say at this point because the notice hasn't gone out, and we don't know how many people are going to submit claims and that kind of thing.  So it's really impossible to be able to determine.

THE COURT:  It's hard for me to evaluate whether this is reasonable and adequate when I don't know what people are going to get.  So what's your --

**MS. HOPKINS:**  Well, Your Honor --

**THE COURT:**  What's the range?

**MS. HOPKINS:**  -- we put in the per share amount in the notice.

**THE COURT:**  But that doesn't mean anything to me.  I don't know how many -- do people typically have one share?  Is this all institutional investors who are going to have --

**MS. HOPKINS:**  Well, I can tell you, Your Honor --

**THE COURT:**  -- tens of thousands of --

(Simultaneous speaking; official reporter interrupts.)

**THE COURT:**  You've got to let me finish first.  Okay?

**MS. HOPKINS:**  Yes, Your Honor.

**THE COURT:**  Are these all institutional investors?  They're going to have tens of thousands -- I just have no understanding of what the recovery is going to look like on a per capita basis.

**MS. HOPKINS:**  Your Honor, I can tell you that this company is not an S&P 500 company; so there's a lot more retail ownership.  And our expert has determined that approximately 60 percent of the stock is owned by institution and 40 percent is owned by retail investors.

But because, as Your Honor probably is aware, with these cases, most of these are held in straight name by brokers, we have no idea for sure how many class members there are, meaning how many people actually have claims, recoverable claims.

So AB Data, we asked to provide an estimate for the notice, and our brief has estimated that approximately 100,000 notices would go out.

And when notice goes out, it's anyone, basically, who held shares during the class period.  It doesn't mean they're going to have recoverable claims because they could have just had those shares before and held them all the way through and not purchased during the class period.  But the purpose of the notice is, obviously, to cast as wide of a net as possible to make sure we reach all potential class members.

But until people submit their claims with their account statements that detail their trades, we won't know for sure who's in the -- how many class members with recoverable claims that we have.

**THE COURT:**  Well, that makes me a little uncomfortable.  I understand what you're saying, but it's really hard for me to determine whether this is adequate and fair without that information.

So if I do end up approving it -- and I'm leaning towards it -- it's going to be with an underscore of the word "preliminary."  Okay?

So when we get to final, I'm going to expect a detailed and well-documented showing of how much, on average, each claimant is getting and why that -- why that makes sense.

I'm also going to be looking at the claims rate itself.

So it will -- you're going to have a problem -- I'll just tell you now, if you tell me "Here's the average claim rate but we only got 10 percent of the eligible class," that's going to be a problem for you.  Okay?  In these kinds of cases, in my experience, 60 percent, at least, of the institutional holders are all over these settlements.  So I would expect a claim rate to be no less than 60 percent and, arguably, much higher, like 80, 85 percent.  Okay?

And then I want to see how this is going to break down in terms of actual dollars in the pockets of the alleged victims with those claims rates and the shareholder recovery you set.

Now, you're looking at somewhere between 8 and 11 percent of what you would have obtained at trial if you hit a home run.  It's not great.  So why should I stick the class members with basically losing 90 cents on the dollar for their injury?

**MS. HOPKINS:**  Your Honor, I wouldn't -- I don't know if Your Honor had received this.  I had e-mailed a presentation to kind of facilitate the discussion.  And if Your Honor would like, I could --

**THE COURT:**  If you e-mailed it, I don't get it because I don't -- you can't e-mail me things.

**MS. HOPKINS:**  Okay.

**THE COURT:**  Okay?  You have to file them.  That's how you talk to the Court.  All right?

**MS. HOPKINS:**  Well, may I approach, or would you --

**THE COURT:**  You can hand it to Ms. Clark, if you'd like.  E-mail is not ECF Lite.  It doesn't exist, as far as I'm concerned.

Okay.  Go ahead.

