**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

*Counsel for Lead Plaintiff the*
*Ferraro Family Foundation, Inc.,*
*and James L. Ferraro*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>CORCEPT THERAPEUTICS INCORPORATED, after JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>     Defendants. | Case No. 3:19-CV-01372-JD<br><br>**CLASS ACTION**<br><br>**LEAD PLAINTIFF'S UNOPPOSED NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:   June 6, 2024<br>Time:  10:00 a.m.<br>Room: Courtroom 11, 19th Floor<br>Judge:  Honorable James Donato after |

**NOTICE OF MOTION AND MOTION**

TO:    ALL PARTIES AND THEIR ATTORNEYS OF RECORD

PLEASE TAKE NOTICE that on June 6, 2024, at 10:00 a.m. or at such other time as the Court determines, in Courtroom 11, 19th Floor, the Honorable James Donato, United States District Court Judge presiding, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Lead Plaintiff the Ferraro Group (consisting of Ferraro Family Foundation, Inc. and James L. Ferraro) ("Lead Plaintiff") will move this Court for entry of a judgment pursuant to Federal Rule of Civil Procedure 23(e) granting final approval of the proposed Settlement and entry of an order granting approval of the proposed Plan of Allocation.

This Motion is based on the Memorandum of Points and Authorities submitted below, the accompanying Declaration of Shannon Hopkins ("Hopkins Declaration" or "Hopkins Decl."), and Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, and Award to Class Representative Pursuant to 15 U.S.C. §78u-4(a)(4), with attached exhibits, and all other pleadings and matters of record, arguments of counsel, and such additional information as may be required by the Court.

A proposed Final Judgment and Order of Dismissal with Prejudice and proposed Order granting approval of the proposed Plan of Allocation will be submitted with Lead Plaintiff's reply, which is to be submitted on May 30, 2024, after the May 13, 2024 deadline for Class Members to object to the Settlement and Plan of Allocation has passed.

Defendants do not oppose this Motion. *See* Hopkins Decl. at ¶2.

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -i-

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... IV

STATEMENT OF ISSUES TO BE DECIDED ....................................................................... VIII

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 1

    I.     INTRODUCTION .......................................................................................... 1

    II.    PERTINENT FACTUAL AND PROCEDURAL BACKGROUND ............................. 3

    III.   ARGUMENT .................................................................................................. 7

        A.    Standards of Law Applicable to Final Approval ................................... 7

        B.    Application of the Rule 23(e)(2) Factors and *Churchill* Factors Supports Approval of the Settlement as Fair, Reasonable, and Adequate ........................ 8

            1.    Lead Plaintiff and Lead Counsel have more than Adequately Represented the Settlement Class (Rule 23(e)(2)(A) and Churchill Factor 6) ............................................................................................ 8

            2.    The Proposed Settlement Was Reached at Arm's-Length (Rule 23(e)(2)(B)) ............................................................................. 10

            3.    The Proposed Settlement is Adequate Considering the Costs, Risk, and Delay of Trial and Appeal (Rule 23(e)(2)(C)(i) and *Churchill* Factors 1 through 4) ............................................................................ 10

                a.    The Settlement Amount is Fair and Reasonable ........................ 11

                b.    The Costs and Risks of Continued Litigation and Trial ............. 13

            4.    The Proposed Method for Distributing Relief is Effective (Rule 23(e)(2)(C)(ii)) ................................................................... 17

            5.    Lead Counsel's Request for Attorneys' Fees is Reasonable (Rule 23(e)(2)(C)(iii)) ................................................................. 18

            6.    No Other Agreements Weigh Against Final Approval (Rule 23(e)(2)(C)(iv)) ................................................................... 19

            7.    The Proposed Plan of Allocation Treats Class Members Equitably (Rule 23(e)(2)(D)) ................................................................... 19

            8.    The Extent of Discovery Completed and Stage of the Proceedings Further Supports Final Approval (*Churchill* Factor 5) ..................... 20

            9.    No Governmental Entity Participated in this Action (*Churchill* Factor 7) ....................................................................................... 21

            10.   The Settlement Class's Reaction Supports Approval (*Churchill* Factor 8) ....................................................................................... 21

C.     The Court-Approved Notice Comports with Due Process ..................................22

D.     The Plan of Allocation Should be Finally Approved...........................................24

CONCLUSION..................................................................................................................................25

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR
FINAL APPROVAL OF PROPOSED SETTLEMENT -iii-

## **TABLE OF AUTHORITIES**

**Cases**

*Allen v. Bedolla,*
   787 F.3d 1218 (9th Cir. 2015) ................................................................................ 7

*Arena v. Intuit Inc.,*
   2021 WL 834253 (N.D. Cal. Mar. 5, 2021) .......................................................... 7

*Arkansas Tch.r Ret. Sys. v. Goldman Sachs Grp., Inc.,*
   77 F.4th 74 (2d Cir. 2023) .............................................................................. 3, 15

*Bellinghausen v. Tractor Supply Co.,*
   306 F.R.D. 245 (N.D. Cal. 2015) ................................................................. 17, 21

*Campbell v. Facebook, Inc.,*
   951 F.3d 1106 (9th Cir. 2020) ......................................................................... 7, 8

*Cheng Jiangchen v. Rentech, Inc.,*
   2019 WL 5173771 (C.D. Cal. Oct. 10, 2019) ..................................................... 9

*Churchill Village, LLC v. Gen. Elec.,*
   361 F.3d 566 (9th Cir. 2004) ................................................................... passim

*Ciuffitelli v. Deloitte & Touche LLP,*
   2019 WL 1441634 (D. Or. Mar. 19, 2019) ....................................................... 25

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ......................................................................... 24

*Dennis v. Kellogg Co.,*
   2013 WL 6055326 (S.D. Cal. Nov. 14, 2013) .................................................. 17

*Destefano v. Zynga Inc.,*
   2016 WL 537946 (N.D. Cal. Feb. 11, 2016) .................................................... 16

*Draney v. Wilson, Morton, Assaf & McElligott,*
   1985 WL 5820 (D. Ariz. Sep. 30, 1985)........................................................... 21

*Dura Pharms., Inc. v. Broudo,*
   544 U.S. 336 (2005)............................................................................................ 13

*Fleming v. Impax Laby's, Inc.,*
   2022 WL 2789496 (N.D. Cal. July 15, 2022) .............................................. 18, 24

*Foster v. Adams & Assocs., Inc.,*
   2022 WL 425559 (N.D. Cal. Feb. 11, 2022) .................................................... 21

*Gretler v. Kaiser Found. Health Plan, Inc.,*
   2019 WL 8198308 (C.D. Cal. Mar. 18, 2019) .................................................. 10

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ................................................................. 7, 8, 22

*Hayes v. MagnaChip Semiconductor Corp.*,
    2016 WL 6902856 (N.D. Cal. Nov. 21, 2016) ................................................................. 24

*Hsu v. Puma Biotechnology, Inc.*,
    No. 8:15-cv-00865, ECF 913 (C.D. Cal. Aug. 3, 2022) ................................................. 16

*In re Amgen Inc. Sec. Litig.*,
    2016 WL 10571773 (C.D. Cal. Oct. 25, 2016)............................................................... 19

*In re Apollo Grp., Inc. Sec. Litig.*,
    2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd and remanded*, 2010 WL
    5927988 (9th Cir. June 23, 2010) ................................................................................. 17

*In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    2019 WL 2554232 (N.D. Cal. May 3, 2019) ................................................................... 8

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
    343 F. Supp. 3d 394, 415 (S.D.N.Y. 2018).................................................................... 25

*In re Heritage Bond Litig.*,
    2005 WL 1594403 (C.D. Cal. June 10, 2005) ............................................................... 24

*In re Hyundai & Kia Fuel Econ. Litig.*,
    926 F.3d 539 (9th Cir. 2019) .......................................................................................... 9

*In re Immune Response Sec. Litig.*,
    497 F. Supp. 2d 1166 (S.D. Cal. 2007).......................................................................... 15

*In re Linkedin User Priv. Litig.*,
    309 F.R.D. 573 (N.D. Cal. 2015).................................................................................... 16

*In re Netflix Priv. Litig.*,
    2013 WL 1120801 (N.D. Cal. Mar. 18, 2013)............................................................... 10

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................. 17, 19

*In re PNC Financial Services Group, Inc.*,
    440 F. Supp. 2d 421 (W.D. Pa. 2006)............................................................................ 25

