**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (admitted *pro hac vice*)
Gregory M. Potrepka (admitted *pro hac vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com

*Counsel for Lead Plaintiff the*
*Ferraro Family Foundation, Inc.,*
*and James L. Ferraro*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| FERRARO FAMILY FOUNDATION, INC. and JAMES L. FERRARO, on behalf of themselves and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CORCEPT THERAPEUTICS INCORPORATED, JOSEPH K. BELANOFF, CHARLES ROBB, and SEAN MADUCK,<br><br>Defendants. | Case No. 3:19-CV-01372-JD<br><br>**CLASS ACTION**<br><br>**DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF**<br><br>Date:    June 6, 2024<br>Time:    10:00 a.m.<br>Room:   Courtroom 11, 19th Floor<br>Judge:   Honorable James Donato |

I, Shannon L. Hopkins, declare:

1.     I am a partner at Levi & Korsinsky, LLP ("Levi & Korsinsky" or "LK"), Court-appointed Lead Counsel for Lead Plaintiff, the Ferraro Group (consisting of Ferraro Family Foundation, Inc. and James L. Ferraro) ("Lead Plaintiff") and the proposed class in the above-captioned matter. I submit this declaration in support of: (1) Lead Plaintiff's Unopposed Motion for Final Approval of Proposed Class Action Settlement ("Final Approval Motion") and (2) Lead Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses, and Award of Costs and Expenses to Lead Plaintiff (the "Fee and Expense Application").

2.     I have been informed by counsel for Defendants that Defendants do not oppose the relief sought by both motions.

3.     I am one of the attorneys overseeing this litigation and participated in the prosecution and resolution of this Action[1] since its inception and have personal knowledge of all material matters related to this Action. I have also been kept informed of developments in the Action by other attorneys working with me and under my direction at Levi & Korsinsky. The statements in this declaration are made based upon my personal knowledge unless otherwise indicated. I could and would testify competently to the matters set forth herein if called upon to do so.

4.     The proposed Settlement, which provides for an all-cash payment of $14,000,000, is an excellent result for the Settlement Class. The Stipulation sets forth the terms of the Settlement, which, if approved, will resolve this Action entirely.

5.     This declaration is not intended to detail every event that occurred since the commencement of this Action. Rather, it sets forth the nature of the claims asserted in the Action, which involved allegations that the Defendants misled investors about Corcept Therapeutics Incorporated's ("Corcept" or the "Company") reliance on an undisclosed off-label marketing scheme to sell its prescription drug, Korlym. The declaration also details the proceedings to date, Lead Plaintiff's factual investigation and discovery taken to date, the extensive efforts undertaken by Lead Plaintiff and Lead

---

[1] Unless otherwise defined herein, capitalized terms have the same meanings as in the Stipulation of Settlement ("Stipulation") (ECF 195-3) and the exhibits attached thereto.

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                    -1-

Counsel in prosecuting and resolving the Action, and the substantial risks of continued litigation and the negotiations resulting in the Settlement. Further, it describes notice of this Settlement to the Settlement Class Members ("Class Members") and the proposed Plan of Allocation, both of which have been preliminarily approved by the Court. Lastly, this declaration provides additional information supporting Lead Counsel's request for an award of attorneys' fees and reimbursement of litigation expenses and Lead Plaintiff's service award.

## I.    Introduction

6.    This Action has been intensely litigated from its commencement on March 14, 2019 through Settlement, which the Parties finalized in the Stipulation on April 11, 2023. The Parties reached the Settlement only after Lead Plaintiff had performed extensive investigation and analysis of the allegations, claims, and defenses. Specifically, over the course of approximately four years, Lead Plaintiff, through the efforts of Lead Counsel, *inter alia*: (i) conducted a detailed investigation into the claims asserted in the Action and drafted three amended complaints; (ii) opposed two motions to dismiss; (iii) drafted Lead Plaintiff's motion for class certification accompanied by a supporting expert report on market efficiency and Lead Plaintiff's proposed damages methodology; (iv) extensively consulted with experts on Cushing's Syndrome ("CS"), the marketing of pharmaceutical drugs and related FDA regulations, market efficiency, loss causation, and damages; (v) conduced a detailed review of Corcept's public filings, annual reports, press releases, and other publicly available information; (vi) reviewed analyst reports and articles relating to Corcept; (vii) researched applicable law with respect to the claims and defenses asserted in the Action; (viii) drafted and responded to written discovery requests; (ix) reviewed nearly one million pages of largely technical documents produced by Defendants and third-parties; (x) participated in the depositions of one of Lead Plaintiff's experts and one of a former Corcept employee; and (xi) drafted and exchanged three detailed mediation statements with Defendants. But for the Settlement, Lead Counsel was prepared to continue fully litigating the Action to trial and beyond, if necessary.

7.    The resulting Settlement is the direct product of Lead Plaintiff's and Lead Counsel's efforts over the past four years and the parties' *three* separate, arm's-length mediation sessions facilitated

Case No. 3:19-CV-01372-JD
DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                    -2-

by Ms. Michelle Yoshida, Esq. of Phillips ADR Enterprises LLC. Each of these Settlement negotiations were conducted by experienced counsel with an intimate understanding of the strengths and weaknesses of the Action, which ultimately resulted in a mediator's double-blind proposal on January 24, 2023 that the Parties accepted on February 8, 2023.

8.    The substantial fact and expert discovery, motion practice, and rounds of attempted mediation sessions outlined herein informed Lead Counsel of the case's strengths and potential weaknesses. Lead Counsel considered all such information in determining the best course of action for the Class Members. Lead Counsel believes the proposed $14,000,000 Settlement represents a significant recovery for the Settlement Class that is fair and reasonable and warrants this Court's approval.

9.    The Settlement is also an excellent result when evaluated against maximum theoretical aggregate damages, representing a recovery of 8% on a FIFO basis (or 9% on a LIFO basis) based on the assumption that Lead Plaintiff would prevail on all claims, including reviving a previously dismissed corrective disclosure, and is well above the median comparable securities class actions settlements reported by Cornerstone Research and the National Economic Research Associates.[2] Here, the Class Period alleged in the operative complaint includes two corrective disclosures. The Honorable Lucy H. Koh dismissed with prejudice all claims to the extent they were based on the January 31, 2019 corrective disclosure, ending the Class Period on January 25, 2019. With respect to the only surviving corrective disclosure, the Settlement represents a recovery of 11.4% of the maximum theoretical damages on a

---

[2] *See* L.T. Bulan, L.E. Simmons, *Securities Class Action Settlements, 2023 Review and Analysis*, Cornerstone Research (2024), at 6 (stating that the median comparable securities class action settlements in Rule 10b-5 cases in 2023 and in 2014 – 2022 resulted in a recovery of 3.5% and 4% of estimated damages, respectively) ("Cornerstone Research") (attached hereto as Exhibit 5); *see also* Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* at 25-26, Figures 21, 22 (NERA Jan. 23, 2024) (median ratio of settlement to investor losses for comparable securities class actions was 2.9% from January 2014 – December 2023 and was 1.8% overall in 2023) ("NERA") (attached hereto as Exhibit 6).

FIFO basis (or 12.9% on a LIFO basis), which is *over twice* the median percentage of recovery for similarly sized cases reported by Cornerstone Research and NERA.[3]

10.    When accounting for the Defendants' arguments—that, even if Lead Plaintiff could establish liability, damages would need to be further reduced to disaggregate the other information unrelated to off-label marketing in the January 25, 2019 SIRF Report—Lead Plaintiff's damages expert estimates total damages ranging from $22.1 to $63.5 million on a FIFO basis (or $19.5 to $55.8 million on a LIFO basis). The proposed Settlement represents *22% to 63.3%* of such damages on a FIFO basis (or 25% to 71.8% on a LIFO basis), which is up to approximately *eight* times the median percentage of recovery for similarly sized securities fraud cases from 2014 to 2022[4] and is *twelve* to *thirty-five* times higher than the median percentage of recovery for securities fraud cases in 2023.[5]

11.    Additionally, Defendants would continue to assert challenges to falsity and scienter by contending, in part, that no documents produced evidenced explicit instructions from any Individual Defendant to engage in off-label marketing.  Defendants would have also argued their statements were not false because: 1) whether to prescribe Korlym is within each doctor's discretion; 2) the FDA never objected to Korlym's marketing materials despite being aware of them, and 3) hypercortisolism, used in marketing materials, and CS, for which Korlym is sometimes an appropriate treatment, are the same. For scienter, Defendants would bolster their arguments by noting that certain documents show Corcept executives instructed employees to keep Korlym marketing to on-label uses, and that Lead Plaintiff has not received documents in discovery to the contrary.