**MS. HOPKINS:**  Your Honor, I take to heart Your Honor's comments, and I've certainly looked at Your Honor's other settlements.  And I would submit that this settlement and the recovery here is not only well in line with cases like this; it is in line with other settlements Your Honor has approved before.

**THE COURT:**  Let me just jump in.

Here's the issue.  There's a problem in the law, and I'll just give you -- here's an illustration that's completely unrelated to you.  I'm not saying you did this.  You had nothing to do with this.

For example, one case will get a point of law or a case citation wrong in a published order, published decision.  And then the next court takes it and nobody looks past that original mistake.  And then it gets propagated and propagated and propagated, and so you get this whole descending tree of error that just kind of becomes the common wisdom, even though it's completely wrong.

I have a real problem -- and I'm increasingly going to be active about it -- in saying, "Well, let's just stay in the echo chamber.  Everybody does 8 percent, so that must be the

number."

I don't buy that. I reject that categorically. And just because a dozen or two dozen or a score of other courts said 8 percent is good, I'm not bound by that.

So I need to know why, in this case -- I shouldn't say "I'm not" -- I'm clearly not bound by it. I'm not persuaded by it. I need to know why in this case asking the class members to give up 90 cents of their injury for every dollar that they were hurt makes sense.

**MS. HOPKINS:** Understood, Your Honor.

So the first point I would like to make is, we're required to give the maximum recoverable damages in the case. And here, there were two corrective disclosures. So we included both of those. But the second corrective disclosure was dismissed by the Court twice. So while we alleged these two corrective disclosures, and the maximum damages that could be gained here account for both of those, one of them is, technically speaking, not in the case right now.

**THE COURT:** The January 31st one?

**MS. HOPKINS:** Yes, Your Honor, exactly.

And so while we may, after the discovery was completed, move for leave to amend to try to add that disclosure back for the class, currently, it's not even in the case. So I would submit, Your Honor, that that's a sig- -- a pretty big risk for us to try to get that portion of the damages back into the

case, which makes the maximum recovery around the 13 percent.

In addition, the one corrective disclosure we do have is a SIRF report by an investigative journalist; and there, defendants successfully argued on the motion to dismiss that it was comprised of entirely public information.  Now, the Court found that it was still in the case because no one had taken this public information from all the different sources and put it together for investors to see.

And so we had one corrective disclosure that had -- the Court found was all public information.  The defendants have argued throughout the case that that SIRF report -- and you look at page -- or Slide 4 of my presentation, the second bullet point, there's examples of some of the information in the SIRF report that defendants have continued to argue are unrelated to our case for off-label marketing.

And so if the Court agrees with defendants, then we would have to disaggregate at least some portion of the one drop that we had for this information that if the Court were to find was unrelated to our case.

THE COURT:  If that came to pass, how much would the damages be reduced by?

MS. HOPKINS:  Well, Your Honor, I guess it depends on whose expert you ask.  And we haven't done that analysis yet because we haven't gotten to summary judgment in the case.  So it would require an expert analysis.  There would be some

percentage that, if Your Honor agreed with defendants' view --

**THE COURT:**  Here's where I'm coming from.

We get an unusually large number of securities cases in this district.  You wouldn't expect it, but we do.  It's one of our top categories; so I see a lot of it.

And I'm just increasingly concerned that there's just this formula, that you all know better than I do, where you come in; you litigate; you go through your motion to dismiss; and then everybody settles for 10 cents on the dollar.  I just -- I'm having serious questions whether that's the right thing to do.  And everyone comes in and says, "Oh, the defendants were going to kill us on this disclosure," all this other stuff.  But it's becoming ritualized in a way that raises concerns to me that it's cookie cutter and not tailored for each individual class in the interests of justice.  So that's where I'm coming from.

And I'm just -- it's not helpful to me to say, "Well, we never" -- "If we lose this point on off-label marketing, we're in trouble, but I can't tell you how that would affect damages."  Because if you told me, "Well, that would cut damages, minimum, in half," then your 10 cents on the dollar is starting to look like 50 cents on the dollar which I can get behind.