*In re Portal Software, Inc. Sec. Litig.*,
    2007 WL 4171201(N.D. Cal. Nov. 26, 2007) ............................................................... 21

*In re Regulus Therapeutics Inc. Sec. Litig.*,
    2020 WL 6381898 (S.D. Cal. Oct. 30, 2020) .......................................................... 12, 19

*In re Splunk Inc. Sec. Litig.*,
    2024 WL 923777 (N.D. Cal. Mar. 4, 2024).................................................................... 12

*In re Warner Commc'ns Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986).......................... 14

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  2020 WL 4212811 (N.D. Cal. July 22, 2020), *aff'd*, 2022 WL 2304236 (9th Cir.
  June 27, 2022) ........................................................................................................ 17

*Kastler v. Oh My Green, Inc.*,
  2022 WL 1157491 (N.D. Cal. Apr. 19, 2022) ....................................................... 7

*Knapp v. Art.com, Inc.*,
  283 F. Supp. 3d 823 (N.D. Cal. 2017) .................................................................. 8

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ........................................................................... 7, 8

*Larsen v. Trader Joe's Company*,
  2014 WL 3404531 (N.D. Cal. July 11, 2014) .................................................. 7, 9

*Longo v. OSI Sys., Inc.*,
  2022 U.S. Dist. LEXIS 158606 (C.D. Cal. Aug. 31, 2022) ................................ 20

*Mauss v. NuVasive, Inc.*,
  2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ................................................ 13, 24

*McPhail v. First Command Fin. Planning, Inc.*,
  2009 WL 839841 (S.D. Cal. Mar. 30, 2009) ....................................................... 12

*Mendoza v. Hyundai Motor Co.*,
  2017 WL 342059 (N.D. Cal. Jan. 23, 2017) ....................................................... 21

*Moorer v. StemGenex Med. Grp., Inc.*,
  2021 WL 640842 (S.D. Cal. Jan. 8, 2021) ........................................................... 9

*Nat'l Rural Telecomms. Coop v. DIRECTV, Inc.*,
  221 F.R.D. 523, 528 (C.D. Cal. 2004) ................................................................. 21

*Nguyen v. Radient Pharms. Corp.*,
  2014 WL 1802293 (C.D. Cal. May 6, 2014) ....................................................... 14

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. Of San Francisco*,
  688 F.2d 615 (9th Cir. 1982) ................................................................................ 8

*Robbins v. Koger Properties., Inc.*,
  116 F.3d 1441 (11th Cir. 1997) ........................................................................... 17

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ......................................................................... 10, 16

*Satchell v. Fed. Express Corp.*,
  2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ..................................................... 10

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003) ............................................................................... 19

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ................................................................................. 17

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR
FINAL APPROVAL OF PROPOSED SETTLEMENT -vi-

*Vataj v. Johnson,*
2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) ............................................................ 12, 24

*Walsh v. CorePower Yoga LLC,*
2017 WL 4390168 (N.D. Cal. Oct. 3, 2017) .................................................................. 10

**Statutes**

15 U.S.C. § 78 ....................................................................................................................... 22, 23

**Other Authorities**

Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action
Litigation: 2023 Full-Year Review* (NERA Jan. 23, 2024) ...................................... 11, 12

L.T. Bulan, L.E. Simmons, *Securities Class Action Settlements, 2023 Review and
Analysis,* Cornerstone Research (2024) ................................................................... 11, 12

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................................... passim

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR
FINAL APPROVAL OF PROPOSED SETTLEMENT -vii-

## STATEMENT OF ISSUES TO BE DECIDED

Whether the application for Final Approval of Proposed Class Action Settlement should be granted upon a finding that:

1. The terms of the proposed Settlement are fair, adequate, and reasonable under Fed. R. Civ. P. 23(e);

2. Notice was sufficient in accordance with Fed. R. Civ. P. 23(c) and 15 U.S.C. § 78u-4(a)(7);

3. The Settlement Class satisfies Fed. R. Civ. P. 23(a) and 23(b); and

4. The Plan of Allocation is fair, adequate, and reasonable.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3

4

5

6

7

8

9

10

11

12

13

14

15

16

　　　Lead Plaintiff respectfully submits this Memorandum of Points and Authority in support of its motion for final approval of the proposed Settlement,[1] providing for a $14,000,000 all-cash Settlement achieved after nearly four-years of hard-fought litigation. As detailed below and in the accompanying Declaration of Shannon Hopkins, the four-years of litigation allowed the Parties to carefully evaluate the potential strengths and weaknesses of the claims against the risks and costs of continued litigation and reach an excellent result for Settlement Class Members ("Class Members"). For example, Lead Plaintiff through Lead Counsel: filed *three* amended complaints and briefed two motions to dismiss, drafted and prepared a motion for class certification, complete with an expert report on market efficiency and Lead Plaintiff's proposed damages methodology, reviewed nearly one million pages of largely technical documents produced by Defendants and third-parties, defended depositions of Lead Plaintiff's expert and a former Corcept employee, retained and consulted with numerous experts, including those on Cushing's Syndrome ("CS"), the marketing of pharmaceutical and related FDA regulations, market efficiency, loss causation, and damages, and participated in *three* arm-length mediation sessions before Michelle Yoshida, Esq. of Phillips ADR Enterprises LLC. Hopkins Decl. at ¶6.

17

18

19

20

21

22

23

24

25

　　　This $14 million Settlement represents an excellent result for the Class Members. While Lead Plaintiff's estimate of maximum *theoretical* aggregate damages includes both corrective disclosures pled in the operative complaint, the Honorable Judge Lucy Koh dismissed with prejudice all claims relating to the January 31, 2019 corrective disclosure, ending the Class Period on January 24, 2019. ECF 145 at 45-47; *Id*. at ¶26. Thus, Lead Plaintiff's sole remaining corrective disclosure was a report published by the Southern Investigative Reporting Foundation on January 25, 2019 (the "SIRF Report"). Defendants advanced credible arguments that the SIRF Report contained information unrelated to the alleged off-label marketing scheme that would further reduce damages. After reducing damages for

26

27

28

---

[1] Unless otherwise defined herein, capitalized terms have the same meanings as in the Stipulation of Settlement (ECF 195-3) and the exhibits appended thereto.  Unless otherwise indicated, all emphasis has been added and all internal citations and quotation marks have been omitted.

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -1-

disclosures the Court previously dismissed and/or disclosures that are arguably unrelated to the alleged fraud, Lead Plaintiff's damages expert has preliminarily determined the most likely recoverable damages with respect to the January 25, 2019 corrective disclosure range from $22.1 to $63.5 million on a FIFO bases (or $19.5 to $55.8 million on a LIFO basis). Declaration of Kenneth N. Kotz ("Kotz Decl.", attached to the Hopkins Decl. as Exhibit 4) at ¶14. This Settlement represents *22% to 63.3%* of such damages on a FIFO basis (or 25% to 71.8% on a LIFO basis), which is up to approximately *eight* times the median percentage of recovery for similarly sized securities fraud cases from 2014 to 2022. *See* Hopkins Decl. at ¶46. This recovery is also *twelve* to *thirty-five* times higher than the median percentage of recovery for securities fraud cases in 2023. *Id*. This recovery, which is the only relief available to Class Members, is even more remarkable given the Department of Justice has not commenced litigation against Corcept despite investigating Corcept's marketing practices and receiving documents in response to its subpoena served on Corcept. Hopkins Decl. at ¶¶32-33.

The Settlement is a particularly good result for Class Members given the multiple credible arguments Defendants would raise on summary judgment and at trial. For instance, Defendants confirmed that they will challenge loss causation on the January 25, 2019 corrective disclosure, arguing that unrelated information about Corcept in the SIRF Report caused the stock to drop. Such information includes allegations relating to trial design flaws, Corcept's withdrawal of a related drug application in Europe, deaths arguably unrelated to Korlym, and high Korlym costs. If Defendants prevailed, they could eliminate damages attributed to the sole surviving corrective disclosure completely or, as set forth in the Kotz Declaration, would reduce damages by as much as 83%. *Id*. at ¶52; Kotz Decl. at ¶14.