12.    Defendants would also raise a host of challenges at class certification, including *inter alia,* that the challenged statements were too generic to have impacted the price of Corcept's securities,

---

[3] *See* Cornerstone Research at 6 (median comparable securities class action settlements in Rule 10b-5 cases in 2023  and in 2014 – 2022 resulted in a recovery of 5.3% of estimated damages); *see also* NERA at 25-26, Figures 21, 22 (median comparable securities class action settlements in January 2014 – December 2023 resulted in recoveries of 2.9% of estimated damages, and median ratio of settlement to investor losses for securities fraud class actions overall in 2023 was 1.8%).

[4] *See* Cornerstone Research at 6

[5] *See* NERA at 26.

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                              -4-

and that few analysts commented on the January 25, 2019 corrective disclosure, undermining materiality, loss causation, and price impact. Defendants would likely rely on the Second Circuit's opinion in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 81 (2d Cir. 2023), which decertified the class and effectively ended the case after 13 years of litigation based on similar arguments.

13. The looming costs and significant delay of pursuing trial further demonstrate the Settlement's reasonableness. For example, ongoing delays and costs absent a Settlement would include, *inter alia*: 1) taking *fifty-eight* remaining depositions, of which at least twenty-eight would be taken in-person; 2) retaining and further consulting with multiple experts, including for research, expert reports and rebuttals, and deposition testimony regarding CS, FDA marketing regulations, market efficiency, damages, and loss causation; 3) briefing motions to compel, class certification, cross motions for summary judgment, *Daubert* and other pre-trial motions; and 4) jury trial, which would be complicated and confusing for jurors.

14. The Settlement removes the possibility that any of these risks, costs, and delays would materialize. All of these issues, and the risks attendant to them, were considered by Lead Counsel and Lead Plaintiff in deciding to settle this Action on the agreed terms.

15. In connection with its request for approval of the Settlement and Plan of Allocation, Lead Counsel is also moving the Court for an award of attorneys' fees and reimbursement of litigation expenses (the "Fee and Expense Application"). Specifically, Lead Counsel is moving for attorneys' fees in the amount of $3,500,000, *i.e.*, 25% of the Settlement amount, representing a 0.4 negative multiplier of Lead Counsel's total lodestar of $8,538,061.75, which excludes all time incurred after the Court preliminary approved the Settlement on January 4, 2024. Moreover, Lead Counsel's fee request of 25% of the common fund is consistent with the Ninth Circuit's benchmark and *excludes* interest, which is commonly awarded so that all interest earned can be distributed to the Class.

16. Lead Counsel is also applying for reimbursement of litigation expenses of $576,161.71, despite the Notice stating that expenses may be $975,000. These litigation expenses were incurred since the Action commenced approximately five years ago and include, among other things, costs associated

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF   -5-

with legal research and investigation, the work of qualified experts and consultants, litigation-related travel, mediation fees, and document reviewers retained by Lead Counsel—all of which were necessary to Lead Counsel's success in achieving the proposed Settlement. Lead Counsel respectfully submits that the Fee and Expense Application is justified in light of the benefits conferred on the Settlement Class, the risks undertaken by Lead Counsel, the quality of representation, and the nature and extent of the legal services performed.

17.    Lead Plaintiff, which consists of the Ferraro Family Foundation, Inc. and James L. Ferraro, also seeks an award of $15,000 in total as partial reimbursement of its costs and expenses related to this Action. James L. Ferraro is an attorney who is a principal of two law firms and has forty years of practice and experience in class action and mass tort litigation. Mr. Ferraro actively monitored the Action and supervised Lead Counsel. Lead Plaintiff also dedicated time and resources to discovery, which included responding to Defendants' written discovery requests and gathering documents and information responsive to Defendants' discovery requests. Only after detailed discussions with Lead Counsel did Lead Plaintiff approve the Settlement.

18.    On behalf of Lead Counsel, and for the reasons discussed herein and in the accompanying Final Approval Motion, I respectfully submit that the Settlement and the Plan of Allocation are each "fair, reasonable, and adequate" in all respects, and that the Court should therefore approve them pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. Likewise, I respectfully submit that the Fee and Expense Application and Service Award is fair and reasonable and should be approved.

## II.    SUMMARY OF THE CLAIMS

19.    The operative Third Amended Class Action Complaint ("Third Amended Complaint") in this Action was brought on behalf of all persons who purchased or otherwise acquired Corcept securities between August 2, 2017 and January 31, 2019, inclusive, and were damaged as a result. The Third Amended Complaint alleges that Defendants artificially inflated the price of Corcept's securities by issuing materially false and misleading statements concerning the marketing of its only drug product, Korlym. Lead Plaintiff alleges that the FDA approved Korlym for the treatment of CS—a rare disease affecting only about 20,000 people in the United States—for a limited set of patients who have

hyperglycemia with type 2 diabetes or glucose intolerance and who have failed or are ineligible for surgery. Lead Plaintiff alleges that the FDA-approved label further limited the pool of potential candidates for Korlym to less than 5,000. Thus, to increase the pool of treatable patients and boost sales, Defendants allegedly engaged in an off-label marketing scheme while telling investors that Corcept adhered to the FDA label and did not engage in off-label marketing. Corcept allegedly effectuated this scheme by encouraging physicians to prescribe Korlym for uses that were not authorized by the FDA, including, *inter alia*, in cases where diagnostic tests were negative or inconclusive and before exploring surgery as a first-line treatment.

20.    The Third Amended Complaint further alleges that the misleading nature of Defendants' statements remained hidden until partial disclosures on January 25, 2019 and January 31, 2019 revealed Corcept's alleged reliance on off-label marketing of Korlym and decreased sales and sales forecasts as the off-label marketing practices came to light. Lead Plaintiff alleges that when the truth was revealed through these partial disclosures, the price of Corcept's securities dropped more than 20%.

III.    **HISTORY OF THE ACTION**

21.    The following summarizes the principal events during the Action and the legal services Lead Counsel provided to Lead Plaintiff and Class Members.

A. **Filing of the Initial Complaints and Appointment of Lead Plaintiff and Lead Counsel**

22.    The initial complaint in this Action was filed on March 14, 2019, alleging claims under the Securities and Exchange Act of 1934 ("Exchange Act"), and was assigned to the Honorable Lucy H. Koh ("Judge Koh"). ECF 1, 6. The initial complaint sought to recover on behalf of a class of investors who purchased or otherwise acquired Corcept securities between August 2, 2017 and February 5, 2019, inclusive. On October 7, 2019, after receiving five motions to appoint lead plaintiff and approve lead counsel, the Honorable Lucy Koh appointed the Ferraro Group as Lead Plaintiff and approved Lead Plaintiff's choice of Levi & Korsinsky as Lead Counsel in the Action. ECFs 15, 17, 24, 29, 32, 82.

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                    -7-

**B. Lead Plaintiff's Factual Investigation, Three Amended Complaints, and Three Motions to Dismiss**

23.     On December 6, 2019, after an extensive investigation by Lead Counsel, Lead Plaintiff filed the First Amended Complaint (ECF 91), alleging violations of the Exchange Act on behalf of all investors who purchased or otherwise acquired Corcept securities between August 2, 2017 and January 31, 2019, inclusive, and were damaged as a result. Lead Plaintiff alleged that Defendants made materially false and misleading statements, which caused the price of Corcept's stock to be artificially inflated during the Class Period and that the misleading nature of such statements remained hidden until partial disclosures on January 25, 2019 and January 31, 2019 revealed Corcept's alleged reliance on off-label marketing of Korlym and decreased sales and sales forecasts as the off-label marketing practices came to light.

24.     On January 27, 2020, Defendants moved to dismiss the First Amended Complaint. ECF 95. In response to Defendants' motion, Lead Plaintiff prepared and filed its Second Amended Complaint on March 20, 2020 (ECF 100), providing additional factual support for its claims. On May 11, 2020, Defendants moved to dismiss the Second Amended Complaint. ECF 105. Judge Koh granted Defendants' motion without prejudice on November 20, 2020 and gave Lead Plaintiff thirty days to file an amended complaint. ECF 124.

25.     On December 21, 2020, Lead Plaintiff filed the operative 116-page Third Amended Complaint and attached 98-page false statement chart (ECF 127)— alleging further factual support for its prior claims, including support from ten physicians located throughout the United States, including eight endocrinologists, four former Corcept sales personnel, and an expert in endocrinology.