**MS. HOPKINS:**  Your Honor, I understand what Your Honor is saying.

If you look at the next slide, we went through merits

discovery and documents.  We reviewed over a million pages of documents.  There were two depositions taken.  So we were pretty informed about the strengths and weaknesses of our case.

And, in particular, in this case, the off-label mark- -- this was all about off-label marketing.  The marketing materials that -- we argue the marketing materials were off label because they included studies in them that showed off-label use; so, implicitly, they were off-label marketing.  But there's no evidence the FDA ever complained that the materials were off-label marketing.  So we discounted for that.  There's no evidence in the documents, so far, that the defendants ever told anybody at the company to off-label market.

**THE COURT:**  There's no evidence of that?

**MS. HOPKINS:**  No documentary evidence.  We have witnesses who said that, certainly, that are cited in our complaint.

But my point is, Your Honor, we went through significant --

**THE COURT:**  What do you mean by "no documentary" -- there's no e-mail on that?  There's not a single --

**MS. HOPKINS:**  Nobody -- there's no e-mail where a defendant -- I'm not talking -- there's documents where somebody complained to the company, saying there's off-label marketing; but there's no company-wide directive in a document

where defendants say, "Okay.  We're going to do this, this, and that," specifically.

And there's a big debate in our case, too, because at the end of the day, it's the doctor that has discretion on how to prescribe a drug.  Now, our case is about what the sales rep said to the doctor.  However, there's kind of a -- not a clear line because the doctor ultimately has discretion on what to do, and none of the doctors went to the defendants and complained about the off-label marketing because they have that discretion.

So we had several pretty serious arguments, we viewed here, against the off-label marketing.

Now, we also had our evidence.  We had -- you know, a former employee had sent a letter complaining about various things, including off-label marketing.  So there was certainly evidence in our favor.

But when it came to *scienter*, we didn't have any, like, smoking gun documents or even documents where any of the defendants explicitly said to do this.  In fact, there were some documents -- not by the defendants, but by executives -- that said, "Keep it on label."

And so we face some real challenges, Your Honor.

I understand Your Honor's concerns about cookie cutter, and I put this presentation to elaborate on what was in our brief a little bit more for Your Honor to see, but there were

some serious and are some serious concerns we had, after getting through discovery, with falsity and *scienter*.

**THE COURT:**  All right.  I have another question I'm going to ask about expenses in a moment, but let me hear from your colleague here.

You're getting an awfully good deal, and it makes me uncomfortable.  I'm not sure that it's fair and adequate.

**MR. WORCESTER:**  You want to hear about expenses first, Your Honor, or do you want me to respond?

**THE COURT:**  Yes.

**MR. WORCESTER:**  Your Honor, when Ms. Hopkins was speaking a moment ago, you heard a lot of mentions of off-label marketing.  And I want to start by noting that this is a securities class action.

She has two problems.  She has a case within a case.  She not only has to win an off-label marketing case, which is difficult for the reasons that she just outlined.  There is literally no documentary evidence of off-label marketing. Literally none.  We don't think it happened.  If that hurdle is overcome, she also has to win a securities class action, because the off-label marketing is the alleged misrepresentation.  Right?

So you've got to win, first, an off-label marketing case, which I don't think anyone's ever done in the securities class action context.  Then you have to win a securities

class action with Rule 9(b) standards, et cetera, et cetera, et cetera. That's going to be difficult also.

Just to take one example of what Ms. Hopkins and you were discussing, the disaggregation point on loss causation.

And I apologize, Your Honor. I have a bit of a cold today.

THE COURT: That's okay.

MR. WORCESTER: I've got a frog in my throat.

THE COURT: All right. That's fine. There's a little bit of water over there, if you need it.

MR. WORCESTER: I would appreciate it.

THE COURT: Yeah. There should be a glass, yeah.

(Pause in proceedings.)

MR. WORCESTER: Thank you. Sorry about that. Much better.