Although Lead Plaintiff remains confident in its ultimate ability to prevail, Defendants would raise multiple other credible arguments, including challenging falsity and scienter by contending, in part, that no produced documents evidenced explicit instructions from any Individual Defendant to engage in off-label marketing. Defendants would further argue their statements were not false because: 1) whether to prescribe Korlym is within each doctor's discretion; 2) the FDA never objected to Korlym's marketing materials despite being aware of them, and 3) hypercortisolism, used in marketing materials, and CS, for which Korlym is sometimes an appropriate treatment, are the same. For scienter, Defendants would

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -2-

bolster their arguments by highlighting documents showing Corcept executives instructed employees to keep Korlym marketing to on-label uses, and the absence of any documents to the contrary.

Defendants undoubtedly would have also challenged class certification by contending, in part, that the challenged statements were too generic to impact Corcept's securities price and that few analysts commented on the challenged statements, undermining materiality, loss causation, and price impact. Hopkins Decl. at ¶¶57-58. Defendants would likely rely on the Second Circuit's recent opinion in *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 81 (2d Cir. 2023), which decertified the class and effectively ended the case after 13 years of litigation based on similar arguments.

The Settlement also avoids costly and lengthy litigation that would otherwise deplete resources available to Class Members, including *fifty-eight* remaining depositions, motions to compel, class certification, cross motions for summary judgment, pretrial motions, a jury trial, and appeals.

Class Members' reaction to the Settlement and Plan of Allocation has been positive. Pursuant to the Court's Order Granting Preliminary Approval of Settlement (ECF 201), the Court-approved Claims Administrator, A.B. Data Ltd. ("A.B. Data") has, *inter alia*, sent 17,385 postcard notices to potential Class Members and their nominees in accordance with procedures approved in the Preliminary Approval Order, posted the requisite documents to the Action's Settlement website, and caused the Summary Notice to be published in Investor's Business Daily and PR Newswire. Declaration of Kathleen Schumacher Regarding Notice Dissemination, Publication, and Requests for Exclusion Received ("Schumacher Decl.", attached to Hopkins Decl. as Exhibit 1) at ¶¶3-12. While the deadline for filing any objections or requests for exclusions does not expire until May 13, 2024, to date, none have been received. *Id*. at ¶¶14-15. Unless otherwise noted, all other relevant facts and conditions are as they were when this Court preliminarily approved the Settlement. Hopkins Decl. at ¶38.

Accordingly, Lead Plaintiff respectfully requests that the Court grant final approval of the Settlement and Plan of Allocation and finally certify the class for Settlement purposes.

## II.    PERTINENT FACTUAL AND PROCEDURAL BACKGROUND

This Action was filed on March 14, 2019. ECF 1. On October 7, 2019, after receiving five motions to appoint lead plaintiff and approve lead counsel, the Honorable Lucy H. Koh ("Judge Koh")

appointed the Ferraro Group as Lead Plaintiff and approved Lead Plaintiff's choice of Levi & Korsinsky, LLP ("LK") as Lead Counsel. *See* Hopkins Decl. at ¶22; ECFs 15, 17, 24, 29, 32, 82.

On December 6, 2019, after an extensive investigation by Lead Counsel, Lead Plaintiff filed the First Amended Complaint (ECF 91) alleging violations of the Securities and Exchange Act of 1934 ("Exchange Act") on behalf of all investors who purchased or otherwise acquired Corcept securities between August 2, 2017 and January 31, 2019, inclusive, and were damaged as a result. *Id*. at ¶23. Lead Plaintiff alleged that Defendants made materially false and misleading statements, which caused the price of Corcept's stock to be artificially inflated during the Class Period and that the misleading nature of such statements remained hidden until partial disclosures on January 25, 2019 and January 31, 2019 revealed Corcept's alleged reliance on off-label marketing of Korlym and decreased sales and sales forecasts as the off-label marketing practices came to light. *Id*.

On January 27, 2020, Defendants moved to dismiss the First Amended Complaint. ECF 95. In response to Defendants' motion, Lead Plaintiff filed the Second Amended Complaint on March 20, 2020 (ECF 100), providing additional factual support for its claims. On May 11, 2020, Defendants moved to dismiss the Second Amended Complaint. ECF 105; *Id*. at ¶24. The Court granted Defendants' motion without prejudice on November 20, 2020. *Id*.; ECF 124.

On December 21, 2020, Lead Plaintiff filed the operative 116-page Third Amended Complaint, and the attached 98-page false statement chart (ECF 127), alleging further factual support, including support from four former Corcept sales personnel. *Id*. at ¶25.

Defendants moved to dismiss the Third Amended Complaint on February 19, 2021. ECF 130. On August 24, 2021, Judge Koh granted in part and denied in part Defendants' motion to dismiss in a 47-page order. ECF 145. Judge Koh dismissed with prejudice each of Lead Plaintiff's claims with respect to seventeen of the alleged false statements and sustained each of Lead Plaintiff's claims with respect to the remaining thirteen allegedly false statements. *Id*. at ¶26. Judge Koh sustained Lead Plaintiff's loss causation allegations as to the January 25, 2019 corrective disclosure, but dismissed the January 31, 2019 corrective disclosure with prejudice. *Id*.; ECF 145 at 46.

On August 31, 2021, Judge Koh also stayed the case for ninety days so the Parties could explore

potential resolution of the Action. ECF 150. On November 29, 2021, the Parties attended a full-day mediation presided over by Michelle Yoshida, Esq. of Phillips ADR Enterprises LLC. The parties were unable to reach a settlement at that time. *Id*. at ¶27.

On December 9, 2021, Judge Koh entered a Case Management Order; Order Lifting Stay setting case deadlines and lifting the previously entered stay. ECF 153. The Action was then reassigned to the Honorable James Donato on January 7, 2022. ECF 156. At a case management conference on April 28, 2022, the Court advised the Parties that it would issue a new schedule and vacated the May 4, 2022 class certification deadline. ECF 172. Prior to the April 28, 2022 conference, Lead Plaintiff drafted a complete motion for class certification with a 48-page draft supporting expert report concerning market efficiency and a damages methodology for filing on May 4, 2022. On September 21, 2022, the Court entered a new scheduling order. *Id*. at ¶28; ECF 180.

Formal discovery began in January 2022. The Parties exchanged initial disclosures on January 7, 2022 and Defendants answered the Third Amended Complaint on February 4, 2022 (ECF 164). *Id*. at ¶29. The Court entered the Parties' Stipulated Protective Order on January 26, 2022 (ECF 159), and the Parties executed a Stipulated and Agreed Document Production Protocol on March 10, 2022. *Id*. The Parties served initial document requests on January 21, 2022 and served responses and objections thereto on February 22, 2022. *Id*. With respect to those requests and objections, the Parties actively exchanged emails and correspondence and met and conferred on the scope of discovery, search terms, and issues related to ESI. *Id*. On December 19, 2022, Lead Plaintiff served Defendants with a second set of requests for production. *Id*. Defendants ultimately produced 171,068 documents totaling over 757,200 pages, including Corcept emails, board materials, training and marketing materials, studies on CS, FDA materials and text messages from certain Corcept employees, among other categories. *Id*. at 30. Many of these documents were highly technical, dealing with complicated medical studies, testing for and diagnosing CS, FDA regulations, lengthy prescription spreadsheets classifying Korlym prescriptions, and other issues requiring expert analysis. Lead Plaintiff also produced 162 documents totaling over 2,100 pages. *Id*. On March 18, 2022, Defendants served their first set of interrogatories on Lead Plaintiff, to which Lead Plaintiff responded and objected on April 18, 2022. *Id*. During this period, the Parties

also engaged in extensive third-party discovery, having subpoenaed 47 non-parties who produced over 146,000 pages of documents. *Id*.

On December 12, 2022 and December 16, 2022, Defendants conducted the deposition of one of Lead Plaintiff's experts, Dr. Robert Cooper, and a former Corcept employee cited in the Third Amended Complaint as a confidential witness, respectively. *Id*. at ¶31. In November and December of 2022, the Parties noticed and scheduled an additional thirty-six depositions out of an anticipated sixty depositions. *Id*. On November 10, 2022, Lead Plaintiff further served Corcept with its Notice of Rule 30(b)(6) Deposition, to which Defendants responded and objected on December 9, 2022. *Id*.