26.     Defendants moved to dismiss the Third Amended Complaint on February 19, 2021. ECF 130. Defendants' challenges included, *inter alia*, that Lead Plaintiff failed to plead: any actionable false or misleading statements; a cogent and compelling inference that Defendants acted with scienter; and a causal connection between its losses and any of the alleged false statements or omissions. ECF 130. On August 24, 2021, Judge Koh granted in part and denied in part Defendants' motion to dismiss. ECF 145. Judge Koh dismissed with prejudice Lead Plaintiff's claims with respect to seventeen of the alleged

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                  -8-

misstatements and sustained Lead Plaintiff's claims with respect to the remaining thirteen alleged false statements. Judge Koh sustained Lead Plaintiff's loss causation allegations as to the January 25, 2019 corrective disclosure, but dismissed the January 31, 2019 corrective disclosure, with prejudice, finding the disclosure "does not mention fraudulent conduct, off-label marketing, increased scrutiny from insurance companies, or the allegations of the [first corrective disclosure]. Instead, the January Press Release simply reports Corcept's 2018 preliminary selected financial results and 2019 revenue guidance." ECF 145 at 46.

### C.  The First Mediation and Preparation of Motion for Class Certification

27.     On August 31, 2021, Judge Koh stayed the case for ninety days so the Parties could explore a potential resolution of the Action. ECF 150. On November 29, 2021, after exchanging detailed mediation statements, the Parties attended a mediation presided over by Ms. Yoshida. The parties were unable to reach a settlement at that time.

28.     On December 9, 2021, the Judge Koh entered a Case Management Order; Order Lifting Stay setting case deadlines and lifting the previously entered stay. ECF 153. The Action was then reassigned to the Honorable James Donato on January 7, 2022. ECF 156. At a case management conference on April 28, 2022, the Court advised the Parties that it would issue a new schedule and vacated the May 4, 2022 class certification deadline. ECF 172. Prior to this case management conference, Lead Plaintiff had fully drafted its motion for class certification, supported by a 48-page expert report on market efficiency and Lead Plaintiff's damages methodology, to be filed on May 4, 2022, as previously ordered. ECF 153. On September 21, 2022, the Court entered a new scheduling order. ECF 180.

### D.  The Parties Conduct Written and Oral Discovery

29.     Fact discovery, which began in January 2022, was thorough. The Parties exchanged initial disclosures on January 7, 2022 and Defendants answered the Third Amended Complaint on February 4, 2022. ECF 164. The Court entered the Parties' Stipulated Protective Order on January 26, 2022 (ECF 159), and the Parties executed a Stipulated and Agreed Document Production Protocol on March 10, 2022.  The Parties served initial document requests on January 21, 2022 and served responses

and objections thereto on February 22, 2022. Lead Plaintiff's first set of document requests contained 59 requests. On December 19, 2022, Lead Plaintiff served Defendants with a second set of requests for production. With respect to these requests and objections, the Parties actively exchanged emails and correspondence and met and conferred on the scope of discovery, search terms, and issues related to ESI. Additionally, Lead Counsel worked closely with Lead Plaintiff in identifying, reviewing, and producing documents and information responsive to Defendants' requests.

30.     Defendants ultimately produced 171,068 documents totaling over 757,200 pages, including emails, board materials, training and marketing materials, medical studies and journals on CS, FDA materials and text messages from certain Corcept employees, among other categories. Many of these documents were highly technical, detailing and analyzing: complicated medical studies, testing for and diagnosing CS, FDA regulations, lengthy prescription spreadsheets classifying Korlym prescriptions, and other issues requiring expert analysis. Lead Plaintiff produced 162 documents totaling over 2,100 pages. On March 18, 2022, Defendants served their first set of interrogatories on Lead Plaintiff, to which Lead Plaintiff responded and objected on April 18, 2022. During this period, the Parties also engaged in extensive third-party discovery, having subpoenaed 47 non-parties who have together produced over 17,200 documents totaling nearly 146,000 pages.

31.     On December 12, 2022 and December 16, 2022, Defendants conducted the deposition of one of Lead Plaintiff's experts, Dr. Robert Cooper, and a former Corcept employee cited in the Third Amended Complaint as a confidential witness, respectively. In November and December of 2022, the Parties noticed and scheduled an additional thirty-six depositions out of an anticipated sixty depositions. *Id*. On November 10, 2022, Lead Plaintiff further served Corcept with its Notice of Rule 30(b)(6) Deposition, to which Defendants responded and objected on December 9, 2022.

### E.  Government Investigation

32.     On February 15, 2022, Corcept filed a Form 10-K disclosing that it had received a records subpoena in November of 2021 from the U.S. Attorney's Office for the District of New Jersey ("NJ USAO") seeking information relating to the sale and promotion of Korlym, Corcept's relationships with

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                            -10-

and payments to health care professionals who can prescribe or recommend Korlym, and prior authorizations and reimbursements for Korlym.

33.    Defendants represented in their public disclosures that Corcept was actively producing discovery to the NJ USAO. To Lead Plaintiff's knowledge, neither the NJ USAO nor the U.S. Securities and Exchange Commission have filed actions against Corcept relating to the off-label marketing and promotion of Korlym. No government or regulatory authority has participated in this Action.

### F.  The Parties Reach a Settlement After Conducting Additional Mediation Sessions

34.    While formal discovery was underway the Parties participated in a second mediation session before Ms. Yoshida on May 12, 2022, but were unable to resolve the Action. In connection with the second mediation the Parties prepared and exchanged supplemental mediation statements and Defendants produced over 60,000 pages of documents.

35.    On December 23, 2022, at the Parties' request, the Court stayed this Action to allow the Parties to explore a resolution. As was the case for the prior two mediation sessions, in advance of the third mediation session scheduled for January 24, 2023, Lead Counsel drafted and provided Ms. Yoshida with a comprehensive mediation statement outlining the alleged fraud, citing various documents Defendants had produced in discovery which supported Lead Plaintiff's claims. Defendants, meanwhile, submitted their own mediation statement, emphasizing what they perceived to be the strengths of their case and the weaknesses in Lead Plaintiff's case. In connection with the mediation, Lead Counsel thoroughly articulated Lead Plaintiff's position on the merits of the Action to Ms. Yoshida, including with respect to Lead Plaintiff's responses to Defendants' numerous arguments. The Parties participated in this third mediation session on January 24, 2023 but were unable to reach an agreement. While no settlement was reached during the formal mediation session, Ms. Yoshida continued her active role in attempting to bring the Parties together for a resolution and the Parties exchanged additional offers and counteroffers. Ultimately, on February 8, 2023, pursuant to a double-blind recommendation from Ms. Yoshida, the Parties reached an agreement in principle to settle the Action for a cash payment of $14,000,000, subject to the execution of a customary "long form" stipulation agreement of settlement and related papers.

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                        -11-

**G. The Court Preliminarily Approves the Settlement**

36.     Upon signing the Stipulation, Lead Plaintiff filed its Unopposed Motion for Preliminary Approval of Proposed Class Action Settlement on April 11, 2023, requesting that the Court, among other things, grant preliminary approval of the Settlement, allow the Parties to send out notice of the Settlement to the Settlement Class, and schedule a Final Approval Hearing and related filing deadlines. ECF 195.

37.     On June 8, 2023, the Court held a hearing on Lead Plaintiff's motion for preliminary approval. ECF 198. On January 4, 2024, the Court issued an Order granting preliminary approval of the settlement ("Preliminary Approval Order") and directing the Parties to submit a proposed schedule to provide notice to the Settlement Class, among other deadlines. ECF 201.

38.     Other than as set forth in Lead Plaintiff's Motion for Final Approval and/or in any Reply submission to be filed, no relevant facts or conditions have changed since the Court's preliminary approval of this Settlement on January 4, 2024.

39.     As set forth in the accompanying Declaration of Kathleen Schumacher Regarding Notice Dissemination, Publication, and Requests for Exclusion Received ("Schumacher Decl."), attached hereto as Exhibit 1, in accordance with the Preliminary Approval Order, A.B. Data has disseminated a total of approximately 17,385 Postcard Notice to potential members of the Settlement Class and nominees. *See* Schumacher Decl. ¶10. Additionally, the Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire* on February 5, 2024, advising of, among other things, the terms of the Settlement, the reasons for the Settlement, and the key procedural dates related to the Settlement, such as the objection and opt-out deadlines, the claims deadline, and the date and time of the Final Approval Hearing. Schumacher Decl. ¶¶3-11.