THE COURT: No problem. Go ahead.

MR. WORCESTER: On the disaggregation point, Your Honor, the question isn't how much of the damages would be left. If we win the disaggregation point, none of the damages would be left. That's the rule at summary judgment. It's the plaintiff's responsibility to disaggregate before we get there. They didn't do so in the complaint, and we submit they're not able to do so. And I think all of the case law on that point goes the defendants' way.

If you think we're getting a good deal, it's because we,

frankly, fully expect to win at summary judgment if the case gets there. And so --

THE COURT: Well, you're paying what: $14 million; right?

MR. WORCESTER: Yes, Your Honor.

THE COURT: Just to avoid summary judgment?

MR. WORCESTER: Your Honor --

THE COURT: That's an expensive -- that makes your summary judgment motion unusually precious.

MR. WORCESTER: Don't tell my client, Your Honor, but we also had discovery, as you may recall. This was a case that had 30 depositions per side. We had 58 of them left to go.

THE COURT: You have to remember, I'm actually -- I'm District Judge Number 2. So I was not around for your -- I did not know you had -- you had 60 depositions total?

MR. WORCESTER: Yes.

THE COURT: And did you use all --

MR. WORCESTER: We haven't taken them yet.

THE COURT: Did you use all of them? Oh, you didn't take any.

MR. WORCESTER: Only two so far.

THE COURT: I see. Okay.

MR. WORCESTER: So it's not the summary judgment motion; it's the discovery.

THE COURT: I get it. Okay.

**MR. WORCESTER:**  And you were a defense lawyer, Your Honor.  I'm sure you know what that entails.

**THE COURT:**  Well, I wouldn't read too much into that, but yes.

**MR. WORCESTER:**  And so if you take the disaggregation just by itself -- right? -- one of the items in the SIRF report, beyond the off-label marketing, is that the drug literally didn't work.  There was a report saying the drug didn't work.  Do you think that might have affected the stock price?  How do you disaggregate that?  The plaintiffs didn't do it.

There were other items in the SIRF report, too, that could have affected the stock price.

**THE COURT:**  Who was that report from about --

**MR. WORCESTER:**  It's called SIRF, which I believe stands for the Southern Institution of Research -- I forget what the exact acronym is.

**THE COURT:**  And they did a clinical study and said -- or they did --

**MR. WORCESTER:**  No.

**THE COURT:**  Was it a meta-study?

**MR. WORCESTER:**  They did not do anything of the sort. They largely put out information that's then used by short sellers.

**THE COURT:**  All right.

**MR. WORCESTER:**  So it's not any sort of clinical study or anything like that.

**THE COURT:**  All right.  So it's an iffy statement that it wasn't efficacious.

**MR. WORCESTER:**  Yes.

Then if you look at the other items -- right? -- the loss causation event itself, as Ms. Hopkins mentioned, was based largely on other items that had made its way into the public domain.

At the motion to dismiss, we sought permission to insert some of those into the record, and the Court elected not to take judicial notice at that stage.  However, at summary judgment, Your Honor would be looking at what's in the record already.  We think we had a very strong loss causation argument, and we're, frankly, unlucky to lose it at the motion to dismiss stage.  So we felt very good about that.

On the misstatements, 17 of the 30 misstatements alleged in the complaint were knocked out at the motion to dismiss. I'm reasonably confident we would have knocked out most, if not all, of the rest at summary judgment.  They simply weren't misstatements.  And so, for example --

**THE COURT:**  Well, the number of statements -- I just settled a Wells Fargo -- I didn't settle it.  A Wells Fargo case just settled in front of me.  Two misstatements, $300 million.  So there's no necessary correlation between

Case 3:19-cv-01372-JD   Document 200   Filed 06/20/23   Page 17 of 21   17

number of statements and class recovery.

MR. WORCESTER:  Unless we get them all, Your Honor.

THE COURT:  Unless you get them all.