While formal discovery was underway and after supplemental briefing, the Parties participated in a second mediation session before Ms. Yoshida on May 12, 2022, but were unable to resolve the Action. *Id*. at ¶34. In connection with the second mediation, Defendants produced over 60,000 pages of documents. *Id*. On December 23, 2022, the Court stayed this Action again to allow the Parties to explore a resolution of the Action. *Id*. at ¶35.  After exchanging extensive supplemental mediation briefing, the Parties participated in a third mediation session before Ms. Yoshida on January 24, 2023. *Id*.  While no settlement was reached during the formal session on January 24, 2023, Ms. Yoshida continued her active role in attempting to bring the Parties together for a resolution and the Parties exchanged additional offers and counteroffers. *Id*. Ultimately, on February 8, 2023, pursuant to a double-blind recommendation from Ms. Yoshida, the Parties reached an agreement in principle to settle and release all claims against Defendants in return for a cash payment of $14,000,000, subject to the execution of a customary "long form" stipulation agreement of settlement and related papers. *Id*.

On June 8, 2023, the Court held a hearing on Lead Plaintiff's motion for preliminary approval. ECF 198. On January 4, 2024, the Court issued an Order granting preliminary approval of the settlement ("Preliminary Approval Order") and directed the Parties, in part, to provide notice of the Settlement to the Settlement Class. ECF 201. As discussed herein and in the accompanying declaration of the Claims Administrator, the Claims Administrator has met all the requirements of the Preliminary Approval Order. *See generally* Schumacher Decl. Pursuant to the Court's Preliminary Approval Order, Lead Plaintiff now files the instant Motion for Final Approval of Proposed Class Action Settlement.

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -6-

## III.    ARGUMENT

### A.    Standards of Law Applicable to Final Approval

Rule 23(e) provides that a class action may be settled "with the court's approval." Fed. R. Civ. P. 23(e). The Ninth Circuit recognizes a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015); *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020); *see also Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004); *Arena v. Intuit Inc.*, 2021 WL 834253, at *6 (N.D. Cal. Mar. 5, 2021); *Larsen v. Trader Joe's Company*, 2014 WL 3404531, at *4 (N.D. Cal. July 11, 2014) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

Courts, however, should not convert approval into a merits inquiry, as "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Kastler v. Oh My Green, Inc.*, 2022 WL 1157491, at *3 (N.D. Cal. Apr. 19, 2022). The "question whether a settlement is fundamentally fair within the meaning of Rule 23(e) is different from the question whether the settlement is perfect in the estimation of the reviewing court. . . . Although Rule 23 imposes strict procedural requirements on the approval of a class settlement, a district court's only role in reviewing the substance of that settlement is to ensure that it is 'fair, adequate, and free from collusion.'" *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (*citing Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998)).

To determine whether a settlement is "fair, reasonable, and adequate" under Rule 23(e)(2), a court must consider whether:

> the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; (iv) and any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23 (e)(2).

Additionally, in order to evaluate the fairness, adequacy, and reasonableness of a proposed class settlement, courts in the Ninth Circuit are instructed to weigh the following non-exhaustive list of factors (the "*Churchill* factors"), which partly overlap with the requirements of Rule 23(e)(2):

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill*, 361 F.3d at 575 (*citing Hanlon*, 150 F.3d at 1026; *see also Lane*, 696 F.3d at 819; *Campbell*, 951 F.3d at 1121. No one factor controls, and the "importance to be attached to any particular factor" depends upon the claims asserted, relief sought, and unique facts of each individual case. *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. Of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982). "In certain cases, one factor alone may prove determinative in finding sufficient grounds for approval." *Knapp v. Art.com, Inc.*, 283 F. Supp. 3d 823, 830 (N.D. Cal. 2017).

Here, the Court's Preliminary Approval Order considered each of the Rule 23(e)(2) and Ninth Circuit factors when assessing the Settlement and found that it was fair, reasonable, and adequate, subject to further consideration at the final approval hearing. *See* ECF 201. The Court's conclusion on preliminary approval is equally true now, as nothing has substantively changed between January 4, 2024 and the present. Hopkins Decl. at ¶38; *see In re Chrysler-Dodge-Jeep EcoDiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2019 WL 2554232, at *2 (N.D. Cal. May 3, 2019) ("Those conclusions [drawn at preliminary approval] stand and counsel equally in favor of final approval now.").

**B.    Application of the Rule 23(e)(2) Factors and *Churchill* Factors Supports Approval of the Settlement as Fair, Reasonable, and Adequate**

**1.    Lead Plaintiff and Lead Counsel have more than Adequately Represented the Settlement Class (Rule 23(e)(2)(A) and Churchill Factor 6)**

"To determine legal adequacy, we resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *In re Hyundai & Kia Fuel Econ.*

*Litig.*, 926 F.3d 539, 566 (9th Cir. 2019). Lead Plaintiff and Lead Counsel have more than adequately represented the Settlement Class. As set forth in the previously filed motion for preliminary approval (ECF 195), Lead Counsel is highly qualified and experienced in securities litigation (*see* ECF 195-8) and zealously represented the interests of Class Members throughout the Action. *See* Hopkins Decl. at ¶¶92-94; *Cheng Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *5 (C.D. Cal. Oct. 10, 2019) (finding this factor satisfied where lead counsel "has significant experience in securities class action lawsuits"). Lead Plaintiff who, himself, is a class action and mass-tort litigator with forty years of experience and the founder of two law firms, closely monitored the litigation and mediation proceedings on behalf of Class Members to ensure that Lead Counsel obtained the best feasible result for Class Members. *See* Declaration of James L. Ferraro ("Ferraro Decl.", attached to the Hopkins Decl. as Exhibit 2) at ¶¶9, 13. The proposed Settlement is the result of nearly four years of diligent prosecution of this action on behalf of Class Members, including briefing three motions to dismiss and filing three amended complaints, drafting Lead Plaintiff's class certification motion, working with multiple experts concerning CS, FDA guidelines and marketing, market efficiency, and damages and loss causation, extensive discovery of highly technical documents, depositions, and three mediations. Hopkins Decl. at ¶¶6-7. Lead Counsel recommends this Settlement as fair, adequate, and reasonable and respectfully asks that it be finally approved. *Id*. at ¶18; *see See, e.g., Larsen*, 2014 WL 3404531, at *5 ("The opinions of counsel should be given considerable weight both because of counsel's familiarity with this litigation and previous experience with cases."); *Moorer v. StemGenex Med. Grp., Inc*., 2021 WL 640842, at *4 (S.D. Cal. Jan. 8, 2021) (giving deference to experienced counsel); *Rodriguez v. Nike Retail Servs., Inc.*, 2022 WL 254349, at *4 (N.D. Cal. Jan. 27, 2022) (noting "the experience and views of counsel . . . favors approving the settlement" and highlighting counsel's "thorough understanding of the strengths and weaknesses of th[e] case and their extensive experience" in prior cases).

Nor do Lead Plaintiff and Lead Counsel have any interests antagonistic to those of other Class Members. Instead, Lead Plaintiff's claims "arise from the same alleged conduct: the purchase of [Corcept's] stock at inflated prices based on Defendants' alleged … misstatements." *Cheng Jiangchen*, 2019 WL 5173771, at *5. Thus, the claims of Lead Plaintiff and the Settlement Class would prevail or

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -9-

fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiff and all members of the Class.

### 2. The Proposed Settlement Was Reached at Arm's-Length (Rule 23(e)(2)(B))

Rule 23 (e)(2)(B) asks whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). "[The Ninth Circuit] put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("*Rodriguez*"). As set forth above, the proposed Settlement was achieved only after three mediation sessions before an experienced mediator, as well as various teleconferences and correspondences through Ms. Yoshida regarding a potential resolution of the Action. *See* Hopkins Decl. at ¶35. These negotiations were concluded on February 8, 2023, when the Parties agreed to a double-blinded mediator's proposal, informed by knowledge Lead Counsel gained from their investigation and analysis of the facts and legal issues, including consultation with Lead Plaintiff's damage consultant. *See Id*. Thus, this factor supports Settlement approval. *Satchell v. Fed. Express Corp.,* 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."); *Walsh v. CorePower Yoga LLC*, 2017 WL 4390168, at *7 (N.D. Cal. Oct. 3, 2017) (mediator's presence "strongly suggests the absence of collusion or bad faith by the parties or counsel"); *In re Netflix Priv. Litig.*, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) (settlement presumed reasonable "where that agreement was the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel"); *Gretler v. Kaiser Found. Health Plan, Inc.*, 2019 WL 8198308, at *3 (C.D. Cal. Mar. 18, 2019) ("One important factor is that the parties reached the settlement after significant arms-length negotiations with a third-party mediator.").

### 3. The Proposed Settlement is Adequate Considering the Costs, Risk, and Delay of Trial and Appeal (Rule 23(e)(2)(C)(i) and *Churchill* Factors 1 through 4)

Pursuant to Rule 23(e)(2)(C), the Court must consider the adequacy of relief to the Settlement Class given "the costs, risks, and delay of trial and appeal" and the relevant overlapping Churchill Factors 1-4 addressing "the strength of the plaintiffs' case", "the risk, expense, complexity, and likely duration of further litigation", "the risk of maintaining class action status", and "the amount offered in

settlement." Fed. R. Civ. P. 23(e)(2); *Churchill*, 361 F.3d at 575. As set forth below, the benefits the Settlement confers greatly outweigh the costs, risks, and delay of further litigation, further confirming the adequacy and reasonableness of the Settlement.

### a. The Settlement Amount is Fair and Reasonable

The $14 million Settlement is fair and reasonable. As detailed in the Hopkins Declaration, Lead Plaintiff's damages consultant has estimated the *maximum theoretical* damages in this Action based on the longest alleged class period of August 2, 2017 through January 31, 2019 to be approximately $185.2 million if calculated on a FIFO basis and $161.4 million if calculated on a LIFO basis. Hopkins Decl. at ¶44. The $14 million recovery represents approximately 8% of the *maximum theoretical* damages on a FIFO basis (or 9% on a LIFO basis). This recovery is demonstrably fair and is approximately *twice* the median percentage of recovery for similarly sized cases in both 2023 and from 2014 through 2022 as reported by Cornerstone Research. *See* L.T. Bulan, L.E. Simmons, *Securities Class Action Settlements, 2023 Review and Analysis*, Cornerstone Research (2024) at 6 (stating that the median comparable securities class action settlements in Rule 10b-5 cases in 2023 and in 2014 – 2023 resulted in a recovery of 3.5% and 4% of estimated damages, respectively) ("Cornerstone Research", attached to Hopkins Decl. as Exhibit 5); *see also* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* at 25-26, Figures 21, 22 (NERA Jan. 23, 2024) (median ratio of settlement to investor losses for comparable securities class actions was 2.9% from January 2014 – December 2023 and was 1.8% overall in 2023) ("NERA", attached to Hopkins Decl. as Exhibit 6).

While Lead Plaintiff's maximum theoretical aggregate damages includes both corrective disclosures initially pled, Judge Koh dismissed the January 31, 2019 corrective disclosure, twice, the second time with prejudice. ECF 145. As such, Lead Plaintiff's ability to prevail on challenged statements in connection with the January 31, 2019 corrective disclosure are dependent on Lead Plaintiff successfully overturning Judge Koh's ruling on appeal. Limited to the only surviving corrective disclosure of January 25, 2019, Lead Plaintiff's damages consultant estimates *maximum theoretical* damages of approximately $120.3 million if calculated on a FIFO basis and $105.4 million if calculated on a LIFO basis. Hopkins Decl. at ¶45. As such, with respect to the only surviving corrective disclosure,

the Settlement represents approximately 12% of the maximum theoretical aggregate damages on a FIFO basis, or 13% on a LIFO basis. *See Id.* These recoveries are *more than double* recoveries in similar securities fraud class actions. *See* Cornerstone Research at 6 (median comparable securities class action settlements in Rule 10b-5 cases in 2023 and in 2014 – 2022 resulted in a recovery of 5.3% of estimated damages); *see also* NERA at 25-26, Figures 21, 22 (median comparable securities class action settlements in January 2014 – December 2023 resulted in recoveries of 2.9% of estimated damages, and median ratio of settlement to investor losses for securities fraud class actions overall in 2023 was 1.8%).

When considering Defendants' credible arguments that damages should be further reduced to disaggregate negative information disclosed in the SIRF Report that was unrelated to the alleged off-label marketing scheme, Plaintiff's damages consultant estimates damages of approximately $22.1 to $63.5 million on a FIFO basis, or 22% to 63.3%% of the most likely damages, which is up to approximately *eight* times the median percentage of recovery for similarly sized securities fraud cases from 2014 to 2022. *See* Hopkins Decl. at ¶46; Cornerstone Research at 6. This recovery is also *twelve* to *thirty-five* times higher than the median percentage of recovery for securities fraud cases in 2023. *See* Hopkins Decl. at ¶46; NERA at 26.

All these recoveries far exceed comparable securities class action settlements and are a very good result for any stage of the litigation. *See Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (approving $10 million settlement representing 2% of estimated damages); *Extreme Networks, Inc. Sec. Litig.,* 2019 WL 3290770, at *9 (N.D. Cal. Jul 22, 2019) (approving $7 million settlement recovering between 5% and 9.5% of estimated maximum damages); *In re Regulus Therapeutics Inc. Sec. Litig.*, 2020 WL 6381898, at *6 (S.D. Cal. Oct. 30, 2020) (approving $900,000 settlement representing "a recovery of 1.99% of total estimated damages" noting that "[o]ther courts have found similar recoveries to be fair and reasonable."); *McPhail v. First Command Fin. Planning, Inc.*, 2009 WL 839841, at *5 (S.D. Cal. Mar. 30, 2009) (approving $12 million settlement recovering 7% of estimated damages); *In re Splunk Inc. Sec. Litig.*, 2024 WL 923777, at *6 (N.D. Cal. Mar. 4, 2024) ($30 million settlement that was 5% to 20.5% of the "realistic maximum damages" was "a good result for the class."). Thus, the Settlement's benefits weigh heavily in favor of preliminary approval.

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -12-

### b. The Costs and Risks of Continued Litigation and Trial

Rule 23 (e)(2)(C)(i), which incorporates *Churchill* Factors 1, 2 and 3, requires the Court to weigh the cost, risk, and delay of further litigation against the result achieved. It is undisputed that "'securities actions are highly complex and . . . securities class litigation is notably difficult and notoriously uncertain.'" *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018); *see also Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at *6 (S.D. Cal. Dec. 6, 2018) (recognizing that "[s]ecurities class actions are complex actions to litigate" and often involve "complex and highly risky trial and likely post-trial appeals and motion practice"). While Lead Plaintiff remains confident in its ability to ultimately prove its claims at trial, Defendants advanced several credible arguments disputing both liability and damages. Lead Counsel anticipates that Defendants would continue to make these arguments at summary judgment and trial.

**First**, Defendants were successful in obtaining dismissal of the January 31, 2019 corrective disclosure with prejudice, thereby eliminating those damages. Even if Lead Plaintiff could establish liability, Defendants would also argue that Lead Plaintiff would be unable to show what part of the stock-price decline for the surviving January 25, 2019 corrective disclosure is attributable to the alleged fraud as opposed to other confounding information. Hopkins Decl. at ¶¶50-51. To succeed at trial "a plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

Defendants had several credible arguments that the January 25, 2019 SIRF Report contained confounding information unrelated to the alleged off-label marketing scheme of Korlym that impacted Corcept's stock price. For example, the SIRF Report alleged that: 1) the FDA found that "Korlym's trial design was flawed without the testing of an approved comparator drug…"; 2) Corcept "withdrew its application for Corluxin (a renamed Korlym)" in Europe, citing "strategic business reasons for ending the process"; 3) there were "103 deaths reported for Korlym since 2012"; and 4) Korlym is expensive where an estimated "yearly cost would be $308,000." Hopkins Decl. at ¶51. Giving some credence to Defendants' challenges, the Honorable Judge Koh acknowledged that the disclosure of deaths related to

Korlym were unrelated to the alleged fraud because they did not mention Corcept's off-label marketing or sales practices. *See* ECF 145 at 45; *see also Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *2 (C.D. Cal. May 6, 2014) (approving settlement in securities case where "[p]roving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law" and "[t]he outcome of that analysis is inherently difficult to predict and risky"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744- 745 (S.D.N.Y. 1985) (approving settlement where "it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions"), *aff'd*, 798 F.2d 35 (2d Cir. 1986).

These credible arguments, if successful, would establish that Corcept's price dropped due to unrelated news in the only remaining corrective disclosure, eliminating any damages available to Class Members or reducing them by up to 83%. *See* Section (B)(3)(A), *supra*; Kotz Decl. at ¶14.

**Second**, Defendants disputed the falsity of the challenged statements. For example, while Lead Plaintiff argued Corcept's marketing materials contained implicit off-label marketing messages by inclusion of case studies using Korlym off-label, there were no marketing materials produced in discovery where any Individual Defendant explicitly instructed Corcept sales personnel to prescribe Korlym off-label as a "bridge to surgery" or first-line therapy. *See* Hopkins Decl. at ¶¶53-54. Likewise, while Lead Plaintiff contended that Corcept impliedly marketed Korlym for off-label uses, there is no specified testing regiment for diagnosing CS. Instead, it is within each doctor's discretion to decide which tests to run, whether to run multiple tests—and how many, and whether to prescribe Korlym. These difficulties would present significant hurdles to winning summary judgment or trial. *Id*. at ¶55.

Further, to refute the contention that it marketed Korlym off-label, Corcept repeatedly asserted that the FDA was aware of its marketing practices and never objected to them. Evidence to date shows that Corcept did send its marketing materials to the FDA and, to Lead Plaintiff's knowledge, the FDA has not objected to them as being off-label. *Id*. at ¶56. Defendants also contend that hypercortisolism, which is used in Corcept's marketing materials, and CS, for which Korlym was sometimes an appropriate treatment, are the same. *Id*. at ¶53. These arguments would further complicate any potential

victory at summary judgment or trial. It is also worth noting that neither the DOJ who subpoenaed Corcept in 2021, nor the SEC, has filed any off-label marketing action against Corcept. *Id.* at ¶33.

**Third,** Defendants vigorously disputed that Lead Plaintiff would be able to establish scienter at summary judgment and trial. Indeed, while Lead Plaintiff's allegations may have been sufficient at the pleading stage, to date, Lead Plaintiff has not received any documents establishing that any Individual Defendant instructed Corcept employees to engage in off-label marketing. Hopkins Decl. at ¶54. Nor has Lead Plaintiff received evidence that any physician complained to any defendant about off-label marketing. *Id.* To the contrary, some documents produced establish that Corcept executives instructed employees to keep Korlym marketing to on-label uses. *Id.*; *See In re Immune Response Sec. Litig.*, 497 F. Supp. 2d 1166, 1172 (S.D. Cal. 2007) ("scienter . . . [is] complex and difficult to establish at trial.").

**Fourth**, Defendants stated that they would also challenge the efficiency of the market for Corcept's securities at class certification, potentially precluding class certification. Hopkins Decl. at ¶57. For example, Defendants have contended (among other things) that the challenged statements were too generic to have impacted the price of Corcept's securities. *Id.* Bolstering the argument, Lead Plaintiff is only aware of four non-duplicative media and analysts reports commenting on the alleged false statements or the SIRF Report, undermining materiality, loss causation, and price impact. *Id.* Further, Defendants would challenge market efficiency, arguing, *inter alia*, that since the SIRF Report relies entirely on publicly available information that was available to the market prior to January 25, 2019, the public allegations in the SIRF Report were already reflected in the Company's stock price. *Id.*

Indeed, the Second Circuit's recent decision in *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 81 (2d Cir. 2023) heightened these very same concerns, where the court, after approximately 13 years of litigation, decertified the class and effectively ended the case in finding statements about Goldman's business practices and approach to conflicts-of-interest management were too "generic" to have impacted Goldman's stock price, and there was an insufficient nexus between the front-end statement and back-end price decline. *Id.* at 105. As Defendants contend the challenged statements were too generic to have impacted Corcept's stock price, Defendants would no doubt have challenged price impact at class certification, summary judgment, and trial. Hopkins Decl. at ¶58. While

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -15-

Lead Plaintiff is confident that a class would have been certified, there was an ongoing risk that any certified class could have been disturbed prior to trial or on appeal if Defendants successfully moved to decertify the Class. *See* Fed. R. Civ. P. 23 (c)(1) (class may be decertified any time prior to a decision on the merits); *Rodriguez*, 563 F.3d at 966 ("A district court may decertify a class at any time.").

While the potential of achieving any recovery at summary judgment or trial is uncertain, costs and delay to prepare again for class certification, summary judgment, and trial would undoubtedly be immense, further diminishing resources otherwise available to satisfy a potential judgment. *See Hsu v. Puma Biotechnology, Inc.*, No. 8:15-cv-00865, ECF 913 (C.D. Cal. Aug. 3, 2022) (granting final approval of securities class action settlement 2.5 years after a February 4, 2019 jury verdict in plaintiff's favor following trial). Ongoing delay and costs would include, *inter alia*: 1) taking *fifty-eight* remaining depositions with at least twenty-eight in-person; 2) further consulting with multiple experts with the preparation of opening and rebuttal expert reports and expert depositions concerning CS, FDA marketing regulations, market efficiency, damages, and loss causation; 3) briefing motions to compel, class certification, cross motions for summary judgment, *Daubert* and other pretrial motions; and 4) persuasively explaining these complicated and confusing issues to jurors. *See Rodriguez*, 563 at 966 (favoring settlement and finding this factor satisfied where "[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years"); *In re Linkedin User Priv. Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Generally, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

Moreover, as set forth *supra*, further litigation presents absolutely no guarantee that Lead Plaintiff or the Settlement Class would achieve any recovery, let alone a recovery greater than that provided by the proposed Settlement. *See Destefano v. Zynga Inc.*, 2016 WL 537946, at *10 (N.D. Cal. Feb. 11, 2016) ("continuing litigation would not only be costly – representing expenses that would take away from any ultimate class-wide recovery – but would also delay resolution and recovery for Settlement Class Members"). It is entirely possible that even if Lead Plaintiff were able to secure a judgment against Defendants, it might ultimately recover nothing and the Class would receive no compensation from the litigation. *See, e.g., In re Apollo Grp., Inc. Sec. Litig.*, 2008 WL 3072731, at *6

(D. Ariz. Aug. 4, 2008), *rev'd and remanded*, 2010 WL 5927988 (9th Cir. June 23, 2010) (district court vacated plaintiffs' verdict and entered judgment in favor of defendants); *Robbins v. Koger Properties., Inc.*, 116 F.3d 1441 (11th Cir. 1997) ($81 million plaintiffs' verdict reversed).

One of the key factors in evaluating a proposed settlement is the risk of continued litigation balanced against the certainty and immediacy of recovery from a settlement. Ultimately, while Lead Plaintiff and Lead Counsel maintain they have a strong case, significant uncertainties remain going forward. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 255 (N.D. Cal. 2015) (Corley, Mag. J.) ("In light of the risks and costs of continued litigation, the immediate rewards to class members are preferable."); *Dennis v. Kellogg Co.*, 2013 WL 6055326, at *3 (S.D. Cal. Nov. 14, 2013) ("[S]ettlement avoids the risks of extreme results on either end, i.e., complete or no recovery. Thus, it is plainly reasonable for the parties at this stage to agree that the actual recovery realized and risks avoided here outweigh the opportunity to pursue potentially more favorable results through full adjudication."); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (recognizing the delay and risk inherent in an appeal by defendants and "an immediate and certain award" supports approval of a settlement versus the risk of receiving nothing from continued litigation).

In contrast to certain delay and mounting costs, without any guarantee of recovery, "the Settlement provides […] timely and certain recovery." *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2020 WL 4212811, at *9 (N.D. Cal. July 22, 2020), *aff'd*, 2022 WL 2304236 (9th Cir. June 27, 2022). The $14-million Settlement thus balances the risks, costs, and delay inherent in complex cases and is a meaningful recovery that is in the Class's best interests. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993).

### 4. The Proposed Method for Distributing Relief is Effective (Rule 23(e)(2)(C)(ii))

The method for distributing relief to eligible claimants and for processing Class Members' claims includes standard, well-established, and effective procedures for processing claims and efficiently distributing the Net Settlement Fund and is therefore an effective method of distribution to the Class under Rule 23(e)(2)(C)(ii). Pursuant to the Preliminary Approval Order, more than 17,385

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -17-

Postcard Notices were disseminated to potential Class Members and nominees; the Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire*; and the website created for this Action, www.CorceptSecuritiesLitigation.com, contains key documents, including the Stipulation of Settlement, Notice, Proof of Claim, and Preliminary Approval Order. *See generally* Schumacher Decl. Further, the claims process includes a standard claim form requesting information necessary to calculate a claimant's claim amount pursuant to the Plan of Allocation, which governs how Class Members' claims will be calculated and how money will be distributed to Authorized Claimants. The Plan of Allocation was prepared with the assistance of Lead Plaintiff's damages expert and is based primarily on the expert's event study and estimation of the amount of artificial inflation in the price of Corcept common stock and options during the Class Period. *See* Section D, *infra*.

Once the Claims Administrator has processed all submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, distributions will be made to eligible claimants pursuant to the Plan of Allocation. If any portion of the Net Settlement Fund remains following distribution pursuant to the Plan of Allocation and is of such an amount that in the discretion of Lead Counsel it is not cost effective to redistribute the amount to the Settlement Class, then such remaining funds, after payment of any further Notice and Administration Costs and Taxes, shall be donated to, subject to Court approval, the Investor Protection Trust, a 501(c)(3) non-profit dedicated to investor education and protection, with which neither Lead Plaintiff nor Lead Counsel are affiliated. *See Fleming v. Impax Laby's, Inc.*, 2022 WL 2789496, at *2 (N.D. Cal. July 15, 2022) (approving Investor Protection Trust as *cy pres* recipient in securities settlement).

### 5. Lead Counsel's Request for Attorneys' Fees is Reasonable (Rule 23(e)(2)(C)(iii))

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). The terms of Lead Counsel's proposed award of attorneys' fees are discussed in Lead Counsel's accompanying Motion for Attorneys' Fees, Reimbursement of Expenses, and Award of Costs and Expenses to Lead Plaintiff ("Fee and Expense Application"), submitted herewith. Lead Counsel seeks an award of attorneys' fees of 25% of the

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR FINAL APPROVAL OF PROPOSED SETTLEMENT -18-

Settlement Fund and expenses not to exceed $975,000 pursuant to the common fund doctrine. *See* Hopkins Decl. at ¶80. As set forth in the lodestar report submitted herewith, Lead Counsel's lodestar represents more than double the requested fee award and results in a significant ***negative "multiplier"*** of 0.4. Hopkins Decl. at ¶85. This fee was fully disclosed in the Postcard Notice (Ex. A to Schumacher Decl.), approved by Lead Plaintiff (Ferraro Decl. at ¶16), and is consistent with the 25% benchmark for attorneys' fee awards in this Circuit. *See Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("[t]his circuit has established 25% of the common fund as a benchmark award for attorney fees.") Further, a negative multiplier, like the one here, is presumptively reasonable because it means Lead Counsel is seeking to be paid "for only a portion of the hours that they expended on the action." *In re Amgen Inc. Sec. Litig.*, 2016 WL 10571773, at *9 (C.D. Cal. Oct. 25, 2016); *see also Regulus Therapeutics*, 2020 WL 6381898, at *7 ("a multiplier less than 1.0 is below the range typically awarded by courts and is presumptively reasonable").

### 6. No Other Agreements Weigh Against Final Approval (Rule 23(e)(2)(C)(iv))

Rule 23(e)(2)(C)(iv) asks the Court to consider the fairness of the proposed Settlement in light of any agreement required to be identified under Rule 23(e)(3). Here, the only agreements made by the Parties in connection with the Settlement are the Stipulation of Settlement and the confidential Supplemental Agreement concerning the circumstances under which Defendants may terminate the Settlement based upon the number of exclusion requests. Hopkins Decl. at ¶40, n.5; *see* Stipulation (ECF 195-3) ¶12.2. It is standard to keep such agreements confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class.

### 7. The Proposed Plan of Allocation Treats Class Members Equitably (Rule 23(e)(2)(D))

Pursuant to Rule 23(e)(2)(D), the Plan of Allocation must "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Assessment of the Settlement's Plan of Allocation "is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d at 1045. As

set forth more fully in Section D, *infra*, the Plan of Allocation details how the Settlement Fund will be distributed among Authorized Claimants and provides formulas for calculating the recognized claim of each Authorized Claimants based on each purchase or acquisition of Corcept securities during the Class Period and if or when they sold. It is fair, reasonable, and adequate because all eligible Class Members (including Lead Plaintiff) will be subject to the same formulas for distribution of the Settlement and each Authorized Claimant will receive a pro rata share of the distribution. *See Longo v. OSI Sys., Inc.*, 2022 U.S. Dist. LEXIS 158606, at *18 (C.D. Cal. Aug. 31, 2022) ("Specifically, each authorized claimant's share of the net settlement amount will be based on when the claimant acquired and sold the subject securities. Accordingly, this factor also weighs in favor of final approval.").

### 8.   The Extent of Discovery Completed and Stage of the Proceedings Further Supports Final Approval (*Churchill* Factor 5)

The stage of proceedings and extent of discovery further supports the Settlement because the Settling Parties had a thorough understanding of the arguments and evidence prior to reaching the Settlement. Lead Plaintiff, through Lead Counsel, had, *inter alia*: (i) conducted a detailed investigation into the claims asserted in the Action and drafted three amended complaints; (ii) opposed two motions to dismiss; (iii) drafted and prepared Lead Plaintiff's motion for class certification, supported by a fully drafted expert report; (iv) extensively consulted with experts on CS, the marketing of pharmaceutical drugs and related FDA regulations, market efficiency, loss causation, and damages; (v) conduced a detailed review of Corcept public filings, annual reports, press releases, and other publicly available information; (vi) reviewed analyst reports and articles relating to Corcept; (vii) researched applicable law with respect to the claims and defenses asserted in the Action; (viii) drafted and responded to written discovery requests; (ix) reviewed and analyzed over 750,000 pages of documents produced by Defendants, 146,000 pages of documents produced by third-parties, and over 2,100 pages of documents produced by Lead Plaintiff; (x) participated in the depositions of one of Lead Plaintiff's experts and a former Corcept employee; and (xi) drafted and exchanged three detailed mediation statements with Defendants. Thus, Lead Plaintiff and Lead Counsel thoroughly examined the issues and relative strengths and weaknesses of the claims and defenses. Hopkins Decl. at ¶86. *See Foster v. Adams &*

*Assocs., Inc.*, 2022 WL 425559, at *6 (N.D. Cal. Feb. 11, 2022) (finding "[p]laintiffs were 'armed with sufficient information about the case' to broker a fair settlement" given extensive discovery, years of litigation, and multiple settlement conferences); *Bellinghausen*, 306 F.R.D. at 257 (factor supported approval where parties had litigated multiple motions to dismiss, engaged in formal and informal discovery, prepared detailed mediation briefs and participated in mediation); *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *4 (N.D. Cal. Nov. 26, 2007) ("The settlement reflects three and a half years of completed work . . . As a result, the true value of the class's claims [were] well-known.").

### 9.   No Governmental Entity Participated in this Action (*Churchill* Factor 7)

Courts may also consider the impact of a governmental participant in the litigation. No such actor is present in this litigation. In such situations, courts have found that this consideration is inapplicable. *Nat'l Rural Telecomms. Coop v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("There is no governmental participant in this Class Action. As a result, this factor does not apply to the Court's analysis."); *Mendoza v. Hyundai Motor Co.*, 2017 WL 342059, at *7 (N.D. Cal. Jan. 23, 2017).[2] Further, the relevant governmental officials were notified of the settlement pursuant to the notice provision of the Class Action Fairness Act ("CAFA"). Hopkins Decl. at ¶70. "Although CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *See Bellinghausen*, 306 F.R.D. at 258. Lead Counsel is aware of no state or federal official that has raised an objection or concern regarding the settlement. Hopkins Decl. at ¶70. Thus, even if considered, this factor weighs in favor of settlement.

### 10.  The Settlement Class's Reaction Supports Approval (*Churchill* Factor 8)

The final *Churchill* factor considers the reaction of the Settlement Class. In this case, after

---

[2] On February 15, 2022, Corcept filed a Form 10-K disclosing that it had received a subpoena in November of 2021 from the U.S. Attorney's Office for the District of New Jersey ("NJ USAO"). To Lead Plaintiff's knowledge, the NJ USAO has received discovery but has not brought an action. Additionally, the NJ USAO has not participated in this Action. Hopkins Decl. at ¶33. *Draney v. Wilson, Morton, Assaf & McElligott*, 1985 WL 5820, at *4 (D. Ariz. Sep. 30, 1985) (factor inapplicable where governmental entity conducted investigation but did not prosecute or initiate proceedings).

dissemination of the Notice and having given Class Members an opportunity to consider the merits of the Settlement, to date, the Settlement Class overwhelmingly supports the Settlement. Although the deadline to object or opt out is May 13, 2024, to date, no purported Class Member has elected to opt out of the settlement and no objections have been received. Hopkins Decl. at ¶69; Schumacher Decl. at ¶14-15. As of the date of this Motion, 17,385 Postcard Notices were disseminated to potential Class Members, 121 of which were undeliverable and remailed by A.B. Data. Schumacher Decl. at ¶10. This kind of positive reaction on the part of the Settlement Class supports final Settlement approval. *See Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."). Lead Plaintiff will update the Court on Reply of any opt outs and/or objections received after the filing of this motion and respond accordingly.

### C.    The Court-Approved Notice Comports with Due Process

Before the Court may grant final approval of a settlement, Fed. R. Civ. P. 23(c)(2) requires that the Court determine that the settlement (i) provides the class with the "best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B) and (ii) the notice requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") must be met, 15 U.S.C. § 78u-4(a)(7). At preliminary approval, the Court approved the Notice plan as to form and content. ECF 201. Upon preliminary approval, Lead Plaintiff implemented the Notice plan in compliance with due process and Rule 23. Hopkins Decl. at ¶¶61-66.

Pursuant to the Court's Preliminary Approval Order, Postcard Notice was disseminated on January 26, 2024 to all Class Members who could be identified with reasonable effort. Hopkins Decl. at ¶61; Schumacher Decl. at ¶10. Since receiving preliminary approval, the Claims Administrator, A.B. Data, disseminated a total of approximately 17,385 copies of the Postcard Notice in this fashion. Schumacher Decl. at ¶10.

The Summary Notice was additionally published in *Investor's Business Daily* and over *PR Newswire* on February 5, 2024. Hopkins Decl. at ¶61; Schumacher Decl. at ¶11.

Further, both the emailed and mailed postcard notice included a direct link to this Action's case-specific Settlement website (www.CorceptSecuritiesLitigation.com), which contains the long-form Notice and other required information. Hopkins Decl. at ¶65; Schumacher Decl. at ¶12. The settlement website went live on January 26, 2024. Hopkins Decl. at ¶65; Schumacher Decl. at ¶12. The website contains the Notice, Postcard Notice, Proof of Claim and Release Form, Settlement Stipulation, and copies of relevant Court documents. Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and supporting papers and Lead Plaintiff's Motion for Attorneys' Fees, Reimbursement of Expenses, and Award of Costs and Expenses to Lead Plaintiff and supporting papers will also be posted on the website when filed. *Id.*

In response to the notice provided by A.B. Data, as of the date of this filing, there have been no requests for exclusion and no objections to the Settlement. Hopkins Decl. at ¶69. The last day to file objections is May 13, 2024. Should any objections be filed after the filing of this Motion, Lead Plaintiff will respond in its reply brief to be filed on May 30, 2024.

Consistent with Fed. R. Civ. P. 23(c)(2)(B) and 15 U.S.C. § 78u-4(a)(7), the Notice: (a) described the nature of the claims asserted in the Action; (b) included a definition of the Class; (c) summarized the Settling Parties' reasons for entering into the Settlement and relief provided by the Settlement; (d) stated that Class Members may retain their own attorney; (e) listed the name, telephone number, and address for Lead Counsel; (f) disclosed that Lead Counsel intends to seek attorneys' fees of up to 25% of the Settlement Fund, plus reimbursement of expenses not to exceed $975,00, and an award for Lead Plaintiff not to exceed $15,000; (g) provided the date, time, and location of the Final Settlement Hearing; (h) advised Class Members of their right to appear at the Final Settlement Hearing and instructed them that the date may change; (i) advised Class Members of their right to exclude themselves from the Class and the binding effect of doing so; (j) provided the deadline and procedure for opting out of or opposing the Settlement, Plan of Allocation, award of attorneys' fees and expenses, or the award to Lead Plaintiff; (k) explained the consequences of remaining in the Class; and (l) provided the manner in which to obtain more information, including the address for the designated website. Hopkins Decl. at ¶62.

As such, the "best notice practicable" was disseminated to all potential Class Members that could

be reasonably identified. *See, e.g., Fleming*, 2022 WL 2789496, at *5-6; *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 6902856, at *4 (N.D. Cal. Nov. 21, 2016).

### D. The Plan of Allocation Should be Finally Approved

Lead Plaintiff seeks final approval of the Plan of Allocation that the Court preliminarily approved on January 4, 2024. ECF 201. The Plan of Allocation is considered separately from the fairness of the Settlement but is nevertheless governed by the same legal standards: the plan must be fair and reasonable. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992); *see also Vataj v. Johnson*, 2021 WL 1550478, at *10 (N.D. Cal. Apr. 20, 2021) ("an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel."); *In re Heritage Bond Litig.*, 2005 WL 1594403, at *11 (C.D. Cal. June 10, 2005).

As more fully detailed in the Notice, the Plan of Allocation assumes that the price of Corcept common stock was artificially inflated throughout the Settlement Class Period. The computation of the estimated alleged artificial inflation in the price of Corcept common stock is based on the fraudulent conduct alleged by Lead Plaintiff and the price change in the stock, net of market and industry-wide factors, in reaction to the SIRF Report published on January 25, 2019 and Corcept's press release on January 31, 2019 that allegedly revealed Corcept's purported reliance on off-label marketing of Korlym and decreased sales and sales forecasts as the off-label marketing practices came to light. In order for a Class Member to have a Recognized Loss under the Plan of Allocation, Corcept common stock must have been purchased or acquired during the Settlement Class Period and held through a Corrective Disclosure Date. This is the traditional and reasonable approach to allocating securities settlements. *See Mauss v. NuVasive, Inc.*, 2018 WL 6421623, at *4 ("'A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable.'").

Further, the Plan of Allocation provides a specific formula for computing each Class Member's "Recognized Loss" as described in the Notice. Recognized Losses are calculated based on whether a Class Member held common stock, call options, or put options. The Claims Administrator will determine each Authorized Claimant's pro rata share of the Net Settlement Fund based upon each Authorized Claimant's Recognized Loss. As set forth more fully in the Notice, the Plan of Allocation

establishes an appropriate discount of 75% to the extent Class Members' damages rely upon the alleged January 31, 2019 corrective disclosure that the Court previously dismissed (ECF 124, 145) to acknowledge additional risks of repleading and proving damages with respect to the January 31, 2019 corrective disclosure, while also taking into account Lead Plaintiff's right to seek further leave to amend or challenge the dismissal on appeal. *See In re PNC Financial Services Group, Inc.*, 440 F. Supp. 2d 421, 428 (W.D. Pa. 2006) (approving 40% discount in plan of allocation proposed by lead counsel to reflect "inherent risk and additional difficulties in establishing claims based on purchases after [first corrective disclosure]."); *In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 343 F. Supp. 3d 394, 415 (S.D.N.Y. 2018) (approving plan of allocation that discounted the recovery of an institutional subclass by 75% "based on the reasonably held position" of lead counsel that the subclass was susceptible to a unique defense and that discounting would "ensure equitable treatment" for all class members).[3]

The Plan of Allocation comports with the criteria set forth in case law governing the approval of such allocation. It has a "reasonable" and "rational basis," makes intra-class allocations based upon the "the timing of purchases and sales of the securities at issue," and was formulated by Lead Plaintiff, Lead Counsel, and a damage consultant. In addition, nothing about the Settlement or Plan of Allocation gives preferential treatment to Lead Plaintiff. *See Ciuffitelli v. Deloitte & Touche LLP*, 2019 WL 1441634, at *18 (D. Or. Mar. 19, 2019) (finding "[t]he Proposed Settlement does not provide preferential treatment to Plaintiffs or segments of the class" where "the proposed Plan of Allocation compensates all Class Members and Class Representatives equally in that they will receive a *pro rata* distribution based of the Settlement Fund based on their net losses").

## **CONCLUSION**

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court grant final approval of the Settlement and Plan of Allocation.

---

[3] *In re Facebook, Inc.*, 1:12-MD-02389, ECF 586, at 23 (S.D.N.Y. Aug. 1, 2018) (stating that "for members of the Institutional Investor Subclass, their 'Recognized Claim,' which is used as the basis for the final pro rata distribution among all Eligible Claimants, will be calculated as 25% of their calculated Net Recognized Loss Amount.").

Dated: March 14, 2024

**LEVI & KORSINSKY, LLP**

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

*Counsel for Lead Plaintiffs the Ferraro Family*
*Foundation, Inc. and James L. Ferraro*

LEAD PLAINTIFF'S MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FOR
FINAL APPROVAL OF PROPOSED SETTLEMENT -26-

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on March 14, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of all counsel of record.


/s/ *Shannon L. Hopkins*
Shannon L. Hopkins