## IV.    THE SETTLEMENT

40.    As discussed here, the Settlement creates an all-cash common fund of $14 million that was the result of extensive arms'-length negotiations and approximately four years of zealous litigation.[6] The Settlement provides the Settlement Class with a substantial benefit and eliminates the significant risks of class certification, summary judgment, and trial. Lead Counsel believes that the Settlement is fair, reasonable, and adequate and an excellent result for Class Members, considering the risk of recovering much less, or even nothing at all, with an unfavorable dispositive decision at class certification or summary judgment, or after a jury trial. Further, even if Lead Plaintiff obtained a verdict in its favor that was ultimately upheld on appeal, this post-trial process would have taken years and substantially delayed any recovery for the Settlement Class.

41.    While Lead Plaintiff and Lead Counsel believe the claims asserted in the Action are meritorious, based on its experience and close knowledge of the facts and applicable law, Lead Counsel—attorneys well-versed in the prosecution of complex securities litigation—believe that the Settlement is in the best interests of the Settlement Class, as set forth below.

### A.  Amount of Settlement

42.    The Settlement represents a substantial portion of the maximum recoverable damages, as estimated by Lead Counsel and its damages consultant, relative to similar settlements.

43.    To estimate aggregate class-wide damages under Section 10(b), the timing and quantity of investor transactions in Corcept securities during the Settlement Class Period were estimated using a "multi-sector" model approach which estimates damages based on reported quarterly institutional holdings (an "institutional model") and a multi-trader trading model to estimate damages for remaining retail volume.  The institutional model estimates daily purchases and sales for each institutional filer and then uses standard share-matching methodology to determine the timing of purchases and sales.  The

---

[6] The only agreements made by the Parties in connection with the Settlement are the Stipulation of Settlement and the confidential Supplemental Agreement concerning the circumstances under which Defendants may terminate the Settlement based upon the number of exclusions request. *See* Stipulation (ECF 195-3).

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                                    -13-

remaining retail volume posits two trader groups with different holdings and propensities to trade. Lead Plaintiff's expert's damages model is explained more fully in the Declaration of Kenneth N. Kotz. ("Kotz Decl."), attached hereto as Exhibit 4.

44.    Applying the theory of per-share damages to the daily trading behavior predicted by the multi-sector model approach, aggregate maximum theoretical damages under Section 10(b) for the full Settlement Class Period are estimated to be $185.2 million if calculated on a FIFO basis, or $161.4 million if calculated on a LIFO basis. The $14 million recovery represents approximately 8% of the *maximum theoretical* damages on a FIFO basis (or 9% on a LIFO basis). This estimate assumes that a jury would accept Lead Plaintiff's liability and damages theories and does not take into account the many risks Lead Plaintiff would face if the Action proceeded to summary judgment and trial (as detailed below), including the risk of overcoming the various defenses the Defendants would likely assert, which could substantially reduce or eliminate damages altogether.

45.    While the maximum theoretical aggregate damages includes both corrective disclosures that Lead Plaintiff initially pled, Defendants argued in each of their three motions to dismiss that the January 31, 2019 press release was not a corrective disclosure because it merely disclosed disappointing financial results rather than issues related to Corcept's alleged off-label marketing. *See* ECF 32 at 24-25, ECF 105 at 30, ECF 130 at 25. Judge Koh agreed with Defendants, ultimately dismissing the January 31, 2019 corrective disclosure with prejudice and ending the Class Period with the January 25, 2019 disclosure. ECF 145. Lead Plaintiff's damages consultant has estimated that, applying the same damages theory to the only surviving corrective disclosure, the *maximum theoretical* damages in this Action is approximately $120.3 million if calculated on a FIFO basis and $105.4 million if calculated on a LIFO basis. As such, the $14 million Settlement represents, with respect to the only surviving corrective disclosure, approximately 12% of the maximum theoretical aggregate damages on a FIFO basis, or 13% on a LIFO basis.

46.    Further, as set forth more fully in Section IV(B), *infra*, with respect to the sole remaining corrective disclosure, Defendants advanced credible arguments that the SIRF Report contained information that, upon disaggregation, would further reduce damages because it was unrelated to the

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                    -14-

alleged off-label marketing scheme which contributed to the stock price decline on January 25, 2019. After reducing damages for disclosures arguably unrelated to the alleged fraud, Lead Plaintiff's expert has preliminarily determined the maximum recoverable damages with respect to the January 25, 2019 corrective disclosure range from $22.1 to $63.5 million on a FIFO bases (or $19.5 to $55.8 million on a LIFO basis). Kotz Decl. at ¶14. This Settlement represents *22% to 63.3%* of such damages on a FIFO basis (or 25% to 71.8% on a LIFO basis), which is up to approximately *eight* times the median percentage of recovery for similarly sized securities fraud cases from 2014 to 2022.[7] This recovery is also *twelve* to *thirty-five* times higher than the median percentage of recovery for securities fraud cases in 2023.[8]

47.    Accordingly, this Settlement represents a very good result for the Settlement Class at any stage of the litigation.

48.    Additionally, the Settlement represents the only financial recovery for Corcept investors, as, to date, no other private litigant or governmental entity has recovered compensation for shareholders arising from Defendants' alleged misconduct.

**B. Risks of Establishing Falsity, Scienter, Loss Causation, Damages, and Certifying a Class**

49.    Although Lead Plaintiff and Lead Counsel believe they developed—and would have continued to develop—persuasive evidence and arguments from their analysis and investigations to support their claims, there remained substantial risks. Lead Plaintiff and Lead Counsel weighed, among other things, the substantial cash benefit to Settlement Class Members against the uncertainties associated with trying a complex class action that implicated highly technical issues regarding securities and medicine, the difficulties and challenges involved in certifying a class, and the fact that, even if Lead Plaintiff prevailed through summary judgment and trial, any monetary recovery could have been less than the Settlement Amount.

---

[7] *See* Cornerstone Research at 6.

[8] *See* NERA at 26.

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                    -15-

50.    **First**, Defendants have argued successfully with respect to the January 31, 2019 corrective disclosure, and would also continue to argue with respect to the surviving January 25, 2019 corrective disclosure that, even if Lead Plaintiff could establish liability, it could not establish loss causation or damages because Corcept's stock price declined as a result of unrelated confounding information.

51.    Judge Koh dismissed Lead Plaintiff's theory of loss causation with prejudice to the extent it relied on the January 31, 2019 press release as revealing the truth about Corcept's alleged off-label marketing practices. Defendants also have made, and will continue to make, similar challenges to the only surviving corrective disclosures in the SIRF Report issued on January 25, 2019, which Lead Plaintiff alleged disclosed Corcept's off-label marketing scheme to investors. Defendants contended that any impact the SIRF Report had on Corcept's stock price was due to disclosures of other information that was unrelated to Corcept's alleged off-label marketing of Korlym. For example, the SIRF Report alleged that: 1) the FDA found that "Korlym's trial design was flawed without the testing of an approved comparator drug…"; 2) Corcept "withdrew its application for Corluxin (a renamed Korlym)" in Europe, citing "strategic business reasons for ending the process"; 3) There were "103 deaths reported for Korlym since 2012"; and 4) Korlym is expensive where an estimated "yearly cost would be $308,000."

52.    If Defendants were successful in arguing any one of them caused Corcept's stock price decline, it would further diminish damages available to Class Members. Indeed, as summarized in the Kotz Decl. at ¶¶9-14, Lead Plaintiff's damages consultant has preliminarily estimated that disaggregation of unrelated news in the SIRF Report would reduce damages attributable to the January 25, 2019 drop to $22.1 to $63.5 million on a FIFO basis (or $19.5 to $55.8 million on a LIFO basis). This damages reduction is based on an exclusion of 50% to 83% of the decline in Corcept's stock price on January 25, 2019 as unrelated to the allegations in this Action, and is based, in part, upon Lead Counsel's investigation and the following allegations:

- CW14 estimated that approximately 50% of Korlym prescriptions came from three physicians known to prescribe large volumes of Korlym off-label in exchange for honoraria payments. TAC ¶392.

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                    -16-

- According to the January 25, 2019 SIRF Report, of the 103 deaths reported since 2012, approximately 17, or 17%, Korlym was "used for [an] unknown indication," indicating off-label use.  TAC ¶322.

- The chart of Medicare Part D prescriptions by state supports the inference that at least 50% of Korlym prescriptions were the result of improper off-label marketing.  TAC ¶311.

- CW11 estimated that approximately 40% of Korlym prescriptions were the result of improper off-label marketing.

Kotz Decl. at ¶9.

53.    **Second**, Defendants disputed the falsity of the challenged statements. For example, while Lead Plaintiff argued Corcept's marketing materials contained implicit off-label marketing messages by inclusion of case studies using Korlym off-label and by stating Korlym could treat hypercortisolism (rather than CS), Defendants argued that they were not marketing Korlym off-label because the case studies were only provided to physicians upon the physician's request, which is allowed, and that hypercortisolism and CS are the same thing.

54.    **Third**, Defendants disputed that they acted with scienter. Lead Plaintiff argued the Defendants were aware of the off-label scheme because they accompanied sales personnel on visits to physicians where they marketed Korlym off label, as well as through internal documentation suggesting, in Lead Plaintiff's view, that Corcept was bribing physicians to prescribe Korlym through speaker program kickback payments and other documents reflecting that Corcept's most successful and compensated sales representatives were widely known to market Korym off-label and were congratulated and lionized via email and during Company sales meetings. However, Defendants would point out that there were no documents produced in discovery where any Individual Defendant explicitly instructed Corcept sales personnel to prescribe Korlym off-label. Nor has Lead Plaintiff received evidence that any physician complained to any Defendant about off-label marketing. To the contrary, some documents produced establish that Corcept executives instructed employees to keep Korlym marketing to on-label uses.

55.    Likewise, while Lead Plaintiff contended that Corcept impliedly marketed Korlym for inappropriate CS uses, there is no specified testing regiment for diagnosing CS. Instead, it is within each doctor's discretion to decide which tests to run, to decide whether to run multiple tests and how many,

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                              -17-

and whether to then prescribe Korlym. These difficulties would present significant hurdles to achieving success at summary judgment or trial.

56. Further, to refute the contention that it marketed Korlym off-label, Corcept repeatedly asserted that the FDA was aware of its marketing practices and never objected to them. Evidence to date shows that Corcept did send its marketing materials to the FDA and, to Lead Plaintiff's knowledge, the FDA has not objected to them as being off-label. These arguments would further complicate any potential victory at summary judgment or trial.

57. **Fourth**, Defendants stated that they would also challenge the efficiency of the market for Corcept's securities at class certification, potentially precluding Lead Plaintiff's ability to achieve and maintain class certification through trial. For example, Defendants have contended (among other things) that the challenged statements were too generic to have impacted the price of Corcept's securities. Bolstering the argument, only four non-duplicative media outlets and analysts commented on the alleged false statements or the SIRF Report, undermining materiality, loss causation, and price impact. Further, Defendants would challenge market efficiency, arguing, *inter alia*, that since the SIRF Report relies entirely on public allegations that were available to the market prior to January 25, 2019, the public allegations in the SIRF Report were already reflected in the Company's stock price.

58. Indeed, the Second Circuit's recent decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 81 (2d Cir. 2023) heightened these very same concerns, where the court, after approximately 13 years of litigation, decertified the class and effectively ended the case finding statements about Goldman's business practices and approach to conflicts-of-interest management were too "generic" to have impacted Goldman's stock price, and there was an insufficient nexus between the front-end statement and back-end price decline. *Id*. at 105. As Defendants contend the challenged statements were too generic to have impacted Corcept's stock price, Defendants would no doubt have challenged price impact at class certification, summary judgment, and trial. While Lead Plaintiff is confident that a class would have been certified, there was an ongoing risk that any certified class could have been disturbed prior to trial or on appeal if Defendants successfully moved to decertify the Settlement Class.

Case No. 3:19-CV-01372-JD
DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                           -18-

**C. Risks of Further Costs, Appeals, and Other Delays**

59.     While the potential of achieving any recovery at summary judgment or trial is uncertain, costs and delay to prepare again for class certification, summary judgment, and trial would undoubtedly be immense, further diminishing resources otherwise available to satisfy a potential judgment. Ongoing delay and costs would include, *inter alia*: 1) taking *fifty-eight* remaining depositions, of which at least twenty-eight would be taken in-person; 2) retaining and further consulting with multiple experts who would need to draft opening and rebuttal reports and sit for depositions on issues concerning CS, FDA marketing regulations, market efficiency, damages, and loss causation in connection with class certification, summary judgment, and trial; 3) briefing motions to compel, class certification, and cross motions for summary judgment; and 4) jury trial, which would be complicating and confusing for jurors, and any appeals, which would likely include, *inter alia*, Lead Plaintiff appealing the dismissal of all claims relating to the January 31, 2019 corrective disclosure.

**D. Notice to the Class Meets the Requirements of Due Process and Federal Rule of Civil Procedure 23**

60.     Pursuant to the Court's January 4, 2024 Preliminary Approval Order, the Court: (a) directed that notice be disseminated to the Settlement Class; (b) set May 13, 2024 as the deadline for Settlement Class Members to submit a claim and to object to, or request exclusion from, the Settlement, the Plan of Allocation, and/or the Fee and Expense Application; and (d) set a Final Approval Hearing date of June 6, 2024 at 10:00 a.m.

61.     Thereafter, and in accordance with the Preliminary Approval Order, Lead Counsel instructed A.B. Data, the Court-appointed Claims Administrator for the Settlement, to: (a) cause the Postcard Notice, substantially in the form annexed to the Stipulation, to be disseminated in accordance with procedures approved in the Preliminary Approval Order on January 26, 2024 to all Class Members who could be identified with reasonable effort and (b) publish the Summary Notice in *Investor's Business Daily* and transmit it over *PR Newswire* on February 5, 2024.

62.     The Postcard Notice and Summary Notice, among other things, direct the Settlement Class to the Notice, which: (a) describes the nature of the claims asserted in the Action; (b) includes a

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                                          -19-

definition of the Settlement Class; (c) summarizes the Settling Parties' reasons for entering into the Settlement and relief provided by the Settlement; (d) states that Class Members may retain their own attorney; (e) lists the name, telephone number, and address for Lead Counsel; (f) discloses that Lead Counsel intends to seek attorneys' fees of up to 25% of the Settlement Fund, plus reimbursement of expenses not to exceed $975,00, and an award for Lead Plaintiff not to exceed $15,000; (g) provides the date, time, and location of the Final Settlement Hearing; (h) advises Class Members of their right to appear at the Final Settlement Hearing and instructed them that the date may change; (i) advises Class Members of their right to exclude themselves from the Settlement Class and the binding effect of doing so; (j) provides the deadline and procedure for opting out of or opposing the Settlement, Plan of Allocation, award of attorneys' fees and expenses, or the award to Lead Plaintiff; (k) explains the consequences of remaining in the Settlement Class; and (l) provides the manner in which to obtain more information, including the address for the designated website.

63. In accordance with the Preliminary Approval Order, A.B. Data has disseminated a total of approximately 17,385 Postcard Notice to potential members of the Settlement Class and nominees, as set forth in the Schumacher Declaration. *See* Schumacher Decl. ¶10. Additionally, on February 5, 2024, A.B. Data caused the Summary Notice to be published in *Investor's Business Daily* and published over *PR Newswire*, which are national business newswire services. *Id*. at ¶11.

64. A.B. Data sent Postcard Notice to all registered holders of Corcept securities during the Settlement Class Period, as identified by Corcept's transfer agent. As part of its standard process, A.B. Data also sent Postcard Notice to the largest and most common U.S. banks, brokerage firms and nominees ("Nominees") contained in A.B. Data's database, as well as the names and addresses for additional potential Settlement Class Members provided to A.B. Data by the Nominees. *Id*. ¶¶5, 9-10.

65. Further, the Postcard Notice included a direct link to this Action's case-specific settlement website (www.CorceptSecuritiesLitigation.com), which contains the long-form Notice and other required information. Schumacher Decl. ¶12. The settlement website went live on January 26, 2024. *Id*. The website contains the Notice, Postcard Notice, Proof of Claim and Release Form, Settlement Stipulation, as well as copies of relevant Court documents including the Third Amended

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                    -20-

Complaint, Lead Plaintiff's Unopposed Notice of Motion and Motion for Preliminary Approval of Proposed Class Action Settlement and Memorandum of Points and Authorities in Support Thereof, and the Court's Preliminary Approval Order. *Id*. Lead Plaintiff's Motion for Final Approval of Proposed Class Action Settlement and supporting papers and Lead Plaintiff's Motion for Attorneys' Fees, Reimbursement of Expenses, and Award of Costs and Expenses to Lead Plaintiff and supporting papers will also be posted on the website when filed. *Id*.

66.    Additionally, A.B. Data established and maintains a toll-free telephone number for both live operator assistance and interactive voice response system to respond to inquiries from Class Members regarding the Settlement and how to obtain and complete a Proof of Claim form. *Id*. ¶13.

67.    Lead Counsel continues to work with A.B. Data to ensure that the claims process progresses smoothly and, when necessary, to assist Class Members with their Proof of Claims Forms and related inquiries.

68.    As set forth above, the deadline for members of the Settlement Class to file objections to the Settlement, Plan of Allocation and/or the Fee and Expense Application is May 13, 2024. Consequently, Class Members have 60 days to review the Final Approval Motion and the Fee and Expense Application before deciding whether to object to or opt out of the settlement.

69.    Despite the dissemination of 17,385 Postcard Notices, as of March 14, 2024, not a single objection or request or exclusion has been received. Schumacher Decl. ¶¶14-15. Should any objections be submitted in accordance with the procedures set forth in the Notice and approved in the Preliminary Approval Order, Lead Plaintiff will address any such objections in its reply submission to be filed on or before May 30, 2024. Further, Lead Plaintiff, is a Class Member, supports the Settlement. *See* the Declaration of James L. Ferraro ("Ferraro Decl.", attached hereto as Exhibit 2), at ¶15.

70.    I have also been informed by counsel for Defendants that notice pursuant to the notice provision of the Class Action Fairness Act was sent on or prior to April 21, 2023. Thus, the relevant government officials were notified of the settlement. To date, I am not aware that any state or federal official has raised any objection or concern regarding the settlement.

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                    -21-

**E. The Plan of Allocation is Fair and Reasonable**

71.    Working with its damages consultant, Lead Counsel has proposed a Plan of Allocation to govern the method by which Class Members' recover will be calculated, and how the proceeds of the Settlement will be allocated among Class Members who submit valid Claims and suffered economic losses because of the alleged fraud.

72.    The Plan of Allocation provides formulas for calculating the recognized claim of each Class Member based on the timing and price of each such Class Members' purchases or acquisitions of Corcept's securities on the open market during the Class Period and if or when they sold them. In summary, the Plan of Allocation employs generally accepted and widely used methodologies to determine how much artificial inflation resided in the price of Corcept's securities on each day of the Class Period.

73.    Under the Plan of Allocation, for each Class Period purchase of Corcept's securities that is properly documented, a "Recognized Loss Amount" will be calculated according to the formulas described in the Notice. As set forth in greater detail in the Notice, the calculation of a Claimant's Recognized Loss Amount is based upon a formula that takes into account such information as: (a) when a Claimant's share was purchased and if and when it was sold; (b) the amount of the alleged artificial inflation per share; (c) the purchase price of the share; and (d) the purchase price minus the average closing price for Corcept securities during a 90-day look-back period. Additionally, the Plan of Allocation establishes an appropriate discount of 75% to the extent Class Members' damages rely upon the alleged January 31, 2019 corrective disclosure that the Court previously dismissed, acknowledging additional risks of repleading and proving damages with respect to the January 31, 2019 corrective disclosure while also taking into account Lead Plaintiff's right to seek further leave to amend or challenge the dismissal on appeal.

74.    The structure of the Plan of Allocation is comparable to plans of allocation that have been used in numerous securities class actions. *See, e.g.*, *Purple Mountain Trust v. Wells Fargo & Co.*, No. 3:18-cv-03948-JD, ECF 231 at 13, 243 (N.D. Cal. Sep. 26, 2023) (Donato, J.) (approving similar plan

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                           -22-

of allocation); *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 1991529, at *6 (N.D. Cal. June 30, 2007) (collecting case), *approved by*, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007).

75.    As set forth above, the Plan of Allocation is fair and reasonable because it allocates the Net Settlement Fund among Class Members in accordance with key principles that (a) investors are only entitled to recover for economic losses suffered as a result of the alleged violations of the federal securities laws asserted in the Action (as opposed to losses caused by market or industry factors or company-specific factors unrelated to the alleged violations of law); (b) they must have held through the stock price drop that revealed the true facts; and (c) damages are limited by the 90-day look-back price pursuant to 15 U.S.C. §78u-4(e).

76.    The Plan of Allocation does not differentiate between Class Members, but rather allocates the funds based on losses suffered for each particular security depending on when the security was purchased as is appropriate under the law.

77.    Lead Counsel's damage consultant determined that, depending on the number of eligible shares purchased by investors who elect to participate in the Settlement and when those shares were purchased and sold, the overall average distribution is estimated to be: $0.18 per damaged share, before deduction of Court-approved fees and expenses described below, or $0.13 after court-approved fees and expenses. The per-share amount assumes all eligible Class Members submit a valid and timely Claim Form. If fewer than all Settlement Class Members submit timely and valid Claim Forms, which is likely, the distributions per share will be higher.

78.    For all these reasons, the Plan of Allocation represents a reliable method by which to weigh, in a fair and equitable manner, the claims of Authorized Claimants against one another for the purpose of making pro rata allocations of the Net Settlement Fund. To date, there have been no objections filed to the Plan.

V.    **APPLICATION FOR ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

79.    The successful prosecution of this Action required Lead Counsel and its staff to perform more than 16,295 hours of work for lodestar of $8,538,061.75, and incur $576,161.71 in expenses, as

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                                          -23-

detailed in the accompanying Declaration of Shannon Hopkins In Support of Lead Counsel's Fee and Expense Application ("Hopkins Fee Decl."), attached hereto as Exhibit 3.

80.     Based on Lead Counsel's efforts on behalf of Class Members, including those described herein, Lead Counsel is applying for compensation from the Settlement Fund in an amount equal to 25% of the Settlement Fund, or $3.5 million, and for $576,161.71 in litigation expenses.

81.     Lead Plaintiff additionally seeks an award in the amount of $15,000 pursuant to 15 U.S.C. §78u-4(a)(4), for reasonable costs and expenses directly relating to its representation of the Settlement Class.

82.     For the reasons set forth herein and in the Fee and Expense Application, Lead Counsel and Lead Plaintiff respectfully submit that the application for fees and expenses described above should be granted.

### A.  Application for Attorneys' Fees

#### 1.  Lead Counsel Expended Significant Resources to Achieve the Excellent Results Here

83.     For its extensive efforts on behalf of the Settlement Class, Lead Counsel is applying for compensation from the Settlement Fund on a percentage basis. As set forth in Lead Counsel's accompanying Fee and Expense Application, the percentage method is the dominant method of fee recovery for common fund cases.

84.     Congress contemplated that the percentage-of-recovery method would be the primary measure of attorneys' fees in securities class actions, and it decreases the burden imposed on courts of performing a detailed and time-consuming lodestar analysis. Additionally, it aligns the lawyers' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances. Indeed, this methodology is supported by public policy, has been recognized as appropriate by the United States Supreme Court for cases of this nature, and represents the overwhelming current trend in most circuits, including the Ninth Circuit. The rationale for enhancing the lodestar figure derives in part from the established practice in the private legal market of rewarding attorneys who take contingency cases with the risk of non-payment by paying

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                             -24-

them "a premium over their normal hourly rates" when they are successful. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002).

85.    Based on the excellent result achieved for the Settlement Class, the extensive efforts expended by Lead Counsel on behalf of the Settlement Class, the quality of work performed, the risks of the litigation, and the contingent nature of the representation, Lead Counsel submits that a 25% fee award is fair and reasonable. As discussed in the Fee and Expense Application, in the Ninth Circuit, a 25% fee is considered the benchmark for fair and reasonable attorneys' fees. Here, the requested fee amount of $3,500,000 represents a ***negative multiplier of .40*** to Lead Counsel's lodestar of $8,538,061.75. Accordingly, Lead Counsel's request for a percentage fee of the Ninth Circuit's 25% benchmark is justified and should be approved.

86.    Lead Counsel undertook time-consuming, challenging, and risky work to prosecute the claims against Defendants and to achieve this Settlement. At all times during the pendency of the Action, Lead Counsel's efforts were driven by, and focused on, advancing the litigation to bring about the most successful outcome for the Settlement Class, whether through settlement or trial. As discussed above, Lead Plaintiff was able to settle this Action only after Lead Counsel, *inter alia*: (i) conducted a detailed investigation into the claims asserted in the Action and drafted three amended complaints; (ii) opposed two motions to dismiss; (iii) drafted and prepared Lead Plaintiff's motion for class certification, supported by a 48-page expert report; (iv) extensively consulted with experts on CS, the marketing of pharmaceutical drugs and related FDA regulations, market efficiency, loss causation, and damages; (v) conduced a detailed review of Corcept's public filings, annual reports, press releases, and other publicly available information; (vi) reviewed analyst reports and articles relating to Corcept; (vii) researched applicable law with respect to the claims and defenses asserted in the Action; (viii) drafted and responded to written discovery requests; (ix) reviewed and analyzed over 750,000 pages of documents produced by Defendants, an additional 146,000 pages of documents produced by third-parties, and over 2,100 additional pages of documents produced by Lead Plaintiff; (x) participated in the depositions of one of Lead Plaintiff's experts and one of a former Corcept employee; (xi) drafted and exchanged three detailed mediation statements with Defendants; and (xii) participated in three mediation sessions.

87.     As described in Lead Counsel's Fee and Expense Application, a lodestar cross-check also confirms the reasonableness of Lead Counsel's fee request. As set forth in the Hopkins Fee Declaration, from the inception of this case through the Court preliminarily approving Settlement on January 4, 2024, Lead Counsel devoted a total of 16,295.10 hours to the investigation, prosecution, and resolution of the claims against Defendants for an aggregate lodestar value of approximately $8,538,061.75. The total requested fee, if awarded, would yield a negative multiplier of approximately .4 on the total lodestar.

88.     I, along with other partners at my firm, maintained daily control and monitoring of the work that each attorney performed on this case.

89.     Throughout the prosecution of the claims against Defendants, work assignments were coordinated and allocated among the attorneys at Levi & Korsinsky in order to avoid unnecessary duplication of effort.

90.     The 16,295.10 hours Lead Counsel dedicated to this Action were divided among the following general categories of tasks: (1) Lead Plaintiff Motion; (2) Amended Complaint, Research, and Drafting; (3) Motion to Dismiss Research and Drafting; (4) Class Certification, Motion Research, and Drafting; (5) Written Discovery; (6) Document Review; (7) Discovery, Legal Research; (8) Depositions; (9) Administrative; (10) Filings; and (11) Settlement. *See* Ex. B to Hopkins Fee Decl.

Moreover, I submit that the hourly billing rates of Lead Counsel here, which range from $900 to $1,050 for Partners and $495 to $675 for Associates as discussed in Exhibit A to the Hopkins Fee Declaration are reasonable. Lead Counsel has surveyed some recent fee awards in securities related settlements and concluded that similar or higher billing rates have been approved by other courts in this district. *See, e.g.*, *Purple Mountain Trust v. Wells Fargo & Co.*, No. 3:18-cv-03948-JD, ECF 232-1 at 10, 243 (N.D. Cal. Sep. 26, 2023) (Donato, J.) (approving fee based on lodestar crosscheck consisting of hourly rates of $735 to $1,375 for partners and $250 to $550 for associates).

91.     It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary.

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                                    -26-

### 2.   Standing and Expertise of Lead Counsel

92.   The expertise and experience of counsel are other important factors in setting a fair fee. As Lead Counsel's firm resume demonstrates (*see* Exhibit D to the Hopkins Fee Declaration), the attorneys at Levi & Korsinsky working on the case are experienced and skilled class action securities litigators and have worked on dozens of mediations and settlements with a successful track record of securing large recoveries for shareholder classes throughout the country.

93.   Levi & Korsinsky has been lead, or co-lead counsel in numerous settlements that have resulted in significant recoveries for shareholders. Ex. D to Hopkins Fee Declaration. *See, e.g.*, *Norton v. Nutanix, Inc., et. al.*, No. 3:21-cv-04080, ECF 138 (N.D. Cal. Oct. 6, 2023) (granting final approval of $71 million settlement fund); *In re U.S. Steel Consolidated Cases*, No. 2:17-cv-00579, ECF 343, 356 (W.D. Pa. Mar. 21, 2023) (final approval of $40 million settlement fund); *Rougier v. Applied Optoelectronics, Inc., et al.*, No. 4:17-cv-2399, ECF 148, 157 (S.D. Tex. Nov. 24, 2020) (final approval of $15.5 million settlement fund); *E-Trade Financial Corp. Sec. Litig.*, No. 07-cv-8538, ECF 137, 154 (S.D.N.Y. Oct. 22, 2012) (final approval of $79 million settlement fund).

94.   The tenacity and skill of Lead Counsel here led to a positive result for the Settlement Class in that Lead Plaintiff was able advance its claims beyond the three motions to dismiss and into discovery to develop arguments to support a persuasive case at mediation.

### 3.   Standing and Caliber of Defendants' Counsel

95.   The quality and vigor of opposing counsel is also important in evaluating the services rendered by Lead Counsel and this case is no exception. Here, Defendants have been represented by well-respected and experienced counsel from Quinn Emanuel Urquhart & Sullivan, LLP who are renowned for their securities litigation practices and aggressively defended the Action.

96.   The fact that Lead Counsel achieved this settlement in the face of such formidable legal opposition further evidences the quality of their work and supports granting the requested fee.

Case No. 3:19-CV-01372-JD

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                    -27-

**4.    Risk of Litigation and Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases**

97.    This Action was initiated, and continued against Defendants, on an entirely contingent basis. This case was complex and the outcome against the Defendants was far from certain. Indeed, before being reassigned to this Court, Judge Koh had already dismissed with prejudice approximately half of the challenged statements and one of the two alleged corrective disclosures, thereby reducing Lead Plaintiff's damages to those that could be asserted as a result of the January 25, 2019 SIRF Report, which, as set forth above, would be subject to Defendants' disaggregation and loss causation arguments.

98.    From the outset, Lead Counsel appreciated the significant risks inherent in securities litigation generally, including overcoming motions to dismiss, generating a compelling factual record through investigation and discovery, obtaining class certification, surviving summary judgment, and prevailing at trial and on any post-trial appeals. As discussed in Section IV(B) above, Lead Plaintiff faced serious risks to establishing its case against Defendants, particularly in proving scienter, falsity, and loss causation and damages. Lead Plaintiff also faced hurdles associated with certifying and maintaining certification of a class.

99.    Lead Counsel and Lead Plaintiff agreed to settle this Action on the terms of the Stipulation based on their careful investigation and evaluation of the facts and law relating to the allegations in the Third Amended Complaint, as well as their evaluation of the significant risks if the Action continued.

100.    Lead Counsel ensured that sufficient attorney resources were dedicated to prosecuting the claims against Defendants and retained highly-competent consultants and document reviewers and ensured that sufficient funds were available to advance the expenses required to pursue and complete such complex litigation. In total, Lead Counsel incurred $576,161.71 in unreimbursed expenses in prosecuting and resolving this Action for the benefit of the Settlement Class. This is approximately $400,000 (or 41%) lower than what was provided in the Notice. Lead Counsel achieved this cost reduction on behalf of Class Members primarily by including hourly document review time in its lodestar calculations rather than as separately reimbursable expenses, as courts in this circuit permit.

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                    -28-

Because Lead Counsel's lodestar resulted in a negative multiplier of negative .9 even without inclusion of hourly document review time, including the hourly document review time in lodestar calculations has no negative implications to the Class Members' recovery and results in substantial expense savings to the Settlement Class.

101.    On many occasions, plaintiffs' counsel in contingency-fee cases have worked thousands of hours and advanced substantial expenses, only to receive zero compensation. From personal experience, Lead Counsel is only too aware that despite the most vigorous and competent of efforts, a law firm's success in contingent litigation, particularly securities litigation, is never guaranteed. Moreover, Lead Counsel knows that many capable plaintiffs' firms have suffered major defeats after years of litigation, and after expending tens of millions of dollars of time, without receiving any compensation for their efforts. Indeed, scores of significant cases have been lost after the investment of tens of thousands of hours of attorney time and millions of dollars of litigation costs at summary judgment or after trial. *See, e.g.*, *In re Tesla Inc. Securities Litigation*, Case No. 18-cv-4865-EMC, ECF 671 (N.D. Cal. Feb. 3, 2023) (Jury verdict in favor in of defendants, despite lead plaintiff winning summary judgment on the elements of falsity and scienter, and after Lead Counsel incurred over 57,000 hours of attorney time, representing a lodestar of approximately $33 million, and over $5 million of unreimbursed costs); *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir. 2010) (summary judgment granted to defendants after eight years of litigation, during which plaintiff's counsel incurred over $7 million in out-of-pocket expenses and over 100,000 hours of work, representing a lodestar of approximately $40 million).

102.    The Supreme Court has long recognized that the public has a strong interest in having capable and experienced attorneys enforce the federal securities laws and regulations intended to safeguard shareholders from the harmful impact of false and misleading statements made in connection with the purchase or sale of publicly-traded securities. Moreover, as evidenced by the PSLRA and repeatedly confirmed by the Supreme Court, private securities litigation provides investors with an invaluable means to recover their losses without having to rely on government action. These private

Case No. 3:19-CV-01372-JD
DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                    -29-

actions promote public confidence in our capital markets, deter future wrongdoing and help to guarantee that corporate officers, auditors, directors, and others comply with the law while performing their duties.

103.    This public policy is particularly evident in this case. Here, despite no action taken by the NJ USAO, SEC, or other regulatory or governmental body with regard to claims alleged in the Action, Lead Counsel has secured a Settlement of $14 million on behalf of investors.

### 5.    Reaction of the Settlement Class to the Fee Application to Date

104.    The Notice explains the Settlement and Lead Counsel's fee request. The deadline to object to Lead Counsel's fee request is May 13, 2024.

105.    To date, Lead Counsel is not aware of any objection to the amount of attorneys' fees set forth in the Notice. Schumacher Decl. ¶15. However, Lead Plaintiff will address any objections received in its reply papers to be filed with the Court or at the Final Approval Hearing.

106.    Moreover, Lead Plaintiff, which is a Class Member, supports the fee and expense requests. *See* Exhibit 2 hereto.

107.    In sum, given the complexity and uncertainty of the claims against Defendants; the efforts undertaken by Lead Counsel on behalf of the Settlement Class; the risks Lead Plaintiff faced in connection with proving falsity, scienter, loss causation, and damages; the experience of Lead Counsel and Defendants' counsel; and the contingent nature of Lead Counsel's agreement to prosecute the claims against Defendants, Lead Counsel respectfully submits that the requested attorneys' fees are reasonable and should be approved.

### B.    Reimbursement of the Requested Litigation Expenses is Fair and Reasonable

108.    Lead Counsel also requests reimbursement from the Settlement Fund in the amount of $576,161.71 for expenses that were reasonably and necessarily incurred by Lead Counsel in connection with commencing, prosecuting, and resolving the claims asserted in the Action against Defendants. The specific expenses incurred by Lead Counsel are summarized in the attached Hopkins Fee Declaration. There were no objections to the expenses disclosed in the Notice to potential Settlement Class members. Moreover, the expenses for which Lead Counsel is seeking reimbursement are approximately $400,000 less than what was disclosed in the Notice.

109. The following chart reflects the combined expenses incurred by Lead Counsel as discussed more fully below:

| Expense Type | Amount |
|---|---|
| Filing, Witness, and Other Fees | $8,285.94 |
| Transportation, Hotels, and Meals[9] | $16,658.16 |
| Court Hearing Transcripts and Deposition Reporting, Transcripts, and Videography | $5,972.85 |
| Experts/Consultants/Investigators | $267,781.68 |
| Online Legal and Financial Research | $8,259.22 |
| eDiscovery Database Hosting | $87,269.24 |
| Legal Fees for Representation of Confidential Former Corcept Employees and Physicians | $154,547.49 |
| Mediation | $27,360.00 |
| Postage | $27.13 |
| **TOTAL** | $576,161.71 |

110. Lead Counsel respectfully submits that the request for reimbursement of litigation expenses, as explained more fully in the Hopkins Fee Declaration at ¶¶10-11, is appropriate, fair, and reasonable, and should be approved in the amounts submitted herein. From the inception of this litigation, Lead Counsel was aware that it might not recover any of its expenses incurred in prosecuting the claims against Defendants, and, at a minimum, would not recover them until the claims were successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, an award of expenses would not compensate it for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Thus, Lead Counsel was motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the claims against Defendants.

111. The expenses incurred by Lead Counsel were necessary and appropriate for the prosecution of this Action. Lead Counsel is prepared to submit all invoices and underlying detail *in camera*, if requested.

112. Considering the complex nature of the Action, as well as the fact that this Action was vigorously prosecuted for approximately four years, the expenses incurred by Lead Counsel were

---

[9] Includes estimated costs for air fare, hotels, and meals for attending the final approval hearing.

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                                                 -31-

reasonable and necessary to pursue the interests of the Settlement Class and achieve the present Settlement. In my experience, courts have typically found that such expenses are reimbursable from a fund recovered by counsel for the benefit of a class in securities fraud class actions. Accordingly, Lead Counsel respectfully submits that the expenses incurred by Lead Counsel and Lead Plaintiff are fair and reasonable and should be reimbursed from the Settlement Fund.

113.    The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $975,000. The present application for litigation expenses is well below the amount contained in the Notice.

114.    To date, Lead Counsel is not aware of any objection to the amount of the litigation expenses fees set forth in the Notice. However, Lead Plaintiff will address any objections received in its reply papers to be filed with the Court and/or at the Final Approval Hearing.

### C. Lead Plaintiff's Reimbursement Pursuant to the PSLRA

115.    Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), James L. Ferraro, on behalf of himself and Ferraro Family Foundation, Inc., has submitted a declaration in support of Lead Plaintiff's request for reimbursement of reasonable costs and expenses (including lost wages) incurred in connection with its work representing the class in the amount of $15,000. The amount of time and effort devoted to this Action by Lead Plaintiff is detailed in the accompanying Declaration of James L. Ferraro on behalf of himself and the Ferraro Family Foundation, Inc., attached hereto as Exhibits 2. Lead Counsel respectfully submits that the amount requested is consistent with the PSLRA.

116.    As discussed in the Fee and Expense Application and detailed in Lead Plaintiff's declaration, James L. Ferraro is an accomplished class action and mass torts attorney with forty years of experience and has been committed to pursuing the claims since Lead Plaintiff became involved in the litigation in 2019. Lead Plaintiff has actively and effectively fulfilled its obligation as a representative of the class, complying with all of the many demands placed upon it during the litigation and settlement of the Action, and providing valuable assistance to Lead Counsel. James L. Ferraro estimates he spent 75 hours executing Lead Plaintiff's duties and responsibilities in this Action, including, *inter alia*: (a) reviewing pleadings, motion to dismiss briefing, and material prepared in connection with Lead

Plaintiff's opening class certification motion; (b) reviewing news and information about Corcept; (c) conferring with Lead Counsel on legal strategy, case status, discovery and settlement negotiations, among other things; (d) providing written responses to Defendants' discovery requests and producing documents; and (e) attending three mediations and evaluating the offers and counteroffers. Lead Plaintiff's specialized professional background allowed Lead Plaintiff to relentlessly and independently supervise the Action, evaluate settlement discussions, and monitor Lead Counsel's requests for attorneys' fees and litigation expenses.

117.    As elaborated in Lead Plaintiff's supporting declaration, Lead Plaintiff's 75 hours assisting Lead counsel in this Action represent lost wages of $90,000 based upon Lead Plaintiff's hourly rate of $1,200 an hour. To compensate Lead Plaintiff for its reasonable costs and expenses, Lead Plaintiff respectfully requests a $15,000 partial reimbursement, representing a reduced hourly rate of $200 for its lost income. These efforts required Lead Plaintiff to dedicate time and resources to the Action that it would have otherwise devoted to its regular duties. The efforts expended by Lead Plaintiff during the course of the Action are precisely the types of activities courts have found support reimbursement to class representatives and support the Lead Plaintiff's request for reimbursement.

118.    Further, the Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of expenses in an amount not to exceed $15,000. To date, Lead Counsel is not aware of any objection to the award of costs and expenses to Lead Plaintiff.

119.    Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Kathleen Schumacher Regarding Notice Dissemination, Publication, and Requests for Exclusion Received.

120.    Attached hereto as Exhibit 2 is a true and correct copy of the Declaration of James L. Ferraro in Support of Lead Plaintiff's Unopposed Motion for final Approval of Class Action Settlement and Lead Plaintiff's Motion for Attorneys' Fees, Reimbursement of Expenses, and Award of Costs and Expenses to Lead Plaintiff.

121.    Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of Shannon L. Hopkins on Behalf of Levi & Korsinsky, LLP in Support of the Fee and Expense Application.

122.    Attached hereto as Exhibit 4 is a true and correct copy of the Declaration of Ken N. Kotz.

123.   Attached hereto as Exhibit 5 is a true and correct copy of L.T. Bulan, L.E. Simmons, *Securities Class Action Settlements, 2023 Review and Analysis*, Cornerstone Research (2024).

124.   Attached hereto as Exhibit 6 is a true and correct copy of Edward Flores and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review* at 25-26, Figures 21, 22 (NERA Jan. 23, 2024).

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed at Stamford, Connecticut, on March 14, 2024.


                                              */s/ Shannon L. Hopkins*
                                              Shannon L. Hopkins

DECLARATION OF SHANNON L. HOPKINS IN SUPPORT OF LEAD PLAINTIFF'S UNOPPOSED MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES, AND AWARD OF COSTS AND EXPENSES TO LEAD PLAINTIFF                                              -34-