MR. WORCESTER:  Unless we get them all.

THE COURT:  How likely is that?

MR. WORCESTER:  I think we had a very good shot at it. Again, you know, at the motion to dismiss stage, the inferences had to go against us.  At summary judgment, when Your Honor has a record to see what was said and the evidence backing it up, I'm not sure that would have happened.

Two of the misstatements in particular -- one was on the percentage of Korlym prescribed for off-label uses -- we actually have the data.  We couldn't put that in at the motion to dismiss stage, but at summary judgment, that would be in front of you.

THE COURT:  Let me ask you this, just to jump in.  So you did only two depositions.  What was the volume of documents and written discovery?

MR. WORCESTER:  About a million pages produced, Your Honor.

THE COURT:  A million pages.  Okay.

And you had a couple of motions with the prior district judge; right?

MR. WORCESTER:  Correct, Your Honor.

THE COURT:  Okay.  All right.  Okay.  I think I have

enough on that.

Just, I had two other questions.  975,000 in expenses seems awful- -- I mean, we're not doing your fees right now. We'll do that later.  But it just seems awfully high.  A million bucks in expenses for a case that invoiced two depositions and a million electronically transferred documents? It seems awfully high.

**MS. HOPKINS:**  Your Honor, so I did come prepared here with some preliminary details.

**THE COURT:**  Okay.  Can I just tell you, next time, you have to file all these things.

**MS. HOPKINS:**  Oh, yeah.  No, I just did it from my own notes --

**THE COURT:**  Oh, all right.

**MS. HOPKINS:**  -- so I could give Your Honor some context if you asked this question.

**THE COURT:**  It doesn't really help me if I don't have it in the record but --

**MS. HOPKINS:**  So one of the --

**THE COURT:**  Here's what you should do.  If you want me to look at that, you should just file it.

But I'm just telling you now -- we'll take it up on another day when you come back, should we reach that day -- you're going to have to give me a pretty good explanation about why almost a million dollars in costs is justified in a case

with relatively modest discovery.  I mean, in this day and age, with electronic discovery, a million documents is not much -- okay? -- in a case of this size.

I've got to tell you also, a 25 percent cut for the lawyers in a case that had a couple of motions and basically no discovery, that is really high, in my view.

So I'm just telling you now so that when you see me again, you understand what I'm going to be asking.  But I'm having a very hard time seeing how you get up to a quarter of the recovery for the class, one quarter goes to you for a case that was barely litigated in terms of any work outside of a couple of motions.  So --

**MS. HOPKINS:**  Your Honor --

**THE COURT:**  You don't have to say anything now.  I'm going to ask you not to.  I'm just planting the seed so you can be prepared to tell me next time.

All right.  Well, if I let it go forward -- and I probably will -- it's going to be very contingent on what you show me at preliminary -- and I would advise both of you that this is a case where you should not bank on an automatic final approval. Don't bank on it.  All right?  Because if I'm not satisfied about all these things we've talked about, you're going to go -- you're going to have your -- your dream will come true and you'll have the chance to do summary judgment.

**MR. WORCESTER:**  Your Honor, there are many people at

my client who wouldn't be that upset by that, I think.

**THE COURT:** All right.  Well, we'll see.  At the end of the day, you got a settlement, and I'm not going to throw it out arbitrarily, but I do want to make sure everybody's getting the right outcome, particularly the class members.

And you need, plaintiff -- I'm sorry.  Ms. Hopkins, you need to -- if we go forward, you've got to make sure you're ready to tell me about why that percentage of cut for the lawyers is justified -- seems too high to me, as I said -- and why the fees are so high.

Okay.  Thanks very much.  I'll get back to you as soon as I can.

**MR. WORCESTER:**  Thank you, Your Honor.

**THE COURT:**  Yes.

**THE CLERK:**  All rise.  Court's in recess.

(Proceedings adjourned at 10:56 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Monday, June 19, 2023

*Ana Dub*

_____

Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter